Michael R. Mushkin, Esq.
Nevada State Bar #2421
Michael R. Mushkin & Associates
4475 South Pecos Road
Las Vegas, Nevada 89121
Telephone: (702) 386-3999
Fax: (702) 454-3333
Michael@mushlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| FASTRAN LLC, a Nevada limited-liability company; <br><br>  Plaintiff, <br><br> vs. <br><br> NASROLLAH GASHTILI, an Individual; FASTRAN, INC., a Delaware corporation; INTEGRATED DYNAMIC SOLUTIONS, INC., a California corporation; DOE INDIVIDUALS 1-10; DOE ENTITIES 1-10; <br><br>  Defendants. | Case No: 2:12-cv-01156 <br><br> **PLAINTIFF FASTRAN LLC'S MOTION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION** |

Plaintiff Fastran LLC, by and through its undersigned attorneys, respectfully requests that this Court restrain Defendants as well as their officers, agents, servants, employees, attorneys, and anyone acting on their behalf from using, copying, distributing, decompiling, or destroying software, data and any other electronic information arising out of the "IDS Cash Access System" (as further identified by Exhibit "1" attached hereto showing United States Copyright Office Registration Number TX0007051036) pending a preliminary injunction hearing in this case. This relief is necessary to avoid irreparable injury to Plaintiff Fastran LLC. The facts supporting this motion are set forth in the attached memorandum, exhibits, and

1

affidavits as well as other court proceedings as referenced therein.

This Motion for Preliminary Injunction and Permanent Injunction (hereinafter "Motion") is made pursuant to Fed. R. Civ. P. 65, 17 U.S.C. § 101 et. seq., 17 U.S.C. Chapter 5, 17 U.S.C. § 502 (Remedies for Infringement: Injunctions) and is based upon the following Memorandum of Points and Authorities, any evidence and testimony that may be adduced at the time of hearing hereof as well as the pleadings and papers on file herein.

DATED: _____, 2012.

MICHAEL R. MUSHKIN & ASSOCIATES

BY: _____
MICHAEL R. MUSHKIN, ESQ.
Nevada State Bar #2421
4475 South Pecos Road
Las Vegas, Nevada 89121
Attorneys Plaintiff

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTS.

#### A.    BACKGROUND.

1.    Defendant Fastran, Inc. entered into a license and services agreement with JB Carter Enterprises, LLC d/b/a ATM Merchant Systems ("ATMMS") to receive certain Fastran, Inc. services, including, but not limited to, receipt of private labeled services that had been customized with ATMMS' branding scheme in exchange for certain compensation, including, but not limited to, license, service, maintenance, and transaction fees.  See also: Deposition of Nasrollah Gashtili, taken March 7, 2012, attached hereto as Exhibit "2" at pages 104-107, lines 1-23.

2.    Defendant Fastran, Inc. failed to provide a fully developed product and

failed to honor the agreement with ATMMS.  See: Exhibit "2" at pages 45-46, lines 11-1.

3.      Defendant Fastran, Inc. solicited Bart Carter, managing member of ATMMS, to become an investment partner in Defendant Fastran, Inc., including its software to enable casino gaming venues to offer credit and debit card cash advance, check cashing services and "All in One" ATM to their customers, an expansion in services by integrating Fastran, Inc.'s product suite with cashless gaming products, ticket redemption Kiosks/ATMs, stored value card wagering platforms and web-based slot floor systems.  See: Fastran Officer's Letter, dated July 23, 2007, attached hereto as Exhibit "3" (also previously marked as Exhibit 11 to the Deposition of Nasrollah Gashtili); Exhibit "2" at page 78, lines 4-8; page 81, Lines 19-24.  However, Defendant Fastran, Inc. did *not* have a three-in-one-product in production on October 17, 2007 and had never done something like this before.  See: Exhibit "4" at page 302, lines 3-16.

4.      Defendant Fastran, Inc. further disclosed its existing debt/commitments and represented that the funds would be used to clear all of Defendant Fastran, Inc.'s debt, including, but not limited to, $150,000.00 to Defendant Integrated Dynamic Solutions, Inc. (hereinafter "IDS") for Software Development, as well as to set aside a cash reserve for subsidizing operating expenses for the next 12-24 months.  See: Exhibit "3"; Exhibit "2" at pages 55-56, lines 20-2.

5.      Throughout Defendant Fastran, Inc.'s solicitation, Defendant Fastran, Inc. *never* disclosed any alleged software ownership by Defendant IDS or any alleged software licensed to or from Defendant IDS.  See: Exhibit "3"; Exhibit "2" at pages 156-157, lines 23-20.

6.      Defendant Fastran, Inc. did disclose in its Monthly Projected Expenses

3

that Defendant Gashtili would be obtaining a salary and that additional monthly expenses would be used for product development. See: Exhibit "3".

7.     Pursuant to an agreement between Defendant Fastran, Inc. and Bartus Carter, managing member of JB Carter Properties Two, LLC, Plaintiff Fastran LLC was created on or about November 29, 2007.  See also: Exhibit "2" at pages 47-48, lines 25-5 (November of 2007).

8.     As a result of the agreements between Defendant Fastran, Inc. and Bartus Carter, Defendant Fastran, Inc. sold all of its assets to Fastran LLC. See: Exhibit "2" at page 30, lines 6-9; page 120, lines 4-7; page 176, lines 7-9; page 183, lines 6-24.  See also: Deposition of Nasrollah Gashtili (Volume II), taken April 24, 2012, attached hereto as Exhibit "4" at page 318, lines 18-21.  In addition, all operations of Defendant Fastran, Inc. were to be closed down.

9.     At the time of Defendant Fastran LLC's formation: Defendant Gashtili was both an officer of Defendant Fastran, Inc. and a member of Plaintiff Fastran, LLC.

10.    At the time of Plaintiff Fastran LLC's formation: Bartus Carter (hereinafter "Carter") was a managing member of JB Carter Properties Two, LLC; a managing member of ATMMS; and a member of Plaintiff Fastran LLC.

11.    JB Carter Properties Two, LLC owns 44% of Fastran LLC.  See also: Exhibit "2" at page 50-51, lines 20-13 (referring to Carter as 40% owner of Fastran LLC).

12.    Defendant Gashtili was also a shareholder of Defendant Fastran, Inc. at the time of Defendant Fastran, Inc.'s inception.  See: Exhibit "2" at pages 28, lines 20-22.  Furthermore, Defendant Gashtili held the title of "chief technology officer" at Defendant Fastran, Inc.  See: Exhibit "4" at page 232-233, lines 4.

4

13.     Despite Defendant Fastran, Inc.'s selling all of Defendant Fastran, Inc.'s assets to Plaintiff Fastran LLC, Defendant Fastran, Inc. failed to terminate all operations and transfer all assets to Plaintiff Fastran LLC, including, but not limited to, legal ownership of the software that was previously developed for Defendant Fastran, Inc. and owned by Defendant Fastran, Inc., licensed to ATMMS, and transferred to Plaintiff Fastran LLC (hereinafter the "Copyright Asset").

14.     In addition, Defendant Fastran, Inc. owned servers which were not transferred to Plaintiff Fastran LLC, in which a computer running "Fastran Inc. software on it" connects to the Fastran servers. See: Exhibit "2" at page 82, lines 21-25; page 84, lines 15-17. These servers are still located at the offices of Defendant IDS. See: Exhibit "4" at page 278, lines 24-25. Defendant Gashtili has also admitted that the servers are probably in "parts and pieces right now" if they are out of service, not on either Defendants' "rack", in use, or being used as a backup for Defendants' production servers. See: Exhibit "4" at page 279, lines 2-17.

15.     Defendant Gashtili kept processing ATMMS customer accounts utilizing Defendant Fastran, Inc.'s bank account as a receptacle for the business transactions despite the facts that all of Defendant Fastran, Inc.'s assets were transferred to Plaintiff Fastran LLC and that Defendant Fastran, Inc. was supposed to be closed. See: Exhibit "4" at page 321-322, lines 13-16; page 330, lines 6-17. Defendant Gasthili then used Defendant Fastran, Inc. counter checks to make secret withdrawals despite the fact the only money left in the subject account was supposed to be distributed between ATMMS and "Fastran" pursuant to the service contract assigned to Plaintiff Fastran LLC. See: Exhibit "4" at page 326, lines 19-14; page 359, lines 2-5; page 361, lines 7-20.

16.     There are no documents stating that Defendant Fastran, Inc. does not

5

own the subject software.  See: Exhibit "2" at page 107, lines 19-22.

17.     There are no documents in existence that create a license between Defendant Fastran, Inc. and Defendant IDS regarding the subject software.  See: Exhibit "2" at pages 107-108, lines 24-2; Exhibit "4" at page 274, lines 18-20.

18.     Defendant Gashtili was at all times relevant hereto an officer of Defendant Fastran, Inc. acting in the regular course of his duties with Defendant Fastran, Inc.

19.     Defendant Fastran, Inc. by and through Defendant Gashtili employed Defendant IDS to develop the Copyright Asset for Defendant Fastran, Inc.  Prior to this, Defendant IDS had never developed a check-cashing application. See: Exhibit "4" at page 313, lines 4-8.

20.     Defendant Gashtili is the sole owner of Defendant IDS. See: Exhibit "2" at page 28, lines 23-24.

21.     Defendant Gashtili personally owns the building in which both Defendant IDS and Defendant Fastran, Inc. operated from in Westlake Village, California, while Plaintiff Fastran LLC operated using a Nevada address. See: Exhibit "2" at pages 96-97, lines 6-22.

22.     There is no signed agreement between Defendant Fastran, Inc. and Defendant IDS regarding Defendant IDS' alleged ownership of the Copyright Asset. See: Exhibit "2" at page 28, lines 18-19; Exhibit "4" at page 269, lines 15-16 ("there is no signed contract").

23.     Defendant Fastran, Inc. paid money to IDS for software development. See: Exhibit "2" at page 30, lines 11-12; page 31, lines 9-10.

24.     Pursuant to 17 U.S.C. § 201(b), Defendant Fastran, Inc. is considered to

6

be the original author of the Copyright Asset since the Copyright Asset is "a work made for hire" and since there is no express written instrument signed by the parties transferring ownership of the Copyright Asset between Defendant Fastran, Inc. and Defendant IDS to Defendant IDS.

25.     Pursuant to 17 U.S.C. § 201(d)(1), Defendant Fastran, Inc. transferred ownership of the Copyright Asset to Plaintiff Fastran LLC when Defendant Fastran, Inc. transferred all of its assets to Plaintiff Fastran LLC on or about November 29, 2007.

26.     Pursuant to 17 U.S.C. § 201(d)(2), as owner of the exclusive right in the Copyright Asset, Plaintiff Fastran LLC is entitled, to the extent of that right, to all of the protection and remedies accorded to Plaintiff Fastran LLC by Title 17 – Copyrights, 17 U.S.C. § 101 et seq. and §§ 502, 504, and 505.

27.     Defendant IDS is not the rightful owner of the Copyright Asset and is neither the author of the Copyright Asset nor owner of the Copyright Asset.

28.     On December 22, 2009, JB Carter Properties II [Two], LLC filed its Verified Complaint against Defendant Gashtili in Eighth Judicial District Court in and for Clark County, Nevada, as Case No. A-09-606457-B alleging breach of contract, breach of fiduciary duty, conversion, misrepresentation, unjust enrichment, constructive trust, declaratory relief, and breach of covenant of good faith and fair dealing.

29.     Plaintiff Fastran LLC's managing member Bartus Carter is also and was a managing member of JB Carter Properties, Two, LLC, a Nevada limited liability company.

30.     Defendant Gashtili was served with a copy of the Verified Complaint in Eighth Judicial District Court Case No. A-09-606457-B on or about December 30, 2009.  See also: Exhibit A attached to Gashtili's Petition for Removal of Civil Action Under 28 U.S.C. §

7

1441 filed in United States District Court – District of Nevada Court Case No. 2:10-cv-00196 on February 12, 2010 as Document 1.

31.     Defendant IDS and/or its sole owner Defendant Gashtili applied for a United States Copyright on or about January 26, 2010 for a "Computer File" with an Application Title and Title of "IDS Cash Access System" incorrectly listing Defendant IDS as the owner of the Copyright Asset.  See: Exhibit "1" attached hereto.  See also: Exhibit "2" at page 28, lines 23-24 (Defendant Gashtili is the sole owner of Defendant IDS).

32.     The application date of January 26, 2010, is after service of the Verified Complaint in Eighth Judicial District Court Case No. A-09-606457-B and the same date that Defendant Gashtili filed his answer and a third-party complaint in Eighth Judicial District Court Case No. A-09-606457-B.  See: Exhibit B attached to Gashtili's Petition for Removal of Civil Action Under 28 U.S.C. § 1441 filed in United States District Court – District of Nevada Court Case No. 2:10-cv-00196 on February 12, 2010 as Document 1.

33.     January 26, 2010 is also the same date that Defendant Gashtili, Defendant Fastran, Inc. and Defendant IDS (aka Integrated Data Systems, Inc.) filed their Petition for Removal of Civil Action Under 28 U.S.C. § 1441 in United States District Court – District of Nevada Court Case No. 2:10-cv-00196 on February 12, 2010.

34.     Defendant IDS now claims to be the author of "IDS Cash Access System" and that its date of creation is 2006 with a date of publication of January 15, 2007. See: Exhibit "1".

35.     Defendant Gashtili personally has not written source code in a while though he relies on employees both in the United States and in India under a subsidiary called Integrated Dynamic Solution Pvt. Ltd. a/k/a "IDS India".  See: Exhibit "4" at page 255-256,

8

lines 16-2. IDS India also has employees that are working for a staffing company named Hartwell Global in which Gashtili and his wife have an ownership interest. See: Exhibit "4" at page 257, lines 9-20.

36. On or about January 26, 2010, the United States Copyright Office issued Copyright Registration No. TX0007051036 to IDS. See: Exhibit "1".

37. Plaintiff Fastran LLC is informed and believes, and on that basis alleges, that Copyright Registration No. TX0007051036 is based upon, arises out of, and/or is the actual Copyright Asset originally developed for Defendant Fastran, Inc. and sold by Defendant Fastran, Inc. to Plaintiff Fastran LLC.

38. Defendant IDS currently has "Cash Advance software customers" who are infringing on Plaintiff Fastran LLC's Copyright Asset. See: Exhibit "2" at page 70, lines 3-10; page 87, lines 1-2. Defendant IDS is also being paid on a monthly basis based on the volume of transactions. See: Exhibit "4" at page 250, lines 6-12.

39. Although Defendant IDS claims it is not actively marketing "Cash Advance System", Defendant Gashtili claims that "we can any time that we want." See: Exhibit "2" at page 86, lines 24-25.

**B.    FACTUAL SUMMARY.**

This action involves the unauthorized, wrongful, knowing, and continuing appropriation, use, copying and reproduction of an original work owned by Plaintiff Fastran LLC referred to herein as the Copyright Asset. As owner of the Copyright Asset, Plaintiff Fastran LLC is entitled to the protection and remedies accorded to Plaintiff Fastran LLC by Title 17 – Copyrights, 17 U.S.C. § 101 et seq. and §§ 502, 504, and 505. Plaintiff Fastran LLC requests that this Court declare that Fastran LLC is the legal owner of the Copyright Asset as

well as the legal owner of the copyrighted work registered with the United States Copyright Office as Registration Number TX0007051036 with an Application Title and Title of "IDS Cash Access System".  See Exhibit "1" attached hereto.[1]  Furthermore, Plaintiff Fastran LLC seeks to enjoin Defendants' unlawful activities and to recover damages and profits resulting from Defendants' misconduct.

## II.     ARGUMENT.

### A.     LEGAL STANDARD.

Fed. R. Civ. P. 65(a), provides:

> Preliminary Injunction.
>      (1) *Notice.* The court may issue a preliminary injunction only on notice to the adverse party.
>      (2) *Consolidating the Hearing with the Trial on the Merits.* Before or after beginning a hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

Fed. R. Civ. P. 65(a), allows the court to issue a preliminary injunction prior to final disposition of litigation.  Station Casinos, Inc. v. Murphy, 2010 U.S. Dist. LEXIS 131260, 5-6 (D. Nev. Nov. 18, 2010).  See also: Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1130-31 (9th Cir. 2006) (15 U.S.C. § 1116(a) vests the district court with the "power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of the trademark owner.).  "A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." Sierra

---

[1] Pursuant to 28 U.S.C. § 2201 (Declaratory Judgment Act), "any court of the United States can declare the rights and legal relations of any interested party in 'a case or controversy within its jurisdiction.'"  Smith v. Wells Fargo Bank, 1997 U.S.Dist. LEXIS 4340, *3-4 (N.D. Cali. April 1997).

On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984), citing Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808-09 (9th Cir.), cert. denied, 375 U.S. 821, 84 S. Ct. 59, 11 L. Ed. 2d 55 (1963).  "The grant of a preliminary injunction is a matter committed to the discretion of the trial judge."  Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).[2]

Furthermore, 17 U.S.C. § 502 provides:

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.
(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:
Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. Taylor v. Westly, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id.

Dzvonick v. JP Morgan Chase, 2010 U.S. Dist. LEXIS 125163, *3-4 (D. Nev. Nov. 12, 2010).

The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. Winter v. NRDC, 555 U.S. 7, 129 S. Ct. 365, 374-76, 172 L. Ed. 2d 249 (2008)

---

[2] See also: Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943 (N.D. Cal. 2009) ("Under the Copyright Act and the DMCA, a court is authorized to grant a permanent injunction 'on such terms as it may deem reasonable to prevent or restrain' further infringement of a copyright or violation of the DMCA. 17 U.S.C. 502(a), 1203(b)(1)").

(rejecting the Ninth Circuits alternative "sliding scale" test). The Supreme Court has made clear that a movant must show both "that he is *likely* to succeed on the merits [and] that he is *likely* to suffer irreparable harm in the absence of preliminary relief . . . ." Winter, 129 S. Ct. at 374 (citing Munaf v. Geren, 553 U.S. 674, 128 S. Ct. 2207, 2218—19, 171 L. Ed. 2d 1 (2008); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311—12, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982)) (emphases added).

Dzvonick v. JP Morgan Chase, 2010 U.S. Dist. LEXIS 125163, *4-5 (D. Nev. Nov. 12, 2010); Dish Network LLC v. Dimarco, 2012 U.S. Dist. LEXIS 33889, *8 (D. Nev. Mar. 13, 2012). "In run-of-the-mill copyright litigation, however, proof of such harm stemming from infringement -- such as harm to business reputation and market share -- should not be difficult to establish." Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943 (N.D. Cal. 2009) (Other citations omitted).

## B.   SUMMARY OF LEGAL ARGUMENT.

Under the Copyright Act, copyright ownership is automatic upon creation of an original work. 17 U.S.C. § 102(a).   An entity, such as Defendant Fastran, Inc. automatically owns copyright in all work created by its employees within the scope of their employment and in all work created by contractors as "works-for-hire."   17 U.S.C. §§ 101, 201(b); Am. Registry of Radiologic Technologists v. Hansen, 2008 U.S. Dist. LEXIS 100442, 10-11 (C.D. Cal. Dec. 2, 2008).   In this case, Defendant Fastran, Inc. automatically owned the Copyright Asset and then transferred ownership of the Copyright Asset to Plaintiff Fastran LLC pursuant to 17 U.S.C. § 201(d) when Defendant Fastran, Inc. sold all of its assets to Plaintiff Fastran LLC.

The actions of Defendants have caused irreparable harm to Plaintiff Fastran LLC.   If Defendants are allowed to continue their course of action, Plaintiff Fastran LLC will be further damaged.   In order to prevent further damages, an injunction is appropriate to restrain and/or prevent Defendants as well as their officers, agents, servants, employees, attorneys, and anyone

acting on their behalf from using, copying, distributing, decompiling, or destroying software, data and any other electronic information arising out of the Copyright Asset and/or the "IDS Cash Access System" (as further identified by Exhibit "1" attached hereto showing United States Copyright Office Registration Number TX0007051036).

**C.   AN INJUNCTION IS APPROPRIATE BECAUSE OF THE IRREPARABLE HARM THAT WILL BE CAUSED TO PLAINTIFF FASTRAN LLC DUE TO THE USE OF THE COPYRIGHT ASSET BY DEFENDANTS**

**1.   Plaintiff Fastran LLC Owns the Copyright Asset.**

17 U.S.C. § 201(b) provides:

(b) Works Made for Hire.— In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

"The general rule is that, in the absence of an agreement to the contrary, the copyright belongs to the person commissioning the work, not the person creating the work." Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366, 371 (7th Cir. Ill. 1987), citing Roth v. Pritikin, 710 F.2d 934 (2d Cir.), cert. denied, 464 U.S. 961, 78 L. Ed. 2d 337, 104 S. Ct. 394, 220 U.S.P.Q. (BNA) 385 (1983); May v. Morganelli-Heumann & Assoc., 618 F.2d 1363 (9th Cir. 1980); Murray v. Gelderman, 566 F.2d 1307 (5th Cir. 1978); Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565 (2d Cir. 1966); Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965); Official Aviation Guide Co. v. American Aviation Associates, Inc., 150 F.2d 173 (7th Cir. 1945), cert. denied, 326 U.S. 776, 66 S. Ct. 267, 90 L. Ed. 469 (1945); Yardley v. Houghton Mifflin Co., 108 F.2d 28, 44 U.S.P.Q. (BNA) 1 (2d Cir. 1939). "The rule applies to independent contractors, as well as employees." Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366, 371 (7th Cir. Ill. 1987), citing Brattleboro Publishing Co., 369 F.2d at 568;

Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972).  See also: Neva, Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533, 1544 (M.D. Fla. 1990) ("Under the work for hire doctrine, one (the hiring party) who solicits another (the commissioned party) to create a work for pay is presumed to be the author and copyright owner unless the express or implied terms of the contract between the parties reserve the copyright to the commissioned party."), citing Community For Creative Non-Violence, 490 U.S. 730, 109 S. Ct. 2166, 2175, 104 L. Ed. 2d 811 (1989); Murray v. Gelderman, 566 F.2d 1307, 1309 (5th Cir. 1978); Yardley v. Houghton Mifflin Co., 108 F.2d 28, 30-31 (2d Cir. 1939), cert. denied, 309 U.S. 686, 84 L. Ed. 1029, 60 S. Ct. 891 (1940).

In the present case, the Copyright Asset was created at the insistence and expense of Defendant Fastran, Inc.  At the time of Defendant Fastran, Inc.'s inception, Defendant Gashtili was a shareholder of Defendant Fastran, Inc.  See: Exhibit "2" at pages 28, lines 20-22. Defendant Gashtili was also an officer of Defendant Fastran, Inc. and at all times relevant hereto an employee of Defendant Fastran, Inc.  In the regular course of Defendant Gashtili's employment with Defendant Fastran, Inc., Defendant Fastran, Inc. hired Defendant IDS to develop software for Defendant Fastran, Inc.  Despite Defendant Gashtili's sole ownership of Defendant IDS, this is further shown by the fact that Defendant Fastran, Inc. disclosed existing debt/commitments in the amount of $150,000.00 owed to Defendant IDS for "Software Development" and Defendant Fastran, Inc.'s plan to clear all outstanding debt.  See: Exhibit "3"; Exhibit "2" at pages 55-56, lines 20-2, pages 156-157, lines 23-2.  As a result of the agreements and in exchange for ownership in Plaintiff Fastran LLC, Carter provided the funds which were placed into the account of Defendant Fastran, Inc. and used to clear all outstanding debt of Defendant Fastran, Inc. as well as for continued software development.  See: Exhibit

"2" at page 31, lines 5-10; pages 50-51, lines 20-2 page 166, lines 5-13.   According to

Defendant Gashtili, there are also no express written instruments signed between Defendant

Fastran, Inc. and Defendant IDS.  See: Exhibit "2" at page 28, lines 18-19.   The facts, the

statutes, and case law all show that Defendant IDS is not the legal owner of the Copyright

Asset since the Copyright Asset is a "work made for hire."  The Work for Hire Doctrine creates

a rebuttable presumption that Defendant Fastran, Inc. is the actual and legal author of the

Copyright Asset pursuant to 17 U.S.C. § 201(b).

17 U.S.C. § 201(d) provides:

(d)     Transfer of Ownership.—
(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.
(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

As the legal author and owner of the Copyright Asset, Defendant Fastran, Inc.

transferred ownership of the Copyright Asset pursuant to 17 U.S.C. § 201(d) when it sold all of

its assets to Plaintiff Fastran LLC.  See: Exhibit "2" at page 30, lines 6-9; page 120, lines 4-7;

page 176, lines 7-9; page 183, lines 6-24.  Despite the sale of the Copyright Asset by Defendant

Fastran, Inc., Defendant Gashtili wrongfully retained control of the Copyright Asset through

his various key positions within Defendant IDS and Defendant Fastran, Inc. and also

wrongfully retained control of the hardware.  As the "true" owner of the Copyright Asset,

Plaintiff Fastran LLC has the exclusive rights and is entitled to all of the protection and

remedies accorded by the Copyright Act (17 U.S.C. § 101 et. seq., 17 U.S.C. Chapter 5, 17

U.S.C. § 502).  Plaintiff Fastran LLC is the legal owner of the Copyright Asset now believed to

15

be the same "copyright" identified by Exhibit "1" attached hereto.  At the very least, Plaintiff Fastran LLC believes that Defendant IDS infringed and continues to infringe upon the Copyright Asset legally owned by Plaintiff Fastran LLC since Defendants failed to apply for a copyright to "IDS Cash Access System" until after a lawsuit was filed against Defendant Gashtili in Eighth Judicial District Court in and for Clark County, Nevada, as Case No. A-09-606457-B alleging breach of contract, breach of fiduciary duty, conversion, misrepresentation, unjust enrichment, constructive trust, declaratory relief, and breach of covenant of good faith and fair dealing.[3]

2. **Defendants Have Had Access to and Still Retain the Copyright Asset Owned by Fastran LLC.**

"Because, in most cases, direct evidence of copying is not available, a plaintiff may establish copying by showing that the infringer had access to the work and that the two works are substantially similar." Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. Cal. 1990), citing Narell v. Freeman, 872 F.2d 907, 910 (9th Cir. Cal. 1989).  See also: B2B CFO Partners, LLC v. Kaufman, 787 F. Supp. 2d 1002, 1007 (D. Ariz. 2011); Am. Registry of Radiologic Technologists v. Hansen, 2008 U.S. Dist. LEXIS 100442 (C.D. Cal. Dec. 2, 2008).

a. **Access to the Work by Gashtili, IDS, and Fastran, Inc.**

As previously shown, Defendant Gashtili (1) is the sole owner of Defendant IDS, (2) has been a shareholder in Defendant Fastran, Inc. from its inception, (3) owns the building

---

[3] After Defendant Gashtili petitioned for removal in United States District Court – District of Nevada Case No. 2:10-cv-00196, both IDS and Fastran, Inc. made an appearance and it was admitted that "Mr. Gashtili is also unable to assert defenses on their behalf and has no interest in the ownership of the intellectual property at issue." See: Opposition to Motion for Remand . . . Counter-Motion to Intervene, filed April 5, 2010, page 7, lines 23-24. United States District Court Case No. 2:10-cv-00196 was remanded back to state court. See: Order Granting Motion for Remand et al, filed June 10, 2010.

16

occupied by Defendant IDS and which previously housed Defendant Fastran, Inc., (4) is at all times relative hereto a member of Plaintiff Fastran LLC, and (5) controls and retains physical possession of the Fastran LLC servers upon which the Copyright Asset is located. There is no doubt whatsoever that Defendant Gashtili, Defendant IDS, and Defendant Fastran, Inc. have had access to and still retain the Copyright Asset owned by Plaintiff Fastran LLC. Defendant Gashtili has also admitted that the Fastran LLC servers or at least those servers which are not still being used by Defendants have been disassembled.

### b.    Substantial Similarity.

The Ninth Circuit employs a two-part test for determining whether one work is substantially similar to another. Narell, 872 F.2d at 912; Olson v. National Broadcasting Co., 855 F.2d 1446, 1448 (9th Cir. 1988). Established in Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir. 1977), the test permits a finding of infringement only if a plaintiff proves both substantial similarity of general ideas under the "extrinsic test" and substantial similarity of the protectable expression of those ideas under the "intrinsic test." Olson, 855 F.2d at 1449; Krofft, 562 F.2d at 1164.

Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. Cal. 1990).

Krofft defined the extrinsic test as a "test for similarity of ideas" under which "analytic dissection and expert testimony are appropriate." 562 F.2d at 1164. The intrinsic test, according to Krofft, should measure "substantial similarity in expressions . . . depending on the response of the ordinary reasonable person. . . . It does not depend on the type of external criteria and analysis which marks the extrinsic test." Id. In decisions under the intrinsic test, "analytic dissection and expert testimony are not appropriate." Id.

Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. Cal. 1990). "Under the reformulated extrinsic test, we mean to perpetuate "analytic dissection" as a tool for comparing not only ideas but also expression." Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1475 (9th Cir. Cal. 1992). "Likewise, computer programs are subject to a Shawtype analytic dissection of various standard components, e.g., screens, menus, and keystrokes." Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1477 (9th Cir. Cal. 1992). "It is well, though recently,

established that copyright protection extends to a program's source and object codes." <u>Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.</u>, 797 F.2d 1222, 1233 (3d Cir. Pa. 1986), citing <u>Stern Elecs., Inc. v. Kaufman</u>, 669 F.2d 852, 855 n.3 (2d Cir. 1982) (source code); <u>Apple Computer, Inc. v. Franklin Computer Corp.</u>, 714 F.2d 1240, 1246-47 (3d Cir. 1983) (source and object code), cert. dismissed, 464 U.S. 1033, 104 S. Ct. 690, 79 L. Ed. 2d 158 (1984); <u>Williams Elecs., Inc. v. Artic International, Inc.</u>, 685 F.2d 870 (3d Cir. 1982) (object code). "[C]opyright protection of computer programs may extend beyond the programs' literal code to their structure, sequence, and organization." <u>Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.</u>, 797 F.2d 1222, 1248 (3d Cir. Pa. 1986). "By analogy to other literary works, it would thus appear that the copyrights of computer programs can be infringed even absent copying of the literal elements of the program." <u>Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.</u>, 797 F.2d 1222, 1234 (3d Cir. Pa. 1986).

> Because all steps of a computer program are not of equal importance, the relevant inquiry cannot therefore be the purely mechanical one of whether most of the programs' steps are similar. Rather, because we are concerned with the overall similarities between the programs, we must ask whether the most significant steps of the programs are similar. See <u>Midway Mfg. Co. v. Strohon</u>, supra, 564 F. Supp. at 753.

<u>Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.</u>, 797 F.2d 1222, 1246 (3d Cir. Pa. 1986).

"At the extrinsic stage of the inquiry, courts require a lower standard of proof on similarity if the defendant had a high degree of access to the subject work." <u>B2B CFO Partners, LLC v. Kaufman</u>, 787 F. Supp. 2d 1002, 1007 (D. Ariz. 2011). As previously shown, there is no doubt whatsoever that Defendants Gashtili, IDS, and Fastran, Inc. have had access to and still retain the Copyright Asset owned by Plaintiff Fastran LLC. As a result, the standard of proof in this case is lower meaning a strong likelihood of success on the merits. At the intrinsic stage, the Court must decide if reasonable minds could differ regarding whether

18

the "IDS Cash Access System" captured the total concept and feel of the Copyright Asset. B2B CFO Partners, LLC v. Kaufman, 787 F. Supp. 2d 1002, 1008 (D. Ariz. 2011).   The organization and expression of the facts or ideas contained in Plaintiff Fastran LLC's Copyright Asset warrant copyright protection.   Plaintiff Fastran LLC believes that reasonable minds will agree with it upon a comparison of the Copyright Asset and the subject copyright known as the "IDS Cash Access System" as further identified by Exhibit "1".   Furthermore,

> [A]ccording to the Ninth Circuit, running copyrighted software, without ownership of the copyright or a license to run the software, constitutes copyright infringement: "[T]he loading of copyrighted computer software from a storage medium (hard disk, floppy disk, or read only memory) into the memory of a central processing unit ('CPU') causes a copy to be made. In the absence of ownership of the copyright or express permission by licen[s]e, such acts constitute copyright infringement." Mai Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993).

Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 995 (N.D. Cal. 2006).   In this case, there is no signed agreement between Defendant Fastran, Inc. and Defendant IDS regarding Defendant IDS' alleged ownership of the Copyright Asset.   See: Exhibit "2" at page 28, lines 18-19. There are also no documents in existence that create a license between Defendant Fastran, Inc. and Defendant IDS regarding the subject software.   See: Exhibit "2" at pages 107-108, lines 24-2.   Plaintiff Fastran LLC has a likelihood of success on the merits.

### 3.    Irreparable Harm is "*Likely*."

> Under federal copyright law . . . a plaintiff that demonstrates a likelihood of success on the merits of a copyright infringement claim is entitled to a presumption of irreparable harm.   See Cadence Design Systems v. Avant! Corp., 125 F.3d 824, 826-27 (9th Cir. 1997), cert. denied, 523 U.S. 1118, 118 S. Ct. 1795, 140 L. Ed. 2d 936 (1998). That presumption means that "the balance of hardships issue cannot be accorded significant -- if any -- weight in determining whether a court should enter a preliminary injunction to prevent the use of infringing material in cases where . . . the plaintiff has made a strong showing of likely success on the merits." Id. at 830.

PlayMedia Sys. v. Am. Online, Inc., 171 F. Supp. 2d 1094, 1117 (C.D. Cal. 2001), citing Sun Microsystems v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999); Realnetworks, Inc. v. DVD Copy Control Ass'n, 641 F. Supp. 2d 913, 953 (N.D. Cal. 2009) (In a case involving copyright claims, where a copyright holder has shown likelihood of success on the merits of a copyright infringement claim, the Ninth Circuit has held that irreparable harm is presumed.), citing LGS Architects, Inc. v. Concordia Homes of Nev., 434 F.3d 1150, 1155-56 (9th Cir. 2006).   "The presumption of irreparable injury for copyright infringement is not easily rebutted." PlayMedia Sys. v. Am. Online, Inc., 171 F. Supp. 2d 1094, 1117 (C.D. Cal. 2001). Infringement can also occur when a subsequent work is a derivative of an earlier copyright-protected work. See: PlayMedia Sys. v. Am. Online, Inc., 171 F. Supp. 2d 1094, 1105 (C.D. Cal. 2001).

Plaintiff Fastran LLC can also qualify for injunctive relief by demonstrating that an injunction is warranted under the traditional standards.  Courts have recognized that irreparable harm is *likely* by evidence of the threatened loss of prospective customers or goodwill. Wyndham Resort Dev. Corp. v. Bingham, 2010 U.S. Dist. LEXIS 80608 (E.D. Cal. July 8, 2010), citing Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill . . . supports a finding of the possibility of irreparable harm."); see also Gallagher Benefit Servs., Inc. v. De La Torre, 283 Fed. Appx. 543, 546 (9th Cir. Jun. 24, 2008) (affirming district court's conclusion that injury to goodwill and customers due to trade secret misappropriation constitutes irreparable harm); TMX Funding, Inc. v. Impero Techs., Inc., No. C 10-00202 JF (PVT), 2010 U.S. Dist. LEXIS 37064, 2010 WL 1028254 at *8 (N.D. Cal. Mar. 18, 2010) (stating that "California courts have presumed irreparable harm when proprietary information is

20

misappropriated"); Lillge v. Verity, No. C 07-2748, 2007 U.S. Dist. LEXIS 73543, 2007 WL 2900568 at *7 (N.D. Cal. Oct. 2, 2007) (finding that the "risk of losing established customers to defendants' . . . due to defendants' improper use of plaintiff's proprietary information would obviously create a lasting, irreparable harm").   Disclosure of the Copyright Asset by Gashtili, IDS, or Third-Party Defendant Fastran, Inc. will also destroy the value of the Copyright Asset and therefore an injunction is warranted.   See: DVD Copy Control Assn., Inc. v. Banner, 31 Cal. 4th 864, 881 (2003) (Prohibiting disclosure of trade secrets acquired by improper means is the only way to preserve the property interest.   Their only value consists in their being kept private.).

      a.     **Plaintiff Fastran LLC's Loss of Market Share, Damage to the Goodwill of Plaintiff Fastran LLC, and Disclosure by Defendants Gashtili, IDS, and Fastran, Inc.**

At the time Defendant Fastran, Inc. was formed, Defendant Gashtili had no experience in the casino business.   See: Exhibit "2", page 23, lines 14-15.   ATMMS was Defendant Fastran, Inc.'s first client customer or at least one of Defendant Fastran, Inc.'s first clients. See: Exhibit "2", page 26, lines 13-15.   Then Defendant Fastran, Inc. was sold to Plaintiff Fastran LLC, in which JB Carter Properties Two, LLC is 44% owner.   See also: Exhibit "2" at page 50-51, lines 20-13 (referring to Carter as 40% owner of Fastran LLC).   ATMMS was also Fastran LLC's largest customer.   See: Exhibit "2", page 130, lines 16-17.   After Carter funded Defendant Fastran, Inc. and the formation of Plaintiff Fastran LLC, market share and profits increased.   Total volume was about $500,000.00 in September of 2007 then it was up to $1,500,000.00.   See: Exhibit "2", page 200-201, lines 13-20.   At one time, Plaintiff Fastran LLC did occupy and enjoy a specialized niche market in the casino industry.

However, according to Defendant Gashtili, Defendant Fastran, Inc. does not do any

business today though Defendant Gashtili has previously executed counter checks from Defendant Fastran, Inc.'s bank account despite the legal transfer of all of the assets previously owned by Defendant Fastran, Inc. to Plaintiff Fastran LLC.  See: Exhibit "2" at page 86, lines 11-12; page 119, lines 1-10; page 120, lines 4-7; page 148, lines 18-23, page 149, lines 17-22. According to Defendant Gashtili, Defendant Fastran, Inc. is not doing any business and neither is Plaintiff Fastran LLC since it is "parked."  See: Exhibit "2" at page 86, lines 11-18.  Again, Defendant Gashtili is in control of the assets which belong to Plaintiff Fastran LLC.  This includes, but is not limited to the Copyright Asset, the servers, and the bank account in which funds belonging to Plaintiff Fastran LLC were deposited under the name of Defendant Fastran, Inc.

Defendants' conduct has also harmed Fastran LLC's goodwill since Defendant Fastran, Inc. has been operating as "Fastran" which is very similar in name to "Fastran LLC" despite the sale of all assets previously owned by Defendant Fastran, Inc. to Plaintiff Fastran LLC and an agreement to close down Defendant Fastran, Inc.  Consequently, any wrongful acts committed by Defendants Gashtili, IDS, and/or Fastran, Inc. incorrectly reflect upon and take away from any goodwill associated with Plaintiff Fastran LLC thereby further damaging Plaintiff Fastran LLC's market share in the target industry.  In addition, Defendant Gashtili's company, i.e. Defendant IDS has one customer known as ASAI which uses the Cash Advance software and is an ATM provider.  See: Exhibit "2" at page 70, lines 3-10; page 87, lines 1-2.  At the time Defendant Gashtili's deposition was taken, Defendant Gashtili stated that he did not know how many locations ASAI had in which ASAI was using the IDS Cash Advance Software.  See: Exhibit "2" at page 70, lines 13-15.  Defendants' clients also include LuckEcash and International Merchant Systems.  See: Exhibit "2", page 133, lines 4-10.  LuckEcash has also

been paid on a monthly basis while ATMMS/Carter have not been paid.  See: Exhibit "2", page 144, lines 1-2, lines 11-12; page 152, lines 22-23.  Defendant IDS can also actively market the Cash Advance System any time it wants.  See: Exhibit "2" at page 86, lines 24-25.  These examples show that Defendants are in direct competition with Plaintiff Fastran LLC.  As previously mentioned, Defendants' conduct and their flagrant infringement upon Fastran LLC's Copyright Asset can also damage the goodwill owned by Plaintiff Fastran LLC since Defendant Fastran, Inc. has also been operating under the name "Fastran" destroying the "value" of the goodwill as well as infringing upon the market share.  In the deposition testimony attached hereto, Defendant Gashtili refused to disclose how much revenue was specifically generated off of Cash Advance System though in 2011, his gross was somewhere over a million, below two million dollars.  See: Exhibit "2" at page 91-2, lines 15-8.  Based on Defendant Gashtili's overall deposition testimony, Plaintiff Fastran LLC has lost its market share and continues to lose prospective customers while Defendants continue to generate revenue at the expense of Fastran LLC and the goodwill of "Fastran."

### 4.    The Balance of Harm Weighs in Favor of the Injunction.

In this matter, Plaintiff Fastran LLC has shown harm to its business reputation and market share as a result of Defendants past infringing and illegal acts.  Plaintiff Fastran LLC will continue to suffer such harm unless this Court grants injunctive relief.  Monetary damages are inadequate to compensate for the continuing injury because of the ongoing damage to Plaintiff Fastran LLC's reputation, goodwill, brand, and loss of potential market share. Monetary damages would also not prevent Defendants from continuing to infringe on Plaintiff Fastran LLC's Copyright Asset.  Monetary damages will also not prevent third-parties from infringing on Plaintiff Fastran LLC's Copyright Asset as the Defendants are allowing third-

parties to utilize the software program developed for Defendant Fastran, Inc. and sold to Plaintiff Fastran LLC.  If this Court does not issue an injunction, Plaintiff Fastran LLC will continue to suffer immediate and irreparable harm.

In addition, until Plaintiff Fastran LLC's Copyright Asset, source code, and any additional misappropriated information believed to be on the computers and/or the servers actually owned by Plaintiff Fastran LLC which remain in Defendants' possession and under their control are secured, that evidence could be altered or destroyed.  None of the Defendant have any legitimate interest in using Plaintiff Fastran LLC's servers, Copyright Asset, and so on.  Furthermore, the relief requested will not harm Defendants legitimate business activities, especially since Defendant Gashtili has previously stated under oath that neither Defendant Fastran, Inc. or Plaintiff Fastran LLC are doing business and since according to Defendant Gashtili, Plaintiff Fastran LLC is "parked."  The balance of harm weighs in favor of Plaintiff Fastran LLC and against the Defendants.

### 5.   Public Policy Favors that this Court Issue an Injunction in this Case.

The sole interest of the United States and the primary object in conferring the monopoly [of copyright protection] lie in the general benefits derived by the public from the labors of authors." Elvis Presley Enterprises, Inc. v. Passport Video, 357 F.3d 896, 899 (9th Cir. 2004) (quoting Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)). In other words, the public receives a benefit when the legitimate rights of copyright holders are vindicated.

Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943 (N.D. Cal. 2009) (Other citations omitted).

The general grant of remedial authority in Section 502(a) of the Copyright Act, [which] permits a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  In copyright actions, courts traditionally have been willing to grant permanent injunctions once liability is established and a continuing threat to the copyright exists, Pacific & Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984), cert. denied, 471 U.S. 1004, 105 S. Ct. 1867, 85 L. Ed. 2d 161 (1985).

National Football League v. McBee & Bruno's, Inc., 792 F.2d 726, 732 (8th Cir. Mo. 1986).

As shown above, public policy favors the granting of temporary and final injunctions to protect copyright ownership. By issuing an injunction reasonably tailored to the circumstances of this litigation, this Court will help promote the public policy of protecting copyright ownership and the legitimate business interests of corporate employers which pay for "works made for hire" and restrain the improper actions of self-dealing employees and corporate officers/members who refuse to turnover corporate/entity assets to the rightful owners. This relief would not harm the public. Instead, the relief would be consistent with the public policy of protecting the general benefits derived by the public from the labors of actual copyright authors when the legitimate rights of copyright holders are vindicated. An injunction preventing Defendants from continuing to infringe upon Plaintiff Fastran LLC's Copyright Asset and illegal, if not criminal, acts under the Copyright Act would ensure that the public continues to benefit from the works and labor owned by Plaintiff Fastran LLC. "In determining the scope of an injunction, a district court has broad latitude, and must balance the equities between the parties and give due regard to the public interest. Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943 (N.D. Cal. 2009), citing Geertson Seed Farms v. Johanns, 570 F.3d 1130, 1136 (9th Cir. 2009).

### 6.    The Injunction Will Preserve the Status Quo.

"Innocent intent generally is not a defense to copyright infringement, and injunctions may be issued without a showing of willful or deliberate infringement." Cybermedia, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1079 (N.D. Cal. 1998), citing Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d 870, 878 (3d Cir. 1982). Consequently, it does not matter if the acts of Defendants Gashtili, IDS, and/or Fastran, Inc. are or are not willful or a deliberate

infringement for this Court to issue an injunction. "A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984), citing Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808-09 (9th Cir.), cert. denied, 375 U.S. 821, 84 S. Ct. 59, 11 L. Ed. 2d 55 (1963). In this matter, there is a strong likelihood that Plaintiff Fastran LLC will succeed on the merits since the Copyright Asset was transferred from Defendant Fastran, Inc. to Plaintiff Fastran LLC upon the sale of all assets to Plaintiff Fastran LLC. As shown above, public policy is in favor of Plaintiff Fastran LLC as the actual owner of the Copyright Asset. Furthermore, the balance of hardships favors Plaintiff Fastran LLC and there is a possibility of irreparable injury to Plaintiff Fastran LLC if preliminary relief is not granted, especially since Defendants Gashtili, IDS, and/or Fastran LLC are in actual possession of the Copyright Asset and the servers owned by Plaintiff Fastran LLC. Again, this is evidence that could be altered and/or destroyed by the Defendants.

Preliminary injunctions preventing the selling, licensing, leasing, transferring, distributing, reproducing, manufacturing or advertising of any version of a software that infringes upon Plaintiff Fastran LLC's Copyright Asset, as well as a recall of all unsold copies of the infringing software are commonly issued and should be issued in this matter. See: Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943, 951 (N.D. Cal. 2009); Cyber Media, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1079-80 (N.D. Cal. 1998); Iconix, Inc. v. Tokuda, 457 F.Supp. 2d 969, 1003 (N.D. Cal. 2006); RealNetworks, Inc. v. DVD Copy Control Ass'n, 641 F. Supp. 2d 913, 954 (N.D. Cal. 2009). "The existence of an ownership dispute between an applicant for injunctive relief in a copyright infringement action and a third party [also] does

not preclude the issuance of an injunction so long as the applicant meets its burden of demonstrating a likelihood of success on the ownership issue. If the law were otherwise, there would be no mechanism by which either of the parties claiming ownership could prevent wholesale, willful infringement of the copyright." Cyber Media, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1076 (N.D. Cal. 1998). The preliminary injunction issued by this Court should also prohibit Defendants Gashtili, IDS, and Fastran, Inc. from altering and/or destroying any evidence, including, but not limited to, the Copyright Asset housed on the servers owned by Plaintiff Fastran LLC that are still under the control and in the possession of the Defendants and/or their agents.

## III.  CONCLUSION.

Pursuant to the Copyright Act, Defendant Fastran, Inc. automatically owned the Copyright Asset and then transferred ownership of the Copyright Asset to Plaintiff Fastran LLC when Defendant Fastran, Inc. sold all of its assets to Plaintiff Fastran LLC. Defendants Gashtili, IDS, and Fastran, Inc. have had access to and they still retain possession of the Copyright Asset owned by Plaintiff Fastran LLC as well as the servers upon which the Copyright Asset is stored. Copyrights of computer programs can also be infringed upon absent copying of the literal elements of the program. In this case, there is a strong likelihood that Plaintiff Fastran LLC will be successful on the merits. The Ninth Circuit has also held that there is a presumption of irreparable harm where a copyright holder has shown a likelihood of success on the merits of a copyright infringement case. Irreparable harm has also been shown since Plaintiff Fastran LLC has lost its share of the market and continues to lose market share and profits. Plaintiff Fastran LLC's goodwill is also threatened since Defendants Gashtili, IDS, and/or Fastran, Inc. have been operating under the name of "Fastran" and have failed to transfer

all assets previously belonging to Defendant Fastran, Inc. to Plaintiff Fastran LLC.  Public policy favors an injunction in this case and the legal standards have been met for this Court to issue both a preliminary injunction and grant a temporary restraining order.

Based on the foregoing, Plaintiff Fastran LLC requests that this Court grant its motion and restrain and/or prevent the Defendants as well as their officers, agents, servants, employees, attorneys, and anyone acting on their behalf from using, copying, distributing, decompiling, or destroying software, data and any other electronic information arising out of the Copyright Asset and/or the "IDS Cash Access System" (as further identified by Exhibit "1" attached hereto showing United States Copyright Office Registration Number TX0007051036).  Furthermore, any and all revenue generated by the use of the Copyright Asset should be preserved pending a resolution on the merits.  A proposed order is attached hereto as Exhibit "5".

DATED: _July 2nd_, 2012.

MICHAEL R. MUSHKIN & ASSOCIATES

BY: _____
MICHAEL R. MUSHKIN, ESQ.
Nevada State Bar #2421
4475 South Pecos Road
Las Vegas, Nevada  89121
Attorneys for Plaintiff

28

# EXHIBIT "1"

Exhibit "1"



## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = IDS Cash Access System
Search Results: Displaying 1 of 10000 entries



*IDS Cash Access System.*

| | |
|---|---|
| **Relevance:** | ■ ■ ■ ■ ■ |
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | TX0007051036 / 2010-01-26 |
| **Application Title:** | IDS Cash Access System. |
| **Title:** | IDS Cash Access System. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Integrated Dynamic Solutions, Inc. Address: 31194 La Baya Drive, Suite 203, Westlake Village, CA, 91362, United States. |
| **Date of Creation:** | 2006 |
| **Date of Publication:** | 2007-01-15 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Integrated Dynamic Solutions, Inc., employer for hire; Domicile: United States; Citizenship: United States. Authorship: computer program. |
| **Rights and Permissions:** | Integrated Dynamic Solutions, Inc., 31194 La Baya Drive, Suite 203, Westlake Village, CA, 91362, United States, gashtili@idspage.com |
| **Names:** | Integrated Dynamic Solutions, Inc. |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record ▼ | Format for Print/Save |
| Enter your email address: | Email |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page

EXHIBIT ___"1"___

# EXHIBIT "2"

Exhibit "2"

**Deposition of:**

Nasrollah Gashtili

Volume I, Pages 1 - 208

**Case:**

JB Carter Properties II, LLC v. Nasrollah Gashtili
A-09-606457

**Date:**

03/07/2012



Oasis Reporting Services, LLC
2620 Regatta Drive, Suite 102
Las Vegas, Nevada  89128
702-476-4500
www.oasisreporting.com
info@oasisreporting.com

Page 1

```
 1            DISTRICT COURT
 2          CLARK COUNTY, NEVADA
 3
 4
 5  JB CARTER PROPERTIES II, LLC, a   )
    Nevada limited-liability company on )
 6  its own behalf and derivatively on )
    behalf of FASTRAN, LLC,           )
 7
                Plaintiff,            )
 8
        vs.                          ) Case No. A-09-606457
 9
    NASROLLAH GASHTILI, an individual; )
10  JOHN DOES 1-10; DOE ENTITIES 1-10, )
11              Defendants.          )
12  _____  )
13
14
15       DEPOSITION OF NASROLLAH GASHTILI
16       Taken on Wednesday, March 7, 2012
17              At 10:03 a.m.
18    Held at Michael R. Mushkin & Associates
19          4475 South Pecos Road
20             Las Vegas, Nevada
21
22
23
24
25  Reported by:  Ellen A. Goldstein, CCR 829
```

Page 2

```
 1  APPEARANCES:
 2
 3     For the Plaintiff:
 4        MICHAEL R. MUSHKIN, ESQ.
          MICHAEL R. MUSHKIN & ASSOCIATES
 5        4475 South Pecos Road
          Las Vegas, Nevada 89121
 6        Phone: (702)386-3999
          Fax:  (702)454-3333
 7        michael@mushlaw.com
 8
 9
10
11     For the Defendants:
12        DONALD L. PRUNTY, ESQ.
          GREENBERG TRAURIG
13        3773 Howard Hughes Parkway
          Suite 400 North
14        Las Vegas, Nevada 89169
          Phone: (702)792-3773
15        Fax: (702)792-9002
          prunty@gtlaw.com
16
17
18
19     Also Present:
20        Bart Carter
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2
 3  WITNESS                          PAGE
 4  NASROLLAH GASHTILI
 5    Examination by MR. MUSHKIN        5
 6
 7
 8            E X H I B I T S
 9  NUMBER   DESCRIPTION        INTRODUCED
10   1   Operating Agreement of Fastran, LLC   48
         Limited-Liability Company  (Bates Nos.
11       GASH 000123 to GASH 000136; 14 pages)
12   2   7-22-07 E-mail from Nasrollah Gashtili   52
         to Bart Carter; 9-4-07 E-mail from
13       Bart Carter to a list of individuals
         (Bates Nos. CARTER 00454 to
14       CARTER 00458; 5 pages)
15   3   11-2-07 E-mail from Bart Carter to   56
         John Bryant  (Bates Nos. GASH 000028
16       to GASH 000030; 3 pages)
17   4   12-12-07 E-mail chain between Richard   60
         Beer and Nasrollah Gashtili  (Bates
18       Nos. GASH 000023 to GASH 000025;
         3 pages)
19
20   5   First Regional Bank - Fastran Inc.   96
         bank statements  (Bates Nos.
         GASH 001524 to GASH 001607; 84 pages)
21
22   6   Services Agreement  (Bates Nos.   104
         GASH 000345 to GASH 000353; 9 pages)
23
24   7   First Regional Bank - Fastran Inc.   125
         bank statements  (Bates Nos.
         GASH 001389 to GASH 001523; 135 pages)
25
```

Page 4

```
 1  (I N D E X  Continued)
 2  NUMBER   DESCRIPTION        INTRODUCED
 3   8   First Regional Bank - Fastran Inc.   126
         bank statements  (Bates Nos.
 4       GASH 001294 to GASH 001388; 95 pages)
 5   9   First Regional Bank - Fastran Inc.   150
         bank statements  (Bates Nos.
 6       GASH 001608 to GASH 001732; 125 pages)
 7  10   Mutual Non-Disclosure Agreement  (Bates   155
         Nos. GASH 000356 to GASH 000359;
 8       4 pages)
 9  11   7-23-07 letter from "Fastran officers"   159
         to Bart Carter  (Bates Nos. GASH 000044
10       to GASH 000046; 3 pages)
11  12   Miscellaneous E-mails  (miscellaneous   164
         Bates numbers; 60 pages)
12
13  13   9-21-09 letter from Chistopher A. Lilly   187
         to Bart Carter  (Bates Nos. GASH 000018
14       to GASH 000019; 2 pages)
15
16
17       INFORMATION REQUESTED
18          PAGE  LINE
19           22    24
             72     1
20           88    23
             94     2
21          124    12
            185    18
22
23
24
25
```

Page 5

1   WEDNESDAY, MARCH 7, 2012 - LAS VEGAS, NEVADA
2                        10:03 A.M.
3
4       (By stipulation of counsel, the requirements of
5   NRCP Rule 30(b)(4) were waived.)
6
7              NASROLLAH GASHTILI,
8   called as a witness by and on behalf of the Plaintiff,
9   having been first duly sworn by the Certified Court
10  Reporter, was examined and testified as follows:
11
12
13      MR. PRUNTY:  Joining us is Bart Carter.
14      MR. MUSHKIN:  Now I got Bart.
15          Bart, you just missed the swearing of the witness.
16  That's it.
17
18              EXAMINATION
19  BY MR. MUSHKIN:
20      Q   Mr. Gashtili, have you ever had your deposition taken
21  before?
22      A   No.
23      Q   I'm going to go through a set of rules -- and your
24  counsel will certainly be able to comment -- on what's going to
25  happen today.

Page 6

1       You've been given an oath.  It's the same oath you
2   would take in a court of law.  You owe the same duty of honesty
3   and candor that you would in a court of law; and by "candor" I
4   mean, if you know the answer to a question, you must give it.
5   You can't not answer because you choose not to answer.
6   Sometimes it's referred to as selective recall.  If I ask you a
7   question and you answer it, I'll assume that you understand my
8   question.
9       So please listen to my questions to their conclusion
10  and then answer afterwards so that we're not talking on top of
11  one another, which is something that happens all the time in
12  daily conversation, but for purposes of a record, you try to
13  avoid that so that each person's words can be heard in their
14  entirety and they can be taken down into a transcript.
15      The young lady to my left is a stenographer, court
16  reporter, who is taking down every word that we say.  It will
17  then be put into a written booklet form.  You'll be afforded an
18  opportunity to review that booklet and correct it if there are
19  any needed corrections.  I should warn you, though, that if you
20  make a substantive change to your testimony, I'll be allowed to
21  comment, at the time of trial on this matter, as to why you
22  testified one way on one day and then about a month later you
23  changed your testimony in writing.
24      The record doesn't reflect well for "uh-huh" or
25  "huh-uh," so you have to say "yes" or "no" or -- and hand

Page 7

1   gestures don't come over on the record too well either, so we
2   try and make audible responses.
3       Are you under any form of medication today?
4       A   I am. ·
5       Q   Is that the type of medication that would not allow
6   you to testify to the best of your ability?
7       A   No.  I'm not a medical professional, but I don't think
8   so.  It's just a regular medication that I take every day for
9   my blood pressure and cholesterol.
10      Q   I doubt that it will have any impact on your
11  testimony.
12      Do you have any questions for him, Counsel?
13      MR. PRUNTY:  Well, the only thing that I would add to that
14  is, as he asks questions today, I may well make objections to
15  certain questions that he has.  Some of those objections, such
16  as for attorney-client privilege, may allow me to tell you not
17  to answer those questions; but for the vast majority of those
18  objections, it's for setting a record for the future, and after
19  I make those objections -- please allow me to have time to make
20  those objections, but for the vast majority of them I will then
21  tell you that you will go forward and you will have to answer
22  the questions, just so you understand the process.  If it has
23  something to do with attorney-client privilege, if he asks you
24  a question regarding the substance of communications between
25  you and your client -- between you and your attorney -- at that

Page 8

1   point in time I would object and I may well inform you not to
2   answer that question.
3       MR. MUSHKIN:  That's exactly right.
4       Q   Most of the time all we're doing is making an
5   objection for the record to preserve it for a later time.  The
6   rules for deposition are a little more broad in terms of how
7   far afield we can go with questions.
8       A   Okay.
9       Q   So with that said, we have a couple other little
10  housekeeping matters.
11      I kind of expected Chris to be here, but --
12      MR. PRUNTY:  He has another deposition today, so he
13  couldn't be in both places at once, so I'm --
14      MR. MUSHKIN:  You're welcome as always, but we have some
15  discovery issues that are kind of outstanding in this case and
16  so Chris has asked that we sign off on a protective order,
17  which I have a hard copy of and I'll provide.  It's a document
18  you guys provided.  We'll sign off and provide it to you today.
19      There are discovery responses that are still
20  outstanding and there is a motion to compel that's outstanding,
21  but I did not want to miss the opportunity to get this
22  deposition in because the protective order is really aimed at
23  the technical side of this case, the software side of this
24  case.  Today what we're going to talk about is the financial
25  side of this case, something that would not require a

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

**Page 9**

1  protective order. You know, we have obviously no intention of
2  publishing any personal or confidential information, but this
3  is really about how the LLC operated, what was done, and some
4  bank statements. So to me, I saw a pretty clear line of
5  demarcation to allow us to go forward today.
6      We'll get as much as we can get done today, deliver to
7  you the protective order. Hopefully by the end of the day you
8  can at some point talk to Chris and see where we're at with the
9  balance of the responses to the discovery and then we can
10 finish whatever might be needed by way of examination of
11 Mr. Gashtili.
12     MR. PRUNTY: Okay. And just so -- along those same lines,
13 I haven't seen the protective order yet. Obviously there
14 hasn't been an entry of an order regarding the protective
15 order, but we'll move forward in good faith. If it gets into
16 anything that we think is exceptionally confidential, that we
17 would either make a request that it be held sealed until such
18 point in time that the Court ruled on it and we would possibly
19 ask that your client be excluded from the deposition at that
20 point in time, but I guess we can work through those as we move
21 forward, but we'll try to be as cooperative as we can in moving
22 forward to make progress.
23     MR. MUSHKIN: I appreciate that, and as -- we'll obviously
24 not -- I don't think today we'll even scare up against that
25 technical side of this case.

**Page 10**

1      MR. PRUNTY: Okay.
2  BY MR. MUSHKIN:
3      Q  So, Mr. Gashtili, tell me about your educational
4  background, please.
5      A  I have my Bachelor degree in mathematics and physics
6  and my Master degree in industrial engineering.
7      Q  And where did you get your degree from?
8      A  University of Missouri Columbia.
9      Q  What year was that?
10     A  I graduated with my Master degree in 1992.
11     Q  And what did you do after that?
12     A  I work for a company called Rocketdyne, which was
13 subsidiary or part of the Rockwell International in
14 Los Angeles. That was my first job after college and we --
15 that company was working for NASA and building the space
16 shuttle engine for space shuttle program, so I work in
17 manufacturing environment as industrial engineer for two years.
18     Q  And what did you do?
19     A  Build computer simulation model at the factory so the
20 factory could make some decision, based on first simulating any
21 changes or any modification they want to make, before actually
22 implement it in the manufacturing; so basically writing
23 simulation programs for the entire manufacturing process.
24     Q  How many people did you work with?
25     A  I -- if I remember correctly, it's -- team that I was

**Page 11**

1  actually part of was team of three people.
2      Q  And how long did you do that?
3      A  Two years.
4      Q  What did you do after that?
5      A  I left the Rocketdyne, so I start doing consulting for
6  multiple companies as a consultant.
7      Q  Again in computer-related issues?
8      A  Absolutely, computer programming.
9      Q  Have you taken any postgraduate courses in computer
10 programming?
11     A  Many of them during my graduate study, so it's -- with
12 "postgraduate" you mean after my Bachelor degree?
13     Q  Right. After you graduated in '92, have you had any
14 post '92 computer training?
15     A  I did. I took many courses with many different
16 institution in many different programming languages and
17 management of ITs and those areas.
18     Q  And do you have a list of those courses that you've
19 taken?
20     A  I don't remember all of them off the top of my head.
21     Q  Are there more than five?
22     A  Probably, yes.
23     Q  More than ten?
24     A  It's depend if -- there are some training classes that
25 I took that was three days or five days, but a full day and

**Page 12**

1  they consider courses. Possible more than ten, but I certainly
2  don't remember exact number.
3      Q  And have you been ostensibly running your own
4  consulting business since 1994?
5      A  Actually for a year I did the individual consulting
6  and then in 1995 I started a company.
7      Q  What is that?
8      A  IDS, or Integrated Dynamic Solutions. So that was --
9  that company was incorporated in California in 1995.
10     Q  Do you draw a paycheck from IDS?
11     A  I do, but sometimes not on consistent basis.
12     Q  And tell me who IDS' customers are -- strike that.
13         Do you own IDS?
14     A  I do.
15     Q  Do you own a hundred percent of IDS?
16     A  Yes, I do.
17     Q  Okay. Now tell me who their customers are.
18     A  I mean we're in business for almost, what, 17, 18
19 years and I can't possibly remember all of our clients, so --
20     Q  Well, how about the big ones?
21     A  We work with companies such as Disney, Universal Music
22 Group, Verizon. Big ones?
23     Q  That's a start.
24         What did you do for Disney?
25     A  We built back-end communication between their Web

Nasrollah Gashtili, Volume I

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 13

1    site, which is their user -- they call it user communities, and
2    the game console and keeping track of some stats and reports on
3    how players play the games and the game console that Disney
4    published and, you know, they transfer some of those
5    information to their Web site for the gaming community. We
6    also were involved in multiple of their games that they
7    published, not that we develop the entire game. They
8    participated in helping them to build and deploy those games.
9    Q   And is your -- I apologize if I don't say this
10   properly.
11       Is your concentration or specialized area "information
12   management," this communication of information back and forth?
13   A   In Disney's project or overall?
14   Q   Particularly as in to Disney.
15   A   That's one of the things we did for them, but Disney
16   is our client for many years and we did many other projects for
17   them. Recently, for example, we did a project for their HR
18   department that handles -- I'm not personally involved in that
19   project, so I can't really explain a lot, but it's really for
20   their HR department and what they do.
21   Q   Internal software?
22   A   Internal software for Disney.
23   MR. PRUNTY: I'm going to interject something here that if
24   there is a confidentiality agreement that you will be breaking
25   by answering any of these questions, please let him know so

Page 14

1    that we can figure out how to go ahead and use that.
2    THE WITNESS: Okay.
3    MR. PRUNTY: To the extent that there isn't, you can go
4    ahead and continue.
5    THE WITNESS: So honestly --
6    MR. MUSHKIN: I'm trying to ask just general questions.
7    MR. PRUNTY: Yeah, general questions for now.
8    THE WITNESS: We do have confidentiality agreement with
9    majority of our client up to the point that any time that we
10   want to advertise their name or mention their name in our Web
11   site, we have to get their permission. So I'm assuming all of
12   these are confidential when I'm answering them.
13   BY MR. MUSHKIN:
14   Q   When you do this work for Disney, who owns the product
15   of your -- of IDS' labor?  Who owns the actual software?
16   A   For Disney specific or for all of our clients?
17   Q   Well, we're working on Disney right now, so I want to
18   understand how you handle Disney.
19   A   Yeah. With Disney, again we sign multiple contracts
20   with them, and each contract might be different; but in these
21   specific cases I mentioned to you about the games, we provide
22   those softwares to them so they can use it without any license
23   fees or royalties fees to us.
24   Q   So they own it?
25   A   No, not really because we keep the right to use those

Page 15

1    softwares or those codes that we develop any time, anywhere.
2    Q   And is there a written agreement that deals with this?
3    A   It depends. Sometimes we sign a contract for the
4    specific project with them and sometimes we don't.
5    Q   No. I'm talking about the ownership of the software.
6    A   Not really because, as I mentioned to you, in Disney
7    we basically provide consultant to them. It's not that we
8    build a package for them that they can -- we are a part of
9    their team, so we provide consultant to them.
10   Q   So they own the software that's created by the team?
11   A   In the cases that we provide consultant to them, yes.
12   Q   Are there any cases where you own the software where
13   you're working with Disney?
14   A   As I mentioned to you, we have the full right to the
15   code but not exclusively.
16   Q   Tell me how you have the right to the code.
17   A   We are a consulting company and we write codes for our
18   client that sometime we give them the nonexclusive right to use
19   it and sometime we keep the right for those products.
20   Q   And I appreciate that. Now, how do you document that?
21   A   It's really depend what contract they ask for us to
22   sign and, quite frankly, it's really depend how smart they are.
23   If -- I try, as an owner of the company, to keep as much right
24   to the software as I can. Now, if a client comes strictly to
25   us and asks for some specific, I read the contract and, based

Page 16

1    on what I think is in that contract, I might agree to it or
2    not. But I deal with it on case by cases. So if the client
3    asks for some things, I review those contract and make decision
4    if I want to agree to it or not.
5    Q   But it's in the contract?
6    A   Possibly in some client relation and possibly in some
7    it's not.
8    Q   So that if it's not in the contract, then IDS owns the
9    program?
10   A   Absolutely.
11   MR. PRUNTY: Objection to the extent it requires a legal
12   conclusion, but answer the question.
13   THE WITNESS: Okay.
14       In my opinion, yes.
15   BY MR. MUSHKIN:
16   Q   I appreciate that.
17       In your opinion, if the contract is silent, you own
18   the program?
19   A   Yes.
20   Q   Okay. Now talk about Universal Music. What do you do
21   for them?
22   A   Same. We provide consultant for them that work at
23   their facility under their management and they're working on
24   different projects for them.
25   Q   Same thing, programming?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 17

1    A   In some cases, in some cases networking during -- and
2    securities and things like that.
3    Q   In this case again, they own whatever the product is
4    because it's at their facility and their system; is that
5    correct?
6    A   Absolutely, because we just providing body to them, so
7    people are working at Universal Music facilities under their
8    direct management.
9    Q   Let's talk about Verizon.  What do you do for Verizon?
10   A   We provide telephone people or network-engineer people
11   for them.
12   Q   What was the first thing you said?
13   A   Telephone related, communication related, network
14   engineers that set up their networks and telephone system.
15   Q   And is that ostensibly a labor?  Are you providing
16   labor, technical labor?
17   A   It's a lot of network engineering, not really like
18   somebody is actually moving equipment around or things like
19   that, actually working with the servers and what is actually
20   handling the telephone system, not actually installing
21   telephone system.
22   Q   But it's a programmer actually providing the
23   programming labor to set up the system?
24   A   Sure, they might do some programming.  They might do
25   some network setup and some engineering.

Page 18

1    Q   Installation?
2    A   Some installation.
3    Q   Configuration?
4    A   Absolutely.
5    Q   Okay.  I want to understand.
6        It is a labor-intensive process?  An individual has to
7    perform these tasks; correct?
8    A   Yes.
9    Q   And in those circumstances, again you're on their
10   machines, their property.  It's -- whatever the outcome is,
11   it's their product?
12   A   Yes.
13   Q   Okay.  And so now let's talk about Fastran; all right?
14       My understanding is that you formed Fastran.  Is that
15   correct?
16   MR. PRUNTY:  Objection as to form in that we need to
17   identify what Fastran you're talking about.
18   MR. MUSHKIN:  You are absolutely right.  I was just about
19   ready to get -- I apologize.  I was just going to get there.
20   Q   It's my understanding that you formed an entity known
21   as Fastran Inc.
22   A   I was one of the people that originally formed that
23   company.
24   Q   And who are the people other than you?
25   A   Actually I know a gentleman who is named Larry Brown

Page 19

1    or Lawrence Brown.  He introduced another gentleman named John
2    Bryant to me, and they approached me if I would be interested
3    to participate in a new entity called Fastran Inc. and help
4    them to get that off the ground.  So those are the three people
5    that originally --
6    Q   And who was the third?  Yourself --
7    A   John Bryant.
8    Q   Oh, John Bryant, that's right.
9        Okay.  And do you know what your respective interests
10   in Fastran Inc. were at the beginning of your relationship?
11   A   At the beginning it was just a negotiation that I'd be
12   interested even in this -- starting up this company.
13   Q   Okay.
14   A   Larry Brown and I are technical people, so Larry is
15   involved in network and security, and obviously you know I'm
16   involved in software development.  I was approached so if I can
17   help to build the software that can support that operation.
18   Q   And did you ultimately form a company together?
19   A   We did.
20   Q   And when you formed that company together, what were
21   the respective interests in the company?
22   A   Between when we start initial talk and when we
23   actually formed the company, there was a fourth person that was
24   introduced.
25   Q   Who was that?

Page 20

1    A   Magnus Rhyu I think.  I can't spell his last name for
2    you.  R -- I don't remember his last name.
3    Q   I think it's R-e-u-h.  There's an "h" in there
4    somewhere, right.
5    A   So --
6    MR. MUSHKIN:  That's the best I can do, but the girls will
7    find his name for you somewhere.
8    THE WITNESS:  I think when we formed the company -- I don't
9    remember exactly.  I'd have to go back to my record, that who
10   owns what percentage of that company.
11   BY MR. MUSHKIN:
12   Q   Were you equal partners?
13   A   No, we were not.
14   Q   What percentage were you supposed to have?
15   A   I don't remember.  I have to go look it up.
16   Q   Did it change over time?
17   A   I don't think so.  I don't remember.  To best of my
18   knowledge, no.
19   Q   Did you put any money into Fastran Inc.?
20   A   We did.
21   Q   I'm not asking "we."  That would be --
22   A   I did.
23   Q   You did.  How much did you put in?
24   A   I don't remember.
25   Q   Well, where would this information be?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 21

1    A   I definitely can go back to my record and pull those
2    records up.
3    Q   Was it more than $10,000?
4    A   No.  I think it -- I mean I want to say 1400 or
5    something like that.  I don't remember exactly, but --
6    Q   Nominal amount?
7    A   That's true.
8    Q   Okay.  And was it the same for Mr. Brown, Mr. Bryant,
9    and Mr. Rhyu?
10   A   I don't think so.  Because we had different ownership
11   of the company, I think we put whatever the amount.
12   Q   Do you know how much the total capitalization of the
13   company was?
14   A   I don't remember.
15   Q   Do you have any records?
16   A   I do.
17   Q   Have you produced them in this case?
18   A   I probably produced them and sent them to my attorneys.
19   Q   Well, "probably" -- these are very specific questions
20   I'm asking you about financial records.
21   A   Yes.
22   Q   Did you produce all of your financial records in
23   regards to Fastran Inc. already in this case?
24   A   Anything that I have in my -- under my control, yes.
25   Q   Well, where else could it be?

Page 22

1    A   I have no idea.  Magnus Rhyu was the CEO of the
2    company for --
3    Q   Well, how about your accountant?  Do you have an
4    accountant that takes care of your tax returns?
5    A   We do, but we never used that accountant for this
6    purpose.
7    Q   Well, did you have a 1099 or a K1 issued for Fastran
8    Inc.?
9    A   We did.
10   Q   So then in your personal tax returns there's going to
11   be some records.
12   A   That's for the money that Fastran paid me, 1099.
13   Q   Or that you put in.  It will reflect both of them,
14   sir.  So what I'm going to ask you to do is I'm going to ask
15   you to find all of your tax returns that mention Fastran Inc.
16   from inception, because it goes back to, you know, a few years,
17   and we'd like you to produce all those documents, okay?
18   A   Okay.
19   Q   And to the best you can, we'll leave a place in your
20   deposition so you can tell us what your percentage was or is in
21   an entity known as Fastran Inc. and how long you held that
22   interest.
23   A   Sure.
24         (Information requested:_____.)
25   ///

Page 23

1    BY MR. MUSHKIN:
2    Q   Now, how did you come to meet Bart Carter?  Strike
3    that.  I'm not ready for that.
4         Tell me what Fastran Inc. did -- when did you form it;
5    do you recall what year?
6    A   2006.
7    Q   Good.  Not so long.  All right.  Now -- as opposed to
8    1995, which is much longer.
9         When you formed Fastran Inc., what was its purpose?
10   A   To market a product that IDS was building to the
11   casinos and to other distributor or -- I don't know what's the
12   right term for it, but -- I don't want to say business partner.
13   I don't remember.  I have to go back to check the records.
14   Q   Do you have any experience in the casino business?
15   A   I did not at the time.
16   Q   Did Mr. Brown have any experience in the casino
17   business?
18   A   Yes, he did.
19   Q   And what was his experience in the casino business?
20   A   He worked for a company named ECHO that was processing
21   cash advance for multiple entities that were providing
22   cash-advance software to casinos.
23   Q   So Larry Brown was the cash advance -- the guy that
24   had the contact in that industry?
25   A   Or he was the one that had the knowledge, basic

Page 24

1    knowledge.
2    Q   What about John Bryant?  What did Mr. John Bryant
3    bring to the table?
4    A   John Bryant was working in the casino environment, and
5    according -- at least at the time he was telling me for many
6    years and he had many contact in the casino environment.
7    Q   How about Magnus Rhyu; do you know what Magnus Rhyu
8    brought to the table?
9    A   No, he did not, but he was -- he had his MBA from, if
10   I remember correctly, Wharton and they brought him in as a --
11   Q   Business guy?
12   A   -- organizational business guy.
13   Q   Now, in 2006 what product was IDS -- did IDS own or
14   develop?  Tell me what that product was.
15   MR. PRUNTY:  To the same extent it requires a legal
16   conclusion, objection as to that.
17        Go ahead and answer the question.
18   THE WITNESS:  I think the question is very general.  I
19   don't understand the question.
20   MR. MUSHKIN:  Wow, I thought it was pretty easy.
21   Q   You said that Fastran was formed to market a product
22   IDS was building and to market it specifically to casinos.
23   A   Yes.
24   Q   What product are we talking about?
25   A   Cash Advance software.

Page 25

1   Q   Okay. I guarantee you I'm not going to ask you about

2 source codes, okay, but I'm going to ask you a few questions

3 because I want to be able to identify this thing.

4   A   Okay.

5   Q   So I'm really really not trying to ask you anything

6 technical, but tell me what method you were going to use this

7 software to interact with customers. Is it an ATM environment?

8 Is it a casino-cage environment? What is the environment that

9 you're going to use your software in?

10   A   The goal was that we produce a software that can

11 provide all of the needs of the casinos for cash advance, and

12 obviously, you know, on 2006 we just start working on this.

13 It's not that we had everything on day one, but the goal was

14 that we produce a product that can do work on ATM; on what in

15 the casino environment they call TITO, which is

16 ticket in/ticket out; on cage unit, which is a normal computer;

17 on kiosk that we're supposed to build and run our application

18 in; on all of those environment combined, which a casino

19 requires if they're going to sign a Cash Advance offer.

20   Q   Now, in your testimony just now you said "we," okay,

21 "We started working on it." Did Fastran Inc. have a contract

22 with IDS?

23   A   No.

24    MR. PRUNTY: Again objection as to him being required to

25 draw a legal conclusion, as to him not being a lawyer.

Page 26

1 BY MR. MUSHKIN:

2   Q   So in this circumstance who owned the software?

3   A   IDS did own the software.

4   Q   And there is no document that reflects that?

5    MR. PRUNTY: Same objection.

6 BY MR. MUSHKIN:

7   Q   No written document?

8   A   If you're asking about a document that we actually

9 signed within IDS and Fastran Inc. in regard to this software,

10 absolutely no document exists.

11   Q   Okay. Now, tell me the first time you met Bart

12 Carter.

13   A   I don't remember exact date or time, but Bart Carter

14 and his company ATMMS was, if not our first client, one of our

15 first client. We were negotiating with a couple of companies

16 to sign them off as our client and Bart Carter and ATMMS was

17 one of our first client. I don't remember exactly when I met

18 him for first time.

19    MR. PRUNTY: When you answer these questions, try not to

20 use pronouns as much and try to explain, when we say "us" or

21 "them" or "they," who it is exactly you're talking about just

22 so we have a clean record.

23    THE WITNESS: Absolutely. I mean Fastran Inc. ATMMS was

24 one of the Fastran Inc. first client, if it's not the first

25 client.

Page 27

1 BY MR. MUSHKIN:

2   Q   What was it that Fastran Inc. offered to ATMMS?

3   A   I was not the one that negotiated the contract between

4 Fastran Inc. and ATMMS; however, I have a copy of that contract

5 and I submitted it and I'm pretty sure you and Bart have a copy

6 of that contract. But I'm assuming it was allowing ATMMS to

7 market that Cash Advance software to the casinos or to their

8 clients, which is limited bar gaming as well -- I think that's

9 the term they use -- small gaming facilities here in Las Vegas.

10   Q   We'll get back to that contract, but it's your

11 understanding that Fastran contracted with ATMMS to market

12 software?

13   A   Not to market software, to install the software at

14 their clients' site.

15   Q   To use the software?

16   A   To use the software. If I remember correctly, there

17 was absolutely no mention about marketing our software.

18   Q   It's actually a license to use, isn't it?

19   A   To install it and use it, that's right.

20   Q   You've been doing this a long time, haven't you?

21   A   Yes.

22   Q   So you understand the notion of allowing someone else

23 to use software that you've created; correct?

24    MR. PRUNTY: Objection again to the extent it requires a

25 legal conclusion.

Page 28

1    MR. MUSHKIN: Let's just make that a continuing objection

2 for now.

3    THE WITNESS: What was the question one more time?

4 BY MR. MUSHKIN:

5   Q   You understand the notion of a license to use

6 software; correct?

7   A   I am.

8   Q   You've bought software for your own use, haven't you?

9   A   Yes.

10   Q   And you've also created software within various

11 companies that you worked for; correct?

12   A   Yes.

13   Q   We went through that and talked about how they own it

14 or you own it; right?

15   A   Yes.

16   Q   But in the case of Fastran Inc. you have no

17 documentation as to who owns it; is that correct?

18   A   There is no signed agreement between Fastran Inc. and

19 IDS.

20   Q   And you're a shareholder of Fastran Inc. at its

21 inception; correct?

22   A   I was.

23   Q   And you're the sole owner of IDS; is that correct?

24   A   Yes.

25   Q   Did you discuss with your partners in Fastran Inc.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 29

1  specifically who would own the software?
2      A   In many occasion.
3      Q   And who did you tell this to?
4      A   The entire members of Fastran.
5      Q   So you told Larry Brown that Fastran Inc. didn't own
6  any software?
7      A   There was in many time that we have verbal discussion
8  and the --
9      Q   Sir, I'm asking you a real specific question, okay,
10  and in our business I get to ask you "yes" or "no" questions
11  and I'll try very hard to frame them so that they're "yes" or
12  "no."
13     A   Okay.
14     Q   Is it your testimony that you told Larry Brown that
15  Fastran Inc. didn't own any software?
16     A   I can't answer that question with "yes" or "no."
17     Q   Is it your testimony that you told John Bryant that
18  Fastran Inc. didn't own any software?
19     A   Same thing.  I can't answer that question with "yes"
20  or "no."
21     Q   Is it your testimony that you told Magnus Rhyu that
22  Fastran Inc. didn't own any software?
23     A   I can't answer that question with "yes" or "no."
24     Q   Why can't you answer that question "yes" or "no"?
25     A   Because the discussion was that Fastran had an option

Page 30

1  of paying for some of the services that IDS is doing up to a
2  certain time and then own the software, and if they didn't pay
3  that amount, then IDS would own the software; and they were all
4  aware of that, that they have limited of time to come up with
5  the sum of money to pay IDS.
6      Q   Well, let's talk about when -- there came a time that
7  Fastran Inc. sold all of its assets to Fastran, LLC; is that
8  correct?
9      A   If Fastran Inc. had any assets.  It's not clear for me
10  what is assets.
11     Q   Fastran Inc. paid money to IDS; is that correct?
12     A   Yes.
13     Q   Fastran Inc., at the time that it sold its assets to
14  Fastran, LLC, had additional bills; is that also correct?
15     MR. PRUNTY:  Objection; assumes facts not in evidence.
16         Go ahead and answer the question.
17     THE WITNESS:  Yes.
18  BY MR. MUSHKIN:
19     Q   Do you know how much those liabilities were?
20     A   To all of their creditors?
21     Q   At the time that Fastran Inc. sold to Fastran, LLC, do
22  you know how much the liabilities were?
23     MR. PRUNTY:  Objection as to form.
24         Go ahead.
25     THE WITNESS:  To all of their creditors?

Page 31

1      MR. MUSHKIN:  Uh-huh.
2      THE WITNESS:  I have to look at that number, but I provided
3  that before to Bart and everybody else.  Hundreds of thousands.
4  BY MR. MUSHKIN:
5      Q   Couple?  $300,000?
6      A   Something like that.
7      Q   I won't hold you to that.  I just want to get a scope.
8      A   Yeah.
9      Q   Now, isn't it true that those bills were paid?
10     A   Yes.
11     Q   And that that was -- it was specifically represented
12  to Mr. Carter that those bills had to be paid in order to own
13  the software?
14     A   No.
15     Q   No?  Well, why don't you tell me what you said to
16  Mr. Carter.
17     MR. PRUNTY:  Objection as to form.
18         Go ahead.
19     THE WITNESS:  We not only approached Bart Carter; we
20  approached a couple of other people to come and bring money to
21  the Fastran because Fastran was financially not in a good
22  position.  We had a lot of people that were asking for money
23  for Fastran Inc., and Fastran Inc. had no income to pay those
24  people or not enough income to pay those people.  We were
25  approaching people to first find some money so we can pay our

Page 32

1  creditors and then have some additional money that we can move
2  the business of the company forward.  One of people we
3  approached was Bart Carter and we were negotiating with him
4  that if he put a certain amount of money into the company, we
5  can pay all of our creditors that are knocking at the door and
6  then have enough money that we can continue our business so
7  we -- that's all we told them, that we need some money to pay
8  the creditors and then continue doing business.
9  BY MR. MUSHKIN:
10     Q   What did you tell him the business of Fastran Inc.
11  was?
12     A   To market a Cash Advance software.
13     Q   Did you tell him that it was -- the software was owned
14  by IDS?
15     A   I can't recall it one way or another, but I'm pretty
16  sure he knew that.
17     Q   How would he have known it, sir?
18     A   Because software always belonged to IDS.
19     Q   How would he have known it, sir?
20     A   He should ask for it.
21     Q   Oh, he should have asked for it.
22         And it's your testimony that you didn't specifically
23  tell him that Fastran Inc. was the owner of Cash Advance
24  software?
25     MR. PRUNTY:  Objection; misstates the evidence.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

| Page 33 | Page 35 |
|---------|---------|
| 1   Go ahead. | 1  the client. |
| 2   THE WITNESS:  Yeah, I don't remember I told him that. | 2     Q   What part about my question that used the word "fees" |
| 3  BY MR. MUSHKIN: | 3  didn't you understand? |
| 4     Q   Would it surprise you if Mr. Carter said that you did | 4     MR. PRUNTY:  Let the record show that the questioning |
| 5  tell him that? | 5  attorney here is being very abusive to my client, raising his |
| 6     A   I don't know what you mean "surprise." | 6  voice and -- |
| 7     MR. MUSHKIN:  Let the record reflect that the witness is | 7     MR. MUSHKIN:  That is a bold -- |
| 8  smirking at me. | 8     MR. PRUNTY:  -- in an accusative tone. |
| 9     Q   What do you mean you don't know what "surprise" means? | 9     MR. MUSHKIN:  That is a bold-faced lie, Counsel.  If you |
| 10 You don't know what the word means? | 10 keep it up, I'll have the video cameras here and prove you to |
| 11    A   No, I don't know what you mean that I will be | 11 be a liar.  Don't do that. |
| 12 surprised. | 12    Now, what I said was, slowly with looking him square |
| 13    Q   I'm asking you, would you be surprised if Mr. Carter | 13 in the eye after he said he didn't understand what a fee was |
| 14 specifically testifies that you told him that the software was | 14 when he used it in his sentence, "What part about the fee |
| 15 owned by Fastran Inc.? | 15 question didn't you understand?"  Because I believe that your |
| 16    A   Again, I don't know what's the answer to that | 16 client is being intentionally evasive and dishonest, and I have |
| 17 question. | 17 not raised my voice.  If I do, everyone in the room and the |
| 18    Q   And would it surprise you that Larry Brown will | 18 room next to us will know it.  So don't cloud my record. |
| 19 testify that the Fastran Inc. owned the software? | 19    MR. PRUNTY:  In my limited lifetime experiences, the tone |
| 20    MR. PRUNTY:  Assumes facts not in evidence. | 20 of voice and the volume of voice you were using -- which you're |
| 21    THE WITNESS:  I mean these are assumptions, not facts. | 21 being recorded and I would ask that the person recording this |
| 22 BY MR. MUSHKIN: | 22 maintain that tape -- I think will serve as a record for |
| 23    Q   I'm asking you, sir, if it would surprise you.  It's a | 23 itself. |
| 24 very simple question. | 24    MR. MUSHKIN:  It absolutely will, Counsel. |
| 25    A   It will surprise me. | 25    MR. PRUNTY:  And I think that it's perfectly okay for you |

| Page 34 | Page 36 |
|---------|---------|
| 1     Q   It would be a "yes" or "no." | 1  to ask the questions that you want to ask, and I'm not |
| 2     A   It will surprise me if Larry says that. | 2  objecting to the question, but when we start raising our tone |
| 3     Q   And would it surprise you if John Bryant said that? | 3  and projecting anger, I think it's inappropriate in the |
| 4     A   No. | 4  circumstance. |
| 5     Q   Would it surprise you if Magnus Rhyu said that? | 5     MR. MUSHKIN:  If someone lies to me, Counsel, it makes me |
| 6     A   Magnus Rhyu was not involved in our effort with Bart | 6  angry, particularly when they do it in an insulting way. |
| 7  Carter for a long time. | 7     Now, he knows that there are fees generated by the |
| 8     Q   I didn't ask you that, sir. | 8  system that processes these financial transactions.  They are |
| 9     I asked you, would it surprise you if Magnus Rhyu | 9  called fees.  In fact they're called 19 different ways. |
| 10 testified that Fastran Inc. owned the Cash Advance software? | 10 There's federal legislation now about the disclosures that you |
| 11    A   Oh, definitely surprise me because he's a smart guy | 11 have to make 'cause you can't call them things other than fees. |
| 12 and a business guy and he can't make a claim like that without | 12    THE WITNESS:  Mr. Mushkin -- |
| 13 something to back it up. | 13    MR. PRUNTY:  Simply clarify the question and I would ask |
| 14    Q   Tell me how Fastran -- strike that. | 14 you to restate the question and I would ask my client to answer |
| 15    Fastran Inc. had a bank account; is that correct? | 15 the question; and if he doesn't understand the question, to |
| 16    A   Yes, multiple. | 16 specifically state what part of it he doesn't understand. |
| 17    Q   Multiple bank accounts -- | 17    THE WITNESS:  Mr. Mushkin, our system does not generate any |
| 18    A   Yes. | 18 fees, so you're wrong.  You're not as familiar with this |
| 19    Q   -- is that correct? | 19 process as I am, so you better take me for my word that when |
| 20    And it had one bank account in particular that was the | 20 you say "fee," you need to explanate a little bit more what you |
| 21 repository for the fees that it generated; is that correct? | 21 mean.  If you mean Cash Advance fees, then I answer your |
| 22    A   I don't think you stated the question correctly. | 22 question, but if you just simply say "fees," I need |
| 23    "Fees," I don't know what you mean with "fees." | 23 clarification on that question.  It's as simple as that. |
| 24    Q   How does Fastran Inc. generate revenue? | 24    I didn't try to disrespect you or not answer your |
| 25    A   Earning a percentage of the fees that are charged to | 25 question.  I just asked for clarification and I think that's my |

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 37

1  full right, to ask that you clarify your question.
2  BY MR. MUSHKIN:
3     Q   Sir, I told you in the beginning, if you don't
4  understand my questions, ask me.
5     A   That's what I did.
6     Q   Respectfully, you didn't ask for a clarification.  Now
7  let's get you clarified.
8     A   Okay.
9     Q   How does Fastran -- how did Fastran Inc. generate
10  revenue?
11    A   By keeping a portion of the Cash Advance fees that we
12  allow our customers to give to their customers, or to process
13  those cash advance for their customers, and then we keep a
14  portion of those fees.
15    Q   Okay.  Let's see if I can -- we can make that a little
16  more explainable, okay?
17    A   I'm sorry.  One more clarification I have to say.
18    Q   Sure.
19    A   That was only one way of Fastran earning money.  There
20  was other ways for Fastran earning money as well, which is
21  selling the right to use our -- this license and also to
22  maintain and support them for future and charging them for the
23  services that we provide to them.
24    Q   Okay.  So let's figure out the revenue sources.
25        You got one is a license fee?

Page 38

1     A   Yes.
2     Q   Okay.  And two is maintenance?
3     A   That's right.
4     Q   And we'll call -- is that also referred to as a fee, a
5  maintenance fee?
6     A   Possibly, yeah.
7     Q   I don't know what else to call it.
8     A   Yeah, maintenance fee.
9     Q   Okay.  And then you have what you've described as a
10  percentage.
11    A   A percentage.
12    Q   And I'm assuming that what you're really referring to
13  is what is generically referred to as interchange fees.
14    A   Not to my knowledge.  I think that's a wrong term for
15  this.
16    Q   What would you call it?
17    A   Interchange fees, based off the knowledge that I have,
18  is only used for the ATM transaction.  Obviously majority of
19  our business was credit card processing, and I don't think they
20  call credit card fees as interchanges.  That's best of my
21  knowledge.
22    Q   So what -- I won't use the word "interchange."  I'll
23  use the word "system," if that's okay with you, a system fee.
24  Whether it's a credit card, whether you're paying Bank of
25  America, you know, somebody charges that customer to use that

Page 39

1  system; correct?  American Express, Bank of America,
2  MasterCard, Visa; right?  You pay fees; correct?
3     A   They have their portion of the fees, yes, you are
4  right.
5     Q   When I say "they," I'll try and be more clear.
6        It's the location where the business takes place;
7  correct?
8     A   The fee is charged at the location, yes.
9     Q   Let me -- and I'm going to use my law firm.  I could
10  use his, but they might not even let you use a credit card at
11  his.  They're very fancy, but we have credit cards here.  My
12  sister made sure of that.  It was something I had to learn.
13        But you get a machine; correct?
14    A   Uh-huh.
15    Q   Is that a "yes"?
16    A   Yes.
17    Q   And that machine allows you to process a credit card,
18  take it as a transaction; is that correct?
19    A   Yes.
20    Q   And somehow there's like a bank account tied to that
21  person, that business; in this case, my law firm.
22    A   Okay.
23    Q   'Cause I have to receive the money that the customer
24  pays me into a bank account; correct?
25    A   Yes.

Page 40

1     Q   And when I receive that money, I have to give a little
2  to the system, whether it's American Express, Bank of America,
3  or Visa and MasterCard.
4     A   Or better yet, they take the money out before they
5  deposit that to your account.
6     Q   That's what I just said.  I get a little less.
7     A   That's true.  You said when you receive the money, you
8  have to give, and I'm saying --
9     Q   No.  I don't get it all.  I get a little less; right?
10    A   That's true.
11    Q   And it depends on -- each credit card is a little
12  different and -- right?  Yes?
13    A   Depend on the business and the credit card and type of
14  transaction.
15    Q   Good.  Now, it's that fee that I -- if I billed $400
16  for my services and I put it on the credit card and I didn't
17  get $400, I probably got $396 for just --
18    A   That's true.
19    Q   For -- and it's that fee, that $4, that you're talking
20  about keeping a percentage of; is that correct?
21    A   That's true, but in the casino environment it's
22  different than the office here.
23    Q   I appreciate that.  I was just trying to make one very
24  specific --
25    A   And the specific fees are much higher in the casino's

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 41

1  environment for cash advance than what you're paying to the
2  credit card company here.
3      Q   So that if you take a percentage of that fee, you get
4  more in a casino than you would get from a law firm?
5      A   I don't know -- when you say "you," what do you mean?
6      Q   If Fastran Inc. is getting to keep a percentage of
7  that fee, the bigger the fee, the bigger the amount of money
8  that Fastran Inc. gets to keep.
9      A   That's obvious.
10      Q   Sure, mathematics.
11         Okay.  Now, tell me where that fee goes.  How does
12  that work?
13      A   In our business, as I mentioned to you, that credit
14  card companies and our processor -- and let me explain this,
15  that there is a credit card company of course like Visa,
16  MasterCard, American Express that are dealing with the banks.
17  So your credit card could be issued with Bank of America but
18  has the Visa logo on it.  And there are companies that actually
19  processing this transaction for us.  So we'll go to a single
20  processor and I request an approval, and they approve it by
21  going to all these banks and Visa, MasterCard and everybody and
22  get their approval.
23      Q   That's referred to as the network; is that correct?
24      A   Processor I think.
25      Q   Well, the processor is referred to as an ISO; is that

Page 42

1  correct?
2      A   I'm not sure.
3      Q   Okay.
4      A   I can't answer that question.
5      Q   Let me see if I can help you.
6         Isn't it true that the business of processing is a
7  business that is different than the business of Fastran Inc.?
8      MR. PRUNTY:  Objection as to form.  I'm getting lost.
9      THE WITNESS:  I have no idea.
10  BY MR. MUSHKIN:
11      Q   Is Fastran Inc. a member of a financial-institution
12  network?
13      A   Too technical for me to answer.  I don't know what are
14  the financial -- I don't know what are the terms in this
15  business, so I can't really answer that question.
16      Q   Wow, you were being pretty specific a minute ago, sir,
17  told me I didn't understand.
18      A   No.  I was trying to explain to you that -- which
19  percentage of fees goes to who and I was just halfway through.
20  I didn't even finish my --
21      Q   By all means, finish.
22      A   -- explanation.
23         So a percentage of the fee goes to possibly a bank,
24  and I'm not familiar with that part.  I can't really say it for
25  sure, possibly to a bank that issued that credit card to Visa,

Page 43

1  MasterCard, American Express, and to our processor, and they
2  took that percentage off our fees up front.  So as I mentioned
3  to you, like you said, you don't get the 400; you get 396.  The
4  same thing for us.  So we don't get a percentage of the fee up
5  front.  The rest of it and the face value of the transaction
6  would go to the Fastran Inc. account.
7      Q   Isn't it true that the fee that comes out is in two
8  parts, one part to Fastran Inc. and one part to the location?
9      A   No.
10      Q   Then tell me how it comes out, sir.
11      A   In the ideal world, when we had a contract with
12  whoever we licensed our product, the fees would split three
13  ways.  The location, which is casino, would keep a percentage
14  of the fee.  Our -- whoever we license them to use our product,
15  which was ATMMS in this case, for example, would keep a
16  percentage of that fee, and Fastran would keep another -- the
17  rest.
18      Q   And where does the money go when it comes out?
19      A   I don't understand the question where the money goes
20  when it comes out.
21      Q   There's three people that are chopping up the money.
22  How does the money move?
23      A   We process the --
24      Q   Who is "we"?
25      A   Fastran.  I'm sorry.  I should be more careful on

Page 44

1  that.  Fastran.
2      MR. PRUNTY:  Let's just for the record --
3      THE WITNESS:  Fastran Inc.
4      MR. PRUNTY:  Inc.?  LLC?  Just a moment.  On all this
5  stuff, we want to have a clean record.  I'm not objecting to
6  the questions, but to the extent we can not use pronouns and we
7  can use detailed names --
8      THE WITNESS:  Please correct me if I forget again.
9         Fastran Inc. would credit the face value of the
10  transaction to the casino's account, bank account, which they
11  provided to us on a schedule base, which I don't remember
12  exactly but maybe the next day and they would get it the
13  following day, something like that, and that was the face
14  value.  Then Fastran would give -- based on their contract,
15  because the fees are all based on the contract.
16         So if you had a contract with one of our clients -- if
17  Fastran Inc. had a contract with one of its clients that they
18  will credit the fees every 30 days at the end of the month, at
19  the end of the month, they would calculate how much money
20  casino earned as the percentage of that fee and how much money
21  that entity that we had the contract with was earning and then
22  we would give them -- Fastran Inc. would -- give the money to
23  that account on a monthly basis, if the contract was monthly.
24  It's possible that we sign a contract and we tell them that --
25  Fastran Inc. tell the client that we do it, Fastran Inc. do it,

Nasrollah Gashtili, Volume I                 JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 45

1  weekly or every two months.
2  BY MR. MUSHKIN:
3     Q   And that's a settlement date?  You settle up every few
4  days or whatever the contract says; right?
5     A   They're all settlement, but based on the face amount
6  of the transaction.
7     Q   You have to account for who gets what of that fee.
8     A   Absolutely.
9     Q   And it's set by contract?
10    A   Yes.
11    Q   Is there a contract with ATMMS?
12    Q   Between who and ATMMS?
13    Q   Fastran and ATMMS.
14    Q   Fastran Inc. and ATMMS?
15    Q   Yes, sir.  Is there a contract?
16    A   Yes.
17    Q   Did you honor that contract?
18    A   We did not because we run out of the money and we were
19  going to bankrupt and Bart Carter came and tried to rescue the
20  company.
21    Q   So Fastran Inc. defaulted to ATMMS; is that correct?
22    MR. PRUNTY:  Objection to the extent it requires a legal
23  conclusion.
24       You can go ahead and testify to your understanding.
25    THE WITNESS:  We did not process those transaction based on

Page 46

1  that contract -- or Fastran Inc. did not follow the terms of
2  that contract both ways.
3  BY MR. MUSHKIN:
4     Q   You didn't pay pursuant to the terms of the contract?
5     A   And we didn't charge ATMMS for what we supposed to
6  charge them for.
7     Q   What were you supposed to charge them for?
8     A   Annual maintenance and support, all the calls that
9  were coming.  So the money should go both ways.
10    Q   How long did it go on?
11    A   What how long?
12    Q   How long did Fastran Inc. provide software to ATMMS
13  before they came and asked for money?
14    A   Over a year.
15    Q   You sure?
16    A   I'm pretty sure.  We can look at the dates, but I'm
17  pretty sure.
18    Q   A year?  Little over a year?
19    A   Yes.
20    Q   How much was the maintenance contract for the first
21  year of service?
22    A   I don't remember.
23    Q   Was there --
24    A   A 20 percent, if I remember correctly.  As I said, I
25  didn't draft that contract.  I didn't sign that contract.  That

Page 47

1  was between Magnus, John Bryant, and Bart Carter that they
2  negotiated.
3       And for the record, I find out that that contract has
4  flawed in it and I -- that's one of the reasons that we fire
5  Magnus as a CEO of the company, because of that contract; and I
6  personally brought it up to Bart Carter, and Bart Carter told
7  me that "we" -- means ATMMS -- they were reviewing this
8  contract for three days to find out how could we sign a
9  contract like that because we were losing money on it.  "We"
10  means Fastran Inc.  He said, "I thought there is something in
11  there that I don't understand it."  And so we find out shortly
12  after signing that contract -- Fastran Inc. -- it will lose
13  money on that contract and there is no way that Fastran Inc.
14  could operate and losing money every month, so --
15    Q   So now we come to the point in time where Fastran Inc.
16  asked Bart Carter for money.
17    A   Asked Bart Carter and few other --
18    Q   You know what?  Let's take a five-minute break.  We've
19  been going at it for a little over an hour.  Take five or six
20  minutes and we'll start again, okay?
21    A   Okay.
22    Q   Thank you.
23       (Brief recess taken.)
24  BY MR. MUSHKIN:
25    Q   Do you know the date that Fastran, LLC was formed?

Page 48

1     MR. PRUNTY:  Objection as to the -- to the extent it
2  requires a legal conclusion.
3       Go ahead and answer the question.
4     THE WITNESS:  I want to say November of 2007, but I'm not
5  so sure.
6  BY MR. MUSHKIN:
7     Q   I'm going to show you what's been marked as -- which
8  will be marked as Exhibit 1, ask you if you've ever seen this
9  document before.
10       (Plaintiff's Exhibit 1 was marked for identification
11  by the Certified Court Reporter and is attached hereto.)
12    THE WITNESS:  You know, for the record I can't say for sure
13  I see this specific one, but something similar to this went
14  back and forth many times between Bart Carter, me, and other
15  members of -- supposed to be members of Fastran, LLC, but I
16  have no way of saying it was this exact document.
17    MR. MUSHKIN:  And for the record, it is an unexecuted copy
18  of something that's entitled Operating Agreement of Fastran
19  LLC, Limited Liability Company.
20    THE WITNESS:  Yes.
21  BY MR. MUSHKIN:
22    Q   Do you recall any of the specific changes that were
23  made to the Operating Agreement?
24    MR. PRUNTY:  Objection as to form.  From what point to what
25  point?

Nasrollah Gashtili, Volume I      JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 49

1     MR. MUSHKIN: At any time. I'm asking his -- he testified
2 that it went back and forth a bunch of times, and I'm asking
3 him if he remembers any issue that was, you know, discussed in
4 terms of changes to the Operating Agreement.
5     THE WITNESS: I don't remember specifically, but I remember
6 seeing the redline copies of this before too, so -- but I can't
7 really say which part.
8 BY MR. MUSHKIN:
9     Q   You don't really remember any specific changes?
10    A   No.
11    Q   Were there any -- I'm going to try and refresh your
12 recollection. May I have -- why don't you take that exhibit
13 back in front of you.
14      Was there any issues regarding meetings that you
15 thought might have been discussed?
16    A   Regarding meetings?
17    Q   Meetings, notice of meetings, special meetings,
18 anything like that.
19    A   I don't remember.
20    Q   Do you recall any discussions about waiver of
21 attendance or quorum? Do you know what a quorum is?
22    A   I do know what the quorum is, but no, I don't remember
23 specifically talking about that.
24    Q   Do you remember any discussions about proxies?
25    A   I mean any of these topic could have be, but I don't

Page 50

1 remember specifically which topic we talked about and we
2 changed or we either already asked, all four of us asked, to
3 change.
4    Q   I'm asking you if you have any recollection of any
5 change that you made during the course of discussions over the
6 Operating Agreement.
7    A   I do not remember that, no.
8    Q   Do you believe that you in fact made changes?
9    A   It is possible that when I was reviewing this document
10 I request some changes, but I don't remember. It was going
11 back and forth between all four of us, so recommendation could
12 have come from any one of us.
13    Q   That's exactly my question.
14      You don't remember whether you were making changes or
15 others were making changes?
16    A   No, I don't remember who.
17    Q   You just know that there were changes?
18    A   I remember that the document was going back and forth
19 redline with changes that people were asking for.
20    Q   Now, do you recall what the percentages of ownership
21 were?
22    A   At the final agreement? Or --
23    Q   At any time.
24    A   I think final agreement was -- or the one I remember
25 was 40/40/20 -- I mean 40/40/10/10.

Page 51

1    Q   And that's 40 for Carter, 40 for Gashtili, 10 for
2 Brown, and 10 for Bryant?
3    A   Yes.
4     MR. MUSHKIN: And that Bryant is with a "t."
5    Q   I would direct your attention to Exhibit A to the --
6     MR. PRUNTY: I believe that's Exhibit 1.
7     MR. MUSHKIN: No. Exhibit A to Exhibit 1.
8     MR. PRUNTY: I'm sorry.
9     MR. MUSHKIN: It's the last page and that is the
10 40/40/10/10.
11    Q   Is that what you recall to be the ultimate
12 negotiation?
13    A   That's what I remember, yes.
14    Q   Okay. Do you know who Mike Poggi is?
15    A   Yes, I do.
16    Q   Who is Mike Poggi?
17    A   I thought it was Mike "Poe-jee."
18    Q   I always say Poeg-ee" and everybody else says
19 "Poe-jee." You know we're talking about the same guy?
20    A   We're talking about the same guy.
21    Q   Little small -- that's the guy.
22     MR. PRUNTY: Could we have the spelling.
23     BART CARTER: P-o-g-g-i.
24     MR. MUSHKIN: Yeah, P-o-g-g-i.
25     THE WITNESS: I know he's working for Bart Carter and I

Page 52

1 think he has some family relationship with Bart Carter too, as
2 I understand.
3 BY MR. MUSHKIN:
4    Q   Tell me your interaction with him.
5     MR. PRUNTY: Objection as to form.
6     Go ahead and answer.
7     THE WITNESS: I -- you know, I still don't know what his
8 position with Bart Carter organization really, but I was -- he
9 was asking for changes to the software from time to time and he
10 was the one that we were requesting to get some parts that they
11 want to integrate with the application; so from time to time
12 that I have to ask him to send this, for example, card reader
13 if they want to integrate it with our application, and he would
14 just ship it to me and he would tell me that, you know, "I need
15 this" or "I need that," "We need this modification," "We need
16 that modification."
17     MR. MUSHKIN: Tell me -- well, I'll just mark this as 2.
18     (Plaintiff's Exhibit 2 was marked for identification
19 by the Certified Court Reporter and is attached hereto.)
20 BY MR. MUSHKIN:
21    Q   I've showed you what's been marked as Exhibit 2.
22    A   Okay.
23    Q   Could you take a minute and take a look at that.
24     MR. PRUNTY: I assume by your production you're waiving
25 attorney-client privilege as to that?

Nasrollah Gashtili, Volume I        JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 53

1     MR. MUSHKIN: Well, I don't think there's anything in here
2 that would be particularly privileged except that they sent me
3 a copy of it. Just because you send your attorney a copy of an
4 E-mail does not create a privilege. This is from Bart Carter
5 to Bill Connell and, to the extent that there would be a
6 waiver, I mean this is an internal memo, but we're not going to
7 deal with -- I mean that speaks for itself. What I want to
8 talk about is from Mr. Gashtili to Bart and Bryant and Brown.
9     Q   Do you recognize that E-mail?
10    A   I don't remember it in specific, but I see up there
11 it's from me, so I'm reading it right now.
12    Q   I would like to direct your attention to the second
13 paragraph.
14    A   Okay.
15    Q   "We offer our products to any additional ATM ISOs."
16       What is your product, sir?
17    A   This is obviously a Fastran Inc., and Fastran Inc. can
18 install software into casinos that allow casinos process cash
19 advance.
20    Q   Does it say here that you're going to install somebody
21 else's product? Doesn't it say "our product"?
22    A   Yeah, but I don't know the legal definition of their
23 product. I have to refer that to my attorney.
24    Q   Okay. Very good, sir.
25    A   Is that all on paragraph 2?

Page 54

1     Q   Please keep looking. Let's take another sentence out.
2 The very last sentence of the first page it says, "We have
3 formed strategic partnerships and relationships in gaming over
4 the past decade that we feel gives us a distinct competitive
5 advantage." Do you see that?
6    A   Yes.
7    Q   What's the date of -- didn't you testify that the
8 formation of Fastran was 2006?
9    A   Yes, I did, but --
10    Q   So how is it that Fastran has a decade of experience
11 if it's only there a year?
12    A   The members of Fastran, members or owners of Fastran
13 Inc., were in the gaming business for many years.
14    Q   It doesn't say that, does it?
15    A   Again that's a legal opinion that I can't make.
16    Q   Thank you.
17     MR. PRUNTY: Just for the record, it says "we."
18 BY MR. MUSHKIN:
19    Q   Now, in the next sentence it says, "our strategic
20 alliances by integrating our product suite." What's that mean,
21 sir?
22    A   Again being able to provide cash access on multiple
23 front; as you mention, on ATM, on different venues to deliver
24 the cash advance to the casinos.
25    Q   Is there anywhere in here that you're talking about

Page 55

1 using somebody else's product?
2    A   Again "product" is a legal definition. I --
3    Q   Sir, I'm not asking for legal definitions.
4    A   Yeah, but I --
5    Q   Please answer my questions, not what you want to
6 answer. Listen to my question.
7      Is there anywhere in this sentence that you talk about
8 using somebody else's product?
9    A   Not the product.
10    Q   Is there anywhere in this sentence where you talk
11 about IDS product?
12    A   Two different things, two different things.
13    Q   Sir, is there anywhere in this sentence where you talk
14 about IDS product?
15    A   No, I did --
16    Q   Thank you.
17    A   -- not mention IDS name here.
18    Q   Thank you.
19      Now, you notice in the paragraph above the graph it
20 says, "We are planning to use the collective funds to clear all
21 of our outstanding debt." Do you see that?
22    A   Uh-huh.
23    Q   That was clearly the intention that you had at the
24 beginning of this; is that correct?
25    A   Yes.

Page 56

1     Q   Now, it says in these debts, "IDS software
2 development, $150,000."
3    A   Yes.
4    Q   "Promissory Note, Larry Brown."
5      You see all these amounts; correct?
6    A   Yes.
7    Q   Is there anywhere in here that it says that IDS owns
8 the software?
9    A   On this paragraph, no, I don't see anything.
10    Q   Is there any anywhere in this agreement?
11    A   I haven't read the entire agreement.
12    Q   Please take your time and read the entire agreement --
13 or the entire document. I don't believe it's an agreement --
14    A   Oh, yeah, entire E-mail. I'm sorry.
15      I still don't understand what's the relevance of this
16 question that I mention anything here that who owns the
17 software. I mean --
18    Q   Your attorney will have plenty of time to discuss
19 relevance with you and what your representations in this letter
20 mean, sir.
21    A   Yeah. I mean we're talking about IDS software.
22    Q   Sir, there's no question before you.
23      Next in order, please.
24      (Plaintiff's Exhibit 3 was marked for identification
25 by the Certified Court Reporter and is attached hereto.)

Nasrollah Gashtili, Volume I      JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 57

1  BY MR. MUSHKIN:
2     Q  Have you ever seen this E-mail before?
3     A  Probably did.  Again I see my name over here, so I
4  probably got this E-mail.
5     Q  Why don't you take a look at it.
6      Do you recall receiving this?
7     A  I remember this E-mail, yes.
8     Q  Yeah, you remember?
9     A  Yes, I do.
10     Q  The last sentence says, "Nasrollah and I have agreed
11  that we would like you to join Fastran as board member and
12  owner.  We know that a strong board of directors and advisors
13  will be an asset to Fastran."
14      Do you recall having a discussion with Mr. Carter in
15  that regard?
16     A  You know, for the record I want to clear one thing,
17  that I remember this E-mail as a general because I see some
18  topics in here that rings the bell that I seen this E-mail.  In
19  no way or shape I can say that every sentence or every part of
20  this E-mail is what I had or what I read.  I just want to make
21  that clear part of the record.
22     Q  Well --
23     A  Not that I remember every sentence, but I remember
24  this general E-mail with this stuff in there.
25     Q  Do you recall discussing this with John Bryant?

Page 58

1     A  This E-mail?
2     Q  Yes.
3     A  I don't remember discussing this E-mail with John
4  Bryant, but I probably did because John Bryant, Larry, and I
5  were discussing how Bart is going to join the organization.
6     Q  Okay.  So now let's look at the -- do you see where it
7  says, "Nasrollah and I"?  I'm not sure if that's part of Bart's
8  E-mail or if that's part of what proceeds on the next page.
9     A  I have no idea.  That's why I'm saying I don't --
10     Q  That's what I'm asking you, if you recognize this or
11  if you know who wrote this.  It's pretty clear that Bart wrote
12  the first part and it says, "Thanks, Bart."
13     A  Yeah.
14     Q  Do you know who starts up, "Nasrollah and I have
15  agreed that we would like you to join Fastran as a board member
16  and owner"?
17     A  No.  I have -- I do not remember who wrote that
18  sentence.
19     Q  How about, "If I become part of Fastran, it will not
20  be just a board member/advisor.  It will be to run the business
21  end of Fastran.  This is where I feel that Fastran is weakest
22  and I am strongest"?
23     A  I think that's Bart Carter's sentence.
24     Q  Okay.  Cash advance -- so do you recall getting all
25  this?

Page 59

1     A  I do remember this specific sentence from Bart Carter
2  before because that was a strong point of our discussion, that
3  Bart should join as contributor, not just investor.
4     Q  Do you recall discussions about "the direct imports of
5  data to generate necessary reports and ACH files to make this
6  more automated instead of manual like we do with ATM
7  locations"?  Do you recall that?
8     A  I remember this.  Now that I'm reading more of this, I
9  think -- and I don't know why this was taken out of contents
10  and why John Bryant name is not up there.  I can assume that
11  these are from John Bryant and Bart respond to John Bryant.
12     MR. PRUNTY:  If I can just make a comment --
13  BY MR. MUSHKIN:
14     Q  Just for the record, this was produced by you,
15  Mr. Gashtili, not by us.
16     A  Yeah.  So maybe when Bart send this E-mail, he just
17  copy this part of John Bryant response and answer to them.
18     MR. PRUNTY:  I mean just as an overall comment to the
19  extent it would help facilitate the discussion here, it looks
20  like this was cut and pasted from another document and there
21  were comments made to different parts of what was cut and
22  pasted from someone else.  This is just the format that it
23  appears to be.
24     MR. MUSHKIN:  It does, and I'm just really trying to
25  refresh his recollection of what was discussed.

Page 60

1     THE WITNESS:  I remember this as being -- because I know
2  his writing.  I know the way he talks, John Bryant.  I remember
3  that these are John Bryant's comments and then Bart respond
4  them.
5  BY MR. MUSHKIN:
6     Q  Do you see anywhere in here where anybody talks about
7  IDS owning software?
8     A  No, I don't.  I haven't seen it yet.
9     Q  Let's look at the last page.  I think that might
10  actually be a repeat of the first page, but I just want to make
11  sure that that's exactly what it is.  It's the same author.
12     MR. PRUNTY:  It looks like the date is a different date.
13     MR. MUSHKIN:  You know what?  It is a different date.  So
14  now let's look at the date on the one on the back.  This is
15  October.  This is earlier.
16     THE WITNESS:  I remember these discussion that were going
17  back and forth between us.
18  BY MR. MUSHKIN:
19     Q  This is just part of the dialogue that went back and
20  forth; is that correct?
21     A  Yes.
22     Q  Okay.
23     (Plaintiff's Exhibit 4 was marked for identification
24  by the Certified Court Reporter and is attached hereto.)
25     MR. PRUNTY:  Is this 4?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 61

1    MR. MUSHKIN: Yes.
2    MR. PRUNTY: I would note that it starts at page 2 of 3.
3    MR. MUSHKIN: It sure does. I'll also note that it's
4  produced by Gashtili.
5    Q   Have you ever seen this document before?
6    A   General comments again: I receive 4-, 500 E-mail a
7  day and these are -- some of these are from years ago, so --
8    Q   Sir, I asked a real simple question.
9    A   I see my name on there.
10   Q   I'm asking you, do you recall if you've ever seen this
11  before? And believe me, "no" is not a bad answer. It just
12  happens to be the truth sometimes.
13   A   Yeah. Let me read them one by one.
14   Q   Sure. Take your time.
15   A   Because I read the first one and I don't remember
16  that, but if I read the whole chain, I might remember it.
17      Yes, I do remember this.
18   Q   Who is Mr. Beer?
19   A   He's a consultant that we used -- okay. Let me
20  correct myself -- that Fastran Inc. and Fastran, LLC used to do
21  some work for them.
22   Q   Take a look at the third page.
23   MR. PRUNTY: Can we use the Bates number at the bottom.
24   MR. MUSHKIN: Sure, 25.
25   Q   Does that describe the work he was going to do?

Page 62

1    A   Yes.
2    Q   Did he perform this work?
3    A   I was not managing him and I was not involved with
4  him, so I'm not sure. I can't say "yes" or "no."
5    Q   Well, it says, "system design, preliminary sequence
6  diagrams."
7    A   Yeah.
8    Q   Do you think that Mr. Beer owns the product of his
9  work?
10   A   I think --
11   MR. PRUNTY: Objection to the extent it requires a legal
12  conclusion.
13      Go ahead.
14   THE WITNESS: Yes, legal conclusion.
15   BY MR. MUSHKIN:
16   Q   Sir, you don't get to make objections. He gets to
17  make the objections. You get to answer my questions.
18   A   I'm saying I have to review the contract between
19  Richard Beer and Fastran Inc. or Fastran, LLC, whoever he was
20  doing the business with. I think I see Fastran, LLC over
21  there; and based on that contract, then probably attorneys can
22  determine who owns that part of--
23   Q   You don't see IDS in this sequence, do you?
24   A   No, but Richard Beer was doing a very small portion of
25  some of the work that we did.

Page 63

1    Q   How do you know? You just told me that he wasn't
2  working for you. How do you know what he was doing?
3    A   I know who did all of this product and I know which
4  consultant we used from time to time.
5    Q   Okay. Who developed the product?
6    A   IDS.
7    Q   IDS is a company. Who is the person that developed
8  the product?
9    A   I'm sorry?
10   Q   Who is the person that developed the product?
11   MR. PRUNTY: Objection as to form; assumes facts not in
12  evidence.
13      Go ahead and answer.
14   THE WITNESS: At least 10, 15, perhaps 20 people work on
15  this product throughout the life of this product that were
16  employee of IDS.
17   BY MR. MUSHKIN:
18   Q   Every one of them was an employee of IDS?
19   A   Every single one was employee of IDS.
20   Q   You're sure about that?
21   A   I am hundred percent sure.
22   Q   Is it your testimony that Mr. Beer --
23   A   Okay. Let me make a correction.
24      IDS owns a subsidiary in India, which is named
25  IDS India and -- or Integrated Dynamic Solutions India -- and

Page 64

1  we own that company, and a lot of the work happen in India and
2  a lot of the work happen in US; so either employees of IDS or
3  IDS India.
4    Q   Isn't it true that IDS has no employees?
5    A   Absolutely not true.
6    Q   How many employees do they have?
7    A   We lease -- we process our employees through a company
8  that we own the same way that Mr. Carter is processing his
9  employee through one of his entities. So our IDS employees are
10  processed through a sister company that we own.
11   Q   Isn't it true that Mr. Beer isn't an employee of any
12  company associated with IDS or Fastran?
13   A   Mr. Beer is not an employee of IDS or Fastran and
14  never been employee of IDS or Fastran.
15   Q   He's a consultant, isn't he?
16   A   He is a consultant.
17   Q   And of the 15 or 16 people that worked on this
18  software, how many of them were consultants?
19   A   None. They're all IDS employees.
20   Q   Except Mr. Beer?
21   A   Mr. Beer didn't work on this software. Mr. Beer was
22  assigned a specific task from time to time to help us with some
23  of the things we want to do.
24   Q   Some of the software issues?
25   A   Sure.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 65

1    Q   Thank you.
2    A   Like any other consultant that we use from time to
3  time.
4    Q   And your testimony is you had no other consultants
5  work on the Cash Advance software?
6    MR. PRUNTY: Assumes facts not in evidence, but go ahead.
7    THE WITNESS: Yeah, that's difference of an opinion. We
8  hire consultant. Not just for Cash Advance, for any other
9  product that we work on, we hire consultants.
10  BY MR. MUSHKIN:
11    Q   Mr. Gashtili, my question is much easier than that.
12       You testified earlier that everyone was an employee of
13  IDS. That's not true, is it?
14    MR. PRUNTY: Misstates prior testimony.
15    MR. MUSHKIN: Some of them -- you want me to have her read
16  it back, Counsel? Because it doesn't misstate it by one word.
17    MR. PRUNTY: Let me make my objection when you're done.
18    MR. MUSHKIN: Make your objection, Counsel, but don't
19  interrupt me just to interrupt me. You got an objection, make
20  it.
21    MR. PRUNTY: I thought you were done. I apologize. Go
22  ahead. I'll make my objection.
23  BY MR. MUSHKIN:
24    Q   Mr. Gashtili, you testified that everyone was an
25  employee of IDS, and I said, "Except Mr. Beer," and then you

Page 66

1  acknowledged Mr. Beer was a consultant; and I asked you, "Is it
2  your testimony that everyone that worked on the Cash Advance
3  software was an employee?" That's the question. Your answer
4  is?
5    MR. PRUNTY: Hang on.
6       Object; misstates the record, and you are directed to
7  go ahead and answer the question.
8    THE WITNESS: Yeah. People that work on the actual
9  software, Cash Advance software, they were all IDS or IDS India
10  employees. From time to time we use outside consulting to
11  consult with us. One of those consultant -- one of those
12  consultant -- was Richard Beer. We use other consultant
13  throughout the life of the company and we consult with those as
14  well. I can give you one name in particular and that's Larry
15  Brown, which is a member of this too.
16    MR. MUSHKIN: That's right.
17    Q   So it is in fact true that nonIDS employees worked on
18  this application.
19    A   As an outside consultant. Not work on application,
20  consult with us.
21    Q   It's all software; correct? You're not building
22  hardware, are you?
23    A   We do build hard -- not building hardware, but we
24  configure hardware.
25    Q   I didn't ask you if you configured hardware. You're

Page 67

1  not building hardware; right?
2    A   No, we're not.
3    Q   You're creating software that integrates hardware
4  pieces and gets people cash; right?
5    A   Yes.
6    Q   And consultants worked on this application, didn't
7  they?
8    A   We use outside consultant on this and other product
9  that we have.
10    Q   And your testimony that every person that worked on
11  the software was an employee of IDS is false --
12    MR. PRUNTY: Objection --
13  BY MR. MUSHKIN:
14    Q   -- isn't that correct?
15    MR. PRUNTY: -- calls for a legal conclusion. To the
16  extent it requires a legal conclusion, there's an objection to
17  it.
18       You may answer the question.
19    THE WITNESS: That's your opinion, not in my opinion.
20       When I said everybody that works on this product was
21  IDS employee, I mean everybody that works on the product every
22  day and every year was IDS employee. Did we use outside
23  consultant from time to time when we needed help on something
24  that we needed help? Yes, we did.
25  ///

Page 68

1  BY MR. MUSHKIN:
2    Q   That's all I was asking. Sometimes it was employees
3  and sometimes it was outside consultants.
4    A   Not in that --
5    MR. MUSHKIN: I think it's time to break for lunch. Don't
6  you, Counsel?
7    MR. PRUNTY: Okay.
8    MR. MUSHKIN: See you guys in about an hour and 20 minutes?
9    MR. PRUNTY: Sounds good.
10       (Lunch recess taken from 11:43 a.m. to 1:20 p.m.)
11  BY MR. MUSHKIN:
12    Q   So tell me your relationship with Larry Brown.
13    MR. PRUNTY: Objection as to form.
14       Go ahead.
15    THE WITNESS: I know -- historically or at the moment? In
16  general? What --
17  BY MR. MUSHKIN:
18    Q   Let's talk about -- when did you first meet Larry
19  Brown?
20    A   Probably in early '90s when he was the CIO of ECHO,
21  E-C-H-O, and we were doing some projects for them.
22    Q   When you say "we" you mean --
23    A   IDS.
24    Q   -- IDS.
25       And did there ever come a time that Larry Brown was

Nasrollah Gashtili, Volume I

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 69

1  employed by IDS?
2     A   No.
3     Q   Did there ever come a time that Larry Brown was a
4  consultant for IDS?
5     A   Yes.
6     Q   When did that come about?
7     A   I have to go check my records throughout time that I
8  know him on multiple project, multiple occasions, multiple
9  times.
10    Q   You engaged him as a consultant?
11    A   Yes.
12    Q   When was the last time that you did that?
13    A   I'm going to be working with him as a consultant.
14    Q   On what project?
15    A   Currently on the CAS, Cash Advance software, that
16  we're maintaining support.
17    MR. PRUNTY:  I'm sorry.  Could you just repeat that again.
18  I didn't hear you.
19    THE WITNESS:  On the CAS, Cash Advance software, that we
20  have.
21  BY MR. MUSHKIN:
22    Q   When you say "we," is it your testimony that IDS
23  somehow owns Cash Advance software?
24    A   Yes.
25    Q   Does Cash Advance have any customers right now?  I'm

Page 70

1  sorry.
2     Does Fastran, Inc. -- excuse me.
3     Does IDS have any Cash Advance software customers?
4     A   Yes.
5     Q   Who are they?
6     A   At the moment ASAI.  I think that stands for Automated
7  System -- I forgot, but the company name is not ASAI but they
8  go as doing business as ASAI as well.
9     Q   Okay.  What kind of company are they?
10    A   ATM and Cash Advance provider.
11    Q   Who else?
12    A   At the moment no one else.
13    Q   How many locations does ASAI -- at how many locations
14  does ASAI use IDS Cash Advance software?
15    A   I am not sure.
16    Q   Who would know?
17    A   I probably can find that.
18    Q   Didn't ask you that, sir.  If you don't know, who
19  would know?
20    A   ASAI.
21    Q   Who else inside of IDS would know?
22    A   No one.
23    Q   No one but you?
24    A   Yes.
25    Q   And approximately how many ATMs does ASAI operate Cash

Page 71

1  Advance software on?
2     A   I don't know.  I mentioned to you I don't know that
3  answer.
4     Q   Was it one?
5     A   No.
6     Q   Is it a thousand?
7     A   No.
8     Q   Is it a hundred?
9     A   No.
10    Q   Is it ten?
11    A   Probably more.
12    Q   More than ten, less than a hundred?
13    A   I'm not sure if it's less than a hundred.
14    Q   I'm going to leave a space in the deposition.  I'll
15  ask you to fill it out and tell us how many locations ASAI
16  operates software.
17    A   And I have to consult with my attorney if I can
18  release those information to --
19    Q   You can make an objection.
20    A   -- someone.
21    Q   You can make whatever objection you want.  The number
22  of locations is, in all likelihood, not something that you can
23  assert a privilege over, but you can certainly consult your
24  attorneys.
25    A   That's something that my attorney can --

Page 72

1     (Information requested:_____
2  _____.)
3  BY MR. MUSHKIN:
4     Q   Who is LuckEcash?
5     A   LuckEcash was one of the client that Fastran, LLC --
6  Fastran Inc. and later Fastran, LLC -- worked with.
7     Q   Does IDS work with LuckEcash?
8     A   Not at the moment.
9     Q   Did IDS ever work with LuckEcash?
10    A   I don't think -- I am not hundred percent sure if we
11  did some small project for them.  I don't remember if we did.
12    Q   What's LuckEcash?
13    A   It's a company that provide Cash Advance software to
14  casinos.
15    Q   How do you come to know LuckEcash?
16    A   They brought LuckEcash in as one of the customers as
17  Fastran Inc.
18    Q   Who is "they"?
19    A   Our sales team, John Bryant.
20    Q   Are they an ISO?
21    A   Again I'm not that familiar with the term ISO to say
22  "yes" or "no."
23    Q   Well --
24    A   ISO is term that is used for multiple things in my
25  industry.

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 73

1    Q   I do notice that you used it in your letter to Bart,
2  so I guess what I better ask you is that -- if you're having a
3  hard time understanding the term ISO, then tell me what you
4  meant in Exhibit 2 at the bottom of the second paragraph.
5    A   This letter probably was drafted with the help from
6  other member of Fastran Inc. at the time, which is Larry Brown
7  and John Bryant, and they probably helped me to come up with
8  some of this; but now that I'm looking at "ATMMS" and "ISO" and
9  reading this letter, it's potentially -- I just remember it
10  could be "Independent Sales Organization," if that's correct.
11  I'm not sure.
12    Q   Sir, I'm just asking you what you meant by "ATM ISO"
13  in your letter.
14    A   As I said, this part could be drafted by other people
15  that help me to draft this letter.
16    Q   Sir, that's not responsive to my question.
17    A   So what is your question?
18    Q   What did you mean by "ATM ISO" in your letter?
19  MR. PRUNTY:  Objection as to form and --
20  BY MR. MUSHKIN:
21    Q   What did you mean --
22  MR. PRUNTY:  -- and to the extent that it misstates the
23  document and prior testimony.
24      Go ahead.
25  THE WITNESS:  Yeah.  As I told you, other people helped me

Page 74

1  to draft this letter.
2  BY MR. MUSHKIN:
3    Q   You're not listening to my question, sir.  We're going
4  to be here a long time if you don't listen to my question.
5    A   Sure.
6    Q   What did you mean by "ATM ISO" in your letter?
7    A   I think I already answer your question.
8    Q   You didn't even come close to answering my question.
9    A   I answer your question.
10  MR. PRUNTY:  Let's not argue here.
11      Objection; asked and answered.
12  MR. MUSHKIN:  Let me see if I can -- it has not been
13  answered, Counsel, and you well know it.  Now, I'm going to try
14  to do this again.
15    Q   Here's the process:  If you don't answer my question,
16  I have to certify the question, I have to take it before the
17  Court, and the Court will make you answer my question.  I'm
18  asking a real simple question and I'm not trying to badger you
19  and I'm not trying to trick you or anything like that.
20    A   And I'm not trying to answer tricky.
21    Q   You have already testified that this is a letter that
22  you sent to Bart Carter.  In your prior testimony you didn't
23  testify that anybody helped you, but not that that really
24  matters.  You're allowed to have all the help you want.  You
25  can even have that fancy girl on the phone help you.  You know,

Page 75

1  we can have automated help now.  I think that's great.  She
2  doesn't want to answer my questions, but let's not go into that
3  right now.  But what I am allowed to ask you is what you meant
4  by this.  Now I'm asking you again, and if you don't answer my
5  question -- and please take your time.  Read the whole
6  paragraph.
7      I need to know what you meant by "any additional ATM
8  ISOs as we know we have solid partners to support our deals."
9  I need to know what you meant when you used that word.
10  MR. PRUNTY:  Okay.  Objection as to the extent that it
11  misrepresented prior testimony and specifically as to whether
12  or not he wrote this, and objection as to asked and answered.
13      To the extent that you can clarify your answer and
14  give something responsive, by all means, go ahead.
15  THE WITNESS:  Yeah.  I mention to you again that other
16  people help me to draft this letter, and this specific part
17  could have been somebody else writing that we agreed that we
18  put it in here.  I could probably mount at that time that ask
19  what is ATM ISO means, but I told you, to the best of my
20  knowledge, possibly means "Independent Sales Organization."
21  And if that's not your answer, I have no other way of answering
22  your question and honestly I don't even know Independent Sales
23  Organization means.  You know, this is the term that people use
24  in this industry.
25  ///

Page 76

1  BY MR. MUSHKIN:
2    Q   I'm going to read the paragraph.  "Fastran Inc. is
3  attempting" --
4  MR. PRUNTY:  Can we have a copy for him to -- for the
5  deponent to look at.
6  THE REPORTER:  You can take them all.
7  MR. MUSHKIN:  It's 2.
8  THE WITNESS:  Okay.
9  MR. MUSHKIN:  Let's be clear.
10    Q   In this letter you're soliciting an investment from
11  Bart Carter; isn't that correct?
12  MR. PRUNTY:  Objection to the extent it calls for a legal
13  conclusion.
14  MR. MUSHKIN:  Counsel, I'm going to ask the court reporter
15  to put that objection to every one of my questions for the rest
16  of this deposition so that I can go on and not have -- not be
17  interrupted.  With all due respect, it's an inappropriate
18  objection under the circumstances of this question, but I want
19  you to have your objection preserved for every question I ask.
20  Can we agree to that?
21      I'll assume by your silence that we can agree to that.
22    Q   Now, isn't it true that in this letter to "dear Bart"
23  from "Nasrollah," you're soliciting from Bart an investment in
24  Fastran?
25    A   I'm going to repeat that -- what I said again, that

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 77

1  this letter comes from me and you see on the copy John Bryant
2  and Larry, and we put this letter together among ourselves. So
3  I was the person that sent this letter out, but I never
4  personally, as Nasrollah Gashtili, asked for Bart Carter to
5  invest. This letter going on behalf of Fastran Inc. from
6  Nasrollah Gashtili, John Bryant and Larry Brown asking Bart if
7  he's interested, not soliciting directly; and if he is
8  interested, to listen to this offer. And we had multiple
9  communication as a company with other investor, potential
10 investor, if they're interested to invest into Fastran Inc.
11    Q   Are you done?
12    A   I'm done.
13    Q   Let's go to the very first sentence. "We are excited
14 about the proposition of ATMMS becoming an investment partner
15 with Fastran." Is that what that letter says?
16    A   Yes. And with "me" I mean Fastran Inc. and --
17    Q   Sir, why don't you let me ask my questions.
18    A   Okay.
19    Q   When I ask -- this is my deposition. I get to ask
20 questions, and if you'll answer them, we'll get out of here in
21 a responsible time. If you don't, we're going to be here the
22 rest of the week.
23    A   That's fine.
24    Q   It will take forever.
25    A   All right.

Page 78

1     Q   Now, what did you mean by "We are excited about the
2  proposition of ATMMS becoming an investment partner with
3  Fastran"?
4     A   That Fastran Inc. is excited with the possibility of
5  Bart Carter becoming investor into Fastran Inc.
6     Q   So you were seeking an investment -- when I say "you,"
7  Fastran Inc. -- was seeking an investment from Bart Carter?
8     A   Yes.
9     Q   Thank you.
10       "We enjoy working with ATMMS and intend to be integral
11 in helping ATMMS to be 'first to market' in Las Vegas with
12 unique cash services and payment products from Fastran."
13       Is that correct?
14    A   Yes.
15    Q   Does it mention IDS in that sentence?
16    A   No. "We" here means Fastran Inc.
17    Q   Thank you.
18       Now, the next paragraph you've set up a goal of
19 1,250,000; is that correct?
20    A   Yes.
21    Q   The last sentence of that paragraph is, "We currently
22 have strategic agreements with ATM Merchant Systems and
23 International Merchant Systems and we don't intend to offer our
24 products to any additional ATM ISOs as we know we have solid
25 partners to support our deals."

Page 79

1        What does that sentence mean to you?
2     A   That we have agreement with ATM Merchant System and
3  with International Merchant System.
4     Q   Okay. ATMMS, that's Bart's company; right?
5     A   That's right.
6     Q   And who is IMS?
7     A   It's another company, similar to Bart Carter's
8  company, that operates out of Texas.
9     Q   "And we don't intend to offer our products to any
10 additional ATM ISOs." What do you mean by "ATM ISOs"?
11    A   Again I assume it's "ATM" -- which is Automated Teller
12 Machine -- "Independent Sales Organization."
13    Q   Okay. You do not -- in your -- in the way you're
14 using this word, is an ISO a processor?
15    A   No.
16    Q   Who would the processor be with ATMMS?
17    A   An electronic clearinghouse.
18    Q   Who would the processor be with International Merchant
19 Systems Services?
20    A   Again our processor, whoever -- Fastran Inc.
21 processor, which is ECHO.
22    Q   Was Fastran using ECHO?
23    A   Through us.
24    Q   Always?
25    A   Through Fastran Inc.

Page 80

1        ECHO and then another processor called CDS; so two
2  separate processors that we process transaction with.
3     Q   Tell me what the processor does.
4     A   Take the request from us, goes to authorized bank or
5  Visa or MasterCard, American Express, get their approval and
6  comes back to us and say "approved" or "declined"; and we'll
7  take their approval and decline as a final answer that this
8  transaction is approved and then Fastran Inc. would tell the
9  casino that "This transaction is approved. You can give the
10 money to the client." So the processor actually takes the
11 request from Fastran Inc. on a cash advance, goes to the
12 appropriate bank or organization that is going to approve that
13 transaction, approves it or declines it, and comes back to us
14 with the result.
15    Q   I'm going to try and say it a little shorter, see if
16 this is what I understand.
17    A   Okay.
18    Q   The processor transmits information, first out to the
19 financial institution, whoever the customer banks with, and
20 then back to the casino or 7-Eleven or whatever the site --
21 wherever the transaction is taking place and either approves or
22 disapproves the transaction; is that correct?
23    A   Not quite. Processor takes and requests from Fastran
24 Inc., not from the casino, from Fastran Inc.
25    Q   Respectfully, I have to disagree with that.

Nasrollah Gashtili, Volume I                      JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 81

1    A   Okay.
2    Q   Fastran Inc. provides software; correct?
3    A   Okay.
4    Q   The information comes from the customer; correct?
5    A   We collect those information.  That information is
6    collected through Fastran Inc. hardware and software that run
7    at the client location.
8    Q   That part I agree with, but we're not quite on the
9    same page, okay?
10       Fastran Inc., in its dealings with ATMMS, did not own
11   an ATM machine, did they?
12   A   No.
13   Q   And Fastran Inc., in their dealings with ATMMS, did
14   not own a business that housed an ATM, did they?
15   A   No.
16   Q   And Fastran Inc., in their dealings with ATMMS, did
17   not sign up a business to put an ATM machine in it, did they?
18   A   No.
19   Q   So what you have, as I understand it, is a series of
20   customers from either ATMMS or, in the case of this letter,
21   IMS, that Fastran Inc. provided, perhaps hardware, but more
22   importantly software, to facilitate the transactions; is that
23   correct?
24   A   Yes.
25   Q   So that when a customer walks into a business that is

Page 82

1    under contract to ATMMS -- now we'll pick a casino -- and says,
2    "I want a hundred dollars.  Here's my Visa," the business, the
3    casino, takes the Visa, runs the Visa through a piece of
4    hardware -- there are several types, ATMs, cage, you know --
5    right?
6    A   Yeah.
7    Q   And then Fastran, through the use of electronic
8    transmission of information, I believe telephone lines --
9    A   In some cases.  In some cases --
10   Q   Well, ATMs use telephone lines I think; right?
11   A   In some cases.  Not always.
12   Q   I know there's a lot of ways to do it.
13   A   No, but I mean some of the ATMs in the casinos are
14   different type of --
15   Q   Different methods?  Okay.  But the point is that
16   there's now -- the card has been run.  Certain information is
17   put into the hardware.  It is then sent off to a financial
18   institution.
19   A   Not -- let me put one, insert one.
20   Q   Okay.
21   A   Those information goes from those devices at the
22   casino's location to the Fastran-run-and-operated-and-owned
23   data center.
24   Q   To the servers?
25   A   To our servers, to Fastran Inc.'s servers.

Page 83

1    Q   Right.  In fact the servers are the subject matter of
2    this lawsuit at this point, aren't they?
3    A   I have to review.
4    Q   You don't recall a motion hearing that was held on
5    that subject?
6    A   I remember that, yes.
7    Q   Ah, yes, okay.
8        So and then from those servers, that information is
9    then transmitted either on the Web or on a phone line to a
10   clearinghouse, yes?
11   A   Yes.
12   Q   That will then tell you whether or not that customer
13   has the money in their account to allow you to distribute that
14   money to them; right?
15   A   Either the money in their account or credit provided.
16   Q   Thank you.  Absolutely correct.
17       If it's a debit card, they got to have the money in.
18   If it's a credit card, they have to have the ability to borrow
19   that money.
20   A   That's right.
21   Q   And then that information is transmitted back?
22   A   Yeah.
23   Q   In this case, the example we're using, it goes back
24   through the same servers, back through that same piece of
25   hardware.  If I remember how it works, a little approval number

Page 84

1    comes up if they're using the -- what I call the old style.
2    A   Well, we have the printer that we actually print the
3    receipt for the customers to sign.
4    Q   Right.  You get an approval number or a receipt.  Now
5    the business can hand that cash and complete the cash advance;
6    is that correct?
7    A   Absolutely.
8    Q   Okay.  Now, and in your testimony you talked about
9    multiple ways to deliver that cash and I want to make sure we
10   have that clear.  It could be an ATM machine?
11   A   Okay.
12   Q   It could be just a standard credit card machine,
13   correct, and the cage has the money and they run the credit
14   card and give the money; right?
15   A   It's a computer that runs Fastran Inc. software on it
16   or, better yet, explaining, it's a computer that connects to
17   the Fastran servers, because this is a Web-based application,
18   and through the Fastran Web servers you view these pages that
19   you can enter the information on, get the approval -- or send
20   it for approval.
21   Q   So it's actually done from a standard computer?
22   A   That's one way of doing it, yes, and the other way, as
23   you mentioned, is ATM or through the TITO machine.
24   Q   Yeah, the TITO.  That's a fancy name for another --
25   for a credit card machine; right?

Nasrollah Gashtili, Volume I

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 85

1    A   No.  Actually, those TITO machine does a lot -- they
2    do a lot more, including, you know, cashing the tickets for the
3    casino's players and also they do exchange -- break the bills.
4    They do multiple functionality.
5    Q   The reason I described it the way I did, if you will,
6    is I -- right over here on the corner is the best car wash in
7    town.  I go there very often; and when you run the credit card
8    through the machine, it makes a couple of squeaks and belches
9    and the cash drawer opens.
10   A   Yeah.
11   Q   Yeah, because that little box is integrated into the
12   cash register.  It's all talking to one another.  That's why I
13   said what I did about the TITO.  It's just a fancy -- you know,
14   it's an in-house system, much like that car wash, where you
15   can -- you know, and instead of a credit card, they actually
16   have their little membership card, right, ticket-in/ticket-out,
17   debits and credits?
18   A   And a lot more.  I mean I don't want to --
19   Q   I'm sure it is.
20   A   You can use your player card.  You can use your ATM
21   card, your credit card, many different things.
22   Q   So really what you're describing now is the way that
23   these various methods of payment and transmission have
24   integrated; is that correct?  Because in the old days, boy, you
25   could -- if you had a Riggs Bank card, you had to go to a Riggs

Page 86

1    Bank ATM or you couldn't get money.  Then eventually they had
2    Cirrus and this one and that one and now you could put whatever
3    you want in any of these machines.  Now, they charge you a
4    little more, but you can get money from all of them.  If I have
5    a Bank of America card, I can go to a Wells Fargo machine;
6    correct?
7    A   That's true.
8    Q   And that's because all of these things are now able to
9    communicate with one another; is that correct?
10   A   Yes.
11   Q   Okay.  Now, does Fastran Inc. do any business today?
12   A   No.
13   Q   And does Fastran, LLC do any business today?
14   A   No.
15   Q   What happened to the business --
16   A   Not to the best of my knowledge.
17   Q   Well, what happened to Fastran, LLC?
18   A   It's parked.  I don't know.  I didn't take any legal
19   action on that.  I'm assuming Bart didn't and Larry didn't and
20   the company is just -- I'm assuming it's still open.  I'm not
21   even sure it's still open or not.
22   Q   Does IDS do business with LuckEcash?
23   A   No.
24   Q   IDS is marketing Cash Advance System; is that correct?
25   A   Not actively, but we can any time that we want.

Page 87

1    Q   And you have this one customer, ASAI?
2    A   Yes.
3    Q   Is that the only product that IDS has today?
4    A   No, they have other products.
5    Q   What other products does IDS have?  I'm not asking you
6    for source codes.  I'm just asking you to describe your
7    products.
8        MR. PRUNTY:  I'll object to -- maybe this can help you.
9        I'll object before we get into the intimate details of
10   your customers and things like that, but in general, go ahead
11   and answer his questions, the types of products.
12       THE WITNESS:  We have multiple product.  We have, for
13   example, electronic medical-record product.
14   BY MR. MUSHKIN:
15   Q   Is that an information system --
16   A   Yeah.
17   Q   -- a search system?
18   A   To keep track of patient records for doctors, for
19   hospitals.
20   Q   Retrieval information system?
21   A   I don't think that's the accurate term.  Retrieval is
22   only when you retrieve information.  We actually collect and
23   retrieve and report and do a lot of other things, research
24   and --
25   Q   Database management?

Page 88

1    A   That's not the right term either.
2    Q   Then you tell me what the term is.
3    A   It's a software that doctors' office use to, you know,
4    do everything from making appointment and registering their
5    patient to making the exams and --
6    Q   Office-management software, is that what you're
7    talking about?
8    A   It's called -- and it's pretty standard term in the
9    industry -- "electronic medical record" because it's used for
10   keeping track of medical record of patient electronically.
11   Q   What other products?
12   A   We do have an emergency-room management software that
13   helps hospital to manage their emergency services.  We might
14   have couple of other products that we're not actively using
15   right now and they're on the shelf and I don't remember.
16   Q   Who else would know what other products IDS has?
17   A   I probably know better than anybody else.  I'm saying
18   for the record there might be other product that I don't
19   remember right now, but we're --
20   Q   We'll leave a space in your deposition.  If you can
21   remember any other products, you'll write them down for us?
22   A   Okay.
23   (Information requested:_____
24   _____
25   _____.)

Page 89

BY MR. MUSHKIN:

1  Q  Since 1995, are these the only three products that you
3  can recall: Cash Advance, electronic medical records, and
4  emergency room management?
5  A  No. We have other products. We did develop other
6  products that were used from one time to other and they might
7  not be in use anymore. We also have a product that we built
8  for recruiting companies called Trinity that helps recruiting
9  companies to -- staffing agencies and recruiting companies --
10  to do their business, day-to-day business. I could easily
11  remember a few more, but I don't remember anything off top of
12  my head now.
13  Q  Now, I'm assuming that the rest of the work that IDS
14  did over all these years was work that was done in-house for
15  somebody else so that the product became the person that hired
16  you; is that correct?
17  A  We did some work like that.
18  Q  You described it earlier.
19  A  Yes, based on each contract independently with each of
20  our client.
21  Q  How much money does -- how much revenue does IDS
22  generate in a year; for instance, in 2011?
23  MR. PRUNTY:  Is IDS a party to this case?
24  MR. MUSHKIN:  No. He is the sole owner of IDS and he's
25  claiming that IDS owns the asset that we claim is owned by

Page 90

1  Fastran, and so my expectation is that this will -- this
2  clearly is going to lead -- is either discoverable or lead to
3  discoverable information. The tracking of revenue of this Cash
4  Advance is clearly subject matter of this case. So I'm going
5  to ask him first what does IDS do just in general terms, then I
6  want to know how much of that is Cash Advance revenue.
7  THE WITNESS:  I am -- I mean I'm going to rely on my
8  attorneys to say something here, but honestly, I don't feel
9  like I have to release those information to Bart Carter.
10  BY MR. MUSHKIN:
11  Q  I want you to know that this will be the subject of
12  not only a motion but of sanctions, so I'm going to ask you
13  again and then, if you don't answer, I'm going to certify the
14  question and we'll go to the judge. You're the hundred percent
15  owner of this company and our belief is you've used this as a
16  shield.
17  So I want to know first how much revenue does IDS
18  generate annually. I don't need to know to the penny, but I
19  mean I want an idea. Is it a hundred thousand a year? Is it a
20  million a year? Is it 5 million a year?
21  MR. PRUNTY:  And I'm going to object to this line of
22  questioning until the confidentiality order is in place.
23  They're direct competitors and I believe this information is
24  such that it could be used to competitive disadvantage.
25  ///

Page 91

BY MR. MUSHKIN:

1  Q  Now you can answer the question.
3  MR. PRUNTY:  So now that --
4  MR. MUSHKIN:  I've signed the protective order, Counsel.
5  You're the one that hasn't signed it.
6  MR. PRUNTY:  There is no protective order that's in place
7  because there hasn't been one signed by the judge; and as we
8  discussed, not being the primary person on this case -- we can
9  have that turned around within a day, but the person who
10  negotiated that agreement has to be the one that signs the
11  agreement.
12  MR. MUSHKIN:  The amount of volume, gross volume, that's
13  done by a business is not something that is subject to trade
14  secret or competitive advantage, respectfully. I'm not asking
15  him who his customers are. I'm going to ask him two questions:
16  One, "What's your gross revenue?" If he chooses not to answer
17  It, I'm going to certify the question and go to discovery -- go
18  to the judge on this one. You know what Denton is going to do.
19  He's going to tell him to answer the question. Then the next
20  question is going to be, "How much revenue are you generating
21  off of Cash Advance Systems"?
22  THE WITNESS:  Yeah. I can answer the first -- I mean are
23  you talking about 2011, you're saying?
24  BY MR. MUSHKIN:
25  Q  Yeah. I'm not trying to --

Page 92

1  A  I don't have those numbers yet, but I can say
2  somewhere over a million, below 2 million.
3  Q  Thanks. I'm not looking to be terribly invasive.
4  Now, of that number, what percentage of that is
5  revenue from Cash Advance Systems?
6  A  That's the part that I don't like to answer. If I
7  answer, I like to have -- to that part to be shield from Bart
8  Carter.
9  Q  Yeah. Well, I'm not going to agree to that, sir,
10  because that's the subject matter of this lawsuit and I don't
11  think you have a right to that.
12  A  Can I ask how much Bart Carter is making on his
13  business.
14  Q  Sure. Put him under oath. Ask him.
15  A  Okay.
16  Q  If you have an affirmative claim, you might be able to
17  do that, but you don't have an affirmative claim and Bart
18  Carter didn't steal money from an account.
19  A  Is that a question?
20  Q  No. That's an assertion in our lawsuit, sir, and the
21  last time --
22  MR. PRUNTY:  Let's stop the arguing.
23  MR. MUSHKIN:  May I finish?
24  Q  Your attorney asked me that question last time and I
25  answered it that way.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 93

1    A   For the record --
2    MR. PRUNTY: This isn't an arguing session.  He has the
3    right to ask questions.  I have the right to object.  If I
4    direct you to answer; you should answer.  My answer is, since
5    you're refusing to shield the information, we will respond to
6    it --
7    MR. MUSHKIN: Shield what information?
8    MR. PRUNTY: -- we will respond to that question once there
9    is a protective order in place.
10   MR. MUSHKIN: What information are you talking about,
11   Counsel?
12   MR. PRUNTY: The amount of money that he's making off of
13   something in direct competition with your client.
14   MR. PRUNTY: I just told him he can ask him -- put my
15   client under oath and he can ask him whatever questions he
16   wants.  I don't know what you're talking about.
17   MR. PRUNTY: Well, what I'm talking about --
18   MR. MUSHKIN: This isn't a deposition for Mr. Gashtili to
19   ask questions, as you've already said.  It's a deposition for
20   me to ask questions.
21   MR. PRUNTY: Right, and I'm objecting to it until we have
22   that protective order in place, in which case we'll respond
23   appropriately.
24   BY MR. MUSHKIN:
25   Q   We'll leave a blank in the deposition and ask you how

Page 94

1    much you are generating from Cash Advance Systems, okay?
2        (Information requested:_____
3    _____.)
4    THE WITNESS: I'd be glad to answer that as long as I know
5    it's not going to hurt me by giving that information to my
6    competitors.
7    BY MR. MUSHKIN:
8    Q   Well, the --
9    A   I mean I'm in business here, Mike, and I don't want --
10   Q   I don't want to engage in any further conversation on
11   this subject, sir, because I'll put on the record that every
12   dime that you make on Cash Advance Systems is being stolen from
13   the rightful owner of the software.
14   MR. PRUNTY: And I obviously object to that because I think
15   it's a complete misrepresentation of the facts, including the
16   fact that my client owns the software.
17   MR. MUSHKIN: We've asked your client to produce the
18   license.  We've asked him to produce any document that shows
19   ownership.
20   MR. PRUNTY: This isn't an argument.  I'm not here to argue
21   with you.
22   MR. MUSHKIN: Then what are you messing up my record for?
23   MR. PRUNTY: Then let's just --
24   MR. MUSHKIN: You want to put something on the record,
25   Counsel, I'm going to respond to it; and I'll respond to it --

Page 95

1    MR. PRUNTY: Feel free.
2    MR. MUSHKIN: -- by saying very clearly that I've already
3    introduced documents created by your client, put them in the
4    record, that says "Fastran Inc., our product."  I think your
5    client is frankly not being honest and I think he will be
6    subject to appropriate remedies from the Court and we'll get
7    there very quickly as soon as this deposition is concluded.
8    Q   Now --
9    MR. PRUNTY: Obviously --
10   BY MR. MUSHKIN:
11   Q   -- did you have bank accounts at Fastran Inc.?
12   A   Can you clarify that question, "Did you have bank
13   account at Fastran Inc."  What does that mean, like --
14   Q   Who signed the checks for Fastran Inc.?
15   A   Two signers were on Fastran Inc.
16   Q   Who were they?
17   A   Me and Larry Brown.
18   Q   And how many bank accounts did Fastran Inc. have?
19   A   Two, and then one of the banks changed, went to a
20   different bank; so in theory three different bank account, but
21   one of them was the bank of an out of business and somebody has
22   to take over it.
23   THE REPORTER: I'm sorry.  What was the end of that?
24   THE WITNESS: The bank that we originally were processing
25   with went out of business during that banking crisis and

Page 96

1    somebody else took over their assets.  So our account moved
2    from one bank account to another.
3        (Plaintiff's Exhibit 5 was marked for identification
4    by the Certified Court Reporter and is attached hereto.)
5    BY MR. MUSHKIN:
6    Q   I've shown you what's been marked as Exhibit 5.  Can
7    you tell me, do you know this address, one -- 31194 La Baya
8    Drive, Suite 206, Westlake Village, California?
9    A   That's -- yes, I do.
10   Q   Whose address is that?
11   A   That's the address that we assign to Fastran Inc.
12   Q   I'm sorry?
13   A   That's the address that we assign to Fastran Inc.
14   because Fastran Inc. was running their business out of the --
15   Q   Who?
16   A   I own that place personally.
17   Q   Is this a home?
18   A   No.  It's a business.
19   Q   Is this the address of IDS?
20   A   No.
21   Q   What business operates out of 31194 La Baya Drive,
22   Suite 206?
23   A   It used to be Fastran Inc.
24   Q   Who operates out of there today?
25   A   I own that building and I operate out of that building

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 97

1   now.

2       Q   How does IDS operate out of that building?

3       A   We operate out of a different suite number. It's

4   completely physically separate suite number, Suite 203.

5       Q   If I were to go to this address right now, what would

6   be in Suite 206?

7       A   IDS operation now.

8       Q   So IDS operate out of 206?

9       A   Today.

10      Q   And how long has IDS operated out of Suite 206?

11      A   We purchase that building in 2005 and we own that

12  building since 2005. At some point I allow Fastran Inc. to

13  operate out of one of my suites in that building.

14      Q   Did Fastran Inc. pay rent?

15      A   They supposed to, but they never did. That was

16  another negotiation that stayed open and never closed. We

17  never sign any agreement or anything, but we were negotiating

18  on how much Fastran Inc. has to pay. Obviously everybody knows

19  that they going to pay later when they have the money to pay.

20      Q   Did Fastran, LLC ever operate out of the Westlake

21  Village address?

22      A   No. Fastran, LLC always has the Nevada address.

23      Q   Okay. So tell me what this bank account is.

24      A   It's First Regional Bank. It's the bank account that

25  Fastran Inc. operate out of, one of the bank account.

Page 98

1       Q   What was the use of this bank account?

2       A   That the funds, all of the funds that -- the face

3   value of the card, the fees, regardless of whose that fees

4   belong to, was coming to this account and then we distribute

5   money out of this bank account to other.

6       Q   Who is "we"?

7       A   Fastran Inc.

8       Q   Who inside of Fastran Inc. distributed the money?

9       A   At time me and at time Larry Brown.

10      Q   Anybody else?

11      A   I authorize one of the Bart Carter's employees to ACH

12  money out of that under one condition: That I be notified

13  every time, every night before he transfer the ACH, with an

14  E-mail to me that where is the ACH going, and I approve that

15  before he actually does the ACH.

16      Q   What does ACH stand for?

17      A   I'm sorry, I don't remember, but you know what is ACH

18  and I know what is ACH.

19      Q   Are you talking about "automated clearinghouse"?

20      A   I'm not sure if that's the term for it, but that's --

21  we have the access to the bank account that we could go in and

22  log in and authorize transaction out of that account to any

23  account that we want, something similar to wire transfer.

24  Technically it's not a wire transfer but something similar to

25  that.

Page 99

1       Q   So it's an automated check, in other words?

2       A   That is actually true. On this case ECHO -- let me

3   actually correct myself. Now I remember that.

4           We didn't actually log into the bank account to send

5   the money out. We log into a facility that ECHO provided to

6   us, and from Echo's Web site we authorized transfer out of this

7   account to our client account, to -- not Fastran Inc. client

8   account -- to the casino's account.

9       Q   Let me understand.

10          So all the money that came into this account did not

11  belong to Fastran Inc. Is that what you're telling me?

12      A   Not all of it.

13      Q   Some of it belonged -- I think we talked about this.

14      A   Yes.

15      Q   It has to get split up; right?

16      A   Yes.

17      Q   Tell me who gets part of each of the deposits.

18  MR. PRUNTY:  Same continuing objection we noted before.

19          Go ahead.

20  THE WITNESS:  Casino is actually receiving the face value

21  of the transaction. So you give an example that if you go to

22  casino and ask for a hundred dollars --

23  BY MR. MUSHKIN:

24      Q   They give you 96.

25      A   No. They give you a hundred, but they charge your

Page 100

1   card $107.

2       Q   Okay. Same difference.

3       A   So the face value, when I mention face value, I mean

4   the hundred dollars. So that's the money you're actually

5   getting, hundred dollars, and that's the money that casino took

6   out of their drawer and give it to the customers. That money

7   is going to the casino's account based on account number that

8   we received either directly from the casino or from our

9   customers.

10      Q   The cardholder; right? The cardholder is going to pay

11  that hundred to the bank -- to the casino?

12      A   Yes, and that money from this account, First

13  Regional --

14      Q   The $7.

15      A   Not the $7, the $100 would go directly from this

16  account to the casino's account.

17      Q   It comes from the customer's account?

18      A   Uh-huh.

19      Q   And from the customer's account $107 comes, in our

20  example?

21      A   Yeah, but you have to remember that we don't get like

22  $100 from this customer. We get a sum of $10,000.

23      Q   No, no. I'm just going to do one. I understand that;

24  right?

25      A   Yeah.

Nasrollah Gashtili, Volume I                     JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 101

1   Q   But on this one transaction, $107 is going to come
2   into this account.
3   A   Not quite. Let's say $105, $104.
4   Q   No. We made it up. We picked the number. You said
5   107.
6   A   I'm saying, out of that 7, ECHO and the Visa and
7   MasterCard and our processor keep their shares. So they don't
8   deposit the entire 107 in here; they deposit, just for sake of
9   number -- and I'm not sure how much -- let's say $104.50.
10   Q   No problem. I appreciate that because that's the
11   whole purpose of the question, is to shave away each of the
12   pieces, how each of the players get a piece of this.
13       So the cage gives the guy a hundred bucks. The
14   electronic transaction takes place. The credit card company
15   keeps a buck and a half or two and a half bucks, the bank or
16   this or that. Now a 104 and a half hit this bank account.
17   A   For sake of argument, yes.
18   Q   A hundred immediately goes to the casino?
19   A   "Immediately" means a matter of few days.
20   Q   As soon as it clears?
21   A   Yes.
22   Q   Now you're left with four and a half dollars?
23   A   Yes.
24   Q   That doesn't all belong to Fastran Inc., does it?
25   A   It does not.

Page 102

1   Q   Who gets the four and a half dollars?
2   A   Based on the agreement that we had with, for example,
3   Bart Carter's company or other companies, we -- they would tell
4   us that -- how much they promised them; out of this four
5   and a half dollars, how much they promised they're going to
6   give to the casinos. Let's say they tell us that, based on
7   their contract with the casino, they have to give $3 to the
8   casinos. So at the end of the month they would send us a
9   statement and said, "For this casino A, all those fees that we
10   have promised them comes up to $5,000."
11   Q   Okay.
12   A   So we would make another transfer out of this account
13   to that casino's account for $5,000, I think. I wasn't doing
14   those transfer personally or calculation, but I'm not sure if
15   that amount would go to Bart Carter's account and then to the
16   casinos or directly to casinos. I think it was going directly
17   to the casino.
18   Q   And then whatever is left after all of those -- after
19   that contract, that's what belongs to Fastran Inc.; right?
20   A   Not quite. That will belong to Fastran and ATMMS.
21   Q   No, no. I said after ATMMS gets theirs.
22   A   No. ATMMS never got their money yet. That money that
23   I was talking about go directly to the casinos. It was their
24   share of the cut.
25   Q   I understand that, but now I'm trying to go farther.

Page 103

1   I'm trying to get to the end.
2   A   Okay.
3   Q   I'm trying to use up all of my $107, okay? So we
4   start out with 107. The bank took 2 and a half. We got 104
5   and a half. The casino got 100.
6   A   Yes.
7   Q   We're left with 4 and a half.
8   A   Yes.
9   Q   Now, there are only three people that participate in
10   that 4 and a half dollars; correct?
11   A   Yes.
12   Q   Whoever had the location --
13   A   Yes.
14   Q   -- and in our example we've used ATMMS.
15       The casino itself -- because ATMMS signed up the
16   location -- the casino itself, and Fastran Inc.?
17   A   That's correct.
18   Q   Okay. What document governs that relationship?
19   MR. PRUNTY: Form of the question. Be specific as to the
20   "relationship."
21   THE WITNESS: I don't understand the question.
22   MR. MUSHKIN: No problem.
23   Q   What document governs the relationship between Fastran
24   Inc. and ATMMS?
25   A   Contract.

Page 104

1   Q   I'm going to show you what's going to be marked as 6.
2       (Plaintiff's Exhibit 6 was marked for identification
3   by the Certified Court Reporter and is attached hereto.)
4   BY MR. MUSHKIN:
5   Q   Is that the Service Agreement?
6   A   I think so, and I see the signature of John Bryant and
7   Bart Carter on bottom of it, yes.
8   Q   Well, you produced this, so I want to -- take your
9   time and take a look at it. I want to make sure this is a true
10   and correct copy of the agreement.
11   A   I mean every page is initiated with both of them, so
12   I'm assuming that this is.
13   Q   Sir, I don't want you to assume. I want you to take a
14   look at the document and make sure that it is a true and
15   correct copy of a Fastran Service Agreement.
16   A   I'm sorry. In what way I can make that except looking
17   at the signatures and initial and say, "Yes, I know the
18   signature and initial and I know the signature and initial, so
19   I'm assuming this is the document that was signed with Bart
20   Carter -- between Bart Carter and John Bryant on behalf of
21   Fastran Inc."? I don't know what else.
22   Q   Well, lawyers don't like the word "assume."
23   A   Okay. Let me take the "assume" off.
24   Q   Let me finish.
25       One of the things that we're asking for today is your

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 105

1  personal knowledge. That's why lawyers hear that word "assume"
2  and they -- 'cause that's an equivocation.
3      A  Yes.
4      Q  I want unequivocal answers. So you can say "I don't
5  know" or you can say "yes" or "no," because the question is do
6  you believe this is a true and correct copy of the Service
7  Agreement between ATMMS and Fastran?
8      A  Yes.
9      Q  Thank you.
10         I want you to take a minute and take a look at this,
11  will you. This says that -- at Article 4 it sets forth a
12  license and services fee; is that correct?
13      A  Okay.
14      Q  It references Exhibit B and there is an Exhibit B.
15      A  Uh-huh.
16      Q  Do you see that?
17      A  Yes.
18      Q  Is there anywhere in here, this document, that says
19  that the license is for software that is not owned by Fastran
20  Inc.?
21      A  You want me to read the entire page?
22      Q  You can read the whole agreement if you need to, sir.
23      A  Are we talking about Exhibit B or are we talking about
24  the entire document?
25      Q  No. We're talking about the entire document.

Page 106

1      A  I have to read it again because -- I mean I know this
2  document, but I don't remember every word in it, so --
3      Q  Well, this is pretty important. I'd take a real hard
4  look at it.
5      A  So the question is if any part of this argument -- in
6  this document, what it says?
7      Q  Right. Is there ever a place in this document where
8  it says that Fastran is not the owner of the software?
9      MR. PRUNTY: My continuing objection stays in place.
10     THE WITNESS: I mean I understand you can ask any question;
11  I have to answer any question. I answer your question.
12         I'm not going to read the entire document. I'm going
13  to say no probably; nowhere in this document it says that
14  Fastran does not own the software. Fastran Inc. does not own
15  the software, but I don't understand the relative.
16  BY MR. MUSHKIN:
17     Q  I'd like to turn your attention to Exhibit A. Under
18  the definitions in Article 1 it says,"'Fastran services' means
19  the services identified in Exhibit A or any future addenda to
20  Exhibit A and associated equipment provided by Fastran to ATMMS
21  and in turn by ATMMS to its customers."
22     MR. PRUNTY: Where is that?
23     MR. MUSHKIN: It's "Definitions." It says "Fastran
24  services" at (c) and then it goes to Exhibit A, "Product
25  Selection."

Page 107

1      Q  Could you turn to Exhibit A.
2      A  I am at Exhibit A.
3      Q  Okay. Is there anything in here that would lead
4  someone to believe that the products aren't those of Fastran?
5      A  Obviously I'm not an attorney and somebody else that
6  is attorney have to review this contract. I did not draft this
7  contract. I did not negotiate it. We had Magnus Rhyu and John
8  Bryant consulting with our attorneys and drafting this contract
9  perhaps and they negotiated with Bart Carter. So I was not
10  involved in drafting, signing or negotiating this contract,
11  one. Two is I'm not an attorney and I can't really give you my
12  opinion, but I can say one thing. There probably is a reason
13  that in the first page, when you mention, it said "services";
14  so Fastran provided services.
15     Q  Yeah. It actually talks about a license too.
16     A  Yeah.
17     Q  So Fastran granted a license, "license and service
18  fees," 4.1. My client paid $37,500 for it. Is there anywhere
19  in this document -- is there anything in this document that
20  says that Fastran doesn't own the software they're providing my
21  client?
22     A  I already answered that question and say perhaps no.
23     Q  Thank you.
24         And is there a -- is there any document in existence
25  that creates a license between Fastran and IDS?

Page 108

1      A  We never finalized that agreement like any other
2  agreement that we tried and we never finalized.
3      MR. PRUNTY: My continuing objection continues.
4  BY MR. MUSHKIN:
5      Q  Let's go back to Exhibit 5 for a minute.
6      A  Okay.
7      Q  Starting with page 1525, these are a series of
8  deposits into the account; is that correct?
9      A  Yes.
10     Q  Do you know where these deposits come from?
11     A  Probably from ECHO. Yeah, they're all saying ECHO.
12     Q  Look at the one under 12-4.
13     A  Okay.
14     Q  It says "Fastran Inc., $1." Do you know what that one
15  is?
16     A  No, I don't.
17     Q  I don't either.
18     A  I mean we were running some test transaction from time
19  to time. It's possible that was one of the test transaction we
20  run.
21     Q  I just don't know.
22     A  If it's a $1, most likely it's a test that we were
23  running.
24     Q  Then the rest of these seem to be from various credit
25  card companies. Just to go at 12-4, settlement Discover

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

| Page 109 | Page 111 |
|---|---|
| 1  Network; 12-4, settlement American Express. | 1  Q.  Okay.  12-4, the next page, "month bill ECHO." |
| 2     A.  Yeah.  You can probably notice here American Express | 2     A.  That's their monthly billing that they bill us for. |
| 3  and Discover deposit the money separately to our account. | 3     Q.  Why would there be a second one? |
| 4  Everybody else combine from ECHO like Visa, MasterCard. | 4     A.  If we had multiple accounts with them. |
| 5     Q.  Visa and MasterCard are combined and the others are | 5     Q.  And there's a third one. |
| 6  separate? | 6     A.  Yeah.  We probably had four account with them at some |
| 7     A.  Yeah. | 7  point and four were active. |
| 8     Q.  These are just -- day after day, transaction after | 8     Q.  Do you know why one would be -- they'd be different |
| 9  transaction, these are Cash Advance transactions that take | 9  amounts? |
| 10  place in various locations; is that correct? | 10     A.  Based on how much transaction we process on those |
| 11     A.  Combined.  In one of these items could be for multiple | 11  accounts. |
| 12  locations, not each from one location. | 12     Q.  And then the next one on 12-4 is Fastran Inc., |
| 13     Q.  And multiple transactions at multiple locations; | 13  23,630.96. |
| 14  correct? | 14     A.  That's probably the money we sent out on that date to |
| 15     A.  Yes. | 15  the casinos possibly.  I'm not sure.  You have to know that I |
| 16     Q.  Okay.  Now let's go a little farther.  This is the | 16  can't really speak on every single one of these transaction.  I |
| 17  part that I always look at in the account where my wife has | 17  just can tell you what it appears to be. |
| 18  taken the money out.  You see all the deposits coming in. | 18     Q.  Who would know better than you? |
| 19  That's one thing, but then if you go to 1554, we start with the | 19     A.  Whoever did actually these transactions, which at the |
| 20  negatives.  Those are monies that are being drawn out; right? | 20  beginning -- we hire an outside consultant.  At the beginning, |
| 21     MR. PRUNTY:  And just for the record here, I think we've | 21  one of our Fastran Inc. employee was doing that.  Her name was |
| 22  skipped into another month, but -- | 22  Touria Dudo.  When she left -- and "Touria" is T-o-u-r-i-a, |
| 23     MR. MUSHKIN:  Well, maybe.  I don't know. | 23  something like that, and her last name was Dudo, D-u-d-o I |
| 24     MR. PRUNTY:  We have. | 24  think.  I'm not a hundred percent on the spelling.  When she |
| 25     MR. MUSHKIN:  It is a series of months, isn't it? | 25  left the company, we hired an outside consultant to do that |

| Page 110 | Page 112 |
|---|---|
| 1     MR. PRUNTY:  Yeah. | 1  daily calculation and transaction for us on the name Dave |
| 2     MR. MUSHKIN:  I apologize. | 2  Stueve; and then when we start working with Bart, Bart actually |
| 3     Q.  So I'm going to go back to the month that we started, | 3  had one of his employees to do that and Dave actually trained |
| 4  which was 12-31-07, and I'm going to -- | 4  and transfer everything to Bart's employee to do these daily |
| 5     MR. PRUNTY:  Probably 1531 you want to look at. | 5  activities. |
| 6     MR. MUSHKIN:  Thank you. | 6     Q.  There came a time that you went and got some counter |
| 7     Q.  Okay.  So now we finish with the -- and this appears | 7  checks from this account. |
| 8  to be the statement that begins on 12-3 and goes to 12-31 and | 8     A.  I did withdraw money from this account before. |
| 9  that is of '07; correct? | 9     Q.  Why? |
| 10     A.  That's right. | 10     A.  We needed some operating cash to operate the business |
| 11     Q.  Okay.  So now we start with the withdrawals. | 11  of Fastran Inc., and some of the money in this account was the |
| 12     A.  I don't think those are still withdrawals.  I don't | 12  money that belonged to Fastran Inc. and I had to withdraw some |
| 13  see any negative in front of them. | 13  money to operate the daily activities of the company. |
| 14     Q.  You're right. | 14     Q.  But you didn't put the money in Fastran Inc., did you? |
| 15     A.  You know, I'm not sure. | 15     A.  Sometime I did.  Sometime I paid directly out of this |
| 16     MR. PRUNTY:  It says "checks." | 16  account to the Fastran vendors or creditors. |
| 17     MR. MUSHKIN:  I know it does. | 17     Q.  You took four counter checks and withdrew money out of |
| 18     THE WITNESS:  It's possible.  Maybe they didn't put | 18  this account, didn't you? |
| 19  negative at that point.  They just separated with a line, so -- | 19     A.  Probably more. |
| 20  BY MR. MUSHKIN: | 20     Q.  Why -- first of all, where is the check register? |
| 21     Q.  So the first one says, "settlement Discover Network." | 21     A.  What do you mean where there is a check register? |
| 22  Would Discover take back money that it had previously sent? | 22     Q.  The register, the ledger that shows the deposits that |
| 23     A.  Possible for multiple reason and then they were | 23  come in, the checks that go out, the dates, the numbers, and |
| 24  charging us monthly for something, but I'm not sure.  I can't | 24  who they're made out to. |
| 25  answer really. | 25     MR. PRUNTY:  Objection; assumes facts not in evidence. |

Nasrollah Gashtili, Volume I                                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 113

1  But go ahead and answer the question.
2  THE WITNESS: I don't know if that check register exists,
3  anybody keep track of that. If they did, it has to be somebody
4  at Bart Carter --
5  BY MR. MUSHKIN:
6  Q  This is '07, sir. This is before Bart is on the team.
7  I'm trying --
8  A  Actually this is right around the time that Bart
9  Carter take over.
10  Q  I'm trying to ask you who took -- who kept the check
11  register.
12  A  We probably didn't keep -- I don't know if such thing
13  exists, the check register for this.
14  Q  Well, you told me you had an outside consultant do
15  this.
16  A  Yes.
17  Q  Do you have copies of the records from the outside
18  consultant? Remember, you're under oath.
19  A  Yes. I'm trying to answer your question to the best
20  of my knowledge, Mike. I'm not trying to hide anything here.
21  Q  Why didn't you produce those?
22  A  You don't need to remind me that I'm under oath.
23  Q  Why didn't you produce those records?
24  A  I don't know if there is such a thing as a check
25  register, but I was ready to answer your question that Dave

Page 114

1  Stueve was probably sending daily or nightly withdrawal out of
2  the account to someone and that person could not be always me.
3  Probably John Bryant, probably somebody, but I had no control
4  over this account that -- this money that they were
5  transferring was out of this account.
6  I did not get involved with managing and maintaining
7  that until one of the employees of Bart Carter's become
8  responsible for it and I ask to be involved with that by
9  receiving an E-mail from him every day. Prior to that, they
10  were doing the money transfer out of this account and I was not
11  monitoring and managing that. I was not the person in charge
12  of financial of the company and I was not keeping track of
13  everything that was happening in this account.
14  Q  If that's the case, sir, then why did you go get
15  counter checks and take money out of this account?
16  A  As I told you, I needed the money to do the business
17  of the company and run.
18  Q  Why didn't you go to your partners and ask for a
19  check?
20  A  At that time Bart Carter -- at the beginning, first
21  time that I withdraw money out of this account, Bart Carter
22  wasn't even part of the business.
23  Q  That's not the question I'm asking you.
24  A  You're asking me why I didn't ask him, and I said he
25  wasn't even part of the business.

Page 115

1  Q  But he was part of the business when you took those
2  four checks I referenced.
3  A  First of all, I don't know which four checks you're
4  referring to.
5  Q  Would you like me to present them to you, sir?
6  A  If you tell me, I can specifically --
7  Q  Well, I want to know what you remember before I hand
8  you things, sir. I want to know what you remember, okay?
9  A  I asked -- I told you, Mike, that there are more than
10  four checks. So I don't know specifically which four checks
11  are you talking about.
12  Q  How many are there?
13  A  I have no idea. I have to go pull those out.
14  Multiples.
15  Q  Why haven't you already produced them, sir?
16  A  I produced them and I give them to my attorneys.
17  Q  Your testimony today is that you've produced all the
18  counter checks that you signed and drew money out of this
19  account?
20  A  Date and amount.
21  Q  When did you produce them?
22  A  I don't remember the date. I provided a lot of
23  documents to my attorneys.
24  Matter of fact, you provide a list to me, Mike, of
25  what you think I did.

Page 116

1  Q  I know I did. That's why I'm trying to ask you why --
2  You're telling me that you produced all those checks?
3  A  As a matter of fact, they're part of all those records
4  that you have over there, and you hire an outside accountant to
5  go through those and give you that list, so --
6  Q  Don't have the checks, sir. I'm asking for the checks
7  themselves.
8  A  What checks?
9  Q  You know what a checkbook is?
10  A  You mean the copy of the check?
11  Q  Do you know what a checkbook is?
12  A  I do know what is a checkbook.
13  Q  Do you have a checkbook?
14  A  I do have a checkbook.
15  Q  Do you happen to have one on you?
16  A  Not now.
17  Q  Okay. Do you know what a check register is?
18  A  I do, but I don't keep track of checks on check
19  register.
20  Q  If you'll just answer my questions, it will go a lot
21  faster.
22  A  Okay.
23  Q  Have you ever seen Fastran Inc.'s checking account --
24  I mean checkbook?
25  A  I was in the control of Fastran Inc. checkbook.

Page 117

1  Q  From when to when?
2  A  From the beginning to the end. I was at least one of
3  the people that had access to it.
4  Q  Where is the checkbook?
5  A  It's still in my possession.
6  Q  If the checkbook was in your possession, why did you
7  go to the bank and get counter checks instead of using checks
8  from the checkbook?
9  A  I'm sorry. What do you mean counter check and check
10 from the checkbook?
11 Q  I'll ask you again.
12    You just testified that the checkbook was always in
13 your control; is that correct?
14 A  Sure.
15 Q  Why did you use counter checks to extract money from
16 this bank account instead of using the checkbook?
17    MR. PRUNTY: Assumes facts not in evidence, but answer the
18 question.
19    THE WITNESS: Probably at the time that I -- if I withdraw
20 any -- up to this point, I didn't know, when you say "counter
21 check," what you mean. I just find out what you mean when you
22 say "counter check." You mean if I walked to the bank and
23 asked for a check. Okay. Now I understand what's your
24 question.
25 ///

Page 118

1  BY MR. MUSHKIN:
2  Q  No problem. I'm not trying to fool you.
3  A  When you were saying "counter checks," I was assuming
4  the checks that I wrote out of this account.
5    It happened before that I needed money and I didn't
6  have the checkbooks at the time with me and I went to the bank
7  and asked for a blank check.
8  Q  Why?
9  A  Same thing. No difference whatsoever for me.
10 Q  It's your testimony that you weren't trying to hide
11 the fact that you were taking money out?
12 A  Absolutely not.
13 Q  Did you know that the bank overdrafted as a result of
14 your taking those monies out?
15 A  I think bank overdrafted as a result of Bart Carter
16 taking illegally money out of that account.
17 Q  I'm asking if you know that the bank overdrafted as a
18 result of your use of counter checks.
19 A  No.
20    MR. PRUNTY: Asked and answered.
21    Go ahead.
22    THE WITNESS: No.
23 BY MR. MUSHKIN:
24 Q  You do not know that?
25 A  No, but I know why it was overdrafted.

Page 119

1  Q  Okay. When you used these counter checks, did you
2  communicate that to your partners?
3  A  I was running the business of Fastran Inc. by myself
4  at that time.
5  Q  You do realize you're under oath; right?
6  A  I do realize --
7  Q  Your testimony is, at the time you issued those
8  counter checks, you were the one running Fastran Inc. without
9  anybody else?
10 A  Absolutely.
11 Q  Under what authority were you doing that?
12 A  Since everybody else left everybody to hang dry there,
13 so there was nobody else involved.
14 Q  How did Mr. Carter leave anybody to hang dry?
15 A  Mr. Carter never was part of Fastran Inc. Are we
16 talking about Fastran Inc. or LLC? I'm sorry.
17 Q  This bank account was used --
18 A  This is Fastran Inc.
19 Q  And it was used by Fastran, LLC; isn't that true?
20 A  Not really.
21 Q  Not really?
22    MR. PRUNTY: Assumes -- objection; assumes facts not in
23 evidence.
24 BY MR. MUSHKIN:
25 Q  Sir, tell me how this bank account wasn't used by

Page 120

1  Fastran, LLC.
2  A  This bank account belongs to Fastran Inc. and it's
3  always been used by Fastran Inc.
4  Q  Didn't Fastran Inc. transfer all of its assets to
5  Fastran, LLC?
6  A  That was part of -- that we transfer our assets to
7  Fastran, LLC, yes.
8  Q  Including this bank account.
9  A  This bank account is nothing that Fastran Inc. can
10 transfer to Fastran, LLC.
11 Q  Didn't ask you that, sir.
12    Isn't it true that this bank account was used by
13 Fastran, LLC after the transfer of assets from Fastran Inc. to
14 Fastran, LLC?
15    MR. PRUNTY: Objection; continuing objection that I have
16 that this requires a legal conclusion that he's not qualified
17 to give.
18    Go ahead. You can answer the question.
19    THE WITNESS: Yeah, that's what I want to say. The best of
20 my knowledge, as far as I know -- I'm not an attorney -- that
21 this bank account belonged to Fastran Inc. from day one until
22 day -- today. It never -- this account never belonged to
23 Fastran, LLC, but that's a legal opinion. I -- that's best of
24 my knowledge.
25 ///

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 121

1   BY MR. MUSHKIN:
2       Q   Sir, just answer my questions.  I'm not asking you for
3   a legal opinion.
4       A   Okay.
5       Q   Isn't it true that after the assets of Fastran Inc.
6   were transferred to Fastran, LLC, Fastran, LLC continued to use
7   the bank account of Fastran Inc.?
8       MR. PRUNTY:  Assumes facts not in evidence.
9       Go ahead.
10      THE WITNESS:  That's assumption.  That's your opinion.  It
11  is not my opinion.
12      MR. MUSHKIN:  Counsel, if you interrupt me again, we're
13  going right to the judge.  Now, I'm only going to ask this one
14  more time.  That's coaching.
15      MR. PRUNTY:  No, it isn't coaching.
16      MR. MUSHKIN:  It's coaching and it's fraud.  I'm going to
17  ask this question last time.
18      THE WITNESS:  First of all, for the record, you can't point
19  your finger at me.
20  BY MR. MUSHKIN:
21      Q   I can point my finger anywhere I damn please.  Do not
22  tell me what to do in my office.
23      A   You can't do that.
24      Q   I am pointing my finger and I can point it at him, at
25  him, and at me.  You show me a law in this land where a man

Page 122

1   can't point his finger.
2       A   You can't yell at me or point fingers at me.
3       Q   I can do --
4       A   Otherwise I will go to judge myself.
5       Q   You go to this judge.
6       MR. PRUNTY:  Okay.  For the record --
7       MR. MUSHKIN:  I'm done playing games.
8       MR. PRUNTY:  For the record --
9       MR. MUSHKIN:  Counsel, don't interrupt me.
10      MR. PRUNTY:  I'm making an objection and a motion for the
11  record.
12      MR. MUSHKIN:  Make your objection.  It's a standard
13  objection.  Don't argue.  Don't coach the witness.
14      MR. PRUNTY:  I'm not coaching the witness.
15      MR. MUSHKIN:  Just state your objection.
16      MR. PRUNTY:  The first thing that I'm objecting to is your
17  tone of voice, yelling and pointing at the deponent.
18      MR. MUSHKIN:  What's next --
19      MR. PRUNTY:  You do not think that that's improper?
20      MR. MUSHKIN:  What is your objection, Counsel?  Are you
21  objecting?  There's a rule of evidence that you must cite.
22  What is your objection?  You're objecting to my conduct?  Thank
23  you.  Now we'll move on.
24      Q   Mr. Gashtili, isn't it true that after the transfer of
25  assets from Fastran Inc. to Fastran, LLC, this very bank

Page 123

1   account continued to serve the same purpose of receiving the
2   bulk money in?
3       MR. PRUNTY:  Objection as to form.
4       Go ahead.
5       THE WITNESS:  Yeah.  You change your question, and the
6   answer to this question is yes.
7       MR. MUSHKIN:  Thank you.
8       Q   Now, it is true that Fastran, LLC used the bank
9   account that says Fastran Inc. on it.
10      A   No.
11      Q   Explain it to me.
12      A   You told me that the money continue going to Fastran
13  Inc. and I said yes.
14      Q   The assets --
15      A   And I had an agreement with Bart that I'm going to
16  allow Bart to continue -- the money continue transfer to this
17  account while Bart is trying to open a different account for
18  Fastran, LLC.
19      Q   Where does it say that?
20      A   Oh, that was hundred percent agreement between me and
21  Bart.
22      Q   Where does it say it?
23      A   Everywhere.
24      Q   Show me.
25      A   I'll show you tens of documents.

Page 124

1       Q   Show me, sir.  You produced thousands of pages.  Show
2   me one.
3       A   I did not bring anything here to show you.
4       Q   I'm going to leave a blank in the deposition.
5       A   Leave a blank.
6       Q   Show me where you have a written document with Bart
7   Carter.
8       A   Oh, tons of places.
9       Q   Show me.
10      A   I'll show you.
11      Q   Thank you.
12      (Information requested:_____
13  _____
14  _____.)
15      THE WITNESS:  I'll produce those documents that I told Bart
16  Carter to continue his negotiation with ECHO to transfer --
17  open a new account for Fastran, LLC and move the business of
18  Fastran, LLC separate from Fastran Inc.  Fastran Inc. had other
19  business that they wanted to continue to do, and Bart Carter
20  needed to move everything to different account and he wouldn't
21  do that.  You know what he did?  He negotiated to open an
22  account for MCC instead of Fastran, LLC.
23  BY MR. MUSHKIN:
24      Q   What other business did Fastran Inc. have?
25      A   Fastran Inc. at the time was processing transaction

Page 125

1  for LuckEcash, and Bart mentioned to me that he doesn't want
2  LuckEcash. He doesn't want to deal with LuckEcash; we better
3  give LuckEcash a notice and, you know, get rid of them.
4       Q   What other business did --
5       A   LuckEcash.
6       Q   That's not another business, sir. That's an account.
7       What -- Fastran Inc. had one product; isn't that
8  correct?
9       A   It's true. When I said "other businesses," I mean
10  other client. Let me correct myself.
11      Q   Thank you.
12      And that product belongs to Fastran, LLC; correct?
13  MR. PRUNTY: Same continuing objection.
14  THE WITNESS: No.
15  BY MR. MUSHKIN:
16      Q   No?
17      A   No.
18      Q   Who does it belong to?
19      A   IDS.
20      Q   Ah, back to that.
21      Let's mark this one.
22      (Plaintiff's Exhibit 7 was marked for identification
23  by the Certified Court Reporter and is attached hereto.)
24  BY MR. MUSHKIN:
25      Q   Same account? Let's check the account number, please.

Page 126

1  775312467, is that the same account as in 5? I'll represent to
2  you that they're the same.
3       A   Yes. I didn't know the question is to me.
4       Q   Do you see the second page, 1390?
5       A   Okay.
6       Q   This has 174 deposits; is that correct?
7       A   Which -- what are you looking at?
8       Q   174 deposits for "a million four sixty-seven"; is that
9  correct?
10      A   I still don't see 174, but I see "million four."
11      Q   (Indicating.)
12      A   Oh, okay. Yeah, I see that now.
13      Q   35 checks or debits; correct?
14      A   Yes.
15      Q   Same type of account. This is the repository for the
16  money that belongs to multiple people; is that correct?
17      A   Yes.
18      (Plaintiff's Exhibit 8 was marked for identification
19  by the Certified Court Reporter and is attached hereto.)
20  BY MR. MUSHKIN:
21      Q   Take a moment and look through this, please, again a
22  series of months in 2008.
23  MR. PRUNTY: By "this" we're referring to Exhibit 8?
24  MR. MUSHKIN: Yes, sir.
25      Q   Are these the documents you produced to your attorney?

Page 127

1       A   Possibly. I produced the same documents to my
2  attorney, so --
3       Q   Well, these are marked with your Bate number. That's
4  why I'm asking you, are these the documents you produced to
5  your attorney?
6       A   Yes. I'm not familiar with these Bate number down
7  here. What is the Bate number?
8       Q   It says "GAS" -- those are your initials, Gashtili --
9  "001294" is the first one.
10      A   The documents I sent to my attorney didn't have these
11  numbers in the bottom of them, so I'm assuming this is
12  something they put in the bottom.
13      Q   Yes, sir. That's what we're required to do under our
14  rules so that we can identify the documents.
15      A   Okay, yeah. So I produce all these statement.
16      Q   Take a look at this one, if you will, this grouping.
17  It starts out with November of '08 and then the next statement
18  is June of '08, and then it goes June, July, August. Is there
19  some reason that September and October are not in this
20  grouping?
21      A   I have no idea. I know I produced all the documents
22  to my attorneys. I know that Chris' assistant asked me couple
23  days ago for two additional statement that she said she was
24  missing. I don't remember which one was those two, but I know
25  I provided those to them.

Page 128

1       Q   I appreciate that.
2       If you go back to Exhibit 7, you will see that the
3  first grouping is September of '08 and then it goes to April,
4  then it goes through May, then it goes to February of '08, and
5  then it picks up with March of '08, and then it goes to -- I
6  think March of '08 might be the last -- oh, no. Then it goes
7  to January of '08. It goes from March to January. Do you have
8  any idea why they're in this order?
9       A   I don't understand the line of questioning, but let me
10  tell you one thing, Mike.
11      I provided all the document to my attorneys, every
12  single month. One possible answer could be that these
13  documents are listed in the Windows Explorer and they grabbed
14  five or six document at the time that they were not in order of
15  the month and they produce this document and give it to you,
16  but I can assure you that I provide every single month of
17  statement to them; and if they haven't produced anything to
18  you, ask them and they can give it to you. There shouldn't be
19  any missing month whatsoever on any of these documents.
20      Q   They're all out of order.
21      A   They're just out of order.
22  MR. PRUNTY: I'll tell you that it appears to me that
23  they're just produced out of order. If you remember right, all
24  these were produced to the accountant ad litem, the whole
25  period of time, and so --

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

|  | Page 129 |
| --- | --- |

1  MR. MUSHKIN: These were stuff that were delivered by your
2  office. I'm just --
3  MR. PRUNTY: They just may simply have been produced out of
4  order.
5  BY MR. MUSHKIN:
6  Q   Where are the checks?
7  A   What checks?
8  Q   The checks. Where are the hard-copy checks?
9  A   Banks never send the checks back to us, so banks
10 should have them and I'm pretty sure -- I mean that bank is no
11 longer in business, but I'm pretty sure --
12 MR. PRUNTY: Banks destroy checks now since Check 21 became
13 a federal law years ago.
14 BY MR. MUSHKIN:
15 Q   Do you have the -- in the accounts that I have, they
16 send you a copy of the check, an electronic copy. Do you have
17 copies of the checks that were written on these accounts?
18 A   No, I don't. I don't know. When you said they send
19 it to you, who send it to me?
20 Q   When I get my bank statement, it has a copy -- it
21 doesn't have the hard check. It has a hard copy of every check
22 that comes in and goes out.
23 A   Yeah.
24 Q   You do not get that?
25 A   I don't think so. I don't remember seeing any checks.

|  | Page 130 |
| --- | --- |

1  Q   And who else worked on this account for Fastran Inc.?
2  A   Can you explain what you mean "work on this account."
3  Q   Who did the bank reconciliations?
4  A   We didn't do bank reconciliation up to the last
5  minute. As a matter of fact, one of the things we asked Bart
6  Carter to do this for us, to help us with accounting and
7  reconciliation.
8  Q   I'm not there yet.
9      Before Bart Carter, who did the bank reconciliation?
10 A   We never did.
11 Q   Who was Fastran's largest customer?
12 A   Fastran Inc.? When you say "Fastran," you mean
13 Fastran Inc.?
14 Q   Yes.
15 A   ATMMS.
16 Q   Who was Fastran, LLC's largest customer?
17 A   ATMMS. Having said that, Fastran, LLC never signed a
18 contract with ATMMS, so assumed customers, but we never really
19 sign a contract with them.
20 Q   Well, but didn't all the assets of Fastran Inc. go to
21 Fastran, LLC?
22 MR. PRUNTY: Same continuing objection.
23 THE WITNESS: That's a legal opinion for me that, you know,
24 automatically the contract is going to be moving over or not.
25 I can't really make a judgment.

|  | Page 131 |
| --- | --- |

1  BY MR. MUSHKIN:
2  Q   Well, that's what happened though, didn't it?
3  MR. PRUNTY: Same objection.
4  THE WITNESS: We told Fastran, LLC that they can take over
5  all of our client, yes, all of Fastran Inc. client.
6  BY MR. MUSHKIN:
7  Q   Right. So on Tuesday it was Fastran Inc. and on
8  Wednesday it became LLC. The outside world couldn't tell the
9  difference, could they?
10 MR. PRUNTY: Objection; misstates the evidence.
11     Go ahead and answer.
12 THE WITNESS: I don't know what you mean with "outside
13 world" because outside world was not really dealing with
14 Fastran Inc. or Fastran, LLC.
15 MR. MUSHKIN: Exactly.
16 Q   So all of that machinations took place between the
17 four partners; correct?
18 A   I don't understand what you mean the "imagination."
19 Q   Machinations.
20 A   What is that?
21 Q   All of the transfer from Fastran Inc. to Fastran, LLC
22 was something that just took place between the owners of the
23 company?
24 MR. PRUNTY: Same objections.
25     Go ahead.

|  | Page 132 |
| --- | --- |

1  THE WITNESS: Yes. Owner of the companies were negotiating
2  to --
3  BY MR. MUSHKIN:
4  Q   In other words, a gas station with an ATM machine
5  that's using Cash Advance wouldn't know if it's Fastran Inc. or
6  Fastran, LLC.
7  MR. PRUNTY: Same objection.
8  THE WITNESS: It would have be something that we decide if
9  we wanted to know or not. We could potentially show Fastran,
10 LLC now and it's a new brand or we could not show. We always
11 went with the name "Fastran," and that was a convenience way to
12 not anybody else doesn't know that if it's Fastran Inc. or
13 Fastran, LLC.
14 BY MR. MUSHKIN:
15 Q   And that's just my point. It was just something that
16 was done just internal with you guys.
17     Now, you made some allegations that confidential or
18 proprietary information was given to Bart Carter or ATMMS. Do
19 you know about that allegation?
20 A   Can you be more specific.
21 Q   Well, no. I'm reading it from your Complaint. You
22 have alleged that proprietary information was given to Bart
23 Carter. What information did you give to Bart Carter?
24 A   Oh, everything from how the software works and how the
25 process works all the way to what were our clients and what

Page 133

1  kind of rates we have with them and how much money we're making
2  from each clients and many other confidential and proper
3  information.
4      Q   What clients did you have?
5      A   IMS and LuckEcash.
6      Q   What clients are IMS?
7      A   That's International Merchant Services, the company
8  out of Dallas, Texas.
9      Q   Who were you servicing?
10     A   IMS.
11     Q   How many?  We went through this.  How many customers
12  are there?
13     A   Oh, how many casinos they had?
14     Q   I don't mean just casinos.  I mean customers.
15     A   Few, but does that make any difference that if it's
16  one casino or hundred casino?
17     Q   Yeah, it makes a big difference to me, not that I'm
18  here to answer your questions, but yeah, it makes a difference.
19         So your testimony is that you provided Bart Carter or
20  ATMMS customer lists?  Is that what you gave them?
21     A   That's after he became a partner with Fastran, LLC or
22  during our negotiation we gave him this information.
23     Q   Well, did he not have a right to it?
24     A   Sure.  As a partner of new company formed, Fastran,
25  LLC, yes.

Page 134

1      Q   Are you claiming that he did something wrong with this
2  information?
3      A   I know he did.
4      Q   What did he do?
5      A   For example, he take some of the information that we
6  had from one of our client and he -- which is LuckEcash -- and
7  he took one of the accounts that belong to LuckEcash and he
8  signed them under his company, so he went around our customers.
9      Q   What customer?
10     A   LuckEcash.  They have a customer called Otoe Paradise
11  or whatever -- I don't remember their name exactly -- and we
12  were negotiating on behalf of LuckEcash with a third-party
13  company called ASAI; and Bart Carter went and hired the head of
14  sales for that company, Ron Hicks, and he went around LuckEcash
15  and negotiated and got that contract for himself, I'm assuming
16  now after everything that I know, based on the inside
17  information that he got as being part of the Fastran, LLC
18  company.
19     Q   What information did he get?
20     A   Oh, lot of information.
21     Q   You have to tell me.  You can't just say "a lot of
22  information," sir.
23     A   Yeah.
24     Q   You made an allegation.
25     A   That we were --

Page 135

1      Q   Tell me -- let me finish.
2      MR. PRUNTY:  Let him answer the question.
3      MR. MUSHKIN:  Let me finish.
4      Q   I asked you if you're claiming that he misused a
5  customer list.  Is that what you're saying?
6      A   That's one of them, one of the things.
7      Q   Okay.  And you're saying that Auto Paradise was on a
8  customer list?
9      A   Not "Auto."  It's "Otoe."
10     BART CARTER:  Otoe, O-t-o-e.
11     MR. MUSHKIN:  O-t-o-e.
12     THE WITNESS:  Yeah, Otoe --
13     MR. MUSHKIN:  You say "po-tay-toe; I say "po-tau-toe."
14     THE WITNESS:  Otoe Paradise was a company that LuckEcash
15  came to us and said that he wants to sign an agreement with
16  Otoe Paradise, and he brought ACI, which is one of the
17  TITO-machine providers; and three of us, Fastran -- I don't
18  remember if it was Inc. or LLC at that point -- Fastran, ACI
19  and LuckEcash were negotiating to get that contract.
20         Then Bart Carter went and hired Ron Hicks, the head of
21  ACI sales team in charge of that account, and he went and got
22  that account for himself, for ATMMS, and he knew about us, ACI
23  and LuckEcash negotiating over that contract because of his
24  inside information and he interfered with our business and our
25  client business by going and signing that casino under his

Page 136

1  company.
2  BY MR. MUSHKIN:
3      Q   Whose business did he interfere with?
4      A   Fastran and LuckEcash, which is our client.  So he
5  bypassed --
6      Q   So is it your testimony that somehow ATMMS is barred
7  from soliciting anybody they want to have an ATM machine?
8      A   First of all, it's not ATM machine; it's more than
9  that, and second it's --
10     MR. PRUNTY:  Same continuing objection, legal, but go
11  ahead.
12  BY MR. MUSHKIN:
13     Q   What do you mean "it's not an ATM machine"?
14     A   It's not ATM only.  It's Cash Advance product, which
15  ATM is only part of it.
16     Q   Are you telling me that ATMMS doesn't place ATM
17  machines?
18     A   They do, but that's only one part of it.
19     Q   Is it your testimony that somehow ATMMS can't go out
20  and compete for these locations?
21     A   I never said that.
22     Q   Then what did they do wrong?
23     A   They had some inside information that they obtained
24  because they were part of our company.
25     Q   What inside information?

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 137

1   A   I told you just now, that what account is opened
2   there; what kind of negotiation we're doing with them; who is
3   with us, ACI; and what kind of pricing we offering.
4   Q   And how was this information transmitted to Bart
5   Carter or ATMMS?
6   A   He was part of the board meeting.  He was sitting on
7   the board meeting.
8   Q   So is your testimony that this was a discussion at a
9   board meeting?
10  A   We talk about many of -- all of our clients, past,
11  future, potential, in our work meetings, yes.
12  Q   Are there minutes kept of this discussion?
13  A   I'm not sure.
14  Q   Did you keep any minutes?
15  A   No.  As a matter of fact, in most of our meetings we
16  did not keep minutes.  Later on we asked Larry if he can, to
17  the best of his information or best of his memory, create some
18  of those minutes, but in most of our meeting we didn't keep
19  minutes.
20  Q   Now, you've alleged that ATMMS illegally used the
21  Fastran application; is that correct?
22  A   That's true too.
23  Q   And how did they do that?
24  A   Because they were our partner; and because of the
25  access that we give them to the back end of the application and

Page 138

1   how this application works, they took our application and show
2   it to an Indian company called Cybage.
3   Q   Spell that.
4   A   S-c-y-b-a-g-e I think.  I'm not sure.
5   BART CARTER:  C-y-b-a-g-e.
6   THE WITNESS:  Yeah.  And then they ask that company to
7   re-engineer this product for them based on what they show them
8   and all the documentation that they had from us.
9   BY MR. MUSHKIN:
10  Q   And how do you know this?
11  A   I know that because I had inside information -- not
12  inside information.  They -- Terry Kremmin, which is Bart
13  Carter employees, told me that they ask him that they want to
14  demo this application in India and how can they do that.
15  Finally they put a camera in front of the computer so the
16  Indian people can see what is happening in the computer.
17      And I brought up to a meeting -- brought that up with
18  Bart Carter in a meeting and he flatly denied at the beginning.
19  Later on he accepted that he is doing it but he is not using
20  our product.
21  Q   Let me see if I got this straight.
22  A   At the beginning he flatly deny it and he said, "I am
23  not" --
24  Q   Is it your testimony that by putting a camera in front
25  of an ATM --

Page 139

1   A   Not an ATM.
2   Q   You got to explain it to me, sir.
3   A   Yeah.  We have a product that it's true that if you
4   walk to a casino and if you're a friend with the cage manager,
5   he probably can take you back there and show you what a cage
6   manager can see in our application; but our application also
7   has --
8   Q   You're talking about on the screen of a computer?
9   A   On the screen of computer.
10  Q   I don't mean to interrupt you, but you're leaving
11  stuff out that we'll never understand what you're saying if we
12  don't.
13  A   Okay.  So they can take you back there --
14  Q   We're just mere lawyers.  We don't understand all this
15  stuff.
16  A   But then our application has a lot more to it that not
17  everybody is going to have access to it except our partners,
18  and Bart Carter used his access to our application to the area
19  that no one else has access to learn that and to show it to
20  other people and to ask them to re-engineer and duplicate it.
21  Q   How do you know this?
22  A   I just explained for you one instance.
23  Q   Terry Kremmin said that he wanted to show this to
24  somebody and that's your instance?
25  A   That Mike Poggi called him and he told him that "I

Page 140

1   want to show this application."
2   Q   Mike Poggi called who?
3   A   Terry Kremmin.
4   Q   Who is Terry Kremmin?
5   A   He's employees of Fastran, later on employee of ATMMS,
6   currently my employee.
7   Q   Terry Kremmin is your employee?
8   A   Yes.
9   Q   And you're telling me that Terry Kremmin was an
10  employee of ATMMS?
11  A   Yes.
12  Q   And Mike Poggi called Terry Kremmin and said he wanted
13  to show something to some guys in India?
14  A   Yes.
15  Q   Do you know what he wanted to show them?
16  A   Yes.  He told them that he want to show this
17  application to some guys in India and how can he do that.
18  Q   You're talking about screen shots?
19  A   The actual application.
20  Q   You have to explain to me.  What's the actual
21  application?
22  A   You open an application, you walk through the
23  application, you demo the application to someone that how this
24  application works page to page.
25  Q   You're talking about screens?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

<!-- Page 141 -->

Page 141

1   A  Yes.

2   Q  You're not talking about programming.  You're talking

3 about the screens; right?

4   A  Some of the screens, yes.

5   Q  Okay.  Now -- and that is what you believe Bart Carter

6 did that you think was wrong?

7   A  One of the things.

8   Q  What else?

9   A  We were going through the list.  We can continue.

10     So as I told you, some -- part of our application is

11 not accessible to anybody except our partners, and he demo

12 those -- it's not that I was present there, but I heard that he

13 or some of his employees actually show that application and the

14 part that is not accessible to anyone else to a company in

15 India.  In addition, he might send other information.  Because

16 he did that, I'm assuming that he sent other information to

17 that company in India and that helped them to build that

18 software for him.

19   Q  Is it your testimony that Bart Carter did not have a

20 right to build his own software?

21   A  That's not true.

22   Q  He did have a right to build his own software?

23   A  Not the software that I have and he was partner with

24 me on that.  He was on licensing that product.

25   MR. PRUNTY:  Again my same continuing objection.

<!-- Page 142 -->

Page 142

1 BY MR. MUSHKIN:

2   Q  Which is he?  Is he a partner in the software or is

3 there a license?

4   A  He was partner in the company that had nonexclusive

5 license to product that I have.

6   Q  And I know I've asked you this, but have you ever

7 produced a license in this case?

8   A  What do you mean with "license"?

9   Q  Is there a written --

10   A  A license agreement?

11   Q  Is there a license?  Is there any written document?

12   A  No.  We don't have agreement on a lot of other things.

13   BART CARTER:  You want to take a break?

14 BY MR. MUSHKIN:

15   Q  Were there any documents that you claim ATMMS

16 illegally used?

17   A  I'm hoping that we produce some of those documents

18 when we request document from you guys, that what document they

19 provided to who and when.  I wasn't present when they share any

20 of our documents or anything with anyone.

21   Q  Do you know what documents ATMMS even had that

22 belonged to Fastran?

23   A  Oh, a lot of documents.

24   Q  What?

25   A  I told you user manuals, how the application works.

<!-- Page 143 -->

Page 143

1   Q  How the application works, tell me what document shows

2 that.

3   A  It's not that easy.  It's a lot of documents and a lot

4 of graphs and diagram that shows how the application works and

5 how the engineering works and everything.

6   Q  I'm assuming you have not produced those documents in

7 this case because we don't have our confidentiality order in

8 place.

9   A  My attorneys probably have them.

10   Q  You've produced everything to them?

11   A  I produced some information about the softwares to

12 them.

13   Q  I didn't ask you if you produced some, sir.  Did you

14 produce every bit of information that you have on this software

15 to your attorneys?

16   A  Yes.

17   Q  Then I'll represent to you that they have not produced

18 it, but I believe I know why.

19   A  I have asked them specifically, if they want to

20 produce something that goes in my competitor's hand, they

21 better somehow assure me that that's not going to happen unless

22 a Court orders that.  I don't want my competitors to get their

23 hand on anything that is confidential to my company.

24   Q  I appreciate that.  That's why I signed the protective

25 order.

<!-- Page 144 -->

Page 144

1    Did LuckEcash pay Fastran for processing?

2   A  Yes.

3   Q  Did Fastran pay LuckEcash the fees they charged at

4 LuckEcash customer locations?

5   A  I didn't understand the question.

6   Q  Did Fastran pay LuckEcash the fees that were charged

7 at LuckEcash customer locations?

8   A  Their share of the fees at the end of the month, yes,

9 we did.  On a monthly basis we send them their percentage of

10 the fee.

11   Q  How did LuckEcash get the fees?

12   A  We send the money to them every month at the end of

13 month.

14   Q  A disbursement from the checking account?

15   A  That's true.  Some of those we draw --

16   Q  How did ATMMS get its fees?

17   A  ATMMS did not get -- I don't know.  I did not process

18 any ATMMS fees.

19   Q  Why?

20   A  I was not in charge of processing ATMMS fees.

21   Q  Who processed LuckEcash fees?

22   A  At the beginning Touria Dudo, then David Stueve, then

23 Kent -- Ken on ATMMS; and when everybody left, I continued

24 processing those for LuckEcash.

25   Q  Did Fastran ever pay ATMMS their collected fees?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 145

1   A   I never did.
2   Q   Why?
3   A   Because I wasn't in charge of that.
4   Q   Well, you're in charge of the company, aren't you?
5   A   When everybody else that was processing left, then I
6   end up to process for LuckEcash and only LuckEcash.
7   Q   Why didn't ATMMS get their fees from Fastran?
8   MR. PRUNTY:  Assumes facts not in evidence.
9       Go ahead and answer the question.
10  THE WITNESS:  I am not sure if they -- let me -- for the
11  record let me say that I'm not sure if they get any or not, so
12  I can't really answer you in general.
13  BY MR. MUSHKIN:
14  Q   Who would know?
15  A   But I can tell you, I can tell you, that I did not
16  process any money to goes to ATMMS account for their share of
17  fees because Bart Carter was negotiating the contract with me
18  on behalf of Fastran, LLC and Bart Carter on behalf of ATMMS.
19  So we put a contract in place so we can distribute money to
20  him.
21  Q   Well, how much was due ATMMS?
22  A   I have no idea.
23  Q   Why?
24  A   Because I was not the one that doing accounting or
25  keeping track of these.

Page 146

1   Q   And who did?
2   A   Perhaps no one.  Closest person is Ken that works for
3   Bart Carter.
4   Q   Before Bart took over the books and records --
5   A   I told you twice, Touria Dudo and after that David
6   Stueve.
7   Q   Who did they answer to?
8   A   They were working under John Bryant.
9   Q   And who is the other one?
10  A   Touria Dudo was our employee.
11  Q   Who was the other one?
12  A   And Dave Stueve was working for us as a consultant.
13  Q   Could you spell that last name.
14  A   I'm going to try, but I'm not sure.  It's S-t-u-v-e?
15  Do you remember?
16  BART CARTER:  I think it's S-t-u-e-v-e, but I could find
17  that out.
18  THE WITNESS:  I can find that out too.
19  BY MR. MUSHKIN:
20  Q   And you're saying Mr. Stueve was an outside
21  consultant?
22  A   Yes.
23  Q   He worked for an accounting firm or something?
24  A   No.  He was working for another company before he had
25  the knowledge of doing this stuff, so on the evening and

Page 147

1   weekend he was working for us, what, moonlighting.
2   Q   Who was his boss?
3   A   He was working with John Bryant.
4   Q   So it's your testimony that John Bryant was in charge
5   of all this?
6   A   John Bryant work with those two people, yes.  They
7   both live in Minnesota.  He -- John Bryant introduce both of
8   them to Fastran and they were both working on the --
9   Q   It's your testimony that John Bryant was responsible
10  for the checking account?
11  A   No, he was not.
12  Q   Who was?
13  A   I was and Larry Brown.  Two signature on that checking
14  account, me and Larry Brown.
15  Q   Then why didn't ATMMS get paid?
16  A   We did not pay our client with a check or signed
17  check.  We did our -- paid our client through logging into an
18  account and doing an ACH, which --
19  Q   ACH.
20  A   -- Touria Dudo, David Stueve and Ken had access to do
21  that.  However, on ATMMS specific, Bart and I were negotiating
22  to finalize a contract between Fastran, LLC and ATMMS so
23  Fastran, LLC could pay their fees.
24  Q   But you had a contract.
25  A   That contract hadn't been finalized.

Page 148

1   Q   But you had a contract between Fastran Inc. and ATMMS.
2   MR. PRUNTY:  Same continuing objection.
3   THE WITNESS:  Yes.  That contract --
4   BY MR. MUSHKIN:
5   Q   Why didn't you pay the fees under this contract?
6   A   I am not responsible for that.  I wasn't responsible
7   for paying any fees to anybody.  I told you just that.
8   Q   But you were -- but you could go to that account and
9   take money out by a counter check.
10  A   Different part of companies have different people
11  responsible for different part of company.
12  Q   Sir, I just asked you a simple "yes" or "no" question.
13  You stand before us under oath and say you're not responsible
14  for this, but it's okay --
15  A   I'm sorry.  "For this," what is that?
16  Q   Responsible to pay ATMMS its fees.
17  A   Yes.
18  Q   But you can take a counter check and go take money out
19  of that bank account where those funds reside.
20  A   Among other monies in that account, yes.
21  Q   What other monies were in that account at the time you
22  took that money other than ATMMS's fees?
23  A   Monies that belonged to Fastran Inc.
24  Q   Isn't it true that you took $250,000 -- more than
25  $250,000 -- out of that account without advising your partners?

Page 149

1   A   I don't have accurate number.
2   MR. PRUNTY: Objection to form.
3   THE WITNESS: I don't have --
4   BY MR. MUSHKIN:
5   Q   Without advising your partners.
6   A   I don't have the accurate number.
7   Q   Isn't it true that you took an amount approximately
8   that amount and did not advise your partners when you took the
9   money?
10   A   It's not true for all of it. Some of it I -- at some
11   point I told my partners that I'm taking money out of that
12   account in writing and I -- those E-mails are produced, and in
13   some cases I don't -- I didn't, because at that time I was the
14   only person in charge of Fastran Inc. Everybody just bail out.
15   Q   Bart Carter bailed out?
16   A   Bart Carter never was part of Fastran Inc.
17   Q   I see. And wasn't this after Fastran had transferred
18   its assets to Fastran, LLC?
19   A   Some money came out of that account and --
20   MR. PRUNTY: Same continuing objection.
21   Go ahead.
22   THE WITNESS: Yeah.
23   MR. MUSHKIN: Counsel, please don't do that. Please don't
24   interrupt him in the middle of a question.
25   MR. PRUNTY: Well, then I'm going to instruct my client to

Page 150

1   wait until I have the opportunity to object before he answers.
2   MR. MUSHKIN: May I finish?
3   This issue has been brought up in the business court
4   repeatedly because the business court now handles its own
5   discovery disputes. I've given you the continuing objection
6   from the very beginning. Please, if you're going to object,
7   stop him before he answers and object, but do not interrupt him
8   mid answer. That is clearly not what's envisioned under the
9   rules; and our judges, all three of them, have said don't do
10   that.
11   MR. PRUNTY: And I have to say that's not my intent.
12   MR. MUSHKIN: I appreciate that.
13   MR. PRUNTY: And I must instruct my client to wait
14   momentarily to allow me to make an objection when one is
15   appropriate. I -- it's not my intent to interrupt or direct my
16   client in any manner how to answer the question.
17   Go ahead.
18   MR. MUSHKIN: Niner.
19   (Plaintiff's Exhibit 9 was marked for identification
20   by the Certified Court Reporter and is attached hereto.)
21   MR. PRUNTY: When you come to a natural breaking point --
22   MR. MUSHKIN: As soon as we just identify this.
23   Q   I've handed you now another grouping of bank
24   statements. This one starts with 5-29-09 and it has 4-09 and
25   then it goes to 12-31-08 and then 1-30-09 and then back in the

Page 151

1   back is 12 -- 10-31-08, which you may recall was missing from
2   another spot.
3   Are these again true and correct copies of the account
4   statements for account No. 775312467?
5   A   Yes.
6   MR. MUSHKIN: Now we're at a breaking point.
7   MR. PRUNTY: Thank you.
8   (Brief recess taken.)
9   BY MR. MUSHKIN:
10   Q   Did there come a time when -- I'm sorry.
11   Read back my last question. Oh, no. I know where I'm
12   at. I finished with these.
13   Okay. Did there come a time that IMS tried to
14   purchase the Fastran software?
15   A   I don't remember that, if there was. As far as I
16   remember, IMS was always interested in licensing but never talk
17   about it.
18   Q   You don't recall an offer of $400,000 for the Fastran
19   software from IMS?
20   A   I don't remember that.
21   Q   Did there come a time that you tried to negotiate to
22   buy Bart Carter out of Fastran?
23   A   Yes.
24   Q   When did that take place?
25   A   Exact date I don't remember, but it was period after

Page 152

1   we had disagreement.
2   Q   And the disagreement was in regards to these funds
3   coming out of the bank account, wasn't it?
4   A   Our disagreement start before that when I approached
5   Bart Carter and I told him that I have news that he's trying to
6   duplicate our product and he flatly denied it.
7   Q   Isn't it true that the funds were taken from the
8   account long before the issue about Bart trying to do something
9   with the software?
10   A   I mentioned that to you, that I took funds out of that
11   account even before Fastran, LLC was formed or Bart Carter was
12   even part of the picture except as one of our clients.
13   Q   Isn't it true that Fastran Inc. never paid ATMMS the
14   fees they were due under the agreement?
15   A   I never did pay ATMMS anything when I was doing the --
16   handling the processing for LuckEcash or I was involved with
17   Kent doing settlement. Prior to that I was not involved on a
18   day-to-day activity. I didn't know where they're sending the
19   money and to who. I was not person in charge of our accounting
20   and anything like that.
21   Q   But that's not what I'm asking you.
22   A   You're asking me if it's true that Fastran never paid
23   him. I said I never did, but I don't know if anybody else did.
24   Q   That was a long way to get to the answer, but you got
25   there.

Nasrollah Gashtili, Volume I                     JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 153

1        You don't know is what you're telling me?
2    A   I don't know, but I never did personally.
3    Q   Did you ever instruct anybody else not to pay them?
4    A   No.
5    Q   What did ATMMS pay Fastran for?
6    A   To license the right to be allowed to use our -- use
7    the software to process transactions for casinos.
8    Q   Where is the software?
9    A   Where is the software?
10   Q   Yeah.
11   A   Physically?
12   Q   Yeah.
13   A   It's on data centers, installed in data centers.
14   Q   So ATMMS never got the software?
15   A   No.  We never sold the software to ATMMS.
16   Q   I'm not asking if you sold it to them.  I'm now
17   talking about physical possession.  Now, when I buy Microsoft
18   Word, I get a disc, I install it, I get a user number, and I
19   own the right to use that software myself.
20       MR. PRUNTY:  Objection; misstates the evidence and I think
21   Microsoft would completely disagree with you.
22       MR. MUSHKIN:  What's the nature of your objection?
23       MR. PRUNTY:  Nature of the objection is you're misstating a
24   pretense to it.  It is a license from Microsoft.
25       MR. MUSHKIN:  I just said that.

Page 154

1        MR. PRUNTY:  No.  You said you owned it.  There's a
2    difference.
3        MR. MUSHKIN:  I just said I own a license to use it.
4        MR. PRUNTY:  Okay.
5        MR. MUSHKIN:  So if you'll do me a favor and not interrupt
6    me on my hypotheticals, because they are just hypotheticals --
7    I'm allowed to make them up -- but if you have an objection, at
8    least allow me to finish my question before you make your
9    objection.
10   Q   But here's the point:  What software did Fastran
11   deliver to ATMMS?
12   A   Fastran did not deliver software to ATMMS.  Fastran
13   delivers service to ATMMS.
14   Q   Thank you.
15       So what software are you alleging that ATMMS stole?
16   A   That's the product that, portion of it is not
17   accessible to public except to the trusted clients and vendors
18   that sign contract that they will not try to re-engineer or
19   duplicate this.  They sign NDA with us that give us a look into
20   something that is not available to other people and then they
21   went around to use that to re-engineer the software after they
22   officially signed and said they will not try to re-engineer
23   this product.
24   Q   No idea what you're talking about, but let's move on
25   because you don't seem to want to answer my questions.

Page 155

1        Let's mark 10.
2        (Plaintiff's Exhibit 10 was marked for identification
3    by the Certified Court Reporter and is attached hereto.)
4    BY MR. MUSHKIN:
5    Q   Is this the Mutual Nondisclosure Agreement that you
6    just referenced in your testimony?
7    A   Yes.
8    Q   And I would note that this is an agreement between
9    Fastran and ATM Merchant Systems.  Is that correct?
10   A   Yes.
11   Q   Dated August 16th, 2006?
12   A   Yes.  Actually it's September 6 or -- on one side is
13   August 6 and one side is September 6.
14   Q   Look on the front page, please.
15   A   Okay.
16   Q   Dated August --
17   A   Okay.
18   Q   -- 16th?
19   A   Sure.
20   Q   And then it's signed by Mr. Connell in September; is
21   that correct?
22   A   Yes.
23   Q   The signature of Magnus, I can't tell if that's an 8
24   or a 9, but I'm not sure that it matters, does it?
25   A   No, it doesn't.

Page 156

1    Q   And I notice that this is an agreement -- is there
2    anywhere in this document that IDS is mentioned?
3    A   No.
4    Q   Why?
5    A   Because IDS was not part of this negotiation between
6    Fastran Inc. and ATMMS.  IDS gave the right to Fastran Inc. to
7    license the product to them that they can go and allow other
8    company to use this software or license this software.
9    Q   Any document that --
10   A   But we didn't tell them specifically to who they can
11   do it or to who they cannot do it.
12   Q   Any written document that exists between IDS and
13   Fastran?
14   A   Never signed.
15   Q   Now, I want to show you one of the exhibits that have
16   already been entered.  This is your letter to Bart.  It's in
17   Exhibit 2.
18       MR. PRUNTY:  Objection to the extent it misrepresents prior
19   testimony.
20       MR. MUSHKIN:  E-mail I suppose.  For those of us that are
21   older than 40, we tend to call things letters instead of
22   E-mails.
23   Q   It shows "creditor - 150,000, IDS, software
24   development."
25   A   Yes.

Nasrollah Gashtili, Volume I

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 157

1  Q  Doesn't say software ownership, does it?
2  A  No.
3  Q  Doesn't say software license, does it?
4  A  We never -- this issue is just the software
5  development that IDS did in addition or additional changes and
6  modification that they want us to do to our software so they
7  can use it, and we continue doing that after Bart become part
8  of the -- that's pretty standard in our industry.  If you call
9  Microsoft and ask to change anything on Microsoft Word for you,
10  they will probably change it and charge you extra for it, but
11  they won't sell you the Microsoft Word.  You still own only the
12  license.
13  Q  Nothing in this document that references anything
14  owned by IDS, does it?
15  A  Are we back to the NDA?
16  Q  Yes.
17  A  Yes.  My answer was yes.
18  Q  What shows in the NDA that it's owned by IDS?
19  A  No.  You said nothing is in there that shows and I
20  said the answer is yes.  Nothing is in there that shows.
21  Q  Thank you.  Sorry.  Syntax error, sorry.
22  A  Okay.
23  Q  I'd like you to look at the second "whereas."
24  MR. PRUNTY:  What document are we looking at?
25  MR. MUSHKIN:  Back to Exhibit 10.

Page 158

1  THE WITNESS:  Second -- I'm sorry.  Second?
2  BY MR. MUSHKIN:
3  Q  Second "whereas."
4  A  Okay.
5  Q  "Whereas both parties possess proprietary and
6  confidential information relating to their technologies and
7  both parties envision disclosing parts of that confidential
8  information in order to appraise the commercial potential of
9  any business relationship."  Is that correct?
10  A  Sure.
11  Q  "Their technologies," what technology does Fastran
12  Inc. own?
13  A  Fastran owns a lot of things and know-how based on
14  members that part of the Fastran.  For example, I told you
15  what's the background of Mr. John Bryant.
16  Q  I'm not asking you about background, sir.  I'm asking
17  you what technology Fastran owns.
18  A  I can't really tell you what they mean with technology
19  when they put "technologies" here, but I can assume that --
20  Q  I don't want you to assume.
21  Who wrote this document?
22  A  I have no idea.  Magnus probably did.
23  Q  Was he an officer of Fastran?
24  A  He was.
25  Q  Thank you.

Page 159

1  He had authority to enter into this document?
2  A  He did.
3  Q  Thank you.
4  I'm going to show you what's been marked as -- I'm out
5  of order.  Show you what's been marked as 11.
6  (Plaintiff's Exhibit 11 was marked for identification
7  by the Certified Court Reporter and is attached hereto.)
8  BY MR. MUSHKIN:
9  Q  You might want to pull out Exhibit 2 so you can
10  compare these.
11  Can you tell me, first of all, have you ever seen
12  Exhibit 11 before?
13  A  I think it's the same one that we had in Exhibit 2.  I
14  mean I didn't compare it word by word, but probably one of the
15  version of what was in Exhibit 2.
16  Q  Do you believe that these are exactly alike?
17  A  I have to review it before I can say.
18  As I mentioned to you, the three members of Fastran
19  Inc. at that time -- John Bryant, Larry Brown and myself --
20  were working on putting these letters together and there was
21  multiple copies of it.  I don't know which one is which
22  version.
23  Q  Well, they appear to be the same.
24  A  They appears to be the same.
25  Q  I'm just curious because one of them says, "sincerely,

Page 160

1  Fastran officers" and the other one says --
2  MR. PRUNTY:  Same thing.
3  MR. MUSHKIN:  No.  I think it says "Nasrollah," doesn't it?
4  THE WITNESS:  It went from my E-mail, so it probably has my
5  signature on the bottom of it.
6  MR. MUSHKIN:  Let me just check.  I just want to see.
7  Q  No.  It says the same thing, "Fastran officers."  I'm
8  sorry.  So they appear to be the same.
9  A  Okay.
10  Q  Do you know why they have different dates?
11  A  As I mentioned to you, we were working on this draft
12  of this letter for Bart and to other potential investors for
13  days and weeks.
14  Q  Anybody else get one of these?
15  A  Probably Larry Brown and John Bryant have copies of
16  it.
17  Q  No.  I meant other investors.
18  A  Oh.  We probably present one to Neal Johnson of IMS.
19  I don't remember exactly, but I know I met with him personally,
20  so we were presenting one to him.  I don't remember anybody
21  else at this point, but I think Bart Carter and Neal Johnson
22  are people that we thought that they might be interested to
23  work with us.
24  Q  Before we broke, I asked you about whether or not you
25  negotiated to buy Bart out of Fastran and you said that you

Nasrollah Gashtili, Volume I        JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 161

1  had.
2  A   Yes.
3  Q   Who were those negotiations with?
4  A   Bart Carter.
5  Q   No third parties?
6  A   No.
7  Q   You didn't try to sell Bart's interest to a third
8  party?
9  A   Oh, that's different question.  You were asking if I
10 negotiated Bart to buy him out, and I said I was negotiating
11 with Bart Carter.  I had potential investor that, you know, if
12 Bart would agree to sell, I wanted to bring in other people to
13 replace him.
14 Q   Who did you negotiate with?
15 A   Multiple people, but the one that negotiation got more
16 serious was a company out of Oklahoma called M3.
17 Q   Do you have any E-mails or correspondence with them?
18 A   I probably do.
19 Q   Have you produced them in this case?
20 A   I am not sure.  I have to go back and check.
21 Q   I'm going to specifically ask you to produce any
22 correspondence, E-mails or any kind of communication with any
23 third party in regard to this purchase of Bart Carter's
24 interest in Fastran.
25 A   I will go and double-check and produce those.

Page 162

1  Q   Do you recall what purchase price you negotiated?
2  A   Based on what time of negotiation we were, different
3  prices was offered to him.  So it was depending what time
4  during our negotiations that I offer him different pricing; and
5  it was all negotiation, so we were going up and down.  So I
6  don't remember.  I mean we never settle on a price, so I can't
7  tell you what price was.
8  Q   Are you talking about a price from Bart?
9  A   No, from -- I was trying to negotiate a price for him
10 to buy him out and he was trying to negotiate to get something
11 from me, so we were going back and forth with prices.  Then on
12 top of that, there was different period of our relationship
13 that at some period I was willing to offer him more and at some
14 period I was not ready to offer him the amount that I offered
15 him before.
16 Q   Did all of your offers to Bart always insist that he
17 forgave any monies that were due from Fastran?
18 A   Maybe or maybe not.  In some cases maybe --
19 Q   Well, which is it?
20 A   I said I'm not sure.  I have to go and look at all
21 those.
22 Q   And do you have all those?
23 A   Probably I have.
24 Q   Have you produced them in this case?
25 A   I did.

Page 163

1  Q   What did you produce in this case?
2  A   All my E-mail communication between me and Bart.
3  Q   That's the only place any of this information would
4  be?
5  A   We might have some verbal communication that I might
6  remember or not remember, so E-mails are best --
7  Q   Isn't it true that all of your negotiations with
8  Mr. Carter you insisted that ATMMS forgave any monies owed by
9  Fastran?
10 A   I can't say "yes" or "no," but most likely, if you
11 press me to say which one I think is true, it's "no," that's
12 not true.
13 Q   How did IDS get paid by Fastran?
14 A   Which Fastran?
15 Q   Either one.
16 A   From Fastran, LLC -- I mean from Fastran Inc.?  In
17 past I wrote some checks from Fastran Inc. account.  From
18 Fastran, LLC, Bart Carter up to a point, he was writing the
19 check out of the Fastran, LLC account.
20 Q   Did he just write a check whenever you want?
21 A   No.  I was presenting an invoice to him.
22 Q   Is it your testimony that you presented invoices to
23 Bart Carter that were unpaid?
24 A   I was presenting invoices to Bart Carter on a monthly
25 basis and he was paying it.  At some point he wrote a letter to

Page 164

1  me and said, "I am not going to pay these invoices when there
2  are money in Fastran Inc. account that we can use to pay our
3  creditors."  So after that I did not submit any more invoices
4  to him since he said that he no longer is going to pay for it
5  and Fastran Inc. should pay for it out of their account.
6  Q   Do you have any documentations that support that
7  allegation?
8  A   That's probably part of our E-mails too.  That
9  discussion -- that E-mail is there and I think I even saw some
10 board meeting that Bart said that.
11 Q   Oh, yes.  We're definitely going to get to that.
12 A   Yeah.
13 MR. MUSHKIN:  Okay.  12.
14 (Plaintiff's Exhibit 12 was marked for identification
15 by the Certified Court Reporter and is attached hereto.)
16 BY MR. MUSHKIN:
17 Q   I'd like to go to the back of this.  I believe it's
18 reverse chronological order, and I want to start with
19 GASH 00541.  I'd like you to take a look at this.  It's dated
20 November 16th, 2007 to John Bryant and Larry Brown.
21 A   Okay.
22 Q   Take a minute and read that, will you.
23 A   Okay.
24 MR. PRUNTY:  Can you read the subject line of it since
25 there's more than one.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 165

1   MR. MUSHKIN: "Request for emergency meeting of Fastran
2   board of directors."
3   MR. PRUNTY: Thank you.
4   BY MR. MUSHKIN:
5   Q   Did you write this letter?
6   A   I did.
7   Q   What happened?
8   A   What happened to what?
9   Q   What happened? Was there an emergency meeting?
10  A   Probably there was. I don't recall exactly. That was
11  five years ago, but I asked for a meeting, I probably got a
12  meeting. This was right around the time that we were trying to
13  push to bringing in Bart Carter as an investor. As you can
14  see, it's November 16 and --
15  Q   I noticed in that second-to-the-last item on the list
16  of bills, it says, "how to purchase back the software from IDS
17  for over 150,000," and then it has "(contract)."
18  A   Yeah.
19  Q   Tell me what that means.
20  A   That was part of the push that I was trying to get to
21  Bart Carter to comes in, and I was telling everyone that they
22  don't even own the software. Software is owned by IDS.
23  Q   In fact IDS got the 150,000, didn't they?
24  A   That's not true.
25  Q   Is it your testimony that Bart Carter didn't put over

Page 166

1   $350,000 towards the payment of the bills listed on that
2   item -- on that list?
3   A   That's the money he put into Fastran account, not to
4   IDS account.
5   Q   Isn't that the very same money that went to IDS?
6   Fastran paid IDS $150,000.
7   A   That's not true. Fastran never paid IDS $150,000.
8   Q   You're sure?
9   A   I am 100 percent sure.
10  Q   In fact they paid more than that, didn't they?
11  A   For software development, for modifying the softwares,
12  for Change Orders, yes; but to buy the software, no, they never
13  did.
14  Q   Is it your testimony that a Cash Advance software
15  existed prior to the funding from Fastran?
16  A   Yes. It was in use.
17  MR. PRUNTY: Objection; form.
18  THE WITNESS: It was in use.
19  BY MR. MUSHKIN:
20  Q   With whom?
21  A   With Bart Carter company and other companies:
22  LuckEcash, IMS.
23  Q   Yes, after funding through Fastran.
24  A   I'm sorry. What was the question then? Maybe I
25  didn't understand the question.

Page 167

1   Q   Isn't it true that no program existed until IDS was
2   funded to develop the program by Fastran?
3   A   That is absolutely not true. I'm sorry.
4   MR. PRUNTY: I would just request that you identify what
5   Fastran you're talking about.
6   MR. MUSHKIN: Doesn't matter.
7   THE WITNESS: Either Fastran. Fastran never paid IDS for
8   the software development. IDS was completely doing the
9   software development on their own for a long time. That's for
10  your information, Mike, that IDS was working for years on this
11  product. IDS was working for years on this product without
12  receiving a penny from Fastran, ATMMS, or anybody else. We
13  developed that product completely on our own.
14  BY MR. MUSHKIN:
15  Q   Okay.
16  A   We started development on that product in July of
17  2006.
18  Q   Let's go back to -- let's go to 524, bottom of the
19  page, from Lawrence Brown to Bart Carter, carbon copy to
20  Nasrollah Gashtili.
21      "Bart" --
22  A   524?
23  Q   524.
24  A   Okay.
25  Q   "Bart, as I indicated in my 8-20-2009 E-mail to you

Page 168

1   and Nasrollah, with carbon copy to your attorney, I have
2   resigned as managing member of Fastran, LLC effective that
3   date. In the absence of a managing member, I am perfectly
4   happy with you convening this board meeting. I'm available all
5   day tomorrow, all day Thursday and all day Friday. We'll be
6   talking to Bart about this today."
7      Do you recall this E-mail?
8   A   I recall this E-mail.
9   Q   Was there a board meeting?
10  A   I don't remember. We had many board meeting around
11  that time. I don't remember after or before that time. I
12  don't remember when.
13  Q   Direct your attention to 523. Appears to be your
14  response to Mr. Brown and Mr. Carter.
15  A   Okay. So you want me to read this E-mail?
16  Q   Sure.
17  A   The second part of 523, yes.
18  Q   You're alleging that Mr. Carter "pirated our
19  intellectual property, design and software, and duplicate it
20  for yourself"; is that correct?
21  A   Yes.
22  Q   And this comes out under a Fastran resolution;
23  correct?
24  A   This is not a resolution. I don't think so.
25  Q   Look what it says, sir. It says, "Subject: Fastran

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

---

Page 169

1  resolution."
2  A   Yeah.  This is r-e.  That's respond to a previous
3  E-mail that was listed as Fastran r-
4  Q   I understand that.
5  A   But it doesn't mean that this was a Fastran
6  resolution.
7  Q   No.  I'm just -- just listen to my question.
8  A   Okay.
9  Q   Is there anywhere in here where it says that this
10 software belongs to IDS?
11 A   No, but if you look at the bottom of the E-mail, this
12 is my signature as Integrated Dynamic Solutions, not as
13 Fastran.
14 Q   So what?  That's my whole point.  Does it say anywhere
15 in here that Integrated Solutions is the owner of this
16 software?
17 A   No.  And you presented already many documents and
18 asked the same question.
19 Q   Do you see the response above?
20 A   From Bart Carter?
21 Q   Right.
22     Did you have a meeting?  Did you commit -- "Let's make
23 a commitment."  Did you make a commitment to a meeting?
24 A   You're asking me for a time chronicle that there is no
25 way I can remember.

Page 170

1  Q   Let's keep going.  Maybe it will refresh your
2  recollection.  Let's look at the next one.
3     "Bart, can we keep the Monday open?  It will be
4  impossible for me to make the rest of this week.  I'm trying to
5  get a commitment from my attorney for Monday.  He will get back
6  to me by tomorrow afternoon.  I will send you an E-mail as soon
7  as I talk to him."  Do you see that?
8  A   Yeah.
9  Q   Then his response, "I will have Monday open."
10 A   Okay.
11 Q   Now let's go to the next one.
12    "Bart, after speaking with my attorney at Troy Gould,
13 who I have retained, I decline your request to conduct a board
14 meeting to resolve our differences."  Do you see that?
15 A   Uh-huh.
16 Q   "Instead I suggest that we have a conference call,
17 just between the two of us, and try to resolve our differences
18 without lawyers or advisors and we will not be accusing each
19 other of anything.  We both know the facts.  I intend to make a
20 proposal to you to resolve all our differences.  The call will
21 be confidential and subject to settlement privilege.  Nothing
22 either of us says may be used in any court.  If you agree to
23 this man-to-man conference, which will be about the future, not
24 the past, and will be privileged settlement communication,
25 please let me know at what time and I will call you."  All

Page 171

1  right?
2  A   Yeah.
3  Q   The next one is Bart's response; is that correct?
4  A   Yes.
5  Q   "Nasrollah, this has gone beyond man-to-man
6  discussions.  You have promised on numerous occasions to return
7  the money wrongfully taken.  This matter must be resolved with
8  lawyers, in writing, once and for all.  I will now request a
9  board meeting on ten days' notice according to our bylaws.  If
10 you choose to require this formal notice, so be it.  I am glad
11 that you have finally retained counsel and hope we can resolve
12 this matter fairly.  If you would like to make a written
13 proposal for settlement, I would be happy to review it."  Do
14 you see that?
15 A   Yes.
16 Q   Did you ask him for that meeting without lawyers and
17 advisors?
18 A   Yes, I did.
19 Q   Why?
20 A   Based on my attorney's advice.
21 Q   Did you promise on numerous occasions to put the money
22 back that was wrongfully taken?
23 A   I always said, "If you put the money back, I'll put
24 the money back."
25 Q   Show me where you say that.  And what money does

Page 172

1  Carter -- is Carter supposed to put back?
2  A   Bart Carter illegally took money out of that account
3  that he didn't have a signature right to.
4  Q   What money did he take?
5  A   I don't know.
6  Q   How do you know he took it if you don't know?
7  A   He admitted it already, at least to 175,000.  I saw in
8  one of those E-mails.
9  Q   Weren't those fees that had already been earned by
10 ATMMS?
11 A   We're not discussing that.
12 Q   What do you mean, "We're not discussing that"?
13 A   We're not discussing that.  I took the money that --
14 Q   Sir, I get to ask the questions.
15    Now, wasn't the money that was taken by ATMMS fees
16 that were earned by ATMMS?
17 A   No.
18 Q   No?  You realize you're under oath?
19 A   I realize I'm under oath.
20 Q   Okay.  So where did the money come from?
21 A   That money was part of the fees that Fastran earned;
22 and based on a contract, I had to give some of it to the
23 client.
24 Q   Isn't ATMMS the client?
25 A   Yes.

---

Page 173

1  Q  And wasn't it true that at the time that those funds
2  were paid to ATMMS, ATMMS was owed those monies for its share
3  of the fees generated?
4  A  There was no contract between ATMMS and Fastran, LLC.
5  Q  Sir, I showed you the contract.
6  A  That was between Fastran Inc. and --
7  Q  Sir, and all of the assets of Fastran Inc. were
8  transferred to Fastran, LLC; correct?
9  A  I'm not the attorney. I can't decide what is an
10 asset.
11 Q  Sir, answer --
12 A  I don't know.
13 Q  Thank you.
14    You do know; and I consider that, sir, to be the
15 highest form of dishonesty. I just want the record to so
16 reflect. You know --
17    MR. PRUNTY: I want the record to reflect I think that's an
18 entirely inappropriate comment.
19    MR. MUSHKIN: Counsel, I hope that you can prove me wrong,
20 but I am absolutely certain that your client just, on the
21 record, intentionally lied. I am absolutely certain of it and
22 I will prove it in court and I will seek sanctions for this
23 conduct. It is reprehensible.
24    MR. PRUNTY: I think your conduct is being reprehensible at
25 this point.

Page 174

1    MR. MUSHKIN: No problem. I stand for everything I say.
2  It's on the record.
3  Q  Now let's go to the next E-mail.
4  A  What page are we on?
5  Q  517.
6  A  Okay.
7  Q  "Nasrollah" -- this is from Bart Carter to Nasrollah,
8  carbon copy to lbrown@imagingoptions.com; is that correct?
9  A  Yes.
10 Q  And that's "lbrown." That's Larry Brown?
11 A  Yes.
12 Q  "Nasrollah, this is one of the things we need to meet
13 about. You were to have negotiated with NRT, IMS, and Lisa and
14 confer with me for final approval. The M3 deal is another
15 matter we need to discuss also. I am in Montana with limited
16 phone, so I cannot do anything until I get back tomorrow
17 evening. Bart."
18    Did you receive that E-mail?
19 A  I did.
20 Q  Did you respond to it?
21 A  You want me to remember that on top of my head?
22 Q  Well, if you look just above it, sir, I think you'll
23 find the next E-mail in the chain.
24 A  The question was did I respond to this and I didn't
25 look up there.

Page 175

1  Q  Do you remember responding to it?
2  A  That's my E-mail to him and that's a respond to his
3  E-mail, yes.
4  Q  And you notice at the end you ask, "Could you be able
5  to give us a financial report. Thanks, Nasrollah."
6    Bart responds the following -- that evening, correct,
7  the 20th at 6:47 p.m.?
8  A  Yeah.
9  Q  "I cannot give a financial report because you never
10 released access to the account that receives the ECHO
11 attractions."
12 A  Okay.
13 Q  Do you understand that?
14 A  Yes.
15 Q  Isn't that true?
16 A  Again it's depend what does "access" mean.
17 Q  Isn't it true that Bart Carter, even though he was
18 then acting as the managing member of Fastran, did not have
19 access to the bank account?
20    MR. PRUNTY: Objection as to form.
21    Go ahead.
22    THE WITNESS: Yeah, he did have access to -- he did have
23 access to all the bank account belonging to Fastran, LLC. He
24 did not have access to account that belong to Fastran Inc.
25 ///

Page 176

1  BY MR. MUSHKIN:
2  Q  And isn't it true that all of the fees being generated
3  by Fastran, LLC were going into the Fastran Inc. bank account?
4  A  Matter of opinion.
5  Q  Sir, that's not a matter of opinion.
6  A  It is a matter of opinion.
7  Q  You've already testified that all of the assets of
8  Fastran Inc. were transferred to Fastran, LLC.
9  A  Yeah.
10 Q  That's all --
11    MR. PRUNTY: Objection; misstates prior testimony.
12    MR. MUSHKIN: It does not, Counsel, and I've asked you not
13 to interrupt me again. It does not. I have -- it is exactly
14 his testimony word for word. He testified three separate times
15 that all of the assets of Fastran Inc. were transferred to
16 Fastran, LLC. The accounts, specifically the ATMMS accounts,
17 generated fees that continued to go into the Fastran Inc. bank
18 account. He also testified to that, and I now have asked him a
19 very specific question and he has refused to answer.
20    MR. PRUNTY: No.
21    MR. MUSHKIN: Now I'm going to ask it again.
22 Q  Isn't it true that after the assets of Fastran, LLC --
23 excuse me, Fastran Inc. -- all of the assets of Fastran Inc.
24 were transferred to Fastran, LLC, that Fastran, LLC continued
25 to use the Fastran Inc. bank account?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 177

1    MR. PRUNTY:  And I'm making --
2    MR. MUSHKIN:  It's a "yes" or "no" answer.
3    MR. PRUNTY:  And I'm making the same objection that it
4  misstates prior testimony.  You can agree with it or not agree
5  with it, but I am making the objection.
6        You may answer the question.
7    THE WITNESS:  Okay.  The question was that if the funds
8  from --
9  BY MR. MUSHKIN:
10   Q   Isn't it true that after the transfer of all of the
11 assets of Fastran Inc. to Fastran, LLC, the accounts that were
12 then the property of Fastran, LLC continued to generate fees
13 that were deposited into the Fastran Inc. bank account?
14   A   Okay.  I cannot answer one part of your question and I
15 can answer the second part.  It's a legal opinion and I can't
16 tell you --
17   Q   It's not a legal opinion.
18   A   I'm telling you --
19   MR. PRUNTY:  Mike, let him answer the question.
20   THE WITNESS:  I'm telling you what I think.
21       I cannot answer the question if Fastran, LLC owned the
22 Fastran Inc. account.  I don't know if that's --
23 BY MR. MUSHKIN:
24   Q   That's not what I asked you.
25   A   You said Fastran Inc. that belonged to Fastran, LLC.

Page 178

1    Q   Listen to --
2    A   In my opinion -- I'm not an attorney.  I need my
3  attorney advice, but I don't think this First Regional Bank
4  account was belonging to Fastran, LLC.  I don't think that's
5  the case.
6    Q   Are you going to listen to my question now, please?
7    A   Okay.
8    Q   Isn't it true that after the assets of Fastran Inc.
9  transferred to Fastran, LLC, the very same accounts that were
10 once Fastran Inc. accounts became Fastran -- and I mean the
11 business, not bank accounts, the location accounts, right, the
12 processing -- those became Fastran, LLC's customers; correct?
13   MR. PRUNTY:  Same objection.  I think it misstates prior
14 testimony.
15   MR. MUSHKIN:  This isn't about prior testimony, Counsel.
16   MR. PRUNTY:  You may answer the question.
17       Well, you're making a presumption in your question
18 that I don't believe is supported by the testimony.
19   MR. MUSHKIN:  We're about two minutes from going to see the
20 judge, Counsel.  I'm getting tired of this.
21   MR. PRUNTY:  I'm making the objection.
22   MR. MUSHKIN:  I'm getting damn tired of it.
23   MR. PRUNTY:  You can disagree with it if you want, but I'm
24 making the objection.
25   MR. MUSHKIN:  Make your objection.  You know the rules,

Page 179

1  Counsel.  You're not supposed to make speaking objections.
2  You're supposed to state your objection and stop.  It's in the
3  rules.  You're a better attorney than that.
4    MR. PRUNTY:  You're the one that's arguing with me.
5    MR. MUSHKIN:  Make your objection.
6    MR. PRUNTY:  The objection is simply --
7    MR. MUSHKIN:  Form of the question.
8    MR. PRUNTY:  Form of the question --
9    MR. MUSHKIN:  Done.
10   MR. PRUNTY:  -- misstates prior testimony.
11   MR. MUSHKIN:  You're done, "form of question," and I've
12 given you that for the whole deposition.  You can have it so
13 you don't need to make it anymore.  Preserve it.
14   THE WITNESS:  Mike, let me ask you one question.
15   MR. MUSHKIN:  No.  I ask the questions.  Hopefully you're
16 going to answer me truthfully.  So far not so much.
17   Q   Let's talk about the money.  The -- I just showed you,
18 sir, I just went through the bank accounts with you month by
19 month, the same ECHO deposits.
20   A   Uh-huh.
21   Q   After the accounts, after all the assets went to LLC,
22 the deposits kept going into the Inc. bank account; isn't that
23 true?
24   A   That's the first time you state your question in a way
25 that I can answer and the answer to that is yes.

Page 180

1    Q   Thank you.
2    A   This is the first time you state your question in a
3  way that I can answer.
4    Q   Thank you very much.
5        And if that's the case, what were you doing taking
6  money out of that bank account?
7    A   That bank account was still Fastran Inc. account.  I
8  had authority to sign money out of that account; and Bart
9  Carter personally directed me, when there is money in the
10 Fastran Inc. account, I am not going to go and get a loan and
11 pay interest on that loan to pay Fastran obligation to their
12 vendors.  Money is on Fastran Inc. account.  This was Bart
13 Carter's statement.
14   Q   Are you ready to answer my questions or you just want
15 to testify randomly?
16   A   You told me why did you go --
17   Q   Sir, I'm asking questions.  If you'll answer my
18 questions, this will get done.  If not, we're going to be here
19 day after day.
20   A   Okay.
21   Q   Now, you finally acknowledge that Fastran, LLC fees
22 went into a Fastran Inc. bank account; is that fair?
23   A   That's fair.
24   Q   Okay.  Now, once those fees hit there -- you're an
25 owner of Fastran, LLC; correct?

Page 181

1   A   Part owner.

2   Q   Part owner; correct?

3   A   Uh-huh.

4   Q   Do you know what a fiduciary duty is?

5   A   I heard the term a lot. I'm not saying I'm expert in

6   it.

7       MR. PRUNTY: Same objection.

8   BY MR. MUSHKIN:

9   Q   I'm not asking if you're an expert. I'm asking if you

10  know what a fiduciary duty is.

11  A   I have some idea, but I can't say for sure I know

12  everything.

13  Q   No problem.

14      You always knew that the money in the Fastran Inc.

15  bank account, after the transfer, belonged to Fastran, LLC?

16      MR. PRUNTY: Objection as to form.

17      Go ahead.

18      THE WITNESS: Some of the money in Fastran Inc. account,

19  yes; some, no.

20  BY MR. MUSHKIN:

21  Q   Whoa. You've already testified that all of the assets

22  of Fastran Inc. went to Fastran, LLC; correct?

23      MR. PRUNTY: Objection -- are you done with your question?

24      MR. MUSHKIN: Yeah, but don't object. I've given you the

25  objection across the board, Counsel.

Page 182

1       MR. PRUNTY: You can't give me -- if you're giving me the

2   objection that every restatement that you're making is

3   acknowledged as being incorrect, and I don't think you're doing

4   that --

5       MR. MUSHKIN: Sir, I am giving you the objection. You can

6   object to the form of every one of my questions, you can object

7   that I presume facts not in evidence, and you can object that

8   they're vague-and-ambiguous questions across the board. I

9   could care less. I would like to be able to ask this witness

10  questions without being interrupted. I'll give you any

11  objection you want, Counsel, because, with all due respect,

12  your objections are misplaced. These are very direct

13  questions. They're designed to elicit very specific answers,

14  and I personally believe that you're trying to coach the

15  witness.

16      MR. PRUNTY: No, I'm not trying to coach the witness.

17      MR. MUSHKIN: You can say that, but --

18      MR. PRUNTY: I'm trying to preserve my objections.

19      MR. MUSHKIN: And I've tried nine ways from Sunday to

20  preserve your objections.

21      MR. PRUNTY: Continuing objection.

22      You may answer the question. I'm not --

23      THE WITNESS: So one more time what's the question?

24      MR. MUSHKIN: I don't know. I've been interrupted so many

25  times, I just don't remember.

Page 183

1       Could I have my last question, please.

2       (The record was read as follows:

3       "QUESTION: You've already testified

4       that all of the assets of Fastran Inc. --")

5       MR. MUSHKIN: I don't need any more. Thank you.

6   Q   You testified that all of the assets of Fastran Inc.

7   were sold to Fastran, LLC; correct?

8   A   That's true.

9   Q   Cash Advance is an asset, isn't it?

10  A   Again that's a legal opinion for me that I don't know

11  if the money that goes to other people, it's -- should be

12  transfer or we had obligation to pay other people first. I

13  have no idea.

14  Q   Wait a minute.

15      Wasn't the whole idea for Bart to put money in to pay

16  all the bills?

17  A   That's true.

18  Q   Thank you.

19      So the cash belonged to Fastran, LLC, didn't it?

20  A   If there was any cash that belonged to Fastran Inc.,

21  yes, it belonged to Fastran, LLC.

22  Q   And you went and took that money without telling your

23  partners in Fastran, LLC, didn't you?

24  A   At some points I did, at some points.

25  Q   Thank you.

Page 184

1       Let's go back to the E-mails.

2       MR. PRUNTY: I would request that you allow him to finish

3   his answer before you cut him off.

4       MR. MUSHKIN: Didn't mean to cut him off, particularly when

5   he's admitting to theft.

6       MR. PRUNTY: Complete mischaracterization.

7       THE WITNESS: Yeah. You know that I was managing director

8   of Fastran, LLC as well, yes, the same authority that Bart

9   Carter had, but Bart Carter didn't have the authority that I

10  had on Fastran Inc., so you can miss --

11  BY MR. MUSHKIN:

12  Q   Sir, with all due respect, you get to tell it to the

13  judge. Doesn't matter what I say. Doesn't matter how I feel.

14  We're going to have an audience of one, okay, and you're going

15  to get to tell it to the judge.

16      Now let's go look at -- I just want to confirm your

17  testimony. I want to go to the top of 517.

18  A   Okay.

19  Q   Bart responds, "I cannot give a financial report

20  because you've never released access to the account that

21  receives the E-C -- the ECHO attractions."

22      That's true, isn't it? Bart did not get the bank

23  statements, did he?

24  A   I think I provide the bank statement to Bart. I sent

25  them to Kent.

Page 185

1  Q   When?

2  A   When there was discussion over all this.

3  Q   They certainly didn't have them in August of '08, did

4  they?

5  A   I don't remember when I send the bank statement to

6  them.

7  Q   Thank you.

8      Do you have any documents that support your allegation

9  that you sent bank statements to Bart Carter?

10  A   I probably do.  I probably did it through the E-mail.

11  I have to go back and check.

12  Q   Have you produced all your E-mails?

13  A   I did produce all of my E-mails.

14  Q   I'm going to leave a blank in your deposition and I'm

15  going to ask you to fill in by Bate number the document that

16  you say was the transmission of bank statements to Bart Carter.

17  A   Okay.

18      (Information requested:_____

19      _____.)

20  BY MR. MUSHKIN:

21  Q   I'd like you to take a look at page 502.  This is from

22  John Bryant to Nasrollah Gashtili; is that correct?

23  A   Yes.

24  Q   "The statement below, among others, is the main reason

25  I want out:"  Quote, "What ATMMS signs has no bearing.  If

Page 186

1  Fastran were successful, I wouldn't have been asked to

2  participate.  If you hadn't gone along with Nasrollah, the new

3  company wouldn't have included you."

4      You understand what this is about?

5  A   I don't even remember.  This is out of content, so I

6  don't remember this statement as coming out of where.

7  Q   "I would accept 200K for my stock with an agreement

8  that allows me to assemble my own organization and operate as

9  an ISO under conditions equal to IMS and MCC."

10  A   Okay.  I remember this E-mail from John Bryant.

11  Q   You remember this?

12  A   Yeah.

13  Q   What is he upset about?  This "What ATMMS signs has no

14  bearing," what's that about?

15  A   I have no idea what this means.  John Bryant has a

16  tendency of writing E-mails that no one understands.

17  Q   Isn't this a quote from Bart Carter's E-mail?

18  A   It is possible.  That makes sense that he took it out

19  of some Bart Carter's E-mail.

20  Q   And isn't this Bart Carter saying that ATMMS is owed

21  its fees just like any other customer of Fastran?

22  A   What does it say?

23  Q   "What ATMMS signs has no bearing.  If Fastran were

24  successful, I wouldn't have been asked to participate."

25  A   Okay.

Page 187

1  Q   "If you hadn't gone along with Nasrollah, the new

2  company wouldn't have included you."

3      Isn't this written because Fastran wasn't paying

4  ATMMS?

5  A   Absolutely has nothing to do with paying.  This is --

6  we can go to original Bart Carter's E-mail, and Bart Carter

7  E-mail is saying, if I remember correctly -- we can pull it

8  out -- Bart is actually telling John Bryant that, "If you

9  wouldn't agree with Nasrollah, you would be completely out.  We

10  wouldn't even giving you the 10 percent.  So go be happy to

11  receive the 10 percent because Nasrollah wants you around.  If

12  Nasrollah didn't want you around, you would be out and me,

13  Nasrollah and Larry would be together."  That's why I think, if

14  you pull the original Bart E-mail, that's what Bart Carter means

15  here most likely.  It has nothing to do about fee.  So

16  basically I think Bart Carter is defending me here and going

17  against John Bryant.

18  Q   Isn't it true that Fastran wasn't paying ATMMS?

19  A   I told you I never paid ATMMS, but I can't tell you

20  for sure if anybody else did or not.

21  Q   Thank you.

22      13.

23      (Plaintiff's Exhibit 13 was marked for identification

24  by the Certified Court Reporter and is attached hereto.)

25      MR. PRUNTY:  I note that this is a communication between

Page 188

1  Bart Carter and Mr. Gashtili's attorneys.  To the extent any

2  question revolves around communication between those attorneys

3  and Mr. Gashtili, I would tell him that those communications

4  are privileged.

5      MR. MUSHKIN:  There's nothing in this letter that can be

6  privileged, Counsel.

7      MR. PRUNTY:  No.  I'm not objecting to anything in that

8  letter being privileged.  I'm just assuming you're going to ask

9  questions about that letter and just informing my client.

10      MR. MUSHKIN:  Well, I'm certainly not going to ask him what

11  his attorney told him.

12      MR. PRUNTY:  Okay.

13      MR. MUSHKIN:  But I am going to ask him questions about the

14  content of this letter.

15  Q   Do you recognize this document?

16  A   I do.

17  Q   Was the firm of Troy Gould your attorneys at one time?

18  A   Yes.

19  Q   Do you know who the "Gashtili parties" are?

20  A   I think clearly it's stating Nasrollah Gashtili and

21  Integrated Dynamic Solutions, then "Gashtili parties."  So

22  obviously my attorney wrote this letter, but I'm assuming

23  "Gashtili parties" means me and Integrated Dynamic Solutions.

24  Q   I notice at the top of the -- you made a settlement

25  proposal.  "Your ownership in Fastran is extinguished.  You pay

Nasrollah Gashtili, Volume I                                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 189

1  the Gashtili parties 500,000.  You keep any and all
2  intellectual property you've taken from the Gashtili parties;
3  mutual releases, all contracts, agreements be terminated; and
4  all parties are permitted to compete against each other freely
5  in the marketplace."
6         Do you know if this offer was accepted by Mr. Carter
7  or his companies?
8      A  I don't think so; otherwise I would be notified.
9      Q  That's right.
10         Do you know what happened after this letter was
11  written?
12      MR. PRUNTY:  Objection as to form.
13      THE WITNESS:  Again I don't remember.  This is
14  September 21st.  I don't know what he mean.
15  BY MR. MUSHKIN:
16      Q  Did you initiate any form of lawsuit?
17      A  I don't -- I didn't.
18      Q  I'd like to direct your attention to 489.
19      MR. PRUNTY:  We're back to 12?
20      MR. MUSHKIN:  Yes, sir.
21      THE WITNESS:  Okay.
22  BY MR. MUSHKIN:
23      Q  You see from John Bryant to Larry Brown, Bart Carter
24  and Nasrollah Gashtili --
25      A  Yes.

Page 190

1      Q  -- "regarding minutes of 2-7-2008 board meeting"?
2      A  Okay.
3      Q  Have you ever received this?
4      A  If my name is in there, I probably have it.  I'm
5  reading it right now if I remember it.
6      Q  Let's go to 490, and these are -- that's where Larry
7  Brown is talking about getting those minutes out; is that
8  correct, bottom of the -- middle of the page from Larry Brown
9  to Carter, Gashtili and Bryant?
10      A  Yeah.
11      Q  "I sincerely apologize for taking so long to get these
12  minutes out.  With all that's been going on, the weeks just got
13  away from me."
14      A  Yeah.
15      Q  So this is about five weeks later than the board
16  meeting you're getting the minutes; is that correct?
17      A  That was the problem I mentioned to you earlier too,
18  that we didn't take notes in board meetings.
19      Q  Sir, that's not the answer to my question.  The answer
20  to my question is that the minutes of 2-7-08 board meeting are
21  received on March 21st.  That's about five weeks; is that
22  correct?
23      A  That's right.
24      Q  Now, do you recall receiving the minutes?
25      A  Honestly, I don't remember.  I have to go back and

Page 191

1  check my records.  I receive many board meetings and minutes
2  from Larry, but if you ask me if I remember 3-21 E-mail with a
3  board meeting attached to it, I have to go and check.
4      Q  Did he take accurate minutes of meetings?
5      A  Did Larry take accurate minutes of meetings?
6      Q  Yes.
7      A  In my opinion, no.
8      Q  Did you voice that opinion?
9      A  No.  We did a lot of things that we didn't do it
10  correctly.
11      Q  That's not what I asked you, sir.
12         Did you voice your opinion, contemporaneous to
13  receiving board minutes, that they were inaccurate?
14      A  No, I did not.
15      Q  Now, I notice that John Bryant is thanking -- and
16  that's on page 489.  Mr. Bryant is thanking him for the minutes
17  but asking questions.  Do you recall seeing this E-mail?
18      A  I recall seeing this E-mail, yes.
19      Q  Did you respond to John Bryant's E-mail?
20      A  Again I'm not sure.  I can't answer "yes" or "no."  I
21  mean how do you expect me to know if I answer an E-mail on
22  2008?
23      Q  Because it's a pretty serious E-mail.  He's asking to
24  be bought out.
25      A  I don't remember.  I'm sorry.

Page 192

1      Q  Do you recall if Mr. Bryant was ever bought out?
2      A  We did buy John Bryant out, yes.
3      Q  Do you know how much you bought him out for?
4      A  I can give you a rough number, but I don't --
5      Q  What's the rough number?
6      A  I think around 160,000.
7      Q  Who paid that money?
8      A  We each paid proportionately to our shares, Bart
9  Carter, me and Larry Brown.
10      Q  So Mr. Bryant was ultimately bought out; is that
11  correct?
12      A  Yes.
13      Q  But did you voice any -- you already testified.  Never
14  mind.
15         Now let's go to Bart Carter's response 4-3-2008.
16      MR. PRUNTY:  Do you have a Bates for that?
17      MR. MUSHKIN:  488.
18      Q  Do you recall receiving this E-mail?
19      A  Yes, I remember this E-mail.
20      Q  Did you respond in any way to Bart?
21      A  I don't remember.  It's hard for me to remember which
22  E-mail I responded to and which E-mail I didn't, so -- when
23  they're four years, five years old.
24      Q  It's obvious that Mr. Bryant and Mr. Carter are not
25  getting along right now; is that correct?

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 193

1   A   That was the normal behavior of Mr. Bryant.
2   Q   He didn't get along with anybody, did he?
3   A   He didn't get along with anybody.
4   Q   So he was ultimately bought out?
5   A   He was bought out.
6   Q   I'd like to direct your attention to 487.
7   A   John Bryant's E-mail or Bart Carter's E-mail?
8   Q   Bart Carter.
9       The third paragraph, "Fastran Inc., the company you
10  spent two years building, is no more.  At its end it consisted
11  of the Cash Advance products, not yet fully developed, and
12  three customers.  The products were the result of Nasrollah and
13  Larry.  Of the three customers, I would say that only ATMMS was
14  capable of attacking the marketplace.  Fastran Inc. was not
15  even able to support ATMMS.  The company went under, period.
16  You failed.  I have failed in the past also.  It is not
17  necessarily a bad thing if you learn from it and become
18  stronger and better."
19      "Now that you are not employed by ATMMS, you can
20  contact anyone you want.  The point you are skirting is that
21  you accepted employment by ATMMS and then refused to follow
22  direction given.  How is that ATMMS's fault?  I feel that you
23  never intended to work for ATMMS.  You just used it as a means
24  to grab some money so you could follow your own agenda."
25      Did you ever respond to this?

Page 194

1   A   Again my answer is same.  I don't remember, but I
2   remember the period that Bart Carter and John Bryant had
3   discussion over this and I had many discussions or E-mail with
4   Bart Carter over it as well.  At that time Bart and I were
5   friends.
6   Q   Let's take a look at 458.
7   A   485 or 458?
8   Q   458.  It's to Larry Brown, carbon copy Bart Carter,
9   from Nasrollah Gashtili.
10  A   I'm sorry.  Let me find it.  Okay.
11  Q   "Larry, last year while Bart was the managing director
12  of Fastran, LLC, he stopped paying IDS invoices and told me
13  something like this: 'I cannot continue paying expenses from
14  Fastran, LLC checking account while Fastran, LLC accumulating
15  money in Fastran Inc. account.  Fastran has enough money to pay
16  you directly and I'm not going to obtain loan, pay interest on
17  it, deposited into Fastran account to pay these or any other
18  invoices.'  I told him we are not asking for charity.  This is
19  what we agreed on when we formed the LLC, but he insists in his
20  position."
21      "If you and Bart want IDS to stop servicing Fastran
22  and do not want to continue paying IDS invoice, please send me
23  an E-mail requesting that and I will stop working on new
24  development, fixing any existing issues, and maintaining and
25  managing the data centers effective August 1."

Page 195

1       Do you see that?
2   A   Yes.
3   Q   Is there anywhere in there where you tell them that
4   you own the software?
5   A   No.
6   Q   You didn't say anything about that.  You say you're
7   not going to work on new development, fix any existing issues,
8   and maintain and manage the data centers effective August 1st.
9   A   But that has nothing to do with the software.
10  Q   But isn't it true that Fastran actually paid for the
11  servers?
12  A   Fastran paid for the servers.
13  Q   Thank you.
14  MR. PRUNTY:  Did you finish your answer?
15  THE WITNESS:  I think he got my answer.
16      Fastran paid for the actual servers, but somebody had
17  to maintain them.
18  BY MR. MUSHKIN:
19  Q   Right.  But those servers were owned, are still owned,
20  by Fastran; correct?
21  A   Which somebody had to maintain them, yes.
22  Q   Sir, I'm not asking about maintaining them.  I'm
23  asking about who owns those servers.
24  A   But in this E-mail that you're referring to, there's
25  no discussion about who owns the servers.  The question I'm

Page 196

1   not going to maintain the data centers.
2   Q   Right, and there's no disclosure to anybody that the
3   software is owned by IDS.
4   A   But why do I have to disclose that in every E-mail
5   that I send out?
6   Q   My question to you, not your questions to me.
7       Let's take a look at 442.  Do you see that from Rachel
8   Gleaton, LuckEcash Inc.?
9   A   Okay.
10  Q   Why wasn't she getting her money on time?
11  A   I have no idea.  I don't know why you asking me that
12  question.
13  Q   Let's look at the next one.  It's from Dave Stueve --
14  BART CARTER:  Stueve.
15  BY MR. MUSHKIN:
16  Q   -- Stueve to John Bryant regarding commissions.
17  A   Okay.
18  Q   Isn't it true that at this time in September of 2007
19  Fastran couldn't pay its bills?
20  A   I know Fastran had difficulties to pay their bills.  I
21  don't remember under that exact month or date, but we all know
22  that Fastran Inc. --
23  Q   Let's go to 441, the bottom of the page from Nasrollah
24  to Bart, Sunday September 23rd, 8:23 p.m.  "Bart, how quickly
25  can you take over this process?  Obviously we need to send you

Nasrollah Gashtili, Volume I | JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 197

1    our contracts with Lisa as well."
2        Isn't it true that in September of '07 Fastran
3    couldn't pay its bills and it looked to Bart Carter to help?
4        A    That was right around the time period that we were
5    negotiating with him to come and help, yes.
6        Q    Thank you.
7        Let's go to the top of page 441. "Nasrollah, I see
8    from the E-mail that no commissions have been paid for two
9    months and they were used to getting commissions every week.
10   The files sent only had data for September.  What is going on
11   here?"
12       Do you recall responding?
13       A    Again I don't remember responding to this individual
14   E-mail, so -- but probably he asked me question and most likely
15   I answer him.
16       And I think that Bart is wrong here.  We never pay
17   commission to anyone weekly, so --
18       Q    That's not what what's-her-name said.  In fact it's
19   right in the preceding trail of E-mails.
20       A    No, but I know for fact that we paid the commission on
21   a monthly basis, not a weekly basis.  That's a fact.  That's
22   not a question.
23       Q    That's not what --
24       A    Rachel.
25       Q    -- Rachel says.  Rachel says, "Commissions are being

Page 198

1    overnighted to the tribes on" -- excuse me, please.
2        (Interruption in proceedings.)
3        THE WITNESS:  So I was telling you that we were paying
4    commission monthly.  You were saying that's not what Rachel
5    said.
6    BY MR. MUSHKIN:
7        Q    Yeah.  I'm just talking about what Rachel said, that
8    they're used to getting them weekly; and I'm sure Bart didn't
9    know because he's brand new to it at that point.  He's just
10   reciting what she said.
11       A    If I remember correctly -- Bart can correct me -- that
12   he was paying his commission to his location on a monthly basis
13   too, not daily or weekly, but that's my recollection.
14       Q    I'm not sure it's of any particular consequence.  It's
15   just what your customer is anticipating.  That's the reason I
16   brought that out, is that clearly at this point -- and if I
17   misstate, you can certainly correct me, but it's fair to say
18   that at this point in time Fastran is having a hard time
19   meeting its obligations.
20       A    That's the right assumption.
21       Q    I'd like to direct your attention to 434.
22       A    Which one?
23       Q    In the center of the page.  This is from Dave Stueve
24   to Larry Brown, John Bryant, yourself.  Is there a reason that
25   his invoice for August wasn't paid?

Page 199

1        A    I don't remember exactly the circumstances on this
2    particular invoice, but we know that we have issues with
3    Fastran financially and being able to pay their invoices.
4        Q    It also says, "I've also attached Fastran's monthly
5    summary report for September.  I've added a tab showing gross
6    profit, which you might find interesting."
7        A    Uh-huh.
8        Q    I notice that that document hasn't been produced.  Do
9    you know where that document is?
10       A    Most likely I have copy of it, and if you don't have
11   it, I definitely can produce it for you.
12       Q    I would like to have that monthly summary report for
13   September.
14       A    Yeah.  You know, we had monthly summaries for every
15   month.
16       Q    I'd like to have them all, please.
17       A    Any one that I have, I certainly can provide to you,
18   but I wasn't involved in every month.
19       Q    Weren't they handed out to all the members?
20       A    Not always, no.  I think this is specific one that he
21   mention he send it to us, so he wanted draw our attention to
22   something, but regularly they were processing them and John
23   Bryant and Dave Stueve were handling those, not me.
24       MR. PRUNTY:  I will point out one thing on this, which is
25   this was a reply.  Normally on replies the document isn't

Page 200

1    attached directly, so it would be separate from this
2    particular --
3        MR. MUSHKIN:  And that's why I asked it.  If you can have
4    that, I'd like to have it.
5        Q    Did you ultimately play Mr. Stueve?
6        A    "Play," what do you mean?
7        Q    Pay.
8        A    We either pay people that we owed money to or
9    negotiated for lower -- acceptance of a lower payment for the
10   monies that we owed to them.  Dave Stueve was one of them.
11       Q    I'd like you to take a look at 433.
12       A    Okay.
13       Q    Now, I note in September of '07 you had total volume
14   of only about $500,000.
15       A    September what?  I'm sorry.
16       Q    '07.
17       A    Okay.  I can't -- that's probably Bart's E-mail.  If
18   you look at the numbers, that's probably correct, but I can't
19   say "yes" or "no" based on my memory.
20       Q    But my point is, is this before all 78 or whatever
21   number of ATM accounts are on line?
22       A    If I remember it correctly, at some point before Bart
23   leaves, we were up to -- I mean I don't want to be hold
24   responsible for it because it's just estimate, but up to
25   million and a half.

Nasrollah Gashtili, Volume I                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 201

1    Q    Correct.
2    A    Something like that.
3    Q    Right.  And by -- your monthly volume in May of '09 is
4    "a million two-fifty"?
5    A    Yeah.  I think at some point we get to million and a
6    half.
7    Q    Almost a million and a half in some of them?
8    A    Yeah.
9    Q    But I notice here in September of '07 it's only at a
10   half a million.
11   A    Yeah.
12   Q    Is this before all the ATMMS accounts go active?
13   A    That's probably the case, yes.  Some of the casinos
14   are not active yet and ATMMS have later.
15   Q    And then once ATMMS gets the bulk of those accounts
16   on, it then gets -- goes all the way up to "a million five"
17   approximately?
18   A    I think ATMMS constantly was -- they were adding
19   location and we were going up and they were adding location.
20   That's a fair statement.
21   Q    At the top of the page it's to --
22   A    We're still 433?
23   Q    Still 433.  "Nasrollah, can you give me a date when
24   the AIO will be finished?  I have a large sale pending."
25        What's AIO?

Page 202

1    A    What's AIO stand for?  "All in one."  AIO stands for
2    "all in one" and it's a software that -- or module that we
3    built, IDS built, that you could put into an ATM and convert a
4    regular ATM to a machine that not only can process ATM
5    transaction, it can also process credit and debit transaction;
6    and this specific area that he's talking about, if I remember
7    correctly, was for a TITO machine.  So we build AIO for a
8    different type of ATM machine.
9    Q    Take a look at 431, please.  Let's go at the bottom of
10   the page, September invoice.  Bart says, "This is not right.
11   I'll call you over the weekend."  Do you see that?
12   A    Uh-huh.
13   Q    So at least at this point there's only three
14   customers; is that correct, Tonkawa --
15   A    Yeah.
16   Q    -- Cher-Ae Heights, and ATMMS?
17   A    The form of this report is wrong because Cher-Ae
18   Heights and Native Lights are two separate casinos.  It would
19   be more appropriate to put the Native Lights and Tonkawa
20   together because they belong to the same tribe and Cher-Ae
21   Height in a separate tribe.
22   Q    Isn't that exactly --
23   A    I don't know who put this together.
24   Q    Isn't that exactly what Bart is saying, "This is not
25   right.  I'll call you over the weekend"?

Page 203

1    A    Possible.  I don't know what Bart means with that.
2    Q    Let's go up to the top where Nasrollah wrote, "Hi,
3    Dave."
4    A    Okay.
5    Q    Do you see that?
6    A    Yes.
7    Q    It asks, "Do you have a report for all ACH you've
8    initiated?"
9    A    Yes.
10   Q    What's ACH?
11   A    Again that's how Dave actually transfer money from --
12   Q    That's the checks themselves; right?
13   A    No.  Actually it's the --
14   Q    ACH, that's outgoing.  That's how you pay out; right?
15   A    Yes, electronic.
16   Q    Electronic, it's like electronic check.  You initiated
17   it out; right?
18        Did you get this information --
19   A    I'm not sure.
20   Q    -- from Dave?
21   A    I'm not sure.  I have to go and check.
22   Q    Let's turn back one more page because I've only got
23   five minutes before counsel is going to renegotiate with me.
24        This goes from Dave to Nasrollah, October.  "I haven't
25   paid LuckEcash for September yet and I'm only going to pay them

Page 204

1    5,005.52 as I'm withholding equipment payment.  Their
2    commissions owed is 6,787.  I paid their August commission on
3    10-4-07.  There was an ACH report showing all ACHs.  There are
4    a lot as it shows all per-location daily ACHs too.  No money
5    has been paid to anyone else.  The only other payments was to
6    LuckEcash for the commission owed to the casinos.  That is it."
7        Do you see that?
8    A    Yes.
9    Q    So you're now holding LuckEcash's money; is that
10   correct?
11   A    I don't understand the question.
12   Q    "The only other payment was to LuckEcash for
13   commissions owed to the casino.  That is it."
14        So they paid the casino a commission but not
15   LuckEcash's share; is that correct?
16   A    He's clearly saying above that I pay for September
17   commission to LuckEcash, 5,005 something; and you have to
18   remember I wasn't doing accounting at this point.
19   Q    I'm confused by this as well, so I'm just trying to
20   get your understanding.
21   A    My understanding is that he said he pays for one of
22   the months but not for the other and he'll hold the equipment
23   cost out of the commission that we have to pay to LuckEcash.
24   Q    Let's look at the E-mail above.
25        "Nasrollah, ask David.  If Fastran receives roughly

Nasrollah Gashtili, Volume I                JB Carter Properties II, LLC v. Nasrollah Gashtili

---

Page 205

1  50 percent of the profit from these locations, why is" -- then
2  it says "why si" but -- "why is LuckEcash getting so much more?
3  It doesn't look like 50/50 to me."
4      A    Yeah.  So Bart -- at this point you have to remember
5  that Bart asked me to get involved with this reporting and get
6  some information for him so he can investigate, and I was
7  merely acting between Bart and Dave -- because Dave obviously
8  didn't send anything directly to Bart -- to send information to
9  Bart, and Bart was actually looking at this information and
10  finding out issues and problems with our operation.
11      Q    And in fact he tells you that on October 17th, which
12  is page 432 at the bottom.
13      A    That's absolutely true.
14      Q    He's asking you for information for breakout of profit
15  and loss so he can evaluate the company; right?
16      A    And that was specifically my request and the rest of
17  Fastran Inc. request, that Bart gets involved with managing the
18  business side of the operation.  He's offered that he's going
19  to bring more than investment and he's going to bring expertise
20  and knowledge.
21      Q    And he brought in about 80 accounts too, didn't he?
22      A    Those accounts were already with Fastran Inc.
23      Q    ATMMS brought 80 accounts to Fastran Inc., didn't
24  they?
25      A    That's true.

---

Page 206

1      Q    Thank you.
2          Okay.  Now let's go to 429, which is from Bart to you,
3  "Offer Review."  This is October 24th, 2007.  Would you take a
4  minute and take a look at that.
5          Did you have a chance to read that, Nasrollah?
6      A    Yes.
7      Q    Is this ultimately the deal that was done?
8      A    I don't remember, but it's very close.  A lot of this
9  stuff that is in here is the stuff that we discussed over and
10  over.
11      Q    But isn't this basically the terms?  ATMMS put 350-
12  into the company.  ATMMS got 40 percent of the company.  Aren't
13  those the basic terms that were ultimately agreed to?
14      A    That -- those are very close to what we agreed on
15  finally.
16      Q    And that's a real good spot to break for the day.
17      THE REPORTER:  Since I don't know when we're coming back,
18  do you want to reserve for reading and signature?
19      MR. PRUNTY:  Yes.
20      THE REPORTER:  And do you want a copy of today's?
21      MR. PRUNTY:  Yes.
22          (Deposition concluded at 4:53 p.m.)
23
24
25

---

Page 207

CERTIFICATE OF DEPONENT

PAGE  LINE    CHANGE              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

* * * * *

          I, NASROLLAH GASHTILI, deponent herein, do hereby
certify and declare under penalty of perjury the within and
foregoing transcription to be my deposition in said action;
that I have read, corrected and do hereby affix my signature to
said deposition.


          _____
          NASROLLAH GASHTILI, Deponent


          Subscribed and sworn to before me this _____ day of
          _____ 2012.
          _____
          NOTARY PUBLIC

---

Page 208

REPORTER'S CERTIFICATE

          I, Ellen A. Goldstein, a duly certified court reporter
in and for the County of Clark, State of Nevada, do hereby
certify:
          That I reported the taking of the deposition of the
witness, NASROLLAH GASHTILI, at the time and place aforesaid;
          That prior to being examined, the witness was by me
duly sworn to testify to the truth, the whole truth and nothing
but the truth;
          That the witness requested to read and sign the
transcript herewith;
          That I thereafter transcribed my said shorthand notes
into typewriting and that the typewritten transcript of said
deposition is a complete, true and accurate transcription of my
said shorthand notes taken down at said time.
          I further certify that I am not a relative or employee
of an attorney or counsel of any of the parties, nor a relative
or employee of any attorney or counsel involved in said action,
nor a person financially interested in the action.
          IN WITNESS THEREOF, I have hereunto set my hand in the
County of Clark, State of Nevada, this 18th day of March 2012.
          _____
          Ellen A. Goldstein, CCR No. 829

---

# EXHIBIT "3"

Exhibit "3"

*FASTRAN*

July 23, 2007

Bart Carter
ATM Merchant Systems
1667 Helm Drive
Las Vegas, NV 89119

Dear Bart,

We are excited about the proposition of ATMMS becoming an investment partner with Fastran. We enjoy working with ATMMS and intend to be integral in helping ATMMS be "first to market" in Las Vegas with unique cash services and payment products from Fastran.

Fastran Inc. is attempting to raise $1,250,000 from our strategic alliances, and business associates before we decide to accept terms from private equity firms that we have been presenting Fastran to over the last few months. We currently have strategic agreements with ATM Merchant Systems (ATMMS) and International Merchant Services (IMS) and we don't intend to offer our products to any additional ATM ISO's as we know we have solid partners to support our deals.

Fastran is targeting the tribal gaming markets and we believe there are two trends forming in the gaming industry that Fastran is uniquely positioned to capture. Within the tribal gaming industry, there is a growing trend to in-source the cash access operations. We are confident this demand will reach a tipping point and spread to the commercial gaming market eventually. In both cases we have designed our model to enable casino gaming venues (tribal, commercial, racetracks etc) to offer credit and debit card cash advance, check cashing services and "All in One" ATM to their customers. We have formed strategic partnerships and relationships in gaming over the past decade that we feel gives us a distinct competitive advantage. Fastran will expand services with our strategic alliances by integrating our product suite with cashless gaming products, ticket redemption Kiosks/ATMs, stored value card wagering platforms and web-based slot floor systems.

Plaintiff EXHIBIT 11
WITNESS  Nascollah Gashil
DATE  March 7, 2012
Ellen A. Goldstein, CCR 829

GASH000044

*ii FASTRAN*

We want ATMMS to be involved because we believe it is good for Fastran and good for ATMMS. For us, it allows us to raise the money we need to grow Fastran from people we trust, and with a mutual strategic objective in mind. For you, taking ownership in a firm that will drive ATM business to ATMMS and the assurance that you have the skilled partners you need to develop infrastructure, drive and produce competitive products.

If you choose to make an investment in us and agree to the terms set forth in this letter we should have the discussion about the future of our partnership.

**We have taken the liberty to propose an outline of the terms for your consideration:**

**PROPOSED: $1,250,000 USD Equity**

- Fastran is willing to give 40% of the total ownership of the company for $1,250,000 in four separate block or any combination of the following four blocks:
    - 16% of the total ownership of Fastran for $500,000
    - 16% of the total ownership of Fastran for $500,000
    - 4% of the total ownership of Fastran for $125,000
    - 4% of the total ownership of Fastran for $125,000

Fastran will add two new Board of Directors seats appointed by each of the $500,000 investors. We have decided to offer four blocks of ownership since we strongly believe there are multiple parties interested in investing in Fastran with different financial abilities and/or desire.

We are planning to use the collected funds to clear all of our outstanding debt and to set aside cash reserve for subsidizing our operating expenses for the next 12 to 24 months. Here are two tables briefly describing the use of proceeds:

| Fastran Existing Debt / Commitments | | |
|---|---|---|
| **Creditor** | **For** | **Amount** |
| IDS | Software Development | $150,000.00 |
| Larry Brown | Promissory note on a Personal Loan | $50,000.00 |
| Law Offices of Pillsbury | Professional Services | $30,000.00 |
| Back pay | To Employees (not Officers) | $50,000.00 |
| Taxes | Taxes Owed | $20,000.00 |
| Credit Card | Bank of America Credit Card | $25,000.00 |

GASH000045

*FASTRAN*

| Legal & Accounting Fees | Other Professional Fees Owed | $5,000.00 |
|---|---|---|
| Buyout the Dell Lease | Existing Data Center Equipment | $50,000.00 |
| Other Miscellaneous Items | Phone, Storage, Rent, Equipment | $20,000.00 |
| **Total:** | | **$400,000.00** |

| Monthly Projected Expenses For The Next 12 Months | | |
|---|---|---|
| Officers Salaries | John, Larry, Nasrollah | $25,000.00 |
| Other Salaries | Terry, Touria, Network Engineer, CEO,CFO | $30,000.00 |
| Product Development | New Modules/Features | $15,000.00 |
| Data Center | Operating Cost for Two Data Centers | $4,000.00 |
| Sales & Marketing | Travel, Marketing Materials, Shows | $5,000.00 |
| Other Expenses | Rent, Phone, Support Travel | $4,000.00 |
| **Total:** | | **$83,000.00** |

If this outline of terms is acceptable, our corporate counsel will prepare the following documents:

- Subscription Agreement
- Common Stock Purchase Warrant

Also an agreement reflecting our promise to abide by any and all terms and a discussion about end strategies is welcome. The stock will be issued immediately on the day we transfer the funds and stock certificates from our corporate counsel, Paul Speltz, will be sent to the address you specify.

We hope that you will consider participating in this mutually beneficial opportunity. We truly believe that ATMMS is poised for success in the Gaming market and we look forward to your support in growing Fastran. Thank you for your consideration; we look forward to discussing this opportunity with you further

Sincerely,

Fastran Officers

GASH000046

# EXHIBIT "4"

Exhibit "4"

**Deposition of:**

Nasrollah Gashtili,

Volume II, Pages 209 - 366

**Case:**

JB Carter Properties II, LLC v. Nasrollah Gashtili
A-09-606457

**Date:**

04/24/2012



Oasis Reporting Services, LLC
2620 Regatta Drive, Suite 102
Las Vegas, Nevada 89128
702-476-4500
www.oasisreporting.com
info@oasisreporting.com

Nasrollah Gashtili, Volume II                     JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 209

```
 1            DISTRICT COURT
 2          CLARK COUNTY, NEVADA
 3
 4   JB CARTER PROPERTIES II, LLC, a  )
 5   Nevada limited-liability company on )
     its own behalf and derivatively on )
 6   behalf of FASTRAN, LLC,        )
 7            Plaintiff,           )
 8      vs.                 ) Case No. A-09-606457
 9   NASROLLAH GASHTILI, an individual; )
10   JOHN DOES 1-10; DOE ENTITIES 1-10, )
11            Defendants.          )
12   _____ )
13
14
15   DEPOSITION OF NASROLLAH GASHTILI  (VOLUME II)
16      Taken on Tuesday, April 24, 2012
17           At 9:53 a.m.
18      Held at Michael R. Mushkin & Associates
19           4475 South Pecos Road
20            Las Vegas, Nevada
21
22
23
24
25   Reported by:  Ellen A. Goldstein, CCR 829
```

Page 210

```
 1   APPEARANCES:
 2
 3      For the Plaintiff:
 4        MICHAEL R. MUSHKIN, ESQ.
          MICHAEL R. MUSHKIN & ASSOCIATES
 5        4475 South Pecos Road
          Las Vegas, Nevada  89121
 6        Phone: (702)386-3999
          Fax: (702)454-3333
 7        michael@mushlaw.com
 8
 9
10
11      For the Defendants:
12        F. CHRISTOPHER AUSTIN, ESQ.
          GREENBERG TRAURIG
13        3773 Howard Hughes Parkway
          Suite 400 North
14        Las Vegas, Nevada  89169
          Phone: (702)938-6889
15        Fax: (702)792-9002
          austinc@gtlaw.com
16
17
18
19      Also Present:
20        Bart Carter
21
22
23
24
25
```

Page 211

```
 1              I N D E X
 2
 3   WITNESS                    PAGE
 4   NASROLLAH GASHTILI
 5     Examination by MR. MUSHKIN        213
 6
 7
 8            E X H I B I T S
 9   NUMBER   DESCRIPTION          INTRODUCED
10   14    6-26-06 E-mail chain among Bill    292
           Connell, Bart Carter, and Lawrence
11         Brown  (Bates Nos. CARTER 00462 to
           CARTER 00463; 2 pages)
12
13   15    2-15-07 E-mail from Lawrence Brown  295
           to Bill Connell (Bates No.
14         CARTER 00536; 1 page)
15   16    7-22-07 through 7-23-07 E-mail chain 296
           between Bart Carter and Nasrollah
16         Gashtili  (Bates Nos. CARTER 06391 to
           CARTER 06394; 4 pages)
17   17    10-17-07 E-mail chain between Nasrollah 301
           Gashtili and Bill Connell  (Bates No.
18         CARTER 06204; 1 page)
19   18    12-13-07 E-mail chain between Nasrollah 310
           Gashtili and Terry Kremmin  (Bates No.
20         CARTER 06018; 1 page)
21   19    1-4-08 E-mail from Nasrollah Gashtili  317
           to Bart Carter  (Bates No.
22         CARTER 06006; 1 page)
23   20    9-21-08 through 9-22-08 E-mail chain  318
           between Nasrollah Gashtili and Bart
24         Carter  (Bates No. CARTER 05235;
           1 page)
25
```

Page 212

```
 1   (I N D E X  Continued)
 2   NUMBER   DESCRIPTION          INTRODUCED
 3   21    9-22-08 E-mail chain among Nasrollah  320
           Gashtili, Larry Brown, and Bart
 4         Carter  (Bates No. CARTER 05234;
           1 page)
 5
 6   22    12-18-07 E-mail              322
           chain between Nasrollah Gashtili and
 7         Bart Carter  (Bates No. CARTER 06011
           to CARTER 06012; 2 pages)
 8   23    Board meeting minutes  (misc. Bates   333
           numbers; 21 pages)
 9
10   24    11-08 through 11-4-08 E-mail chain   335
           between Lawrence Brown and Bart Carter
11         (Bates Nos. CARTER 04692 to
           CARTER 04693; 2 pages)
12
13
14
15         INFORMATION REQUESTED
16           PAGE  LINE
17            281    8
              290    2
18            304   14
              319   15
19            325    1
20
21
22       EXCERPT OF TRANSCRIPT UNDER CONFIDENTIAL SEAL
23           PAGE  LINE
24            252   21
25
```

Page 213

1    TUESDAY, APRIL 24, 2012 - LAS VEGAS, NEVADA
2                    9:53 A.M.
3
4        (By stipulation of counsel, the requirements of
5    NRCP Rule 30(b)(4) were waived.)
6
7              NASROLLAH GASHTILI,
8    called as a witness by and on behalf of the Plaintiff,
9    having been first duly sworn by the Certified Court
10   Reporter, was examined and testified as follows:
11
12              EXAMINATION
13   BY MR. MUSHKIN:
14       Q   Mr. Gashtili, have you had a chance to review the
15   transcript of your -- the first portion of your deposition?
16       A   Yes, I did review it.
17       Q   Have you had a chance to mark it up and make any
18   changes to it?
19       A   I did.
20       Q   Can I have those changes.
21       A   I don't have it with me.  I submit to --
22       MR. AUSTIN:  I think it was sent to my office.  I think the
23   only change was just an acronym, a reference to a company by
24   its acronym that appeared to be incorrect.
25   ///

Page 214

1    BY MR. MUSHKIN:
2        Q   Is that your recollection, there was only one change?
3        A   I think that and one more thing, but it was just
4    acronym.
5        Q   A name or something like --
6        A   Yeah.
7        Q   No substantive changes?
8        A   No.
9        Q   When we left off, we had talked about certain
10   exhibits; and do you recall this offer that was made to
11   Mr. Carter in I guess September of '07?  Do you know what I'm
12   talking about?
13       A   Not specifically.
14       Q   Do you remember having your deposition taken before?
15       A   I do.
16       Q   Do you remember the documents that we talked about?
17       A   I remember some of them, but I can't -- I mean I have
18   to see them again if you refer to them.
19       MR. AUSTIN:  Mr. Mushkin has no problem projecting, but you
20   need to speak a little louder over the air handler.
21       THE WITNESS:  Okay.
22   BY MR. MUSHKIN:
23       Q   Do you have any recollection of the offer that you
24   made to Mr. Carter on behalf of Fastran Inc.?
25       A   I don't remember if I made the offer, because it was

Page 215

1    obviously multiple times that we were negotiating.  I don't
2    remember exactly if it was on behalf of Fastran Inc. or on my
3    personal behalf of me personally.  I think it was on behalf of
4    me personally, not the Fastran Inc.
5        Q   You do?
6        A   Yeah.  Fastran Inc. at that point was not even in the
7    picture anymore.
8        Q   What were you offering Mr. Carter?
9        A   I don't remember exactly.  As I said, it was multiple
10   times, multiple going back and forth.
11       MR. AUSTIN:  Do we have a year that we're talking about
12   here?
13       MR. MUSHKIN:  Yeah, when he originally brought him in.
14       THE WITNESS:  It was well after that.
15   BY MR. MUSHKIN:
16       Q   Let's try and refresh your recollection a little bit,
17   okay?
18           Do you recall your testimony last time that you said
19   that you had -- that IDS -- first of all you are the sole owner
20   of IDS; is that correct?
21       A   I am.
22       Q   So that at least for purposes of this deposition, when
23   we say "you," we can mean you or IDS.  We may later have to
24   clarify that, but I'm not going to do so each time I address
25   it.

Page 216

1            But you testified earlier that IDS had a software
2    product and that you went out and hired John Bryant to market
3    it.
4        A   I did not say that.
5        Q   What did you say?
6        A   I don't know what -- I mean the entire day of
7    deposition?
8        Q   Did you or did you not say that you had software
9    that you owned and that you went out and hired John Bryant to
10   market the software?
11       A   I never said that.
12       MR. AUSTIN:  Objection; calls for -- objection; ambiguity.
13   Are we talking software that he owned?  Actually, objection;
14   calls for a legal conclusion as to what the word "owns" means
15   with regard to software and who owns what, if you could just be
16   more clear as to what you're referring to in your question.
17       MR. MUSHKIN:  That was a Clintonesque objection.  I would
18   appreciate it if you would keep your objections to be less
19   coaching the witness and just state -- if it's the "form of
20   the question," I'll restate the question.  If it's "vague and
21   ambiguous," it's vague and ambiguous.  If it calls for a legal
22   conclusion, "legal conclusion."  Who owns what?  The man
23   testified for hours that IDS owns certain software that is
24   currently being used by -- ASAI?
25       BART CARTER:  Correct.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 217

1    MR. MUSHKIN: And generating revenue for IDS. So now to
2 make such an objection is disingenuous.
3    Q   Back to the question, do you remember anything -- what
4 software did Fastran Inc. own?
5    A   To the best of my knowledge, I don't know if they own
6 any software.
7    Q   Well, you were a one-third shareholder of Fastran
8 Inc.; right?
9    A   Yes.
10    Q   And you were the development end of that corporation;
11 right?
12    A   I don't know, when you say "development end of that
13 corporation," what does that mean.
14    Q   Didn't you represent to John Bryant and Larry Brown
15 and Magnus that you had 80 people in India ready to create this
16 software?
17    A   I don't remember I told them I have 80 people in
18 India, so --
19    Q   But everything else you did tell them?
20    A   It -- the question is not really -- I don't -- Magnus,
21 Larry Brown and John Bryant didn't came together to me. Magnus
22 was introduced to the picture way later.
23    Q   So how does it come together? We'll go back to the
24 beginning. How does this relationship come together? How does
25 Fastran Inc. come together?

Page 218

1    A   It was Larry Brown and John Bryant and they came to my
2 office.
3    Q   Who started it?
4    A   The three of us.
5    Q   Who started this?
6    A   Three people: John Bryant, Larry Brown and myself.
7    Q   Did you invite John Bryant?
8    A   No. Larry Brown was the one that knew John Bryant and
9 knew me.
10    Q   And did John Bryant go to Larry Brown?
11    A   I'm assuming, because Larry Brown brought John Bryant
12 to my office.
13    Q   And did you in fact work at Countrywide the same time
14 that John Bryant did?
15    A   John Bryant never -- as far as I know, he didn't work
16 for Countrywide.
17    Q   How about Larry Brown? Did you work at Countrywide
18 the same time Larry Brown worked at Countrywide?
19    A   As far as I know, Larry Brown didn't work for
20 Countrywide.
21    Q   Do you know who John McWaters is?
22    A   I do know who John McWaters is.
23    Q   And did you and John McWaters work at Countrywide at
24 the same time?
25    A   At some point me and John McWaters work at

Page 219

1 Countrywide, that's true.
2    Q   Okay. And at some point did John McWaters come to
3 work with you at IDS?
4    A   I -- again I don't know what is the "with you" means.
5 I offered him a job and he accepted the job and he was my
6 employee.
7    Q   What does "with you" mean to you?
8    A   It's a bad question, but it could be partnership, it
9 could be any other thing; just, you know, working with me. I
10 just explained for you that he was my employee. I offer him
11 officially a position at my company and he accepted and he came
12 and work for me.
13    Q   And how long did he work for you?
14    A   I don't remember. I have to go back, check.
15    Q   Did he work on Fastran product?
16    A   He did work on -- one of the projects he worked on was
17 Fastran.
18    Q   One of the projects he worked on was Fastran.
19        Now, your prior testimony is that when -- well, I'll
20 give you another chance.
21        When John Bryant came to you with Larry Brown, what
22 did they want?
23    A   They wanted to know -- they were saying there is a
24 market opportunity out there and, if I can build software, they
25 can market it.

Page 220

1    Q   So when they came to you, was there any -- was the
2 platform for multiple -- let's define the platform between you
3 and me. What would you like to call this software, "cash
4 advance" --
5    A   Okay.
6    Q   -- "multi cash"? "Three in one"?
7        Tell me how you believe -- what was it referenced
8 amongst you guys? What is it that you were calling it?
9    MR. AUSTIN: Objection as to the form of the question.
10    MR. MUSHKIN: It was a diatribe.
11    Q   I accept his objection, but you understand where I'm
12 going. What did you guys call this?
13    A   I don't remember, at the time that we meet, there was
14 any name or we called it anything, but for the sake of
15 argument, you can call it "cash-advance software."
16    Q   Cash advance.
17        So they came to you with a request to build
18 cash-advance software; is that correct?
19    A   They told me if I build a software, they can market
20 it.
21    Q   "If I can build the software" -- well, whose idea was
22 the software?
23    A   I don't understand what is "whose idea was the
24 software" means.
25    Q   Whose idea -- isn't this referred to as an application

Page 221

1  sometimes?
2      A   Okay, application, sure.
3      Q   All right.  Whose idea, whose concept, was the
4  application?
5      A   Oh, concept was already out there in the market.
6  Multiple companies were offering the same or similar software,
7  so it wasn't any new idea.  They were saying, "This, this, this
8  companies are offering this software, if you can build
9  something like that."
10     Q   In fact Larry Brown had built such a software for
11 Countrywide; isn't that correct?
12     A   I don't think so, but I'm not sure.
13     Q   I'm sorry.  Larry Brown had -- sorry.
14         Larry Brown had written such an application for Fast
15 Funds, hadn't he?
16     A   I can't answer for Larry Brown.  I really don't know
17 if he did or not.
18     Q   Didn't he provide it to you?
19     A   No.
20     Q   It's your testimony that Larry Brown did not provide
21 you a copy of the Fastran software?
22     BART CARTER:  Fast Funds.
23     MR. AUSTIN:  Objection --
24     MR. MUSHKIN:  Sorry.  Fast Funds software.
25     THE WITNESS:  Not to me, no.

Page 222

1  BY MR. MUSHKIN:
2      Q   Anybody that worked for you?
3      A   I can't say that and I don't know.  I -- we do not
4  take softwares from anybody else.  That's the company's policy.
5  We build software ourself unless if somebody is asking us to
6  work on their product and give us the product to work on it.
7  Otherwise we build the product ourselves.
8      Q   Do you recall receiving any screen captures from Larry
9  Brown as they relate to the Fast Funds application?
10     A   I do not recall that.
11     Q   Do you recall having discussions regarding such
12 captures with employees that worked for IDS?
13     A   I do not recall that.
14     Q   If I told you that two people have testified that you
15 were present when this software was discussed --
16     MR. AUSTIN:  Objection as to form.  Where did they testify?
17     MR. MUSHKIN:  In front of me.
18     Q   If I told you that I interviewed two people that said
19 you were there when this very issue was discussed, would you be
20 surprised?
21     A   I will be surprised.
22     Q   You will be surprised?  I suspect you will.
23         So is it your testimony that when John Bryant and
24 Larry Brown come to you, IDS does not own or possess a
25 cash-advance software?

Page 223

1      A   On the first meeting when they came to my office?
2      Q   First meeting when they come to your office.
3      A   Yes.
4      Q   You do not possess a product; is that correct?
5      A   That's true.
6      Q   Do you know if John Bryant worked for Cash Systems?
7      A   I don't know.
8      Q   Do you know if John Bryant worked for Fast Funds?
9      A   I don't know.
10     Q   Do you know if Larry Brown worked for Fast Funds?
11     A   I do not know that answer.
12     Q   Do you know Larry Brown's son David?
13     A   I know David just by name.  I never -- maybe I met him
14 once.
15     Q   And do you have a working relationship with Larry
16 Brown today?
17     A   I do.
18     Q   Tell me what that relationship is.
19     A   He does consulting for me from time to time.
20     Q   Do you know what ECHO is?
21     A   I do know who ECHO is.
22     Q   What is ECHO?
23     A   I think it stands for Electronic Clearinghouse and
24 it's a credit-card-processing and check-processing company.
25     Q   When did you first come into contact with ECHO?

Page 224

1      A   I have to go back and check my records, but sometime
2  in '90s.
3      Q   For what purpose?
4      A   ECHO was one of the client of IDS.
5      Q   When was ECHO first a client for IDS?
6      A   I have to go back and check that.
7      Q   Give me an estimate, sir.
8      A   I told you '90s.
9      Q   '90s?
10     A   That's correct.
11     Q   Early '90s or late '90s?
12     A   If I have to guess, second half of '90s.
13     Q   What did you do for ECHO?
14     A   It was long time ago.  I don't remember, but probably
15 programming for PIN pads and devices for cash advance.
16     Q   You're telling me you were working on cash advance in
17 the '90s?
18     MR. AUSTIN:  Objection as to form.
19     THE WITNESS:  No, I didn't say that.  I said --
20     BY MR. MUSHKIN:
21     Q   That's exactly what you just said, sir.  You said,
22 "PIN pads for cash advance."  I can -- if you want me to, I'll
23 have her read it back to you.  Did you not mean to say that?
24     A   I said I work on a PIN pad that belongs to ECHO and
25 ECHO is processing cash advance for many companies and ECHO was

Nasrollah Gashtili, Volume II                     JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 225

1  our client.
2      MR. MUSHKIN: I want you to read back his prior testimony,
3  please.
4      (The record was read as follows:
5          "QUESTION: It was long time ago. I
6      don't remember, but probably programming for
7      PIN pads and devices for cash advance.")
8  THE WITNESS: That's exactly what I said.
9  BY MR. MUSHKIN:
10     Q   Is it your testimony that in the '90s you were
11  programming devices for cash advance?
12     A   We were programming devices by PIN pad or printers.
13     Q   Those are credit card transactions, aren't they?
14     A   Credit card transactions.
15     Q   There was no such thing as cash advance in the '90s,
16  was there?
17     A   I can't answer that question. I have no idea.
18     Q   Let me explain this. Let me go back over the rules of
19  this deposition, okay?
20         There's a duty of candor, okay, and it's called
21  perjury when you intentionally answer a question in a deceptive
22  or evasive process. I'm sure that your counsel has advised
23  you. Now, some of this stuff is pretty obvious. If you insist
24  upon dodging the answers, we're going to be here day after day
25  until we're done.

Page 226

1      MR. AUSTIN: Objection as to form; objection as to
2  harassment.
3      MR. MUSHKIN: Are you going to tell me that I raised my
4  voice again, Counsel? That was real close to a Rule 11
5  sanction move right there, buddy. There's no harassment here.
6  He's been asked a very simple question and he's given first a
7  deceptive answer, and this is exactly on the point of this case
8  as to who owns what and when it happened. So here we go and
9  you want to try and make a record. Please don't do it. If I
10  harass your client, you can call the discovery commissioner and
11  end this deposition and we'll deal with it with the discovery
12  commissioner or the judge. I guess it's the discovery
13  commissioner in this case.
14     Q   Now, let's go back.
15         Isn't it true there was no such thing as cash advance
16  in the '90s?
17     MR. AUSTIN: Objection; asked and answered.
18     THE WITNESS: I already answer that question.
19  BY MR. MUSHKIN:
20     Q   What's your answer?
21     A   I don't know.
22     MR. AUSTIN: Objection; asked and answered.
23  BY MR. MUSHKIN:
24     Q   Have you ever heard of a cash-advance product in the
25  '90s?

Page 227

1      A   I did not probably.
2      Q   Thank you.
3          When you were brought this notion from John Bryant and
4  Larry Brown, did they have a specific market that they talked
5  to you about where they were trying to sell the application?
6      A   I don't remember the exact discussion, but obviously
7  it was regarding to the casinos and gaming industry.
8      Q   Even from the very beginning that was discussed?
9      A   That was the main areas that they had access to, but
10  obviously you could use it in other areas.
11     Q   Sure. I just want to make sure that, from a time
12  line, everybody from the very beginning understood the market
13  for the product and this was discussed right at the very
14  beginning, the notion of going to the casinos. Is that
15  correct?
16     A   Yes.
17     Q   Was there -- I want to go back to my question.
18         Did IDS own a cash-advance software product at the
19  time that John Bryant and Larry Brown came to you?
20     A   No.
21     Q   And is it fair to say that Fastran Inc. then engaged
22  IDS in development services?
23     MR. AUSTIN: Objection as to form; calls for speculation,
24  calls for legal conclusion.
25     THE WITNESS: I don't think so.

Page 228

1  BY MR. MUSHKIN:
2      Q   Tell me what IDS did when it was receiving money from
3  Fastran.
4      A   IDS never received money from Fastran at that time or
5  for many many months after that.
6      Q   Okay. And did that lead to the offer that you made to
7  Mr. Carter, the document that we went over last time that laid
8  out all those terms?
9      A   What lead to that? I don't understand the question.
10     Q   There was an offer made to Mr. Carter by Fastran Inc.;
11  is that correct?
12     A   Yes.
13     Q   And you signed on that; is that correct?
14     A   I did talk to Mr. Carter.
15     Q   Well, you put your name at the bottom; is that
16  correct?
17     A   In multiple times we were going back and forth and
18  talking.
19     Q   And in every one of those -- well, let's find the
20  one -- let's take a break for just a minute until I can put my
21  hands on it.
22         (Brief recess taken.)
23  BY MR. MUSHKIN:
24     Q   Mr. Gashtili, I'm going to show you page 23 of your --
25  I better just ask it to you.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 229

1    On page 23 I asked you this question: "When you
2  formed Fastran Inc., what was its purpose?"  And your answer
3  was, "To market a product that IDS was building to the casinos
4  and to other distributors or -- I don't know what's the right
5  term for it, but I don't want to say business partner.  I don't
6  remember.  I have to go back and check the records."
7        Do you recall that answer?
8    A   Yes.
9    Q   Well, that's not true, is it?
10   A   I don't understand what you mean, "That's not true."
11   Q   You weren't building a product yet when Fastran was
12  formed.
13   A   We were actually.  You're talking about two different
14  time.  You're talking about when Bryant -- Larry Brown and
15  Bryant came to my office, which at that point Fastran was not
16  formed.  Then later on you're talking about when Fastran was
17  formed, two different time frame.  Fastran Inc. was formed
18  sometime after John Bryant and Larry came to my office.
19   Q   Do you recall discussions with Mr. Brown in June of
20  2006?
21   A   That's a question?
22   Q   Yes.
23   A   Absolutely not.  I don't -- how can I remember
24  June 2006?
25   Q   You do know that you were having discussions with him.

Page 230

1    A   I have no idea if I even met him on June 2006 -- not
2  met him as knowing him, you know -- had a meeting with him on
3  June 2006.  I don't meet with him every day.  I don't see the
4  guy every day.
5    Q   When did you first come into contact with Larry Brown?
6    A   I told you when he was working for ECHO back in I
7  think late '90s possibly.  I have to go look at that.
8    Q   Did Larry Brown ever tell you that he and his son
9  David created software for Fast Funds?
10   A   I don't remember the exact name of the company, but he
11  told me that he work with the company that had the cash-advance
12  product, but I don't remember if it was Fast Fund.  There are
13  so many similar names that I don't remember which one.
14   Q   Had you ever personally -- strike that.
15       Did IDS own a cash-advance product in 2004?
16   A   I don't think so, no.  2004 was before I met John
17  Bryant and Larry Brown on that topic.
18   Q   Are you aware that Larry Brown and his son sold that
19  fastware [sic] to ECHO -- I'm sorry, to Fast Funds?
20   A   I don't know about that.
21   Q   Larry Brown didn't tell you that he sold his software?
22   A   I don't even know if he had a software.  I don't know.
23   Q   Do you recall when in '06 you met with, for the first
24  time, John Bryant and Larry Brown to discuss a cash-advance
25  product?

Page 231

1    A   I don't remember the exact date, but maybe somewhere
2  close to middle of 2006.
3    Q   June fair time?
4    A   That's possible.
5    Q   And do you know when -- who did you put to work inside
6  of IDS on this project?  Do you know who started working on the
7  software application?
8    A   Multiple people.
9    Q   Do you know if Mr. McWaters worked on it?  I think you
10  already testified that he did.
11   A   He was one of my employees that work on this product.
12   Q   Was he in the project from inception?
13   A   I don't remember.
14   Q   Is it likely that he was on it from inception?  Let me
15  put that differently.
16       Was he one of the first guys that you assigned to work
17  on the project?
18   A   I don't remember.
19   Q   And do you believe that also took place sometime in
20  the middle of '06?
21   A   We probably started working on the product right
22  around that time.
23   Q   Are you aware of a nondisclosure agreement that was
24  issued in August of '06 by John Bryant?
25   A   I don't even remember what you're referring to.  Just

Page 232

1  by the date and "nondisclosure," I don't remember what we're
2  talking about.
3    Q   I'm going to show you what's been marked as --
4  previously as Exhibit 10.  Take a look at that.  Have you ever
5  seen that document before?
6    A   I remember an NDA agreement that was signed between
7  Fastran Inc. and ATMMS and it appears this is the one because
8  it has a signature on the bottom from John Bryant and Bill.
9    Q   Did you -- at the time that that was issued, what was
10  your position at Fastran Inc.?
11   A   Let me look at the date.  I'm assuming, since we were
12  signing as Fastran Inc., Fastran Inc. was already formed; and I
13  was one of the partner of Fastran Inc. from day one that the
14  company was formed.
15   Q   Were you an officer?
16   A   I think my title, original title, was CTO or something
17  like that.
18   Q   Do you have any recollection whether you were an
19  officer?
20   A   I don't even know what --
21   Q   What does CTO mean?
22   A   I think it stands for chief technology officer.
23   Q   So then you were an officer of the company?
24   A   Based on my knowledge, sometime people have the name
25  and it doesn't mean that they're officially officer of that

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 233

1  company, but again I'm not -- that might be a legal opinion. I
2  don't know; but based on my past experience, I've seen people
3  that have like title of COO and CTO and they're not really
4  officer of company the way I understand officer of company.
5     Q  Well, you acknowledge that you've used counter checks
6  to access Fastran Inc. bank account and take money out; true?
7     A  Yeah. I was one of the authorized signature on the
8  Fastran Inc. account.
9     Q  Were you authorized signature as an officer of the
10  company?
11     MR. AUSTIN: Objection as to form; calls for speculation,
12  calls for a legal conclusion.
13     THE WITNESS: I have to go back and check and see what was
14  my official title with the company or was I secretary or CFO.
15  I don't think I was CFO or secretary, but I don't remember what
16  was my actual title with the company.
17  BY MR. MUSHKIN:
18     Q  By what authority did you go into the bank account and
19  take money?
20     MR. AUSTIN: Objection as to form; asked and answered.
21     THE WITNESS: I was the authorized signature assigned to
22  that account by the company. There was two signature on that
23  account, me and Larry Brown.
24     MR. MUSHKIN: That's not what I'm asking.
25     Q  You acknowledge it was a company bank account;

Page 234

1  correct?
2     A  Yes.
3     Q  And you took money from that bank account and gave it
4  to IDS; correct?
5     A  At what -- which --
6     Q  Four counter --
7     A  I did take some money out of that account at some
8  point in the future and paid some of the bills, not just to
9  IDS, to other vendors of Fastran Inc. as well.
10     Q  What vendors of Fastran Inc. did you pay? And when
11  you say you, did you Nasrollah Gashtili pay it or did you IDS
12  pay it?
13     MR. AUSTIN: Objection as to form.
14     THE WITNESS: Yeah.
15     MR. AUSTIN: "You" also could mean Fastran Inc.
16     THE WITNESS: Yeah. I used that bank account sometime to
17  pay some of the bills that Fastran Inc. owed to their vendors
18  and I think in occasions to their -- and I don't know if that's
19  the right name or not -- customers. For example, I used that
20  account to pay LuckEcash that, you know, is one of Fastran Inc.
21  client and I used that account to pay other vendors of Fastran
22  Inc. besides IDS.
23  BY MR. MUSHKIN:
24     Q  Other customers or other vendors?
25     A  Customers and vendors.

Page 235

1     Q  What vendors did you pay other than IDS from that bank
2  account?
3     A  I have to go and check, but I am 100 percent sure that
4  I pay other vendors of Fastran Inc. out of that account.
5     Q  At the time that you took those four counter checks
6  and cashed them, the checkbook was being managed by Bart
7  Carter; isn't that correct?
8     A  That is absolutely not correct.
9     Q  Who was it being managed by?
10     A  It's depend what you mean with "manage." I mentioned
11  to you that we didn't keep track of our checkbook, but I was
12  the only -- me and Larry Brown -- only signature on that
13  account. Bart Carter never was signature on that account.
14     Q  Isn't it true that you took money from that account
15  after Fastran Inc. accepted money from Bart Carter to buy into
16  Fastran, LLC?
17     A  I'm not sure if I understand the question or if the
18  question makes sense to me. Could you repeat that.
19     Q  No problem.
20        Isn't it true that Fastran Inc. transferred all of its
21  assets to Fastran, LLC?
22     A  I mentioned to you before on the previous deposition
23  that I don't know. You're putting me under pressure and say
24  assets. I don't even know what assets of Fastran Inc. is or
25  anything like that.

Page 236

1     Q  Well, what did Fastran Inc. transfer to Fastran, LLC?
2     MR. AUSTIN: Objection as to form; calls for a legal
3  conclusion.
4  BY MR. MUSHKIN:
5     Q  You still have to answer the question and you are
6  definitely painted into a corner, sir, so answer the question.
7     A  Yeah. Customers, debt of Fastran Inc.
8     Q  Bank account?
9     A  I don't think so. I changed what I said. Debt never
10  was transferred. I think we pay all of the debt off.
11     Q  Who is "we"?
12     A  Fastran Inc. actually pay all of their debtors or
13  people that we owe money to.
14     Q  You know that's not true, Mr. Gashtili. You know that
15  in all the E-mails we went through, you laid out all the bills
16  that Mr. Carter had to pay. You went through that -- we went
17  through it in great detail, sir.
18     MR. AUSTIN: Objection as to form.
19  BY MR. MUSHKIN:
20     Q  You know that all the bills of Fastran Inc. weren't
21  paid. That was the reason for bringing Bart in, to pay the
22  bills; isn't that true?
23     MR. AUSTIN: Objection as to form. The question he
24  answered is post that time period.
25  ///

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 237

BY MR. MUSHKIN:
1   Q   Isn't it true that the reason to bring Bart Carter in
2   was to pay the bills that Fastran Inc. couldn't pay?
3   A   That's not true.
4   Q   Tell me why Mr. Carter was brought in then.
5   A   That was one of the reason but not the only reason.
6   Fastran Inc. needed some investors.
7   Q   So it was true that one of the reasons -- sir, you
8   understand you just committed perjury.
9   A   I'm sorry. You change your question.
10   MR. AUSTIN: Objection as to form. He did not.
11   MR. MUSHKIN: He sure as hell did.
12   MR. AUSTIN: Objection as to form; calls for speculation.
13   MR. MUSHKIN: Read the question back.
14   MR. AUSTIN: Constitutes harassment of my client.
15   MR. MUSHKIN: I'm harassing your client because I've
16   pointed out that he's lied on the record again.
17        Read his answer back, please.
18   THE WITNESS: I'm sorry. I'd like to hear the question.
19   MR. MUSHKIN: She's going to do it.
20        Read the question and answer, please.
21        (The record was read as follows:
22             "QUESTION: Isn't it true that the
23        reason to bring Bart Carter in was to pay the
24        bills that Fastran Inc. couldn't pay?"

Page 238

1             "ANSWER: That's not true."
2             "QUESTION: Tell me why Mr. Carter
3        was brought in then."
4             "ANSWER: That was one of the reason
5        but not the only reason. Fastran Inc. needed
6        some investors.")
7   BY MR. MUSHKIN:
8   Q   Now, Mr. Gashtili, explain to me how it's not true
9   that he was brought in because you couldn't pay the bills of
10   Fastran Inc.
11   MR. AUSTIN: Objection.
12   BY MR. MUSHKIN:
13   Q   Explain how that's not true.
14   MR. AUSTIN: Objection; asked and answered. He has
15   answered the question.
16   MR. MUSHKIN: It has not been answered and it has not been
17   asked.
18   Q   Answer the question.
19   MR. AUSTIN: He answered the question by saying that was
20   one of the reasons.
21   MR. MUSHKIN: That's coaching, Counsel.
22        Stop the record. Stop the record. Stop the record.
23   I'm calling the discovery commissioner.
24        (Discussion held off the record.)
25   MR. MUSHKIN: Are you through coaching, Counsel? Are you

Page 239

1   through coaching, Counsel? Would that be a "yes" or a "no"?
2   MR. AUSTIN: I'm not under deposition and I haven't coached
3   at all. So if you'd like --
4   MR. MUSHKIN: The record will speak for itself.
5   MR. AUSTIN: If you'd like to --
6   MR. MUSHKIN: The record will speak for itself.
7   Q   Mr. Gashtili, tell me what's untrue about my question
8   that you brought Mr. Carter in because Fastran couldn't pay the
9   bills.
10   MR. AUSTIN: Objection; mischaracterizes testimony.
11   BY MR. MUSHKIN:
12   Q   What was untrue about that?
13   MR. AUSTIN: Objection; mischaracterizes my client's prior
14   testimony.
15        Please read back his answer to the prior question.
16   MR. MUSHKIN: No.
17   Q   Answer the question.
18   THE WITNESS: Mike, I told you I'm not here to argue with
19   you. My understanding from your question is "Is this the
20   reason" and you told me to answer "yes" or "no," and I said
21   "no" and I told you it's because that was one of the reasons,
22   not the only reason.
23   BY MR. MUSHKIN:
24   Q   Now we're going to read your testimony back again,
25   sir, because you didn't say no. You said --

Page 240

1   A   I said that was one of the reason.
2   MR. MUSHKIN: Read it back again, please.
3        (The record was read as follows:
4             "QUESTION: Isn't it true that the
5        reason to bring Bart Carter in was to pay the
6        bills that Fastran Inc. couldn't pay?"
7             "ANSWER: That's not true.")
8   BY MR. MUSHKIN:
9   Q   Now I'm going to ask you again, sir, what's not true
10   about that question?
11   MR. AUSTIN: Objection as to form; question has been asked
12   and answered. Exactly that question has been asked and
13   answered.
14   BY MR. MUSHKIN:
15   Q   What's untrue about it?
16   MR. AUSTIN: Objection as to form; the question has been
17   asked and answered.
18        Go back and re-read back --
19   MR. MUSHKIN: Counsel, I'm going to let your objection
20   rest. You can have it a standard objection. Do not interrupt
21   me again. I want to know what was untrue about that question.
22   MR. AUSTIN: I'd like the reporter to go back and read the
23   earlier question when he asked exactly that question and read
24   back the answer of Mr. Gashtili to that exact question so we
25   can stop the harassment on the same question. He has answered

Page 241

1  that question.
2     MR. MUSHKIN:  We now will have read it three times for the
3  record, but let's read it again and I still don't understand
4  how that's harassment, but let's read it again.
5     MR. AUSTIN:  No.  We're not going back that far, just the
6  previous time in which he asked the question that he just asked
7  and where there was an answer by Mr. Gashtili to that question.
8     (The record was read as follows:
9        "QUESTION:  What was untrue about
10       that?"
11       "ANSWER:  Mike, I told you I'm not
12       here to argue with you.  My understanding
13       from your question is 'Is this the reason'
14       and you told me to answer 'yes' or 'no,' and
15       I said 'no' and I told you it's because that
16       was one of the reasons, not the only
17       reason.")
18    MR. MUSHKIN:  Now that you've wasted 20 minutes, Counsel,
19  here's the bottom line.
20    Q   You didn't say "no," Mr. Gashtili.  You said, "That's
21  untrue," and then --
22    MR. MUSHKIN:  Objection.
23  BY MR. MUSHKIN:
24    Q   -- you went around and in your next answer you
25  included you couldn't pay the bills and probably because you

Page 242

1  know it's in the E-mails.  Stop doing this.  You did the same
2  thing when I asked you the word "fee."
3     MR. AUSTIN:  Objection; harassment.
4     MR. MUSHKIN:  I'm putting this on the record.
5     Q   You did the same thing when I asked you about the term
6  "fee" in the use of ATMs.  You told me I didn't know what I was
7  talking about and then you used the word "fee" in your
8  definition; that's called a breach of the duty of candor.
9  I've given you two very explicit examples where you've done
10 this, sir, and I'm going to ask you for the record, just answer
11 truthfully.
12    A   Mike --
13    MR. AUSTIN:  Objection.  There's not a question pending.
14 BY MR. MUSHKIN:
15    Q   There's no question pending.  I'm putting on the
16 record my understanding of what you've been doing --
17    A   I'm just --
18    Q   -- so your counsel can accuse me of harassment, and
19 I'm going to ask you to stop doing it because eventually we're
20 going to go before the Court with this transcript and seek
21 sanctions for it because you've cost us time and money while we
22 vantzed around over some pretty simple stuff.
23       Now let's go back to the time line.  So did you form
24 an entity called IDS Cash Advance?
25    A   No.

Page 243

1     Q   So what -- is there any such entity called IDS Cash
2  Advance?
3     A   No.  Could you explain what you mean "entity."
4     Q   You say you got all these companies and all this
5  stuff.
6     A   Yeah.  If you mean a company, no.
7     Q   When you're doing business with ASAI -- I can never
8  get that one right -- when you're doing business with ASAI, who
9  are you doing business as?
10    A   IDS.
11    Q   Do you recall Bill Connell coming to IDS in September
12 of '06?
13    A   I remember Bill came to our office.  I don't know the
14 exact date, but somewhere in 2006 I think.
15    Q   If I represent to you that's on or about the first
16 week of September, would you -- would that surprise you in any
17 way?
18    A   No.  I think that's possible.
19    Q   Okay.  Do you know when Magnus Rhyu -- let me go back.
20       Who hired Magnus Rhyu?
21    A   I think it was collective decision.  There was three
22 people at the time and John Bryant, Larry and me -- and, if I
23 remember correctly, Larry introduced me and we all agreed at
24 some point that we going to bring him in.
25    Q   And do you recall Magnus in September of '06 sending

Page 244

1  out a next-steps E-mail to everybody concerned, people at
2  ATMMS, yourself, John Bryant, Larry Brown?  Do you recall that
3  where you're now talking about how to get the product
4  completed?
5     A   I don't remember that specific E-mail.
6     Q   Let me try and refresh your recollection.
7        Do you remember in that E-mail they discussed that
8  they have the cage function; they have no kiosk, AIO, or check?
9  They are implementing AIO for Triton but have no Triton or ATM
10 processor as of that date?  Do you recall that communication?
11    A   It is familiar, but I don't --
12    Q   I can appreciate that and all I'm trying to do is sort
13 of get a time line as to where we're at at a given point in
14 time.  If I have to, I can pull out these E-mails and we can go
15 through them in great detail, but I'll represent to you that
16 that's on September 11th of 2006.
17       So if he said that they have cage, what does that mean
18 to you, that they have cage function now?
19    A   To me or what Magnus really means?
20    Q   Whatever you can tell me.  I just want to know what
21 you recall of the status of the software in September of 2006.
22    A   If that E-mail is the date and if he was telling the
23 truth over there, that means that we had the cage application
24 ready.
25    Q   "No kiosk," that means the kiosk application is not

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 245

1  ready yet; is that correct?
2     A    That's probably what he mean if he was saying the
3  truth.
4     Q    Fair enough.  I'm just doing that, again, just to sort
5  of give us a time line.
6        Do you know what "AIO" means?
7     A    I do know what "AIO" means.
8     Q    What does it mean?
9     A    "All-in-one."
10    Q    So it says, "no kiosk, all-in-one, or check."  So you
11 don't have the check-cashing function yet, the application done
12 yet; is that correct?
13    A    Based on that E-mail and what Magnus is saying, yes.
14    Q    Now, the next thing is, "are implementing AIO for
15 Triton."  Do you know what Triton is?
16    A    Yes, I do.
17    Q    What's Triton?
18    A    Brand of an ATM machine.
19    Q    Okay.  Tell me what "all-in-one" means.
20    A    "All-in-one" is when we put enhancement, additional
21 software, into an ATM to allow that ATM to do additional
22 functionality in addition to what regular ATM do, which is just
23 using your ATM card to get cash from ATM machine.  By putting
24 in AIO software, then you can also use your debit card and
25 credit card too, basically additional ways to get cash out of

Page 246

1  an ATM machine.
2     Q    Let me make sure we're clear for the record 'cause you
3  were real quiet there for a minute.
4        If you go to an ATM today that has all-in-one
5  function, you can use multiple cards to get cash; is that
6  correct?
7     A    For the same card in multiple ways, because some of
8  your cards could be an ATM, debit and credit.
9     Q    I hadn't thought of that, but you can now have a card
10 that accesses more than one account.  Fair enough?
11    A    Or more than one way accessing same account.
12    Q    Same account, I gotcha'.  And this -- all right, very
13 good.
14        And Triton is one particular type of ATM machine; is
15 that correct?
16    A    Yes.
17    Q    And then it says, "but have no Triton or ATM
18 processor."  What's that mean to you?
19    A    That means we -- at that time Magnus is saying that we
20 don't have any processor to send the actual transaction to to
21 process those transaction.
22    Q    You're just not live yet; is that fair?
23    A    For that AIO, based on Magnus' E-mail, yes.
24    Q    Right, again just based upon Magnus' E-mail.
25        So whatever product IDS is working on in September

Page 247

1  of '06, you are not processing with that product; is that
2  correct?
3     A    Based on that E-mail, he's talking about the AIO only.
4     Q    Are you aware --
5     A    He said earlier that the cage unit is ready.
6     Q    Are you aware of any customers in September of '06
7  that were active with the software of Fastran Inc. or IDS?  I
8  mean I don't know who owns it.  That's in dispute, but we know
9  what software we're talking about.
10    A    I don't remember when we actually had the first
11 customer.  I have to check the record.
12    Q    I'm going to leave a blank in your deposition.  You
13 can tell me when you had your first customer.
14    A    I'm pretty sure Bart Carter knows too.  He was the
15 first customer.
16    Q    Well, that's easy then.  Bart Carter is your first
17 customer?
18    A    One of his location was the first account that we
19 brought in.
20    Q    Very good.  We can fill that blank in ourselves.
21        Do you know who RBS Link is?
22    A    I do know who RBS Link is.
23    Q    Who are they?
24    A    I think it's Royal Bank of Scotland processing
25 division.  I'm not hundred percent sure.  That's what I know.

Page 248

1     Q    And do you know why you were in contact, or that
2  Magnus was in contact, with them?
3     A    Probably to use them as a processor.
4     Q    Do you know when -- do you know if you ever used RBS
5  Link?
6     A    At that time, no, we didn't.
7     Q    Do you know if IDS ever used RBS Link?
8     A    We do use RBS Link.
9     Q    Say it again.
10    A    We do use -- RBS Link does not exist anymore.  They're
11 out of business.  They stop that part.  It's a different
12 company, but it's continuation of the company.
13    Q    What are they called now?
14    A    I think it's World Pay, "world" like "world."
15        MR. AUSTIN:  World Pay.
16 BY MR. MUSHKIN:
17    Q    I thought you said "word" too.
18        As in round world; right?
19    A    That's right.
20    Q    World Pay.  And that's the new name of RBS Link?
21        MR. AUSTIN:  Objection; calls for speculation.
22 BY MR. MUSHKIN:
23    Q    To the best of your knowledge?
24    A    To the best of my knowledge, yes.  RBS, which is Royal
25 Bank of Scotland spinoff, their credit card processing, and

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 249

1  that's their new name; but again that's what I know.
2     Q   Does IDS use them today?
3     A   I don't -- I mean the question is not correct.  IDS
4  doesn't -- IDS product software that we have process
5  transaction through RBS.
6     Q   Who is processing for ASAI?
7     A   I don't know all of them.  They're not my company, so
8  I can't answer that question.
9     Q   How is the Fastran software being used by ASAI?
10    A   I don't understand the question, how the Fastran
11 software is used by IDS.
12    MR. AUSTIN:  Not IDS, ASAI.
13    THE WITNESS:  ASAI.
14 BY MR. MUSHKIN:
15    Q   What do you mean you don't understand?
16    A   First of all, I don't even know if Fastran had a
17 software and if IDS is -- ASAI is using Fastran software or
18 not.  It's not -- as far as I know, I don't think they're using
19 Fastran software.
20    Q   Let's not play dodge ball, sir.  I call it Fastran
21 software.  You want to call it IDS software; correct?
22    A   Well --
23    Q   So let's agree for now that we're talking about the
24 software in question --
25    A   Okay.

Page 250

1     Q   -- that I believe you sold to Fastran, LLC; but the
2  Court will decide that or a Court will decide that issue
3  ultimately.
4     A   Okay.
5     Q   But is IDS processing for ASAI?
6     A   ASAI is utilizing IDS software to process transaction,
7  yes.
8     Q   And how is IDS being paid?
9     A   On a monthly basis based on volume of the transaction
10 they have.
11    Q   So it's a percentage of transactions?
12    A   It is percentage of transactions, yes.
13    Q   I'm sorry?
14    A   It is.
15    Q   Same way Fastran was getting paid by ATMMS; is that
16 correct?
17    A   I don't think Fastran --
18    Q   Not the exact same amount, same principle:  A
19 percentage of transactions?
20    A   No.
21    Q   How was Fastran being paid by ATMMS?
22    A   As you know and I know, that contract was never
23 finalized, so that's still on dispute.
24    Q   It was intended to be a percentage of the transaction;
25 is that correct?

Page 251

1     A   No, I don't think so.
2     Q   Tell me what you believe.
3     A   I think it was percentage of the fees.
4     Q   Isn't that the same thing that you're getting from
5  ASAI?
6     A   No.  It's a different way that they're calculating.
7  Agreement that we have with ASAI is nothing like what we were
8  negotiating with ATMMS or other companies that we were
9  negotiating at the time or had a contract at the time.
10    Q   How much are you getting paid by ASAI per month?
11    MR. AUSTIN:  Objection; calls for privileged confidential
12 information.  We are subject to protective order.  If you would
13 like to --
14    MR. MUSHKIN:  Have Bart leave the room?
15    MR. AUSTIN:  -- designate this particular portion of the
16 record --
17    MR. MUSHKIN:  Not a problem.  I object that I don't believe
18 this is privileged at all, but you can make the claim here and
19 I'll ask my client to excuse himself and he won't be allowed to
20 review this portion of the transcript until -- you'll have to
21 bring an application to seal this portion because I'm not
22 stipulating to it.  I do not believe this is the type of
23 information that would be privileged.
24    MR. AUSTIN:  Then I'm not going to allow my client to
25 answer unless we've got clarity as to whether or not this would

Page 252

1  be privileged confidential information.  If you're willing to
2  designate this portion of the record as privileged and
3  confidential, attorneys' eyes only, I would allow my client to
4  answer the question.
5     MR. MUSHKIN:  I will do so for purposes of the record, but
6  I do not agree that this is the type of information that is
7  attorneys' eyes only, and you have to bring your request before
8  the Court.
9     MR. AUSTIN:  There's a process in place pursuant to the
10 stipulated protective order that we have in place.
11    MR. MUSHKIN:  Right.
12    MR. AUSTIN:  And we'll follow that procedure.
13    MR. MUSHKIN:  Okay.  That we agree to.
14       Bart, would you leave for just a moment.
15    THE WITNESS:  Actually I need to ask my attorney a question
16 too.
17    MR. AUSTIN:  After you answer this question.  Just wait.
18    (Bart Carter exited the deposition proceedings.)
19    (The following proceedings were held under
20 confidential seal, attorneys' eyes only.)
21
22
23
24
25

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 253

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22    (Bart Carter re-entered the deposition proceedings.)
23  BY MR. MUSHKIN:
24    Q   Now, who prepared the pricing for the development of
25  the software?

Page 254

1    A   I don't understand the question, "pricing for the
2  development of software."
3    Q   Fastran, there was pricing -- when did you first -- as
4  Fastran, when did you first receive money from ATMMS?
5    A   I don't understand the question, "Fastran receive
6  money from ATMMS." Could you explain that more.
7    Q   Do you recall when Fastran first received money from
8  ATMMS?
9    A   I just want to clarify the question. Do you mean when
10  ATMMS agreed to use Fastran to process transaction? Is that
11  what you mean, the check that they wrote to --
12    Q   I'm asking you the first time you received money from
13  ATMMS.
14    A   I did --
15    Q   Fastran.
16    A   -- or Fastran Inc.?
17    Q   Inc.
18    A   I have to go and check, but there is a date on the
19  contract and a date on the check. I'm pretty sure we both can
20  find that out. I don't remember exactly what date was that.
21    Q   Do you know when the first install took place?
22    A   I don't know exact date, but sometime in 2006, end of
23  2006, close to end of 2006.
24    Q   If I told you January 12th of 2007, would that
25  surprise you?

Page 255

1    A   That's possible. I was expecting November or December
2  2006.
3    Q   If I said January 12th, to be exact, was the first
4  install --
5    A   That's possible.
6    Q   And that was kiosk and cage equipment only?
7    A   I don't remember.
8    Q   Well, who developed this software?
9    A   You're talking about installation, not development.
10    Q   No, I understand, but who developed the software?
11    A   IDS did.
12    Q   Did you do it?
13    A   I was definitely part of the whole project.
14    Q   What did you do?
15    A   I own the company and I run all the big projects.
16    Q   So you didn't personally write any of the source code;
17  is that correct?
18    A   It's been a while since I personally write the source
19  code.
20    Q   So you hire a group of people to -- you put a team
21  together to create a product; is that correct?
22    A   My employees.
23    Q   And some of them are in the United States; is that
24  correct?
25    A   Some are in the United States.

Page 256

1    Q   And some are in India; is that correct?
2    A   That is true.
3    Q   What is -- I'm looking for the name of the company.
4  Do you have an association with -- is there a company called
5  IDS India?
6    A   Our subsidiary in India called Integrated Dynamic
7  Solution Pvt. Ltd., Integrated Dynamic Solution India Pvt. Ltd.
8  So it's the same name as our company with -- because in India
9  it's not "Inc."; it's "Pvt. Ltd." and we own that company.
10    Q   And you refer to it as "IDS India"?
11    A   That's the short name we use.
12    Q   Okay. I didn't mean to do anything more than that.
13        Are you associated with another company in India?
14    A   No, I'm not.
15    Q   Is your wife associated with another company in India?
16    A   No, she is not.
17    Q   Well, what is --
18    A   I'm sorry. Let me clarify the question.
19        If "association" means that we own any part of any
20  other company in India, I answer already no. If you talking
21  about if I know other people in India or other companies in
22  India, I do. I should ask what does "association" mean. I
23  assume that you mean ownership.
24    Q   I'm sorry, but I'll be more precise.
25        Does your wife have an ownership interest in any other

Nasrollah Gashtili, Volume II                          JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 257

1  company in India?
2      A  No, she does not.
3      Q  Do you have an ownership interest in any other company
4  in India?
5      A  No, I don't.
6      Q  Is there a staffing company that your wife is
7  associated with?
8      A  In India, no.
9      Q  Is there a staffing company in the United States that
10  your wife is associated with?
11      A  Yes, we do own a staffing company here in U.S.
12      Q  And what's the name of that company?
13      A  Hartwell, H-a-r-t-w-e-l-l, Global Inc.
14      Q  Does Hartwell Global have employees in India?
15      A  No, they don't.
16      Q  Do they gather employees from India and place them?
17      A  No, they don't, but IDS India has some employees that
18  are working for Hartwell Global.
19      Q  What do those employees do for Hartwell Global?
20      A  Recruiting.
21      Q  How many employees does IDS India have?
22      A  Today?
23      Q  No, in 2007.
24      A  I have to go back and check.
25      Q  How many today?

Page 258

1      A  I don't know the exact number, but if I want to guess,
2  somewhere around maybe 40 or more.
3      Q  And how many approximately did it have in the end of
4  2006?
5      A  I can't answer that question.  I have to check the
6  record.
7      Q  You have no idea?
8      A  I don't know.
9      Q  More than ten?
10      A  Oh, definitely more than ten.
11      Q  More than a hundred?
12      A  Less than a hundred.
13      Q  More than 20?
14      A  Probably more than 20.
15      Q  Less than --
16      A  Let me give you an answer.
17          Our company in India, because of the fluctuation --
18  obviously we start the company with one employee, but we
19  generally somewhere between 25, 30 to 50 to 60 employee.  It's
20  depend what time of the year or what year based on economy.
21      Q  The IDS employees do recruiting for --
22      A  Hartwell Global.
23      Q  Hartwell Global?
24      A  No.  IDS has couple or few employees, again based on
25  economy -- maybe two, three, four -- that their job is to

Page 259

1  recruit for Hartwell Global.
2      Q  What are they recruiting?
3      A  Anything that any of the Hartwell Global clients need,
4  anything from admin to CEO.
5      Q  So does IDS India bill Hartwell Global for the labor
6  costs associated with those employees?
7      A  They do -- IDS India doesn't; IDS U.S. does.  IDS U.S.
8  owns the IDS India.
9      Q  So it passes through?
10      A  Yes.
11      Q  Okay, gotcha'.
12          Do you recall telling Mr. McWaters that you had 80
13  programmers in India?
14      A  I don't recall that.  I don't think I ever had 80.  I
15  don't recall that.
16      Q  Who is Terry Kremmin?
17      A  Could you be more specific on "who is Terry Kremmin."
18      Q  Do you know who Terry Kremmin is?
19      A  I do.  It's a person lives in Minnesota and currently
20  my employee.
21      Q  And did Mr. Kremmin work for Fast Funds at one time?
22      A  Possibly.  I'm not sure.  As I told you, those names
23  are so similar that I can't tell one company from another.
24      Q  Before you hired Mr. Kremmin, were you aware that he
25  had experience in electronic-fund transactions?

Page 260

1      A  Mr. Terry Kremmin was at first employees of Fastran
2  Inc., and the reason that Fastran Inc. hired him was for his
3  previous experience.
4      Q  So you've taken over an employee from Fastran Inc.; is
5  that correct?
6      MR. AUSTIN:  Objection; mischaracterizes prior testimony.
7  BY MR. MUSHKIN:
8      Q  IDS has taken over an employee from Fastran Inc.; is
9  that correct?
10      MR. AUSTIN:  Objection; same objection.
11      THE WITNESS:  Terry Kremmin, after Fastran Inc., I think
12  work for one of the companies that Bart Carter owns.
13  BY MR. MUSHKIN:
14      Q  Do you know who Touria Duda is?
15      A  I do know who Touria Duda is.
16      Q  Who is that?
17      A  She's a person lives in Minnesota too.
18      Q  Does she work for IDS?
19      A  No, she does not.
20      Q  Do you know if she worked for Fast Funds?
21      A  I said that again the names are so similar, I don't
22  know which company, but I know she worked for cash-advance
23  companies before.
24      Q  Have you ever had any dealings with Miss Duda?
25      A  She was the employee of Fastran Inc. for a period of

Page 261

1   time as well.
2       Q   What did she do?
3       A   She was doing account settlement and she wasn't
4   reporting directly to me, but I know that was one of the things
5   she was doing.
6       Q   Do you know who Chris Epple is?
7       A   Name is very familiar, but I don't remember right now.
8   MR. AUSTIN:  Is that spelled E-p-p-l-e?
9   MR. MUSHKIN:  E-p-p-l-e, correct.
10      Q   Now, do you know -- was there an agreement between IDS
11  and Fastran Inc. to develop software?
12      A   There was no agreement that's ever signed.
13      Q   Why?
14      A   Because we never agreed on how this is going to work.
15  We were negotiating.
16      Q   With who?
17      A   I think at the beginning Magnus.  Magnus was the CEO
18  of Fastran Inc.
19      Q   Well, you're a shareholder of Fastran Inc., aren't
20  you?
21      A   I was.
22      Q   And you're telling me you didn't have a deal with IDS
23  when you formed Fastran Inc.?
24      A   We were negotiating over how this thing is going to
25  work.  I couldn't be negotiating on behalf of Fastran Inc.

Page 262

1       Q   I'm sorry?
2       A   I could not negotiate on both sides, so Magnus was the
3   person that was negotiating over what kind of deal we're going
4   to have; and by the way, Magnus was COO.  He was negotiating
5   all of them.
6       Q   Who was Magnus negotiating with?
7       A   On IDS side?  With IDS?
8       Q   Yeah.
9       A   With me.
10      Q   Well, if you can't negotiate one side, do you think
11  you can negotiate the other?  Is that how it works?
12      A   I think that's the only way it works.  How could I
13  negotiate for both sides?
14      Q   How about you don't negotiate for either side.
15      A   I own IDS.  Who else would negotiate on behalf --
16      Q   Somebody you appoint.
17      A   Okay.  Next time I'll get your advice.
18      Q   And you never make a deal?
19      A   We never signed an agreement.
20      Q   So you say there's no deal?
21      A   No.
22      Q   Okay.  So then what's the deal when Fastran Inc. goes
23  to Bart Carter?
24      A   I think -- I don't understand the question, "Fastran
25  Inc. goes to Bart Carter."

Page 263

1       Q   You met with Bart Carter; correct?
2       A   Okay.  So with "go" you mean going and talking to him?
3       Q   (Nods head.)
4       A   I didn't understand the question.  I'm sorry.
5       Q   No problem.
6           When you go to Bart Carter, he's ATMMS.  Why do you go
7   meet with Bart Carter?
8       A   We didn't only meet with Bart Carter.  We meet with
9   potential investor to bring some new investor into the Fastran
10  Inc.
11      Q   Well, didn't you go to Bart Carter first to try and
12  sell him the use of the software?
13      A   I don't think so.  Me personally going to Fastran --
14  to Bart Carter to sell him the use of software?  I don't
15  remember I did that.
16      MR. AUSTIN:  Are you talking about when they first got the
17  first client, the first installation location, or are you
18  talking about when they came in to him to invest in the
19  company?
20      MR. MUSHKIN:  I'm asking him.
21      MR. AUSTIN:  I'm not sure what your question is.
22      THE WITNESS:  I don't understand now the question.  I
23  thought you talking about when we were looking at him as
24  investor.  Are you talking about when we --
25  ///

Page 264

1   BY MR. MUSHKIN:
2       Q   Was it all the same time?
3       A   No, absolutely not.  Bart Carter was our client and
4   Magnus and John Bryant were negotiating with his company,
5   ATMMS.
6       Q   Right.  So when you go to Bart Carter the first time,
7   when Fastran Inc. goes to Bart Carter the first time, he's a
8   customer; right?
9       A   He was a customer.  They were trying to make him a
10  customer, yes.
11      Q   In fact he's your first customer; right?
12      A   I think so, but I can't really be hundred percent sure
13  because we were talking --
14      Q   You were a hundred percent sure earlier, but that's
15  okay.  We're not going to worry about that.
16      A   No.  I'm sorry.  Earlier I said that the first
17  location that we install on Bart Carter, but I don't
18  remember who signed the agreement first because we were talking
19  to IMS at the same time, so I'm just trying to be honest.  I'm
20  not trying to --
21      Q   No problem.  If he's not first, there's only one
22  other, IMS; right?
23      A   Or two other.  LuckEcash was another customer.
24      Q   Okay.  So what is Fastran Inc. selling to Bart Carter?
25  What do they have that they're trying to get him as a customer

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 265

1   to use?
2      A   I'm assuming that our contract with them -- I'm
3   assuming Fastran Inc. was telling Bart Carter that "We can
4   facilitate processing transaction for you."
5      Q   Right.  They're selling a software package; right?
6      A   In my opinion, absolutely not.
7      Q   You're right.  They're selling the use of a software
8   package, aren't they?
9      A   Again, you know, that's really -- I didn't write those
10  contract.  I don't even remember those contract.  I don't know
11  what they sold, but that might be the right term; but I'm not
12  an attorney, so I can't really say "use of the software,"
13  "license of the software," or whatever the right term is.
14     Q   Now, sometime later you approached Bart Carter about
15  investing money; is that correct?
16     A   Fastran Inc. approached Bart Carter as one of the
17  people -- as a matter of fact, throughout its life,
18  Fastran Inc. was trying to find investors, and at some point we
19  approached Bart Carter as one of the people that we approached
20  to become an investor into Fastran Inc.
21     Q   I'm going to show you which is the -- it's Exhibit 6
22  and this is the Service Agreement.  I just want to make sure
23  that --
24     A   I remember that term.  They were using "Service
25  Agreement."

Page 266

1      Q   Right.  Is that the only agreement that you believe
2   exists between Fastran and ATMMS?
3      A   I believe there is only one signed agreement between
4   Fastran Inc. and ATMMS and I see that this is signed, so I'm
5   assuming this is the only agreement.
6      Q   So in this document it talks about "private labeled
7   services."  Can you tell me what that means?
8      A   It means that we are able to modify the look and feel
9   of the software to make the software look different for each
10  client, so that's the private labeling.
11     Q   Now, have you seen Exhibit A to the contract?
12     A   I think I seen that contract, but I don't remember.
13  If you want to refer to any specific point, either read it to
14  me or show it to me.
15     Q   Well, it says "cage-advance application."  Do you see
16  that?
17     A   Cage-advance application, okay.
18     Q   Do you understand what that means?
19     A   It's not the right term, but I understand what they
20  want to say.
21     Q   Then it says "cash-advance self-service kiosk
22  application."
23     A   Okay.
24     Q   Do you understand what that means?
25     A   Yes.

Page 267

1      Q   Then it says "Triton all-in-one ATM application."  Do
2   you understand what that means?
3      A   Yes, I do.
4      Q   And it represents these to be the products of Fastran
5   Inc.
6      A   Actually you read at the beginning it said "service."
7      Q   No.  It says "product," product selection.
8      A   That's right, the service of those product.
9      Q   Right, but isn't it true that this agreement
10  represents that these are Fastran Inc. products?
11     A   I can't make that judgment.  I'm not an attorney.  I'm
12  sorry.
13     Q   I'm not asking you to make --
14     A   You are.
15     Q   You have to answer my questions, sir.  You can't just
16  say, "I don't like your question," and your attorney didn't
17  even object.
18     A   I'm sorry.  You asking me isn't it true that this
19  means this, and I can't really tell you what does that
20  agreement mean.
21     MR. AUSTIN:  I'm going to object at this point because
22  you're now arguing with my witness.  He's given an answer.  You
23  can ask another question or you can repeat and ask the same
24  question back again and we'll see if you get a different
25  answer.

Page 268

1      MR. MUSHKIN:  Read my question back, please, and I'd like
2   you to read his answer.
3      (The record was read as follows:
4         "QUESTION:  Right, but isn't it true
5      that this agreement represents that these are
6      Fastran Inc. products?")
7         "ANSWER:  I can't make that
8      judgment.  I'm not an attorney.  I'm sorry.")
9   BY MR. MUSHKIN:
10     Q   I'm not asking you to make a judgment as an attorney.
11  I'm asking you what you believe this contract means.
12     A   I really can't answer that question, Mark -- Mike.  If
13  you tell me, I'm going to send it to my attorney and say,
14  "Please review this and tell me what it means."  That's really
15  what I'm going to do.
16     Q   Did you have any discussions with your two partners
17  before you entered into this agreement with ATMMS?
18     A   I did, and Magnus and John Bryant were managing the
19  contract agreement.  So I should be more careful and I should
20  select -- but I'm thinking, and I remember, probably they were
21  negotiating -- I mean they were getting advice from our
22  attorney, one of our attorneys, I'm assuming.  I don't know
23  which one or what, but I don't think they were writing this
24  contract themselves.
25     Q   The second paragraph of the contract says, "Whereas

Page 269

1  Fastran," which is a defined term, Fastran Inc., "is engaged in
2  the business of providing cash-advance and check-processing
3  services and associated equipment."
4      What associated equipment does this contract
5  reference?
6      A  Computers, PIN pad, printer, check reader.
7      Q  Is there anywhere in this contract that it is
8  disclosed that Fastran is a licensee of any of these products?
9      A  I don't remember that I seen anything like that in the
10 contract.  I don't think so.
11     Q  Is there a license that exists between IDS and Fastran
12 Inc.?
13     MR. AUSTIN:  Objection as to form; calls for a legal
14 conclusion.
15     THE WITNESS:  I don't have -- there is no signed contract
16 between Fastran Inc. and IDS.
17 BY MR. MUSHKIN:
18     Q  Of any kind?
19     A  I don't remember any signed agreement whatsoever.
20 Maybe an NDA, maybe other things.  I'm not sure.
21     Q  So now I want to go to -- now let's look at Exhibit C,
22 and it says its effective date of January 3rd, 2007; and it
23 says, "cash-advance software license, $75,000 one-time fees,"
24 and then "private label customization, $24,000."
25     MR. AUSTIN:  Is this the same --

Page 270

1      MR. MUSHKIN:  Same contract, yeah, Exhibit 6.
2      Q  So how can Fastran Inc. license software to ATMMS if
3  it doesn't own it?
4      MR. AUSTIN:  Objection as to form; calls for a legal
5  conclusion and speculation.
6      THE WITNESS:  That's exactly what I would say.  I don't
7  know.  I'm not an attorney.  I told you that Magnus and John
8  Bryant, in association with attorneys, draw that contract and I
9  am not sure if that was the right contract or not.  You're
10 asking me for something that I can't answer.
11 BY MR. MUSHKIN:
12     Q  If I told you that Magnus Rhyu specifically had
13 conversations with you regarding that $75,000 fee, would that
14 surprise you?
15     A  Probably in some meetings we talk about how much
16 they're going to charge ATMMS, that is probably true.
17     Q  And is it also true that in those meetings you
18 specifically discussed a license of Fastran software to ATMMS?
19     A  I'm not sure in what term we talk over these, but I am
20 100 percent sure that the task of drawing a legal contract was
21 assigned to Magnus Rhyu to work with our attorneys and draft a
22 legal contract between us -- between Fastran Inc. and any
23 potential customers like ATMMS.  So I was not part of those
24 detail meeting between John Bryant, Magnus, our attorneys; and
25 as a matter of fact, when they went and signed this with Bart

Page 271

1  Carter, negotiated this with Bart Carter, it was John Bryant,
2  Magnus Rhyu, and our attorney.
3      Q  Now answer my question.
4      Isn't it true that Magnus Rhyu specifically discussed
5  the $75,000 software-license fee before this contract was
6  entered into?
7      MR. AUSTIN:  Objection as to form; calls for speculation.
8      THE WITNESS:  Magnus Rhyu and John Bryant were setting the
9  pricing and they probably were talking to us at some point, but
10 I had no way of knowing what is the pricing should be.  So they
11 were setting the pricing based on the experience and knowledge
12 that they had.
13 BY MR. MUSHKIN:
14     Q  And isn't it also true that at this time you did not
15 express any ownership rights by IDS against Fastran?
16     MR. AUSTIN:  Objection as to form; ambiguous.
17     THE WITNESS:  Not true.  Everybody knew all along that --
18 who owns the software.
19 BY MR. MUSHKIN:
20     Q  Who owned it, yes.  Everybody knew that Fastran owned
21 the software.
22     A  No.  Everybody knew that IDS owned the software.
23     Q  Isn't it true that Magnus Rhyu specifically inquired
24 as to you that Fastran owned the software?
25     A  We were negotiating that at some point Fastran have

Page 272

1  the option of buying the software from IDS.
2      Q  And isn't it true that John Bryant said to you that
3  Fastran was to own the software?
4      A  I don't remember that discussion with John Bryant.
5      Q  Isn't it true that John Bryant specifically told you
6  that Fastran was going -- Fastran Inc. was transferring the
7  software to Fastran, LLC upon payment of $150,000?
8      A  I don't remember that discussion with John Bryant and
9  I don't even remember what you're referring to when you say
10 "payment."
11     Q  Isn't it true that you signed your name to a letter
12 that had a term in it for the buy-back of the software for
13 $150,000?
14     A  I don't think so.  I don't remember.
15     Q  You don't remember the testimony you gave at the last
16 time we were here when we went into this or you don't remember
17 the existence of that document?
18     A  I don't remember that I said that I sell the software
19 for $150,000.
20     Q  You don't remember that it's in the document that you
21 sent to Bart Carter?
22     A  I don't remember that.
23     Q  You don't remember testifying about it last time?
24     A  I don't remember that.
25     Q  Okay.  Well, let's start over then.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 273

1  Do you remember exactly where I had that, Bart? I
2  apologize.
3  BART CARTER: Which part?
4  MR. MUSHKIN: You know, the offer to you. Did we attach it
5  or is that where we stopped?
6  BART CARTER: Oh, for the exhibits?
7  MR. MUSHKIN: Yeah. You know what I'm talking about, the
8  offer, the thing that went back and forth.
9  BART CARTER: That was one of the exhibits; right?
10  MR. MUSHKIN: Yeah. I'm just trying to figure out exactly
11  where.
12  BART CARTER: It was an E-mail exhibit.
13  MR. AUSTIN: Can we take a brief break? I don't believe
14  there's a question pending.
15  MR. MUSHKIN: We've had a lot of breaks, Counsel, unless
16  you want to break early for lunch.
17  MR. AUSTIN: No. I just want to run to the restroom.
18  MR. MUSHKIN: Oh, sure. Go ahead.
19  (Brief recess taken.)
20  BY MR. MUSHKIN:
21  Q  So, Mr. Gashtili, isn't it true that on July 22nd,
22  2007 you transmitted to Bart Carter an E-mail expressing your
23  excitement about ATMMS becoming an investment partner with
24  Fastran?
25  A  It sounds right around that time I was talking to Bart

Page 274

1  Carter about that.
2  Q  The only reason I use that word is because that's the
3  sentence. "We are excited about the" -- okay? That's your
4  term, not mine.
5  A  We use sometime to put that letter together.
6  Q  Yes. And in that, there was an obligation due to IDS;
7  correct?
8  A  I remember that.
9  Q  And it's for software development; correct?
10  A  I remember that.
11  Q  Is it your testimony that the payment of that $150,000
12  did not make Fastran Inc. the owner of software?
13  MR. AUSTIN: Objection as to form; calls for legal
14  conclusion, speculation.
15  THE WITNESS: It is a legal opinion, but in my opinion, no,
16  that doesn't mean that Fastran owns the software.
17  BY MR. MUSHKIN:
18  Q  Is there any piece of paper anywhere that reflects a
19  license between IDS and Fastran?
20  A  I don't think so. I don't know about one.
21  Q  Is there any piece of paper from you to anybody from
22  July -- strike that -- from June of '06 until December
23  of '09 -- strike that -- December of '08 that claims that IDS
24  is the owner of the software?
25  A  That's a long period and a long time ago. I can't

Page 275

1  really talk about all the documents.
2  Q  Sorry, sir. It's your obligation to tell me if you
3  are aware of any document that was created by you or anybody on
4  behalf of IDS that made a claim of ownership of this software
5  between those dates.
6  MR. AUSTIN: I'm going to object to the implication of the
7  question that he is trying to hide something from you. I
8  believe that there is a little bit of a language barrier here
9  as English is not his first language. His answer was in
10  response to that question. Now, I think it's just a
11  misunderstanding of one of the terms you used. If you could
12  just clarify the question, I think we'll be in good shape.
13  BY MR. MUSHKIN:
14  Q  Do you understand my question?
15  A  Maybe if you said it in different form, it's going to
16  help me.
17  Q  Well, I'll try although that's not my job. My job is
18  to ask clear and concise questions and I think I did.
19  A  Okay.
20  Q  Are you aware of any document that you created that
21  made claim to ownership of this software between the middle
22  of '06 and the end of '08?
23  A  My honest answer is possibly there could be. I don't
24  remember anything right now that I can point to.
25  Q  Have you produced anything in this case?

Page 276

1  A  I sent all my E-mails to my attorney, so it could be
2  part of the documents.
3  Q  Sir, please, if you will listen to my questions, you
4  can answer them, because it's not about -- I'm not asking you
5  what you sent to your attorneys. I'm asking you what you know;
6  and you have a duty, you have an affirmative duty, to tell me
7  what you know. So I'm asking real specific questions.
8  A  Okay.
9  Q  Do you know of any written document issued by you or
10  anybody at IDS that claims ownership of the Fastran software --
11  that I refer to as the Fastran software?
12  A  Yeah. I'm going to answer it again.
13  At this moment I don't remember any, but you can put
14  an E-mail in front of me tomorrow and say, "You said no, but
15  here is a document."
16  Q  Well, I don't think I would be putting that E-mail in
17  front of you. I think your attorney would be putting that
18  E-mail in front of you.
19  A  Yeah, and then you can tell me, "You said there is
20  none."
21  I'm going to say I don't remember all of my E-mails
22  from 2006, 2007 or other documents. It should be part of the
23  documents; and if it's there, it's there. If it's not, it's
24  not.
25  Q  Isn't it true that the first time that IDS made claim

Nasrollah Gashtili, Volume II | JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 277

1  to ownership of this software is when you filed the application
2  for copyright?
3    A  That is not true.
4    Q  Tell me when the first time you made claim to
5  ownership was.
6    A  From day one everybody knew that IDS owns the
7  software.
8    Q  Who is "everybody"?
9    A  Everybody that was involved in Fastran Inc.
10   Q  Tell me who they are.
11   A  Magnus, John Bryant, and Larry.
12   Q  They're all going to testify that IDS owned the
13  software?
14   A  I can't really tell you if they're going to testify
15  that or not.
16   Q  Well, what if I told you that they're all going to
17  testify that Fastran was the owner of the software?
18   A  I -- what do you want me to say?
19   MR. AUSTIN:  Is there a question?
20   THE WITNESS:  Is that a question?
21 BY MR. MUSHKIN:
22   Q  I'm asking you, what would you say to -- what would
23  you say to Larry Brown if he testified, "No.  I thought Fastran
24  owned the software"?  What would you say to him?
25   A  I'm going to probably say, "You misunderstood."

Page 278

1    Q  What about John Bryant?
2    A  "You're not a right person.  You're not a good person.
3  You're always lying.  Here is another lie."
4    Q  What about Bart Carter?
5    A  I'm probably going to say, "You misunderstood."
6    Q  How does Bart Carter misunderstand that when you send
7  him a document that says that they're paying for software
8  development?
9    A  Bart Carter always knew they're paying for software
10  development.  Everybody pays for software development.
11   Q  And when people pay for software development, don't
12  they ordinarily own the software they develop?
13   A  That's a legal opinion.  In my opinion, no.
14   Q  Okay.  And when they get customized software, don't
15  they own their customized software?
16   A  No.
17   Q  No?
18   A  In my opinion again.
19   Q  That's your opinion, okay.
20      I had a question that I meant to ask earlier today.
21  We have -- there's some servers that are subject to an
22  injunction in this case.  Are you aware of that?
23   A  I do know about the servers that we talked about.
24   Q  Where are those servers?
25   A  They're at IDS office.

Page 279

1    Q  And are they being used?
2    A  I don't think so.  They're pretty old and probably
3  they're parts and pieces right now.
4    Q  They're not being used as backup servers for your
5  processing operation?
6    A  No.
7    Q  You're certain?
8    A  I am certain.
9    Q  When did they go out of service?
10   A  I didn't say they're all out of service.  Some of them
11  may be out of service.  Some of them may be sitting on our
12  rack.  We might use them or not.  I'm not sure.  I have to go
13  back and check each server, but you know the life expectancy of
14  those servers.  Those are very very old servers.
15   Q  What were they used for?
16   A  I think they were always used as a backup for our
17  production servers.
18   Q  Do you know how long they've been -- if they're not in
19  service, do you know how long they've been out of service?
20   A  I didn't say they're out of service.  I said some of
21  them may be out of service.
22   Q  So those that are in service, are they processing now
23  transactions for IDS?
24   A  No, none of those servers are processing any
25  transaction.  They're not being used for processing

Page 280

1  transaction.
2    Q  What are they being used for?
3    A  I'm telling you I don't know, Mike.  If you want me, I
4  can go back and check.  Most likely there --
5    Q  We'll leave a blank in the deposition.  I want you to
6  check and see what those servers are being used for.
7    MR. AUSTIN:  He said most likely they were.  You cut him
8  off.
9    MR. MUSHKIN:  I don't want him to guess.
10   MR. AUSTIN:  You cut him off in the middle of his answer.
11   MR. MUSHKIN:  Sorry.
12   THE WITNESS:  I said most likely they're not being used.
13  They're sitting on the rack at IDS office.
14  BY MR. MUSHKIN:
15   Q  Well, if they were being used, would they be being
16  used in your general business for processing?
17   A  We do not process any transaction from our IDS office.
18  So if they're sitting in our IDS office, they're not being used
19  for processing transaction.
20   Q  And are you sure they're in your IDS office?
21   A  I am positive.
22   Q  Okay.
23   MR. AUSTIN:  Mike, you still need him to go back and fill
24  in the blank in the transcript?
25   MR. MUSHKIN:  Yes.  I want to know when they went out of

Page 281

1 operation -- if they're in operation or when they went out.

2    MR. AUSTIN: Okay.

3    MR. MUSHKIN: Sounds to me like there's been a violation of

4 the injunction for quite some time. We'll find out about that.

5    MR. AUSTIN: Was there an injunction granted -- given as to

6 those servers? I can't recall.

7    MR. MUSHKIN: There certainly were, certainly was.

8    (Information requested:_____

9 _____

10 _____.)

11 BY MR. MUSHKIN:

12    Q   I'd like you to look at -- it's marked CARTER 457 and

13 this again was part of your transmission to Bart Carter, and

14 when it says "intellectual property and contract development,"

15 what intellectual property is on that schedule?

16    MR. AUSTIN: Objection as to form; calls for a legal

17 conclusion and speculation.

18    MR. MUSHKIN: That's an inappropriate objection, Counsel.

19 These are his documents. He sent them. It's his product.

20    Q   What intellectual property is that?

21    A   I'm sorry. Where does it say that this is my

22 document?

23    Q   Right here.

24    A   I know, but where do you see that this is my document?

25    Q   It says Fastran right at the top, sir.

Page 282

1    A   Oh, because you keep using word "you" for Fastran,

2 IDS, me, and I'm just confused.

3    Q   You're a shareholder of Fastran at the time.

4    A   Yeah. I want to know which "you" you're talking

5 about.

6    Q   I appreciate that.

7    A   I'm not sure. I'm not sure. I have to see what

8 they're talking about when they -- I don't even know who put

9 this together. I don't remember.

10    Q   It came from you, sir.

11    A   I don't remember.

12    Q   Okay.

13    A   I'm not saying I didn't put it together. I don't

14 remember.

15    Q   Okay.

16    MR. AUSTIN: What is that? Is that Exhibit 2 as well?

17    MR. MUSHKIN: Yeah, it's one of the pages of Exhibit 2.

18    Q   It also has the Fastran Pro Forma Income Statement as

19 the next page. You recall this document, don't you, sir?

20    A   I do not recall this document, but I seen documents

21 similar to this. It is most likely something created by Magnus

22 or John Bryant. I do not put these kind of documents together.

23 I know my documents. These are either Magnus or John Bryant.

24    Q   Just for the record, you were part of the group that

25 hired Magnus; correct?

Page 283

1    A   Yes, I was.

2    Q   So he was authorized to make this offer; isn't that

3 correct?

4    A   On the time that he was the COO, he was authorized to

5 act as the COO of Fastran Inc.

6    Q   But you do recognize that this actually came from you

7 on July 22nd?

8    A   I told you I'm not sure if that document was E-mailed

9 by me or not, but I'm hundred percent sure I did not create

10 that document.

11    Q   Well, what makes you think it was not sent by you?

12 Did somebody else have access --

13    A   I was looking at it and you couldn't show me. I said

14 I don't remember. I didn't say it didn't came from me. I said

15 I don't remember this document and I couldn't get to the point

16 that it shows where this document is coming from.

17    Q   What do you mean? It's right there, sir, right on the

18 first page.

19    A   You just opened that page.

20    Q   It says "from Nasrollah Gashtili."

21    A   I know. I was trying to get back to it and you

22 stopped me.

23    Q   I'm sorry.

24    MR. AUSTIN: Objection. The page you showed him was not

25 that page.

Page 284

1    THE WITNESS: This was the page you showed me.

2 BY MR. MUSHKIN:

3    Q   No, sir. I'm talking about earlier.

4    This document that is Exhibit No. 2 --

5    A   Yeah.

6    Q   -- it contains an E-mail from you; isn't that correct?

7    A   I see my name here. I see this E-mail is mine, but

8 you're going like five, six pages down. I don't know if that's

9 part of this E-mail or not. I just don't know. I'm just

10 telling you I don't know.

11    Q   You don't think that this is part of the document

12 dated July of '07, on the July of '07 --

13    A   Honestly, based on the appearance, I don't think this

14 is part of that document.

15    Q   And you don't think that that Pro Forma would also be

16 transmitted as part of that document?

17    A   I can't say that. Here is page 1 of 3; so page 1,

18 page 2, page 3. So I don't know if this page that is after

19 page 3 is part of that document or not. I'm not saying it is

20 or not. I'm saying I don't know.

21    Q   You just don't know, okay. But let's assume for the

22 moment -- let's have it as a stand-alone document, all right?

23    A   Uh-huh.

24    Q   It has Fastran's letterhead; correct?

25    A   Okay. Fastran Business Plan, yes.

Nasrollah Gashtili, Volume II

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 285

1    Q   Right. And it references a firm commitment; correct?
2    A   Yes.
3    Q   And that same firm commitment is referenced in your
4    E-mail; correct?
5    A   I don't know if it's the same or not.
6    Q   Well, it says "a million two fifty"; right?
7    A   It's the same amount.
8    Q   Same amount; right?
9    A   Yeah.
10   Q   Okay. And do you ever recall seeing this document
11   that is 457, CARTER 457?
12   A   I don't recall seeing that document.
13   Q   Do you ever recall seeing 458?
14   A   I know this type of document that Magnus and John were
15   creating. I don't recall this exact document, but this is
16   familiar to me because I seen them create documents like this.
17   Q   I understand you may not know because you're not
18   taking the time to read it, but --
19   A   Even if I read it --
20   Q   I agree with you. I wouldn't recognize it either, but
21   you recognize at least the form of that document?
22   A   I seen document like this before from John and Magnus
23   and I am -- if you ask me, "Who do you think created this
24   document," this specific page, I probably going to tell you
25   either Magnus or John Bryant.

Page 286

1    Q   Do you recall ever seeing this specific page before?
2    A   I don't. I don't recall seeing this specific page.
3    Q   In your first date of deposition, I asked you what the
4    percentages were in Fastran Inc. and you told me you
5    couldn't -- you didn't remember. Have you had a chance to look
6    up and determine what those percentages were?
7    MR. AUSTIN:  Percentages as to what?
8    MR. MUSHKIN:  Ownership. Sorry.
9    THE WITNESS:  I -- honestly, I forgot about that and I
10   didn't look, but it's -- there is a document exists, I'm pretty
11   sure, in Fastran Inc. that who owns what percentage.
12   BY MR. MUSHKIN:
13   Q   It wasn't a third, a third, a third?
14   A   No. I think from day we started the Fastran Inc.,
15   Magnus was already there. We hire Magnus before we actually
16   formed the corporation. So when we form the corporation,
17   Fastran Inc. as a corporation, it was four owner. There were
18   four owners involved, so it was -- and it wasn't equal
19   ownership.
20   Q   I'm sorry. It was not?
21   A   It was not equal ownership.
22   Q   Do you know how much Magnus owned?
23   A   I think lesser percentage. I know that John Bryant
24   and us owned higher percentage and Magnus and Larry a little
25   bit lower, but I don't remember exactly what percentage.

Page 287

1    Q   Do you know what happened to the license fee that
2    ATMMS paid, that 75,000? What happened to that money?
3    A   I think at that time Magnus was writing checks and
4    deciding where we're going to spend the money, so I don't
5    remember how we spend that money.
6    Q   Isn't it true that in February 15th of 2007 there was
7    an E-mail from Larry Brown to Bill Connell that Fastran is
8    working on a patent for the Fastran product?
9    A   I can't say "yes" or "no." I don't remember that
10   E-mail. You're saying from Larry to Bill Connell. I don't
11   know why you're --
12   Q   Well, Larry Brown was also an officer of Fastran,
13   wasn't he?
14   A   That is true, but if Larry sent an E-mail to Bill
15   Connell and if you're asking me if I remember that E-mail, I
16   don't.
17   Q   Well, were you aware that Fastran was starting its
18   application process for patent or copyright of the software?
19   MR. AUSTIN:  Objection as to form. There's a huge
20   difference between a patent and a copyright. Are you asking if
21   the E-mail mentioned a patent? I don't remember your E-mail
22   directly talking about a copyright.
23   MR. MUSHKIN:  Well, let's ask the witness this way:
24   Q   Are you aware of any efforts that Fastran was making
25   to patent its product?

Page 288

1    A   I'm not.
2    Q   Are you aware of any efforts that Fastran was making
3    to copyright its products?
4    A   I'm not.
5    Q   You were not at any meetings where this was discussed?
6    A   I don't remember.
7    Q   Are you certain?
8    A   Certain that we didn't discuss?
9    Q   Correct.
10   A   I don't think we ever discussed that.
11   Q   That's not what I asked you. I asked you are you
12   certain that the -- that these issues were not discussed by the
13   officers of Fastran Inc.?
14   MR. AUSTIN:  Objection as to form; mischaracterizes his
15   prior answer.
16   MR. MUSHKIN:  Inappropriate objection.
17   Q   Go ahead.
18   A   Based on my recollection, I don't remember such thing.
19   Q   Are you certain of it?
20   A   Based on my recollection, I don't remember.
21   Q   Does that mean you're not certain?
22   MR. AUSTIN:  Objection as to form. You've asked the
23   question. He's answered it he does not remember.
24   THE WITNESS:  I said based on my recollection, I don't
25   remember.

Page 289

1    MR. MUSHKIN:  I think it's a good time for lunch.  We're
2  off the record.
3    (Lunch recess taken from 11:56 a.m. to 1:20 p.m.)
4  BY MR. MUSHKIN:
5    Q   Okay.  So I had one sort of follow-up question.
6    You've pretty consistently insisted that IDS owned the
7  software.  How much money was IDS paid to develop the software?
8    A   We develop the software internally.  It's our own
9  software and we develop it.
10    Q   How much was IDS paid to develop the cash-advance
11  software?
12    A   I don't understand the question.
13    MR. AUSTIN:  Speak a little louder.  They got that air
14  going.
15  BY MR. MUSHKIN:
16    Q   How much was IDS paid by Fastran to develop the
17  cash-advance software?
18    A   I don't have the exact number, but we were charging
19  our client for modification and changes.
20    Q   I didn't ask you that.  I just asked you how much.  Do
21  you not know?
22    A   I do not know.
23    Q   If I leave a blank in your deposition, can you find
24  out how much IDS was paid?
25    A   I probably can go back to our accounting and find out.

Page 290

1    Q   Thank you.  I'll need you to do that for me.
2    (Information requested:_____
3  _____
4  _____.)
5  BY MR. MUSHKIN:
6    Q   In the process of charging for that, was there a
7  reason that, if IDS was maintaining ownership of the software,
8  then why did you get an interest in Fastran?
9    A   Fastran Inc. are we talking about?
10    Q   Yes, Fastran Inc.
11    A   Because Fastran had no other way of having the
12  software that IDS could build.
13    Q   Well, but if you got paid for it --
14    A   They came to me and they said, "If you can build this
15  software, we can go and sell it."  So part of the ownership was
16  somebody that could build the software and then allow them to go
17  and use that service.
18    Q   So wasn't -- sorry.  I didn't mean to interrupt you.
19    A   Use the software that we have to offer the service to
20  their client -- or to new clients, not their client.
21    Q   So wasn't the development of the software and the
22  contribution of the software your contribution to Fastran?
23    A   No.
24    Q   Then why -- I want you to take a look at Exhibit 6.
25  Sorry.  I lied.  It's Exhibit 2.

Page 291

1    Why did -- just one second, please.  With your
2  indulgence, just a moment.
3    Do you recall the E-mails we looked at earlier where I
4  pointed out the language to you that says, "buy back the
5  software"?  Do you recall that language?
6    A   I don't remember.  If you show it to me --
7    Q   Okay.  I'm going to take a moment and find it.
8    So I just want to be clear.  It's your testimony that
9  you're supposed to receive all of these software-development
10  fees and continue to own the software and get the stock
11  interest in Fastran Inc.?
12    A   Yes.  Fastran Inc. was --
13    Q   Is there any document that you have that reflects that
14  to be your transaction with Mr. Bryant and Mr. Rhyu and
15  Mr. Brown?
16    A   Fastran Inc. was four individual.
17    Q   Sir, that's not what I'm asking you.  I'm asking you
18  is there a document anywhere that reflects the deal that you
19  just said represents your side of the transaction?
20    A   The documents for Fastran Inc. exist that how Fastran
21  Inc. was formed.  I have to go back and read all of those.
22    Q   Is there anywhere that it sets out the financial terms
23  that I just outlined for you?
24    A   I don't remember.  It's pretty long document.
25    Q   Is there any document that you know that exists that

Page 292

1  sets out those financial terms with Mr. Bryant and Mr. Brown?
2    A   What financial term?
3    Q   That IDS gets paid for the development, that IDS gets
4  to continue the ownership of the software that's developed, and
5  that IDS or you individually gets a stock interest in Fastran
6  Inc.
7    A   I am pretty sure that if you review the documents of
8  Fastran Inc., it is stated there that how I get the stock
9  ownership in Fastran Inc.
10    Q   I'm not asking you that, sir.  Please listen to my
11  question.
12    Is there a document --
13    A   A single document that put all those three together?
14  I don't know if there exists or not.
15    Q   Thank you.
16    A   I have no recollection of that.
17    (Plaintiff's Exhibit 14 was marked for identification
18  by the Certified Court Reporter and is attached hereto.)
19  BY MR. MUSHKIN:
20    Q   That's CARTER 462 and 463.  Have you ever seen this
21  E-mail before?
22    A   I don't remember.  I'm reading it right now.
23    Q   Do you see where it says, "original message, Lawrence
24  Brown"?
25    A   One second.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 293

1  Q  Oh, go ahead. I'm sorry.
2  A  Okay. So what's the question? I'm sorry.
3  Q  Take a look at the second page.
4  A  Okay. I read the whole thing.
5  Q  Do you ever -- have you ever seen this before?
6  A  I don't remember.
7  Q  Do you recall providing Mr. Brown with the information
8  contained on the second page, specifically as it relates to
9  yourself at the bottom?
10  A  I don't remember if I give this, but this is pretty
11  basic information; but I don't remember if I give him this
12  specific paragraph.
13  Q  Is it true?
14  A  It's true.
15  Q  And do you recall seeing Mr. Bryant's background
16  information?
17  A  In this document that you just give me?
18  Q  Either --
19  A  Oh, recall this?
20  Q  Yeah. Have you ever seen any of this information
21  about Mr. Bryant before?
22  A  I've probably seen here and other places, but I
23  couldn't remember.
24  Q  Similarly for Mr. Brown?
25  A  Yes.

Page 294

1  Q  Is it true that Fastran is a being-formed -- I guess
2  it wasn't an LLC. It ended up being an Inc.
3  A  That's true.
4  Q  Principal officers Lawrence Brown, John Bryant,
5  Nasrollah Gashtili; is that correct?
6  A  That's what Larry Brown is saying here, yes.
7  Q  Is it true?
8  A  I don't remember that we talk about making it an LLC
9  or Inc. I don't recall what the decision was at that point.
10  Q  Were you the three principals?
11  MR. AUSTIN: Hold on. Let him finish.
12     You don't recall that that was the decision at that
13  what?
14  THE WITNESS: At the point -- because I don't even know why
15  I wasn't copy on this E-mail, but when Larry send this to Bill
16  and copy John Bryant and not me -- and I don't remember why --
17  I don't remember at that point if we were talking about making
18  it LLC, Inc., or whatever. I don't remember that specifically.
19  I know that at the end of it it was an Inc., as you know.
20  BY MR. MUSHKIN:
21  Q  No. I'm just asking you if the to-be-formed entity,
22  the principal officers were John Bryant, Lawrence Brown,
23  Nasrollah Gashtili.
24  A  At some point before we bring Magnus in, the three
25  people that we're talking were these three, yes.

Page 295

1  MR. AUSTIN: Any further questions as to that document?
2  BY MR. MUSHKIN:
3  Q  At this date in June of '06, again, the software had
4  not been completed; is that correct? It was under development?
5  A  That is probably true.
6  Q  Okay. Now I'm going to show you what's going to be
7  marked as 15.
8     (Plaintiff's Exhibit 15 was marked for identification
9  by the Certified Court Reporter and is attached hereto.)
10  BY MR. MUSHKIN:
11  Q  Again I'd ask you to look at the -- what's been marked
12  as Exhibit 15, CARTER 536, specifically under where it says
13  "original message."
14  MR. AUSTIN: It's just this one-page document; correct?
15  MR. MUSHKIN: Yes, sir, one of one.
16  Q  Have you ever seen that before?
17  A  I don't recall it, but my name is in here. I probably
18  had this back in 2007.
19  Q  And you'll notice in the second paragraph it says,
20  from Mr. Brown to Mr. Connell, that "We have been working with
21  our IP lawyers to submit patent applications for some of our
22  processes. We couldn't release some of the information in this
23  document until we had at least initiated that process." Do you
24  see that?
25  A  I do see that.

Page 296

1  Q  Did Fastran initiate any patent process?
2  A  To the best of my knowledge, no, I don't know about
3  anything.
4  Q  Do you know what they would have been patenting other
5  than the software?
6  A  No. You should ask Mr. Brown, if he wrote that.
7  Q  And in 2007 did you make any written objection to
8  Fastran patenting its software?
9  A  Even today when I read that, I don't know what
10  processes Mr. Brown is talking about.
11  Q  Okay. Of course you don't. Of course not.
12     What do you think he's talking about?
13  A  I can't really speculate on that. I don't know.
14  Q  I'd like to show you what will be marked as Exhibit 16
15  and it is CARTER 6391 through 6394 even though 6394 appears to
16  be some kind of receipt.
17     (Plaintiff's Exhibit 16 was marked for identification
18  by the Certified Court Reporter and is attached hereto.)
19  BY MR. MUSHKIN:
20  Q  Now, we've already gone through the second part of
21  this document where it lists the products of Fastran, but I'd
22  like to direct your attention to the E-mail from Bart on 6391.
23  A  Okay.
24  Q  "Nasrollah, thanks for the information. I see no
25  projected income. Can you list the different products, when

Nasrollah Gashtili, Volume II                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 297

1  they are to be fully functional, the marketing progress for
2  them, and income projections over the next 24 months. Thanks,
3  Bart."
4          Do you recall receiving that?
5  A  It's very familiar. I remember this E-mail, yes.
6  Q  Yes?
7  A  (Nods head.)
8  Q  Did you ever respond to it?
9  A  I don't remember. It's one above it? No, I don't
10 remember.
11 Q  Well, the one above it is from Bart to Nasrollah.
12 "Bill got his copy fine. Don't know why you guys didn't. Here
13 you are."
14         That's a little different in the string; right?
15 A  Yeah, so I'm not sure.
16 Q  But I'm trying to understand if you ever answered the
17 list of different products. Do you recall responding to that?
18 A  I don't remember. I have to go check.
19 Q  Do you ever recall telling Bart Carter that Fastran
20 was only a licensee of these products?
21 A  I don't remember if I specifically talk to him or not.
22 I can't recall.
23 Q  Don't you think that might have been important if you
24 were trying to sell him a piece of a company?
25 A  I don't know.

Page 298

1  Q  Don't you think you might have had a duty to disclose
2  that the products that you represented were only licensed and
3  not owned by Fastran?
4  A  I think Bart knew that.
5  Q  Well, how would Bart know that? We just showed you
6  the E-mail that was copied to you from Larry Brown that says
7  he's trying to patent the process.
8  A  Process.
9  Q  Sir, I'm not interested in the legal terms. I'm
10 trying to understand how there's anything else at issue other
11 than software here. Did you provide anything other than
12 software?
13 A  Process is not the software.
14 Q  Sir, I'm not asking you to define "process" for me.
15         Did you provide ATMMS anything other than software for
16 these financial transactions?
17 A  I'm sorry. What is the question?
18 Q  Did you provide ATMMS anything other than software?
19 A  Of course. We process transaction for ATMMS. We did
20 not provide software to ATMMS, never. We only process
21 transaction for ATMMS.
22 Q  Who processed the transactions?
23 A  We did.
24 Q  Who is "we"?
25 A  Fastran.

Page 299

1  Q  Fastran isn't an ISO.
2  A  You want to get to those terms? I already explained
3  for you how it work, that transactions came from Bart Carter's
4  location to Fastran data center and then we had different
5  agreement with different processor to --
6  Q  So you didn't process.
7  A  We did process. We did process those transaction.
8  Everybody process transaction. It's just what steps of the
9  process you're handling.
10 Q  What did you have that allowed you to participate in
11 the process?
12 A  We were the only facility that Bart Carter location
13 could send the transaction to to get the approve or decline.
14 They had no idea -- or they had no connection to anybody else.
15 We were one part of the whole entire transaction.
16 Q  That's right. And you had --
17 A  It's ECHO, Visa, MasterCard, whoever.
18 Q  What did you possess that allowed you to be one part
19 of the process? Software; correct?
20 A  Software was one of it.
21 Q  And you had some servers; correct?
22 A  We had some servers.
23 Q  And you had software to allow those servers to
24 operate; right?
25 A  We had softwares to allow the servers --

Page 300

1  Q  Is there anything else that could be talked about in
2  here except the software?
3  A  You just explained how many things goes in there. How
4  you coming back to using that software is the only thing?
5  Q  Servers are servers. We know how to describe a
6  server.
7  A  Yes.
8  Q  So you had servers and software?
9  A  Contracts.
10 Q  What contracts?
11 A  Contracts with ECHO or anybody else that we process
12 transaction -- we send our transaction to get approval. We had
13 a lot of pieces that we put together, one of them being a
14 software license that Fastran had from IDS.
15 Q  Where is that software licensed?
16 A  It was a verbal agreement that we allowed you to use
17 it.
18 Q  You better get some advice from your attorney on what
19 that means, Counsel -- I mean --
20 A  I told you already --
21 MR. AUSTIN:  Objection.
22 MR. MUSHKIN:  I'll keep my mouth shut.
23 MR. AUSTIN:  Harassment.
24 MR. MUSHKIN:  Harassment?
25 MR. AUSTIN:  Badgering, maybe that's a better word.

Page 301

1    MR. MUSHKIN: No. It's the truth. That's what it is. He
2  needs to get some advice.
3    MR. AUSTIN: Objection.
4    MR. MUSHKIN: That's what it is.
5    So we'll admit this as 16.
6    Q  Now I'd like you to take a look at CARTER 6204, which
7  will be 17.
8    (Plaintiff's Exhibit 17 was marked for identification
9  by the Certified Court Reporter and is attached hereto.)
10  BY MR. MUSHKIN:
11   Q  I'd like you to focus on the center of the page, which
12  is Bill to you on October 17th, 2007 at 8:58 a.m. The one at
13  the bottom is an old message that I really can't tell you why
14  that got printed on there except my guess is Bill used the
15  address or -- you know what I mean -- forwarding, but the two
16  that I'm looking at are the two from Bill to Nasrollah,
17  October 17th, 2007 at 8:58 a.m. and your response at 9:29 a.m.
18  on the same day. So if you'd read those, I'd like to ask you
19  some questions about them.
20   A  Okay.
21   MR. MUSHKIN: Miss Reporter, this is No.?
22   THE REPORTER: 17.
23   THE WITNESS: Okay.
24  BY MR. MUSHKIN:
25   Q  Now, you wrote that; right?

Page 302

1    A  I did.
2    Q  So the first sentence in your response to Bill is that
3  "We've never done before -- something we have never -- we are
4  doing something we've never done before." Does that relate to
5  this software?
6    A  I don't recall exactly what module or what part of the
7  software. As you know, by then we had the software in
8  production. Most likely the discussion is over any specific
9  things that they were asking to be added and I don't recall --
10   Q  It says, "three-in-one product" right there, doesn't
11  it?
12   A  Okay, three-in-one product.
13   Q  You didn't have the three-in-one product in production
14  on October 17th, 2007, did you?
15   A  I have to check, but based on this, probably we
16  didn't.
17   Q  And it had been promised for quite some time, hadn't
18  it?
19   A  We work on that product for a while.
20   Q  Wasn't that what you were -- wasn't that the whole
21  idea from the beginning, to provide a three-in-one -- sorry --
22  three-in-one cash-advance product? Let me restate that, make
23  it easier.
24    Isn't it true that in late 2006, when you approached
25  Bart, there was no three-in-one cash-advance product available?

Page 303

1    A  First of all, late 2006 I never approached Bart Carter
2  and then I don't know what they offered. Everybody knew at
3  that point what we had already and what we didn't have ready
4  yet. I don't think we ever lied to Bart Carter. He's pretty
5  smart guy. He could ask for us to show it to him or deploy it.
6  So at any given point, he knew that what was completely ready
7  and what was not ready yet.
8    Q  I don't know what question you answered, sir, but that
9  wasn't my question.
10   A  I answer your question. I never approach Bart Carter
11  in 2006. I'm sorry.
12   Q  I apologize. When Fastran approached ATMMS in 2006.
13  Does that make it better?
14   A  Okay. So then what's the question?
15   Q  So you didn't have a functioning product when you
16  approached ATMMS; correct?
17   A  That's not true. We did have a functioning product.
18   Q  Okay. What product did you have that was -- what
19  product did Fastran Inc. have that was functioning in 2006?
20   A  Again it's a legal term that what product Fastran Inc.
21  had, but Fastran Inc. had access to a cash-advance software
22  that IDS developed for it and licensed to them to use it.
23   Q  In 2006?
24   A  Sometime in 2006 we were ready with -- we were
25  processing transaction, yes.

Page 304

1    Q  Where?
2    A  You mentioned to me that the first location was
3  operational on January 17th, 2007. So that was your -- you
4  point that out.
5    Q  That's what I'm telling you. You didn't have anything
6  processing transactions in 2006.
7    A  Because we didn't have a customer. You said, "You
8  didn't have a product." I said we did have a software that
9  could process transaction. We just didn't have a client.
10   Q  When was the product functional?
11   A  I have to check my records.
12   Q  We'll leave a blank in the transcript. Please check
13  your records for that.
14    (Information requested:_____
15  _____.)
16  BY MR. MUSHKIN:
17   Q  Is there anybody other than you that would know?
18   A  I probably be the right person.
19   Q  How about McWaters?
20   A  He probably knew too.
21   Q  Didn't he do the first install?
22   A  I am not sure. I don't remember.
23   MR. AUSTIN: I believe he answered, "He probably knows
24  too."
25   THE REPORTER: I'm sorry?

Nasrollah Gashtili, Volume II      JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 305

1   MR. MUSHKIN: You just interrupted my record, Counsel.
2   MR. AUSTIN: No. I believe he answered. I'm just not sure
3 sometimes you're hearing his answer because he's a little soft.
4 I'm clarifying his answer was, "I believe he probably knows
5 too."
6   MR. MUSHKIN: I heard his answer and my next question was,
7 wasn't he on hand for the first install.
8   THE WITNESS: I don't remember who did the first install.
9 BY MR. MUSHKIN:
10   Q   Would you be surprised if he was the person who was on
11 the --
12   A   No, not really.
13   Q   Do you really not remember or do you just choose not
14 to tell me?
15   A   You can accuse me as much as you want. I'm just
16 trying to give you the best answer from what I know. I don't
17 want to answer something that I don't remember exactly.
18   Q   When you made the offer to Bart Carter in July of
19 2007, what products did Fastran Inc. own?
20   A   Again, I said that before. What product own is a
21 legal definition. I don't want to get to that. If you mean a
22 software that Fastran owned, I told you that IDS owns that
23 software and Fastran never owned the software.
24   Q   Is there anything else that Fastran owned?
25   A   Fastran owned the license to use that software, data

Page 306

1 center, contracts, processors, know-how.
2   Q   In Exhibit 17 it says, "We were promised to work with
3 someone that has done this before for other clients and now we
4 realize that was not true statement."
5   Who were you talking about there? Who were you
6 working with that made a false promise to you?
7   A   I don't remember that three-on-one was for what type
8 of machine, if it was for Triton or ACI or any other type of
9 machine. If I would remember that, I would have probably -- I
10 would be able to answer that question and say who was that
11 company, but I don't remember that specific three-on-one was
12 for what type of machine.
13   Q   "There are also multiple companies cooperating on this
14 project."
15   Who were the multiple companies cooperating on that
16 project?
17   A   Again, because I don't know what machine those
18 machines were, I can't answer that question.
19   Q   What's the machines got to do with the multiple
20 companies coordinating on this project?
21   A   To give you an example, if it was Triton, then Triton
22 was involved. If it was ACI, ACI was involved. If it was
23 Diebold, Diebold was involved. It depend what company we work
24 with.
25   Q   Aren't you trying to make an application that works on

Page 307

1 all of them?
2   A   You can't make an application to work on everything
3 just by clicking a switch.
4   Q   I didn't say clicking a switch. Sir, listen to my
5 question.
6   A   No, you can't. I answer. No, you can't.
7   Q   You're telling me that you can't make an application
8 that works on three different types of machines?
9   A   You can't make all three of them at once.
10   Q   I didn't ask you that, sir. Listen to my question.
11   A   I can't answer that question.
12   Q   You haven't listened to the question yet.
13   A   I don't understand it.
14   Q   Then let me --
15   A   I'm sorry. Let me finish what I want to say.
16   Explain it differently for me, please.
17   Q   Isn't the whole idea to create an application that you
18 can use on each type of machine?
19   A   The whole idea for --
20   Q   You don't want to create a software that only works on
21 one type of machine. You want to be able to use it. If your
22 customer has Diebold, the customer needs to use the
23 software on Diebold. If the customer has NCR, he needs to use
24 the software on NCR. If he has -- ACI? ASI?
25   BART CARTER: ASAI.

Page 308

1 BY MR. MUSHKIN:
2   Q   You understand what I'm saying?
3   A   I understand what you're saying, but your question --
4 people make software that work on one type of machine all the
5 time.
6   Q   That's not what I'm asking you.
7   A   I don't understand what you're trying to get out of
8 me. You're saying isn't it the whole idea to make a software
9 to runs on all machine, and I'm saying --
10   Q   Did ATMMS tell you that they only wanted software on
11 one type of machine?
12   A   No. As a matter of fact we add more stuff to them as
13 we were going on. Then they were asking for more thing.
14   Q   Exactly. That's the point of my question, sir. The
15 whole idea is to make the software as usable as possible;
16 right?
17   A   It's nice to have a software that is usable as
18 possible.
19   Q   Sure. You would like to have more users than less
20 users, yes?
21   A   It's very nice. It's advantage for you.
22   Q   And in fact you've used the term throughout our
23 deposition of "modules" because you've added additional
24 modules, different features. Is that a fair use of "module"
25 for "feature"? Is that a fair exchange?

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 309

1   A   Okay.

2   Q   I'm just -- I don't want to use words that you don't

3   understand.

4   A   No. I understand both "modules" and "features."

5   They're not exactly the same, but I understand what you want to

6   say.

7   Q   They're close. They could be used interchangeably in

8   this context only because, in the context of this E-mail I'm

9   asking you, there are multiple companies cooperating on this

10  project. Are those multiple companies the multiple companies

11  that manufacture the devices?

12  A   Obviously if it's a three-in-one, there are

13  companies -- there was a company that we were trying to install

14  the three-in-one on that and that company was involved. I am

15  just telling you -- you asked me what company and I said, based

16  on this E-mail, I cannot tell you what company. I have to see

17  more. If -- but I can tell you, Mike, I answer your question.

18  If it was all-in-one for ACI, ACI was involved. If it was

19  all-in-one for Triton, Triton was involved. I don't know how

20  else I can answer your question.

21  Q   Isn't it equally likely that, because Mr. Carter had

22  various types of hardware, that Fastran was making the

23  application work on more than one type of hardware?

24  A   Every time that any of our client would ask to use our

25  software on a different type of machine, we were able to

Page 310

1   accommodate that request.

2   Q   And you in fact billed them for each one of these

3   modules and enhancements, didn't you?

4   A   Again that's something that Fastran was charging ATMMS

5   some amount of money for what they were providing to ATMMS.

6   Q   Thank you.

7       I'm going to show you what's been marked 18.

8       (Plaintiff's Exhibit 18 was marked for identification

9   by the Certified Court Reporter and is attached hereto.)

10  BY MR. MUSHKIN:

11  Q   I'll just note this is from you.

12  MR. AUSTIN: Are you talking about the first page?

13  MR. MUSHKIN: Yes. It says "1 of 3," but I only have one

14  page I'm looking at.

15  Q   There's a "from Terry Kremmin," but I'm not really

16  interested in all of his comments. I just want to talk about

17  what Nasrollah wrote.

18      Is this an E-mail that you wrote?

19  A   Yes, it is.

20  Q   And is the date correct, that this was written on or

21  about the 13th of December 2007?

22  A   Again I see the date. It's my name. I'm assuming

23  it's correct.

24  Q   That's all I'm asking. I'm only asking if there's any

25  reason to believe that's wrong.

Page 311

1   A   No, there's no reason to believe --

2   Q   It's not a trick question obviously.

3   A   No.

4   Q   Did you intend it to go to Mr. Kremmin?

5   A   If I read the whole thing, I can tell you.

6       Okay. Yes, probably meant to send this to Terry

7   Kremmin.

8   Q   You probably meant to send it to him?

9   A   No, I take it back. I send this E-mail to Terry

10  Kremmin.

11  Q   Did you write this E-mail?

12  A   I did write this E-mail.

13  Q   And did you intend it to go to Mike Poggi?

14  A   I don't remember. Maybe, maybe not.

15  Q   Well, if you look where it says "cc," it says

16  "mike@atmms.com."

17  A   You asked me if I intended. You didn't say if it's

18  copied to Mike. I see that it's copied to Mike, but you asking

19  me if I intended to send it to him or by mistake I typed his

20  name, I assume; and I'm saying I can't say that. I have Mike's

21  name in there. Most likely I put it in there. If you're

22  asking the question --

23  Q   Did you intend to send it --

24  A   Okay. Go ahead.

25  Q   Did you intend to send it to Bart Carter?

Page 312

1   A   Probably I did if I have his name there.

2   Q   Did you intend to send it to Larry Brown?

3   A   Probably I did.

4   Q   And did you intend to send it to Jim Bryant?

5   A   John Bryant?

6   Q   I'm sorry, John Bryant.

7   A   Probably. He's there.

8   Q   And Bill Connell?

9   A   Yes. He's there.

10  Q   So now let's take a look at it.

11      Tell me what you believe you -- are you responding to

12  Mr. Kremmin's earlier E-mail?

13  A   Yes.

14  Q   And do you recall what he said to you in that E-mail?

15  A   Based on what I read on my E-mail, probably he

16  complain about something and I went back to him and said why he

17  didn't say these things before. "Now that we're ready to

18  deploy, you're saying that these are issues." That's -- I

19  can't read his entire E-mail, but probably that's the reason.

20  It appears that I was not happy with the comments he made.

21  Q   Well, did you tell somebody that the check-cashing

22  piece is a hundred percent ready?

23  A   Based on what they ask us that they want to see it's

24  going to operate, I was assuming it's ready and that's why I

25  wasn't happy when they said that there are some issues with it.

Page 313

1  Q  In fact it wasn't ready, was it?
2  A  Based on what I'm saying, it was ready based on what
3  they ask for.
4  Q  Well, what -- it says here, "As you know, IDS is a
5  software-development company with no prior experience in this
6  industry." Is that true?
7  A  We never develop a check-cashing application prior to
8  this one.
9  Q  "Check-cashing module was developed based on a
10 requirement document written or at least reviewed by Larry,
11 John, you and Touria. In addition, after releasing the module
12 almost a year ago, you guys were the one that time after time
13 reviewed and tested the application and ask for changes that we
14 have implemented, and at some point we all agreed that this is
15 a good candidate for our first release and decided to present
16 to our client as a ready-to-deploy module."
17     When did that -- and let's talk about who is "at some
18 point we all agreed." Who is "we all agreed"?
19 A  Based on what I'm reading here, I probably mean
20 Fastran people, which is Terry Kremmin, Larry Brown, John
21 Bryant, and Touria -- I don't know why Touria name is not
22 there. Okay. Touria at that time probably wasn't our employee
23 anymore. So that's probably I mean Fastran people.
24 Q  And I'm guessing that within Fastran there was
25 probably a disagreement. Terry didn't think it was a hundred

Page 314

1  percent ready. Is that what you believe?
2  A  I'm believing that when Terry reviewed that, he said
3  that there are some issues with that and we can't deploy it as
4  it is right now. We need to make modification.
5  Q  Well, Terry works for you; right?
6  A  Yes, today he's working for me. Before he used to
7  work for Fastran.
8  Q  I'm sorry. When I meant to say "you," I mean Terry
9  works for Fastran?
10 A  He was working for Fastran.
11 Q  Now, it says, "If we are changing our mind this late
12 into the game and saying the check-cashing module cannot be
13 deployed in its current form and shape, I need a new
14 requirements document based on input from people that are more
15 familiar with the industry ASAP."
16     Who are you talking about? Who were you wanting that
17 information from?
18 A  Probably Terry Kremmin at that point because Touria
19 was no longer with us and I was -- Larry probably was a good
20 person. John Bryant probably was a good person. I mentioned
21 to you that John Bryant and Larry came to me and said they know
22 this industry. "If you build software," they can go sell it.
23 Q  But this is December of '07. You've already got Bart
24 in the loop.
25 A  Sure. What's the question?

Page 315

1  Q  It doesn't -- why -- if the check-cashing module isn't
2  working, who are the people that you're wanting to go to?
3  MR. AUSTIN: Objection.
4  BY MR. MUSHKIN:
5  Q  "I need new requirement documents based upon input
6  from people that are more familiar with the industry ASAP."
7  Who is more familiar? Who are you asking for information?
8  MR. AUSTIN: Hold on. Objection as to form. It's assuming
9  facts that are not yet presented in this matter. It's a
10 misstatement of what is in this E-mail and your underlying
11 buildup to your question.
12 MR. MUSHKIN: Once again, Counsel, stop testifying. State
13 your stated objection. "Form of the question," gotcha'.
14 "Assumes facts not in evidence," gotcha'. But when you go
15 beyond that, you're coaching.
16 Q  And I don't even understand why he's coaching because
17 I don't understand what he's talking about. I repeated what
18 you wrote, sir. "I need new requirements based on input from
19 people that are more familiar with the industry ASAP."
20     What people? Who are you referring to?
21 A  I just answer that question. I don't know why you're
22 asking again.
23 Q  I'm sorry. I --
24 A  Didn't I answer that question?
25 Q  Terry Kremmin?

Page 316

1  A  I said Terry Kremmin, John Bryant, Larry Brown; and
2  Touria no longer was with our company, so no Touria. I just
3  answer that question.
4  Q  At the bottom it says, "Please go ahead and set up a
5  meeting with at least the following people (others are welcome
6  to attend) in order to talk about who should be involved in
7  writing the requirements and how quickly we can come up with
8  one." You have Terry Kremmin, Mike Harmon -- who is Mike
9  Harmon?
10 A  Mike Harmon is a person that works for -- used to work
11 for Bart. I don't know if he still or not.
12 Q  Larry Brown, we know who that is; John Bryant, we know
13 who that is; Bill Connell, that's Bart's guy; and yourself?
14 A  Yeah.
15 Q  Okay. So are you including Bart among these people in
16 the industry that -- or I shouldn't say Bart -- you know, Bill
17 Connell and I'm wondering if -- oh, Mike Harmon. I remember
18 now, sorry -- these requirements for a check-cashing module?
19 A  So what's the question? I'm sorry.
20 Q  Are the people in the industry that you want to talk
21 to the people on this list? Are there any others?
22 A  I mean I probably ask -- not probably. I said at
23 least with these people, isn't it?
24 Q  Yes.
25 A  "Please go ahead and set up a meeting at least with

Nasrollah Gashtili, Volume II

JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 317

1  these people" --

2     Q  That's why I'm asking are there any others.

3     A  -- "or anybody else that you want to add."

4     Q  No.  Is there anybody else that you want to add?

5     A  I didn't want.  Otherwise I would put the name there.

6     Q  Okay.  19.

7     (Plaintiff's Exhibit 19 was marked for identification

8  by the Certified Court Reporter and is attached hereto.)

9  BY MR. MUSHKIN:

10     Q  Exhibit 19 is 6006.  Have you had a chance to read it?

11     A  I did read it.

12     Q  Have you ever seen this before?

13     A  It's my E-mail.  Probably I wrote it -- not probably

14  again.  I wrote this E-mail.

15     Q  So, "I am not sure if we can just go ahead and open a

16  bank account with First Republic Bank for Fastran, LLC and ask

17  ECHO to send the traffic to this new account since Fastran, LLC

18  has purchased all of the Fastran Inc. assets.  What do you

19  think?"

20     Why did you write this E-mail?

21     A  I told exactly what I said in here, that I'm not sure

22  if Fastran, LLC can just open a bank account with -- not First

23  Republic as you said -- First Regional Bank and ask ECHO to

24  just --

25     Q  I'm sorry.  I read it wrong.

Page 318

1     A  -- just to redirect the funds now to ECHO.  I probably

2  meant that, as I mentioned before, that Bart needs to move

3  forward with opening or creating a contract between

4  Fastran, LLC and ECHO so ECHO can start processing for Fastran,

5  LLC.  I think that's pretty obvious from what I wrote here too.

6     Q  Where does it say that Fastran, LLC has to have a

7  contract with ECHO?

8     A  You asked me to speculate and why did I read this

9  E-mail, and I speculate.  I said based on what Bart Carter and

10  we were talking, that he needs to talk to ECHO and start a new

11  contract between ECHO and LLC.  I wrote to him that we just

12  can't tell ECHO to now move everything to the Fastran, LLC

13  account even if he open an account with Fastran under

14  Fastran, LLC name because Fastran, LLC needs to have a contract

15  with ECHO first.

16     Q  You certainly --

17     A  Speculation.

18     Q  No problem.  But you certainly acknowledge in this

19  E-mail that LLC has purchased all of Fastran Inc.'s assets;

20  correct?

21     A  I said it there.

22     Q  Thank you.

23     (Plaintiff's Exhibit 20 was marked for identification

24  by the Certified Court Reporter and is attached hereto.)

25     MR. AUSTIN:  Does 20 begin "page 2 of 2"?

Page 319

1     MR. MUSHKIN:  It does, 05235.

2     Q  This is September 21st, 2008 and your last two

3  invoices.  Do you recall how much those invoices were for?

4     A  No, I don't.

5     Q  Can you provide us with the information on those last

6  two invoices?

7     A  I think all the invoices are submitted as part of

8  the evidence.

9     Q  But I can't identify them.  Only you can identify them

10  that relate to this E-mail.

11     A  Sure.

12     Q  So I'm going to leave a blank in your depo and ask you

13  to identify the last two invoices that are referenced, okay?

14     A  Okay.

15     (Information requested:_____

16  _____.)

17  BY MR. MUSHKIN:

18     Q  Now, you see the response the next day -- is that

19  correct -- from Bart?

20     A  Yes.

21     Q  And it says, "At this point I don't feel that I should

22  have to borrow money to fund Fastran's obligations when there

23  is money that should be distributed from the Fastran Inc.

24  account that is just sitting there.  Let's talk about this and

25  the ATMMS contract as soon as possible.  I'm available all day

Page 320

1  today.  You guys?"

2     Do you see that?

3     A  Yes.

4     Q  Did you respond to that?

5     A  I don't remember.  The one above this has my signature

6  on it.  It probably is my response to him.  You just didn't

7  provide that.  It's "page 2 of 2" as you can see.

8     Q  Let's see if we can find it.  I think it's the next

9  page here.

10     So let's make the next one as 21.

11     (Plaintiff's Exhibit 21 was marked for identification

12  by the Certified Court Reporter and is attached hereto.)

13  BY MR. MUSHKIN:

14     Q  You were right, Mr. Gashtili.  So now let's look at

15  the prior one from Nasrollah to Bart, "last two invoices."

16  "Sure, Bart.  I can wait.  I can call you today at 3:30, if

17  it's okay with you, to finalize our contract.  Once we are done

18  with that, we can try to complete our accounting."

19     Do you see that?

20     A  Yes.

21     Q  And you see Bart above, "I will be on the phone at

22  3:30"?

23     A  Yeah.

24     Q  And then Larry, "I will also be available at 3:30"?

25     A  Yeah.

Page 321

1    Q   Then it says, "I did not see this E-mail before
2    sending my previous E-mail.  Conference number will go out
3    shortly."  Do you see that?
4    A   Yes.
5    Q   Did you have a conference that day?
6    A   I don't remember.  I'm sorry.
7    Q   Well, did you ever make an agreement?
8    A   What agreement?
9    Q   "Okay with you to finalize our contract."  Did you
10   ever complete your contract between ATMMS and Fastran?
11   A   I -- as far as I know and I don't think we ever did,
12   so I did not.
13   Q   So you just kept collecting all this money from ATMMS
14   customers and you weren't going to give it to them?
15   MR. AUSTIN:  Objection; mischaracterizes his testimony and
16   his answer.
17   MR. MUSHKIN:  I haven't referenced his testimony and his
18   answer and again it's an inappropriate objection.
19   Q   So you are processing ATMMS customers on
20   September 22nd of 2008; correct?
21   A   With "you" you mean Fastran?
22   Q   Fastran Inc.  Actually I believe it's Fastran, LLC by
23   now, but Fastran whoever it is.  I don't care because it's
24   either Inc. or LLC.
25   A   That account was going to Fastran Inc.

Page 322

1    Q   Right.  So now ATMMS has, I want to say, 80 customers
2    going; right?
3    A   Probably somewhere around that number.
4    Q   I want to say 80, 83, something like that.
5    A   Okay.
6    Q   And the revenue, the money off of each of those
7    transactions that is due to ATMMS from a contract with their
8    location, is flowing into that Fastran Inc. bank account, isn't
9    it?
10   A   That's true.
11   Q   Did you ever provide ATMMS with the accounting that
12   was discussed in this E-mail?
13   A   I was never an accountant of Fastran Inc. or Fastran,
14   LLC.
15   Q   Did Fastran Inc. ever provide the accounting?
16   A   I did not.
17   MR. MUSHKIN:  22.
18   (Plaintiff's Exhibit 22 was marked for identification
19   by the Certified Court Reporter and is attached hereto.)
20   MR. MUSHKIN:  Hold that one for just a moment.  I want to
21   go back.
22   Q   Let's go back to 21 for just a minute -- I'm sorry.
23   Let's go back to 20.
24   Do you know how much money was in Fastran Inc.'s bank
25   account on September 22nd, 2008?

Page 323

1    A   No.
2    Q   Was there a reason that your partners did not know how
3    much money was in -- strike that.
4    Is there a reason that your co-owners of Fastran, LLC
5    did not know how much money was in that Fastran account?
6    A   Is there a reason that my co-owner?  First of all I
7    mention to you that there was two signature and two people that
8    could log into that account, me and Larry Brown; so Larry Brown
9    could log in any time and look at the account and check the
10   account out.
11   Q   Isn't it true that Bill Connell asked you regularly
12   for access to that account and you refused to give it to him?
13   A   I don't remember if he specifically asked me for
14   access to that account, but even if he would ask, I probably
15   would not give access to Bill Connell to that account.
16   Q   Isn't it true that Bart Carter asked you repeatedly
17   for access to the account, the information from -- strike that.
18   Isn't it true that Bart Carter repeatedly asked you
19   for the account statements and you refused to give them to him?
20   A   I did provide account statement to Bart Carter.
21   Q   Your testimony is that you provided Bart Carter the
22   account statements on the Fastran Inc. bank account?
23   A   I did.
24   Q   When?
25   A   I don't remember.  I have to go check.

Page 324

1    Q   Well, how did you transmit them?
2    A   I don't remember, but I gave those to Ken.  Is that
3    right, Ken Connell?
4    Q   Did you give them to them contemporaneously?
5    A   What does that mean?
6    Q   Each month as they came in.
7    A   No.  They didn't ask for it.  Once they asked -- at
8    some point they asked for some statements and I provide that to
9    them.
10   Q   Isn't it true that Bart Carter asked month after month
11   for the statements and you refused to give them?
12   A   That is not true.
13   Q   You want to think about that for a minute?
14   A   No.  He did not ask month after month.
15   Q   Isn't it even true that in the minutes of the board
16   meeting, this issue is discussed and you still won't -- and you
17   promised to provide the information and you never did, did you?
18   A   I did provide bank statement to them.
19   Q   When?
20   A   It's in the record.
21   Q   What record?
22   A   Whatever records we have.
23   Q   Well, we're going to leave a blank in your deposition,
24   and you provide us a record of when you transmitted bank
25   statements to Bart Carter or anybody at ATMMS, okay?

Page 325

1    (Information requested:_____
2    _____
3    _____.)
4    THE WITNESS: Mike, you know and I know that
5    they have bank statements.
6    BY MR. MUSHKIN:
7    Q   You know and I know that they didn't.
8    A   That's fine.
9    Q   If they had, there wouldn't have been bounced checks.
10   If they had the bank statements, they would have seen the
11   counter checks that you surreptitiously took from the bank so
12   you could extract money.
13   MR. AUSTIN: Objection. Don't answer the question.
14   THE WITNESS: Is that a question?
15   MR. MUSHKIN: It is a question.
16   Q   Why did you use counter checks?
17   MR. AUSTIN: Don't answer the question. Let me get my
18   objection in.
19   BY MR. MUSHKIN:
20   Q   Why did you use counter checks?
21   MR. AUSTIN: Let me get my objection in.
22   MR. MUSHKIN: Whatever your objection is, it can be a
23   standard objection. You've had all of them. You can have them
24   again.
25   Q   Why did you use counter checks?

Page 326

1    MR. AUSTIN: Let's leave for a minute until I can get an
2    opportunity to actually function as a lawyer.
3    MR. MUSHKIN: Are you ending the deposition?
4    MR. AUSTIN: Unless you let me put an objection on the
5    record --
6    MR. MUSHKIN: By all means put your objection. What's your
7    objection?
8    MR. AUSTIN: Go ahead and sit down.
9    If you would read back his very first series of
10   questions.
11   (The record was read as follows:
12   "QUESTION: If they had, there
13   wouldn't have been bounced checks.")
14   THE REPORTER:  Do you want me to go on?
15   MR. AUSTIN: No. The objection I was raising was as to
16   badgering the witness by arguing with the witness and not
17   allowing him to answer the question.
18   BY MR. MUSHKIN:
19   Q   Why did you use counter checks?
20   A   Could you explain for me one more time what you mean
21   with "counter checks."
22   Q   On at least four occasions you went and took a counter
23   check, which is a blank check that you can get from the bank.
24   You filled in the account number, and four different occasions
25   you extracted money from the Fastran Inc. account. Why did you

Page 327

1    use counter checks instead of checks from the checkbook?
2    A   I think I explained that for you once before, but I
3    will do it again.
4    At the time that I went to the bank, I probably didn't
5    have any actual check with me.
6    Q   Four different times?
7    A   That's true.
8    Q   But why didn't you have a check with you?
9    A   I don't carry the check with me all the time.
10   Q   Why didn't you go get one?
11   A   I didn't think there is any difference between what
12   you call counter check and a regular check. There is
13   absolutely no difference between the two.
14   Q   Isn't it true that you were trying to hide the
15   withdrawals from your co-owners of the company?
16   A   Could you explain for me how that's going to be
17   hiding. What's the difference between the two? They both
18   going to be recorded in our account. They're both in our
19   statement. They're both there. How could I hide one compared
20   to the other?
21   Q   Isn't it true that if you're not providing the bank
22   statements, then they would never know that the counter check
23   had gone through?
24   A   What's the difference between counter check and check?
25   Q   Isn't it true that if you're hiding the bank

Page 328

1    statements, they won't know that the counter check went through
2    because there will be no issue -- record of it in the
3    checkbook?
4    MR. AUSTIN: If you know the answer to that question, you
5    can answer the question.
6    THE WITNESS: Yeah. Absolutely not true because, as I
7    mentioned to you, Larry Brown had access to that account any
8    time, login, password, user name. He could see that account
9    any time.
10   BY MR. MUSHKIN:
11   Q   Are you telling me that Larry Brown did go into that
12   account and see those counter checks?
13   A   I can't speak to that.
14   Q   Yeah, I didn't think so.
15   MR. AUSTIN: 22 is 6011?
16   MR. MUSHKIN: Yes.
17   Q   Now, the middle one -- the bottom one is from
18   Nasrollah to Bart, carbon copy to Paul Speltz. Who is Paul
19   Speltz?
20   A   He was an attorney that we used for Fastran Inc.
21   Q   And you're asking Bart for his attorney; right?
22   A   Yes.
23   Q   And then the next one is from you to Bart. "Good
24   morning, Bart. Any update on this? As you know, we are trying
25   to close the Fastran Inc. by next week. That is the week of

Page 329

1   Christmas."
2         Now, is this you trying to get Bart to give you his
3   money before the end of 2007?
4    A   I can't say based on what is in here.
5    Q   What are you trying to close?
6    A   Fastran Inc. so we don't have to file tax return for
7   the next following year.
8    Q   Right.  You're trying to close the sale into Fastran,
9   LLC; right?
10    A   That's what I'm saying here, that we're trying to
11   close the Fastran Inc. in 2007.
12    Q   That's what I mean, into the Fastran, LLC, which is
13   where Bart's money is coming in; correct?
14    A   I don't understand the question.
15    Q   This closing that you're trying to have is the closing
16   of Bart buying into Fastran, LLC; right?
17    MR. AUSTIN:  Objection as to form as to the definition of
18   the word "closing."
19    THE WITNESS:  And I --
20    MR. MUSHKIN:  You're objecting to the definition of the
21   word "closing," Counsel?  I'm just one inch from filing a
22   motion on you.  It's your client's transaction.  It's your
23   client's E-mail.  He's the one that uses the word "closing."  I
24   haven't defined the word "closing."  I'm asking him.  Why don't
25   you coach him a little more.

Page 330

1    MR. AUSTIN:  Objection as to mischaracterizing his
2   statement and his E-mail.  That's not how he's using the word
3   "close."  He's testified as to how he's using the word "close"
4   and you're misstating his testimony.
5   BY MR. MUSHKIN:
6    Q   What do you mean by "close"?
7    A   I mean we want to close Fastran Inc.
8    Q   What's that mean?
9    A   That -- you know how to close a corporation.
10    Q   Do you mean you're going to shut the corporation down?
11    A   Yes.
12    Q   Why?
13    A   Because that was the deal, that at some point we close
14   the Fastran Inc. and we use Fastran, LLC.
15    Q   That's my whole point.  Is that because the assets
16   were transferred to Fastran, LLC?
17    A   You saw that somewhere else in the E-mails too.
18    Q   And why your attorney is making these frivolous
19   objections, I have no idea.
20    A   Because you were --
21    Q   Because you and I are on the same page.
22    A   No, but after going back and forth a few times.  If
23   you state your questions more clearly, then I can answer it
24   more clearly.
25    Q   Absolutely.  This happens to be the one time where you

Page 331

1   and I were on the same page.
2         Up above it's from Bart to Nasrollah.  "He has contact
3   information and is going to call today," and you can see that's
4   copied to me; is that correct?
5    A   Yeah.
6    Q   So that's the beginning of the sale transaction with
7   attorneys.  Is that to the best of your knowledge when this
8   thing gets turned over to attorneys?
9    A   No, I don't think -- to the best of my knowledge,
10   that's not the case, but I don't know.  I have to go back and
11   check the record.
12    Q   What do you think?
13    A   I'm assuming by then Fastran, LLC was an open
14   corporation in Nevada.  I don't remember the date that Fastran,
15   LLC was open.
16    Q   No problem.  In other words, you think this is just
17   talking about shutting down Inc.?
18    A   Yes.  And as you can see, because I wasn't an
19   attorney, I was asking Bart to put you and Paul together so you
20   can do that.
21    Q   Then it says at the top you'd like to listen in as
22   well as Mike and Paul are talking in order to save time.  "I'm
23   trying to prevent any duplicate effort."
24         You're referencing me, Mike Mushkin, and Paul Speltz;
25   is that correct?

Page 332

1    A   Yes.
2    Q   Thank you.
3         And Mr. Spelts is in Edina, Minnesota?
4    A   I don't know the city, but I think it's one of the
5   suburb of Minneapolis.
6    Q   If you look on page 2, that's where it has his
7   address.
8    A   I'm not familiar with this city.
9    Q   Edina, it must be the name of the suburb.
10         And that was 22; right?
11    THE REPORTER:  Yes.
12    MR. AUSTIN:  Can we take a brief recess here.
13    MR. MUSHKIN:  Sure.  Why not.
14         (Brief recess taken.)
15   BY MR. MUSHKIN:
16    Q   Mr. Gashtili, you testified that Larry Brown had
17   access to the Fastran Inc. checking account several times.
18   Would it surprise you to know that Mr. Brown had written an
19   E-mail that said he did not have access to that account?
20    A   It will surprise me.
21    Q   I'm sorry?
22    A   It will surprise me.
23    Q   Okay.  We'll provide that to you in a few minutes, but
24   would it also surprise you that, from the date that the first
25   counter check was used by you, that you specifically refused to

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 333

1  provide any banking statements from that date forward?
2      A   I mentioned to you I don't think that's true.
3      Q   So did you attend certain Fastran board meetings?
4      A   I'm sorry.  What is the question?
5      Q   Did you attend meetings of the officers and directors
6  of Fastran?
7      A   I did multiple occasions.
8      Q   Were they in person or telephonic?
9      A   I think majority of them telephonic.
10     MR. AUSTIN:  Speak up just a little bit because of that
11  air.  I'm having a hard time hearing you.
12     THE WITNESS:  Majority of them telephonic.
13  BY MR. MUSHKIN:
14     Q   I'm going to show you what is collectively going to be
15  marked 23.
16     (Plaintiff's Exhibit 23 was marked for identification
17  by the Certified Court Reporter and is attached hereto.)
18     MR. MUSHKIN:  I'm going to give you a minute or two to take
19  a look at this.  It's a fairly --
20     MR. AUSTIN:  You have another copy?
21     MR. MUSHKIN:  I'm sorry.
22     THE WITNESS:  I have to read all of these.  Are we going to
23  refer to specific section or are you --
24  BY MR. MUSHKIN:
25     Q   We're going to go through every one of them.

Page 334

1      A   Okay.  So I need more time to read them.
2      Q   This is going to take some time because -- and I'll
3  preface this by saying that I have seen E-mails from you that
4  complain about the minutes, but I have not seen a single E-mail
5  from you that offers any correction to the minutes.  So I need
6  you to go through these and tell me what you believe is
7  objectionable in these minutes.
8      A   I'm sorry.  I don't think I can do this right here.  I
9  mean if we have time, I be more than happy to do that, but I
10  have to read them and think about the past and all of that, so
11  I --
12     Q   You have all the time you need.  You have until 5:30
13  today and then we can start -- we can't start tomorrow because
14  I have other things scheduled, but at the end of today we'll
15  schedule the next date for your deposition, because I have to
16  go through these and I've got a few other exhibits that I need
17  to go through and then I'm going to go back through the time
18  line some more and then I have about 40 times in your
19  deposition that I have to confront you with documents that say
20  that you were not telling the truth.  So we probably have about
21  one more full day, maybe a little more, but probably one more
22  full day of testimony to get through all this.
23     Okay.  So today I'd like to start with the minutes,
24  'cause I think if you take a few minutes and read them -- and
25  you're welcome to mark up your attorney's copy of them.  I'd

Page 335

1  rather have you not mark up the court copies, but you can write
2  on those so that it will help you to tell me what content in
3  here you somehow disagree with, okay?
4      MR. AUSTIN:  I suggest we go off the record and let him do
5  that and then we can come back on.
6      MR. MUSHKIN:  By all means.  Take as much time as you need.
7      (Recess taken from 2:40 p.m. to 3:59 p.m.)
8      MR. MUSHKIN:  I'd like to mark what's been marked as 24 and
9  this is CARTER 4692 and 4693.
10     (Plaintiff's Exhibit 24 was marked for identification
11  by the Certified Court Reporter and is attached hereto.)
12  BY MR. MUSHKIN:
13     Q   Take a minute and look at 24, will you please.  I'd
14  like to direct your attention specifically to page 2 to items 1
15  through 6.  You can take your time and read that if you want.
16     Have you read it?
17     A   I read the section 1 through 6.
18     Q   Did you read the first page?
19     A   Not completely yet.
20     MR. AUSTIN:  Go ahead and read that whole E-mail so you're
21  able to see it in context.
22     THE WITNESS:  Okay.
23  BY MR. MUSHKIN:
24     Q   Okay.  So I want to start with the second paragraph of
25  Bart's November 3rd, 2008 6:00 p.m. E-mail to Larry Brown.  It

Page 336

1  starts on 4692 and ends on 4693.  "It appears that Nasrollah
2  wants to run the show.  He wants ATMMS under his control.  He
3  wants to dictate pricing, not negotiate pricing.  He wants
4  Fastran to become the next Global, yet he has no infrastructure
5  or plans for a needed -- to create such an infrastructure in
6  order to become the next Global.  He expects ATMMS to create
7  that for him.  That wasn't the deal.  The deal was that ATMMS
8  would promote Fastran and Fastran products.  That is exactly
9  what we have done.  We now bring in a net, after network
10  expenses, of 50K a month compared to less than 5,000 a month
11  for Lisa.  I have just checked with my sales departments.  LBG
12  has just signed three deals last week and have 25 more in
13  various stages of closing.  They have 10 LBG locations that
14  want AIO as soon as it is perfected.  Casino gaming estimates 6
15  to 10 properties will be closing over the next 6 to 8 months
16  and 20 to 50 AIOs.  All of this will more than triple the net.
17  This didn't happen because of Fastran.  This happened because
18  of ATMMS."  That's what Bart writes.
19     Now let's look at the response from Larry Brown.  The
20  first paragraph, "Thank you.  I spent -- eye surgery.  I
21  plan -- tomorrow morning."  Then he says, "I'm addressing below
22  the items in your letter," and then below his first paragraph
23  is, "I agree with most of your points and assessments in your
24  second paragraph.  No argument, although I might have a
25  slightly different take on some of the specifics.  We can talk

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 337

1  about them if you would like."
2      Then the next area is "1" and I would like the ATM --
3  I mean the E-mail says, "I would like your thoughts on the
4  above, plus the following questions:  Did Nasrollah ever give
5  you the list of withdrawals he took from the account?"
6      Answer:  "No, he hasn't.  He also hasn't given me the
7  password to the bank account either."
8      Do you see that information?
9  A  I do see.
10  Q  Is it still your testimony that Larry Brown had access
11  to the bank account?
12  A  Yes, absolutely.  Larry Brown is a signature on that
13  account.  He can have -- as a matter of fact he's saying it
14  here, that he can get access to that account any time he wants.
15  Q  It says right here, "He also hasn't given me the
16  password to the bank account either."
17      So which is it?  Did he have it or did he not?  Do you
18  think -- is Larry Brown lying?
19  A  I didn't say that.  I said read the rest of the
20  sentence; you'll have your answer.
21  Q  "Regardless, I know Charles Arrindale from when I was
22  with ECHO and I can get it changed with a visit."
23      That's not the question, sir.  The question -- and by
24  the way, this is November 4th of 2008.  You've testified that
25  throughout all of 2008, in fact starting back in 2007, that

Page 338

1  John -- Larry Brown had access to the bank account.
2  A  Absolutely.
3  Q  In here he says he does not.
4  MR. AUSTIN:  Objection; misstates Larry Brown's statement.
5  MR. MUSHKIN:  It does not.  Counsel, it's an inappropriate
6  objection.
7  Q  "Did Nasrollah ever give you the list of withdrawals
8  he took from the account?"
9      Answer, "No, he hasn't.  He also hasn't given me the
10  password to the bank account either."
11  MR. AUSTIN:  I stand by my objection.
12  BY MR. MUSHKIN:
13  Q  Is it your testimony that Lawrence Brown is not
14  telling the truth?
15  MR. AUSTIN:  Objection; misstates the question.  The
16  statement of Mr. Brown was not that "I do not have access to
17  the account."  Mr. Brown's statement was, "He has not given me
18  the password."
19  MR. MUSHKIN:  Well, don't you think you need the password
20  to get into the account, Counsel?
21  MR. AUSTIN:  I'm not here to testify as to how bank
22  accounts are accessed.
23  MR. MUSHKIN:  You can interrupt me all you want.  It's not
24  going to help your client.
25  Q  Do you believe that Larry Brown had the password to

Page 339

1  the bank account before November 4th of 2008?
2  MR. AUSTIN:  Objection; calls for speculation.
3  THE WITNESS:  I said Larry Brown was a signature and could
4  access that bank account from day one, not from November.  From
5  day one that account was opened, Larry Brown is signature and
6  can access that bank account any time.  If you ask me if he
7  access it or not, I can't answer that.
8  MR. MUSHKIN:  Well, we'll certainly ask him.
9  Q  No. 2, "Do you think it is reasonable to include only
10  U.S. processing in a buy-out?  Fastran has not invested
11  anything in a project like this and I do not want to spend the
12  monies to get Fastran in this arena and then be held hostage by
13  Nasrollah.  ATMMS started developing this as a strictly ATMMS
14  operation months ago."
15      Item No. 2, "In your shoes I would not even mention
16  potential offshore business.  I see nothing wrong with your
17  logic."
18      Do you understand that response?
19  A  I do understand that response.
20  Q  Do you agree with Mr. Brown?
21  A  I disagree 100 percent.
22  Q  Okay.  I had a feeling you would.
23      3, "Fastran has provided development for kiosk, cage
24  and Triton.  Of course we do not have a check guarantee as
25  promised, and after two years there are still problems with the

Page 340

1  Triton.  Would offering a two-year exclusivity for LBG and
2  locations that use the Triton AIO be fair for the noncompete
3  that Nasrollah is so intent upon?"
4      Item No. 3, "Probably.  We should discuss this one."
5      How do you feel about his response to item No. 3?  Do
6  you think that bears discussion?
7  A  I don't understand.  Could you tell me what is your
8  question again, and before that could you tell me what is LBG.
9  Q  I don't know.  You don't know what LBG is?
10  A  No.
11  BART CARTER:  Limited bar gaming.
12  THE WITNESS:  Okay.  I know limited bar gaming.
13      So the question is if I agree that Bart and Larry
14  should discuss this --
15  MR. MUSHKIN:  Do you disagree --
16  MR. AUSTIN:  Hold on.  Let him restate what your question
17  is.
18  THE WITNESS:  Oh, I'm sorry.
19  BY MR. MUSHKIN:
20  Q  Do you disagree --
21  MR. AUSTIN:  No, no.  I was asking him to allow you to
22  finish.
23  THE WITNESS:  I know.  Sometime I have the intention of
24  saying the question again.
25  MR. MUSHKIN:  That's no problem.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 341

1    Q   Do you agree that Fastran has provided development for
2  kiosk, cage and Triton?
3    A   I -- Fastran provided development through IDS, yes.
4    Q   No.  "Fastran has provided development for kiosk, cage
5  and Triton to ATMMS."  Do you agree with that?
6    A   Yes.
7    Q   "Of course we do not have a check guarantee."  Do you
8  agree with that?
9    A   I'm not sure at that point.  Well, I think --
10   Q   This is November 4th of 2008.
11   A   I think we didn't have check guarantee at that -- no,
12  I take it back.  If I remember correctly, we did have some kind
13  of check processing with ECHO.
14   Q   "As promised.  After two years there are still
15  problems with the Triton.  Would offering a two-year
16  exclusivity for limited bar gaming and locations that use the
17  Triton all-in-one be fair for the noncompete that Nasrollah is
18  so intent upon?"
19       And do you believe that there -- and he said,
20  "Probably.  We should discuss this one."
21       Do you agree with Mr. Brown's assessment of that
22  assertion?
23   A   I don't understand the question really.
24   Q   Don't worry about it.
25   A   It's discussion between Bart and Larry.  Why do you

Page 342

1  want me to --
2    Q   Because it involves Fastran product.
3    A   But they left me out clearly of that E-mail.  They
4  were communicating between them --
5    Q   I'm not asking you whether they left you out.  I'm
6  just asking whether you agree or disagree with Mr. Brown's
7  assessment.
8    A   I disagree that they discuss anything without me.  We
9  were part of the same company.
10   Q   No. 4, "Would asking for a guaranty from Fastran for
11  things like processing uptime and needed reporting be
12  reasonable?"
13       Answer No. 4, "Absolutely.  As long as we don't have
14  the dual locations up and working, we are all at risk.  You
15  might even consider asking for penalties (or additional
16  discounts for lost business) if something like 99.99 is
17  exceeded."
18       Do you understand that?
19   A   I understand that.
20   Q   Do you agree with that?
21   A   I disagree.
22   Q   Disagree again.
23       No. 5, "Do you feel that Nasrollah would release funds
24  to pay Fastran bills until we come to an agreement?"
25       BART CARTER:  "Should."

Page 343

1    MR. MUSHKIN:  Sorry.
2    Q   "Do you feel Nasrollah should release funds to pay
3  Fastran bills until we come to an agreement?"
4        No. 5, "I felt he never should have taken the money in
5  the first place.  As soon as we found out he had done so, I
6  felt he should have returned it.  The fact that he hasn't
7  already is the biggest issue I have (from my perspective) with
8  him."
9        Do you understand that?
10   A   I do understand.
11   Q   Do you agree or disagree with Mr. Brown?
12   A   I don't understand how could I agree and disagree with
13  Mr. Brown's feeling.
14   Q   Do you agree that you should have put the money back?
15   A   I disagree.
16   Q   Did you say you would put the money back?
17   A   I might said it conditionally.
18   Q   Conditioned on what?
19   A   On him putting the money back as well.
20   Q   Okay, we'll see.
21       Now let's go to the minutes.  First minute, "New
22  Business," CARTER 00011, got any problem with the first page of
23  the minutes?
24   MR. AUSTIN:  You're going to go in reverse chronological
25  order?

Page 344

1    MR. MUSHKIN:  Right.  I'm going with 011.
2    MR. AUSTIN:  Hold on.  Let me make sure I'm with you.
3    MR. MUSHKIN:  I'm sorry.  It's 10 and 11.  The first minute
4  is dated 12-17-07.
5    MR. AUSTIN:  Okay.  That's right.  We put them back in
6  chronological order.
7    MR. MUSHKIN:  I'm sorry.  I just didn't turn to the first
8  page.
9    Q   Okay, Mr. Nasrollah, what's the problem with these
10  minutes?
11   A   I don't have any problem.
12   Q   Good.  And so you agree that Larry Brown was the
13  person that was elected to create minutes?
14   A   Larry Brown was elected to be the secretary, yes, and
15  take the minutes.
16   Q   And do you believe that Mr. Brown kept these minutes?
17   A   I believe and have knowledge that Mr. Brown didn't
18  kept the minutes as the meetings were going on.  He was
19  creating them after that and we have E-mails proving that as
20  well.
21   Q   That's not what I asked you, sir.  All I asked you was
22  did Mr. Brown create these minutes.
23   A   I'm assuming yes.
24   Q   Let's go back to page CARTER 12 and 13.  These are the
25  minutes of 8-25-2008, 2:00 p.m.

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 345

1    First of all, do you believe there were any minutes
2  taken between 12-17-07 and 8-25-08?
3    A   I noticed the gap as well, but I can't answer that
4  question.  I don't remember.
5    Q   Do you have any recollection of any other meetings?
6    A   As I said, I don't remember.  I'm assuming we had
7  other meetings.  It's a big gap, but -- eight months.
8    Q   "Present:  Gashtili, Carter and Brown."  Do you
9  believe those to be the people that were present on 8-25-08 at
10  2:00 p.m.?
11    A   For August 8 that's probably the three people that
12  were present, yes.
13    Q   It's not August 8.  It's August 25.
14    A   August 25, 2008 I mean.
15    Q   Any problem with the contents of these minutes?
16    A   As I said, except that, I don't have any recollection
17  specifically that I want to say anything is wrong in there.
18    Q   Thank you.
19        Turn back one page.
20    A   Okay.
21    MR. AUSTIN:  Back or forward?
22    MR. MUSHKIN:  This is 00023.
23    THE WITNESS:  00023?
24  BY MR. MUSHKIN:
25    Q   Uh-huh.  I'm sorry.  I misspoke.  12-10 -- sorry.

Page 346

1  10-28-2008 at 7:00 a.m. board meeting, 0020.
2    MR. AUSTIN:  Okay.
3    THE WITNESS:  Okay.
4  BY MR. MUSHKIN:
5    Q   Any problem with the content of these?
6    A   I don't have anything specifically that I want to
7  point out here.
8    Q   I want to direct your attention to 00023.
9    A   Okay.
10    Q   This appears to be a resumption of the meeting.
11    A   Okay.
12    Q   At the top it says, "We will continue meeting Friday
13  at 1:00 o'clock."
14    A   Okay.
15    Q   And was there in fact a continuation of that meeting
16  on that day?
17    A   Based on the document we have here, yes.  If you're
18  asking if I remember exactly the date and time, I don't; but
19  based on this document.
20    Q   Does it refresh your recollection that the meeting was
21  split into two parts?
22    A   No.  I don't remember that.
23    Q   Any dispute with the contents of the continued
24  meeting?
25    A   I don't have anything specific.

Page 347

1    Q   Now I direct your attention --
2    A   I'm sorry -- okay, that's a different meeting.  Okay.
3    Q   Now I'm directing your attention to the meeting of
4  2-26-2009.
5    A   Okay.
6    MR. AUSTIN:  Page No. 024?
7    MR. MUSHKIN:  Correct.
8    Q   Any problem with the contents of this meeting?
9    A   It says over here under IDS contract that
10  IDS originally had a contract --
11    THE REPORTER:  I'm sorry.  I'm not understanding you.
12  BY MR. MUSHKIN:
13    Q   Just speak a little bit slower and try to enunciate so
14  she can hear you.
15    A   Okay.  It says that IDS originally had a contract with
16  Fastran signed by Magnus.  As I know, that's not true and I
17  don't know why it's there.
18    Q   It says, "Nasrollah to retrieve original contract and
19  review it in terms of the current situation.  He and Larry will
20  work together to produce a version for review for the board,
21  target date 3-13."
22        Did you agree to do that at that meeting?
23    A   I don't remember specifically.  As I said, some of
24  these were written from Larry's memory later after the
25  meetings.

Page 348

1    Q   But I'm asking you.  Did you agree to retrieve the
2  original contract and review it in terms of the current
3  situation?
4    A   I don't remember.
5    Q   Thank you.
6        Let's go to the board meeting of September 3rd, 2008.
7    A   September 3rd, 2008?
8    Q   9-3-2008; 0018 and 0019, CARTER 18 and 19.
9    A   Okay.
10    Q   It says this meeting was a continuation of the board
11  meeting of 8-25-08.  Do you recall our discussion about the --
12  I'm sorry.  This is a little out of order.  February -- I got
13  it out of order.
14        Do you recall a meeting on August 25th, 2008?
15    A   Which page are we looking?
16    Q   0018.
17    MR. AUSTIN:  0018?
18    MR. MUSHKIN:  Uh-huh.
19    THE WITNESS:  You said September 3rd?
20    MR. AUSTIN:  Hold on.
21    MR. MUSHKIN:  9-3-2008.
22    MR. AUSTIN:  Hold on.  Let's make sure we have the right
23  page.
24        Okay, we're on the right page.  What's your question?
25  ///

Page 349

BY MR. MUSHKIN:

1  Q   Any problem with the contents of these minutes, these
3  meeting minutes?
4  A   I don't have any specific --
5  Q   Okay.  Now let's go to 9-3-2008, 0016.
6  A   I think it's the same document that we just went
7  through?
8  Q   Is that just a duplicate?
9  A   There are, yeah, three copies of that document.
10 Q   Oh, you're right.  That's just -- they're Bates
11 stamped differently, but they're the exact same document.
12 Never mind.  We'll skip over those.  This is another one.
13 14 and 15 is the same document, isn't it?
14 A   I think there are three copies of that two pages.
15 Q   Now I know why, because they were trying to give me
16 three.  Let's go a little farther.  Sorry.  I didn't mean to
17 repeat something three times.
18     Now let's look at the May 28th, 2009 meeting, which is
19 the first three pages.  That's -- for some reason these are not
20 Bates stamped.  It's four pages of unBates-stamped documents.
21 I have no idea why they're not Bates stamped.
22 A   Okay.
23     BART CARTER:  I got five pages.
24     MR. MUSHKIN:  He's right, five pages, and I'm going to
25 put -- I'm just going to describe it that way.  Exhibit 23 is

Page 350

1  not Bates stamped.  It has five pages.  I really cannot tell
2  you why this isn't Bates stamped.  If at some point in time,
3  Counsel, I can find it with a Bates-stamp number, I'll replace
4  it, but I apologize.
5      MR. AUSTIN:  No problem.
6  BY MR. MUSHKIN:
7  Q   So have we got a problem with this one?
8  A   No, not in general.  I mean as you can see, we were
9  fighting in here and Larry is putting this together.  As I
10 said, in general Larry is probably putting these together after
11 the meeting.
12 Q   Is he accurate in his rendition of what took place at
13 the meetings?
14 A   As I said, I don't have any objection to any specific
15 part, but if you're asking me these are exactly the words that
16 people spoke, I can't say yes.  I cannot say yes.
17 Q   Did you provide any opposition to these minutes at any
18 point in time?
19 A   I don't even remember when he provided these minutes
20 to us.
21 Q   Didn't ask you that question, sir.  I asked you did
22 you provide any written opposition to the minutes to Mr. Brown?
23 A   I don't remember.
24 Q   Does that mean you did and can't remember or does that
25 mean you didn't provide --

Page 351

1  A   It means I don't remember if I did or did not.
2  Q   Have you provided all of your documents to your
3  attorney?
4  A   Yes, I did.
5  Q   I represent to you that we have found no document from
6  you that either criticizes nor protests the content of the
7  minutes.  Does that sound accurate to you?
8  A   Again I don't remember if I did or not.
9  Q   Well, let's ask you another question, sir.
10     What did you do in preparation for your deposition
11 today?
12 A   I'm sorry.  I don't understand.  If you're asking me
13 if I did anything to prepare for this, I didn't do much.  I
14 didn't know I have to do anything.
15 Q   What did you do?
16 A   Today?
17 Q   You said you didn't do much.  What did you do?
18 A   Nothing.
19 Q   Then why did you say you didn't do much?  That would
20 infer that you did something.
21 A   I'm sorry.  You want to complain about my English or
22 do you want to ask a question and I answer?
23 Q   I want to complain about your honesty, because --
24 A   Go ahead and complain.
25 Q   -- when you answer things in a direct fashion, I'm

Page 352

1  assuming that you understand the question and I can rely upon
2  your answer.  Fourteen times you've answered a question and
3  then retracted your answer through the course of this
4  deposition, and it's kind of hard for me to do this.  I want
5  you again to listen to my questions and try and answer the
6  question that I ask.  It will make life a lot easier for us.
7  A   Okay.
8  Q   So the question that I asked was, did you -- within
9  these minutes there are -- and within the Exhibit 24, the
10 letter between Mr. Bryant and Mr. Carter -- there's
11 considerable discussion about the funds that were taken by way
12 of counter checks.  Do you understand that?
13 A   No.  I didn't see anything in there specifically
14 talking about counter checks, now that I understand what is
15 counter check mean from you.
16 Q   I will refer you to Mr. Brown's answer No. 5 on
17 Exhibit 24.
18 A   Okay.
19 Q   "I felt he never should have taken the money in the
20 first place."
21     This is his response to the counter-check deposits --
22 withdrawals; right?
23     MR. AUSTIN:  Objection; misstates the record.
24     THE WITNESS:  Yeah.
25 ///

Nasrollah Gashtili, Volume II                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 353

1  BY MR. MUSHKIN:
2      Q   Isn't this his response to your taking monies without
3  permission?
4      MR. AUSTIN:  That's different than --
5      THE WITNESS:  That's different question than you asked
6  first.
7      MR. MUSHKIN:  Look, guys, I get to ask whatever question I
8  want.
9      THE WITNESS:  And I answer it.
10  BY MR. MUSHKIN:
11      Q   Listen to my question and answer it.  Don't answer my
12  question that that's a different question.  Answer the question
13  that I asked.
14      Here's the question real simple:  Did Mr. Brown say
15  that you took money that you were not authorized to take?
16      A   He said that.
17      Q   Right.  And did you not tell Mr. Brown and Mr. Carter
18  that you would put the money back?
19      A   Conditionally, yes.
20      Q   Where did you say -- show me where the condition is.
21      A   I said it many times.  I said I put the money back in
22  if Bart puts the money back he took back.
23      Q   What money did he take?
24      A   He knows what money he took out.  What money do you
25  want me to --

Page 354

1      Q   Sir, I want you to understand that every time you do
2  that, I'm going to go to the Court and seek damages for it.
3  Don't jerk me around.
4      MR. AUSTIN:  Objection.
5      THE WITNESS:  I'm not jerking you around.
6  BY MR. MUSHKIN:
7      Q   Answer my question.
8      MR. AUSTIN:  No, stop.  Objection; this is clearly
9  inappropriate behavior with my client.
10      MR. MUSHKIN:  I don't think it's inappropriate and you're
11  not here to object to my behavior.  You make your stated
12  objection.
13      MR. AUSTIN:  You do not have the right to demean my client.
14  You have the right to ask him questions and he has the
15  obligation to answer.  You don't have the right to sit there
16  and badger him, to demean him, to accuse him.  You can ask him
17  a question.  He can answer the question.
18      MR. MUSHKIN:  Now that you have finished, Counsel, here's
19  the problem that you have:  I'm not demeaning your client.
20  Your client's behavior is demeaning.  His partners, his fellow
21  shareholders, called him on the carpet and said, "Put the money
22  back."  He said he would put the money back and he didn't.
23  I've asked him what conditions.  Every time you ask this guy
24  for a specific answer, he comes up with an excuse not to
25  answer.  So here's the question again.

Page 355

1      Q   What condition did you set to putting the money that
2  you stole back?
3      MR. AUSTIN:  Objection; misstates his testimony, asked and
4  answered.
5      You can read back his answer to that question.
6  BY MR. MUSHKIN:
7      Q   What conditions did you set and how did you set them?
8      A   I said that if Bart puts the money that he took out, I
9  will put the money that I take back.
10      Q   What money did Bart take out?
11      A   He authorized Ken to ACH money out of Fastran Inc.
12  account to his account.
13      Q   And what was the purpose of that payment?
14      A   I have no idea.
15      Q   You know exactly what that payment was for.  It was
16  discussed at great length.
17      A   He has --
18      Q   Let's go back over it.
19      MR. AUSTIN:  Hold on.  Let him finish answering the
20  question.
21      "He has" what?
22      THE WITNESS:  I'm sorry.  You can't really talk to me like
23  that, Mike.
24  BY MR. MUSHKIN:
25      Q   I can.  Let me explain this to you, sir.

Page 356

1      MR. AUSTIN:  We're done.
2      MR. MUSHKIN:  I haven't used any words --
3      MR. AUSTIN:  We're done.
4      MR. MUSHKIN:  -- that would be considered curses.  I
5  haven't raised my voice.  I haven't done anything except try
6  and explain.  If you walk out of here, Counsel, I'm not done.
7  I haven't raised my voice once all day.
8      MR. AUSTIN:  You have.  You want to -- you've asked a
9  question --
10      MR. MUSHKIN:  If you want a video deposition --
11      MR. AUSTIN:  -- and you're preventing him from answering
12  the question.
13      MR. MUSHKIN:  I'm not preventing him from answering the
14  question.
15      Q   Answer the question.
16      MR. AUSTIN:  Good.  Then let's be quiet and let him answer
17  the question.
18      Would you please read back the last actual question
19  that was asked.
20      (The record was read as follows:
21      "QUESTION:  And what was the purpose
22      of that payment?")
23      MR. AUSTIN:  So that's the last question.
24  BY MR. MUSHKIN:
25      Q   What was the payment for?

Nasrollah Gashtili, Volume II                JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 357

1    A   Bart making the claim that that's the money that
2   Fastran owes to him.
3    Q   Okay.  Now let's -- remember we started this in the
4   very beginning of the deposition.
5        The accounts that ATMMS used Fastran for were ATMMS
6   locations; correct?
7    A   I can't answer that question.  Could you repeat it
8   different way.
9    Q   Did Fastran have contracts with any locations that
10  were using -- that were serviced by ATMMS?
11   A   Fastran did not have contract with those location.
12   Q   ATMMS had contracts, didn't they?
13   A   ATMMS had the contract with those location.
14   Q   And ATMMS received a fee on each transaction at each
15  location, correct, by contract?
16   A   That's not -- that's not accurate.
17   Q   Tell me what's not accurate about it.
18   A   There are fees that collected from those transaction
19  that went to the Fastran account that was supposed to be a
20  split between Fastran and ATMMS based on the contract that was
21  never signed.
22   Q   Does that mean that ATMMS -- that Fastran gets to just
23  keep the money?
24   A   No.  I didn't say that.
25   Q   So there was a time when there was a buildup of funds

Page 358

1   that were due to ATMMS customers; correct?
2    A   That's true.
3    Q   Okay.  And there were a series of E-mails back and
4   forth that Bart had to get money to pay his customers; correct?
5    A   That's not true.  We always pay our -- Bart's
6   customer.  We always pay Bart customer.
7        The money that Bart took out of --
8    Q   Your testimony is that Fastran Inc. always paid Bart
9   Carter's customers?
10   A   Yes.
11   Q   And what documents do you have to support that?
12   A   If Bart has any claim that we didn't pay any of his
13  clients, he needs to come forward and present that.  I think --
14   Q   Did you hear my question?
15   A   Okay.  Go ahead and repeat it one more time.
16   MR. MUSHKIN:  Read the question back, Miss Court Reporter.
17       (The record was read as follows:
18         "QUESTION:  And what documents do
19        you have to support that?")
20   THE WITNESS:  We did the daily ACH transaction to Bart
21  Carter account every day and his employee did that, Kent,
22  Ken -- it's not Kent actually; it's Ken.  Ken actually did the
23  transaction to their customers' account on a daily basis.  He
24  has control of that process.
25  ///

Page 359

1   BY MR. MUSHKIN:
2    Q   Then when the money that was left over was
3   distributed, what was that money?
4    A   The only money that left in the Fastran account was
5   the money that supposed to be split between ATMMS and Fastran.
6    Q   Okay.  And when Ken Connell authored [sic] the
7   transfer from Fastran to ATMMS, did he take an amount in excess
8   of what was due to ATMMS?
9    A   That's the question I can't answer.
10   Q   Why can't you answer that question?
11   A   Because I don't have the accounting and I don't have
12  the contract.
13   Q   Then why do they have to put that money back?
14   A   Because I don't know if that money belongs to them or
15  not or how much of it.
16   Q   Well, but if they know and they've provided you a
17  breakout of how much, they've provided you exactly the
18  percentage, what is the problem with putting it back?
19   A   They never did --
20   MR. AUSTIN:  Objection; misstates the funds that are at
21  issue here.  You're convoluting the ATMMS funds that go to them
22  as a fee --
23   MR. MUSHKIN:  Counsel, please don't testify.
24   MR. AUSTIN:  -- as opposed to the funds that go -- that go
25  to the individual customers.

Page 360

1    MR. MUSHKIN:  Counsel, I'm not confusing anything and don't
2   testify.  I'm not confusing in the least.  I've been very
3   specific.  Your client has testified that those fees were to be
4   split between ATMMS and Fastran.
5    Q   There was a series of transactions back and forth -- a
6   series of communications back and forth on this topic; isn't
7   that correct?
8    A   On the topic of?
9    Q   The split.
10   A   We were negotiating on a contract, yes.
11   Q   "We were negotiating on a contract."
12       Now, Fastran Inc. paid ATMMS --
13   BART CARTER:  Can I see you for a second.
14   MR. MUSHKIN:  Sure.  Let's take a quick break.
15       (Brief recess taken.)
16   BY MR. MUSHKIN:
17   Q   Mr. Gashtili, we have a problem.  You have testified
18  about six times that there wasn't a contract between Fastran
19  and ATMMS.  That's not true, is it?
20   A   I don't know what you really mean with that.  I told
21  you that we were negotiating back and forth.
22   Q   Well, what's this signed contract, Exhibit 6?  You've
23  already testified that's the contract.
24   MR. AUSTIN:  Objection; that's not what he's testified to.
25  That's a Service Agreement.  That is different than the

Page 361

1  contract that results from the formation of Fastran Inc. that
2  you have been talking about here and the splitting of fees.
3      MR. MUSHKIN: I don't know what you're talking about,
4  Counsel. Quit testifying.
5      MR. AUSTIN: I'm not.
6  BY MR. MUSHKIN:
7      Q   You sold all of the assets of Fastran Inc. to Fastran,
8  LLC, and Mr. Carter bought in.
9      A   Yeah.
10     Q   At the time that he did that, there was a Service
11 Agreement between Fastran Inc. and Fastran, LLC; correct?
12     A   That's not Fastran, LLC. Fastran Inc. and ATMMS.
13     Q   Thank you. Fastran Inc. and ATMMS.
14         Now, you were negotiating to replace this contract,
15 weren't you?
16     A   No. We were negotiating to sign a contract between
17 Fastran, LLC and ATMMS.
18     Q   But Fastran Inc. -- this contract was assigned to
19 Fastran, LLC by law.
20     A   That's a legal opinion.
21     Q   No problem.
22         Let's look at the split. Sir, there was no split in
23 those fees, was there? You knew exactly how much money was
24 supposed to go out of that account, didn't you, because it's
25 right there on Exhibit C? 20 cents per transaction --

Page 362

1      MR. AUSTIN: Objection. Are you asking questions --
2      MR. MUSHKIN: If you'll let me finish, I'll ask my
3  question.
4      MR. AUSTIN: You've asked three questions, but you've
5  not --
6      MR. MUSHKIN: No, I didn't.
7      MR. AUSTIN: You did indeed. There are three questions
8  that you just asked. They were all rhetorical questions. Are
9  they intended for him to answer or are they not intended for
10 him to answer?
11     MR. MUSHKIN: Rhetorical questions are rhetorical
12 questions, not intended for him to answer. If you recognize
13 them as rhetorical questions, I think he might be able to
14 recognize them, but here's what it comes down to:
15     Q   There was no split of those fees, was there, sir?
16     A   I don't know which period of time and which companies
17 you are talking about.
18     Q   Well, let's look at Exhibit C, and the effective date
19 of this contract is 1-3-2007. Doesn't that set out exactly who
20 gets what out of those monies?
21     A   We talk about this specific contract and I told you
22 before that Bart Carter personally told me, "I sat and went
23 through this contract many times trying to figure out how
24 Fastran Inc. is going to make money. Fastran Inc. is losing
25 money on every transaction." He told me that personally. This

Page 363

1  contract is not a valid contract. The stupid people that
2  signed this contract, Magnus and John Bryant with Bart Carter,
3  are at fault. Don't blame it on me. If Fastran Inc. operate
4  on this contract, Fastran Inc. will be out of business the
5  second day that we went to the business.
6      Q   And instead of Fastran honoring its contract, you just
7  took all the assets, didn't you?
8      A   Absolutely not.
9      Q   You took the software, didn't you?
10     A   Software belongs to IDS.
11     Q   You took the accounts.
12     A   What accounts?
13     Q   ASAI.
14     A   ASAI was never accounts of any Fastran, either Inc. or
15 LLC.
16     Q   Where did it come from?
17     A   That was something that I negotiated agreement with
18 them later to allow them to use the software that I own.
19     Q   What about LuckEcash?
20     A   LuckEcash stays Fastran, LLC account until the last
21 day because --
22     Q   Didn't LuckEcash have the exact same type of payout
23 agreement with Fastran?
24     A   They sign a new agreement based on Bart's suggestion.
25     Q   That's not what I asked you, sir.

Page 364

1          Didn't they have an agreement similar to this
2  beforehand?
3      A   I can't answer that question.
4      Q   Why can't you?
5      A   Because I don't have the contract. I don't remember
6  the contract.
7      Q   I didn't ask you if you --
8      A   I don't remember if the contract was similar to this
9  or not, Mike. I answer your question. I don't remember.
10     Q   That's not what -- now you got around to the answer.
11         You don't remember whether there was a contract like
12 this?
13     A   I said that from first time you asked the question.
14     MR. MUSHKIN: Counsel, when is your next available date?
15         We can go off the record.
16         (Discussion held off the record.)
17     MR. MUSHKIN: Counsel, it's now 5:00 o'clock. We're going
18 to call it a day. We're going to reconvene on May 8th at
19 10:00 a.m. My office will send a notice of continued
20 deposition. It will probably go out of here today or tomorrow.
21         (Deposition concluded at 4:56 p.m.)

Nasrollah Gashtili, Volume II                                    JB Carter Properties II, LLC v. Nasrollah Gashtili

Page 365

1          CERTIFICATE OF DEPONENT

2     PAGE  LINE    CHANGE       REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12              * * * * *

13         I, NASROLLAH GASHTILI, deponent herein, do hereby

14    certify and declare under penalty of perjury the within and

15    foregoing transcription to be my deposition in said action;

16    that I have read, corrected and do hereby affix my signature to

17    said deposition.

18

19    _____
      NASROLLAH GASHTILI, Deponent

20

21

22         Subscribed and sworn to before me this _____ day of

23    _____ 2012.

24    _____
      NOTARY PUBLIC

25

Page 366

1          REPORTER'S CERTIFICATE

2

3         I, Ellen A. Goldstein, a duly certified court reporter

4     in and for the County of Clark, State of Nevada, do hereby

5     certify:

6         That I reported the taking of the deposition of the

7     witness, NASROLLAH GASHTILI, at the time and place aforesaid;

8         That prior to being examined, the witness was by me

9     duly sworn to testify to the truth, the whole truth and nothing

10    but the truth;

11        That the witness requested to read and sign the

12    transcript herewith;

13        That I thereafter transcribed my said shorthand notes

14    into typewriting and that the typewritten transcript of said

15    deposition is a complete, true and accurate transcription of my

16    said shorthand notes taken down at said time.

17        I further certify that I am not a relative or employee

18    of an attorney or counsel of any of the parties, nor a relative

19    or employee of any attorney or counsel involved in said action,

20    nor a person financially interested in the action.

21        IN WITNESS THEREOF, I have hereunto set my hand in the

22    County of Clark, State of Nevada, this 4th day of May 2012.

23              _____
                Ellen A. Goldstein, CCR No. 829

24

25

# EXHIBIT "5"

Exhibit "5"

1   Michael R. Mushkin, Esq.
    Nevada State Bar #2421
2   Michael R. Mushkin & Associates
3   4475 South Pecos Road
    Las Vegas, Nevada  89121
4   Telephone: (702) 386-3999
    Fax: (702) 454-3333
5   Michael@mushlaw.com

6
    Attorneys for Plaintiff
7
                 **UNITED STATES DISTRICT COURT**
8
                    **DISTRICT OF NEVADA**
9

10  FASTRAN LLC, a Nevada limited-liability      Case No: 2:12-cv-01156
    company;
11
12              Plaintiff,                        **[PROPOSED] ORDER UPON**
                                                  **PLAINTIFF FASTRAN LLC'S**
13      vs.                                       **MOTION FOR PRELIMINARY**
                                                  **INJUNCTION AND PERMANENT**
14  NASROLLAH GASHTILI, an Individual;           **INJUNCTION**
15  FASTRAN, INC., a Delaware corporation;
    INTEGRATED DYNAMIC SOLUTIONS,
16  INC., a California corporation; DOE
    INDIVIDUALS 1-10; DOE ENTITIES 1-10;
17
18              Defendants.

19

20          This Court having read Plaintiff Fastran LLC's Motion for Preliminary Injunction and

21
22  Permanent Injunction, filed by Plaintiff Fastran LLC on or about July 2, 2012, and good cause

23  appearing for granting Plaintiff's Motion,

24          IT IS HEREBY ORDERED that   Plaintiff Fastran LLC's Motion for Preliminary

25  Injunction and Permanent Injunction, is granted and Defendants, above-named, as well as their

26
    officers, agents, servants, employees, attorneys, and anyone acting on their behalf are
27
28  prohibited from using, copying, distributing, decompiling, or destroying software, data and any

    other electronic information arising out of the Copyright Asset and/or the "IDS Cash Access

                                         1

System" (showing United States Copyright Office Registration Number TX0007051036) pending a preliminary injunction hearing in this case.

IT IS HEREBY FURTHER ORDERED that any and all revenue generated by the use of the Copyright Asset and/or the "IDS Cash Access System" (showing United States Copyright Office Registration Number TX0007051036) should be preserved pending a resolution on the merits.

The Hearing on Plaintiff Fastran LLC's Motion for Preliminary Injunction and Permanent Injunction shall be held on _____ at _____.

DATED: _____, 2012.


_____
DISTRICT COURT JUDGE